ROLAND P. REYNOLDS, ESQ., (SBN 150864)
rreynolds@pfeiferlaw.com
ANNABELLE DE LA MORA, ESQ. (SBN 117649)
adelamora@pfeiferlaw.com
PFEIFER & REYNOLDS, LLP
765 The City Drive, Suite 380
Orange, CA 92868
Telephone:      (310) 788-3900
Facsimile:      (310) 388-5416


Attorneys for Defendants MORTGAGE INVESTORS
GROUP, INC., and MORTGAGE INVESTORS GROUP,
A General Partnership

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAY J. RALSTON, On Behalf Of Himself And All Others Similarly Situated; | ) Civil Case No. CV 08-00536 JF |
|                Plaintiff, | ) |
| vs. | ) **NOTICE OF MOTION AND MOTION OF DEFENDANTS TO DISMISS PLAINTIFF'S COMPLAINT** |
| MORTGAGE INVESTORS GROUP, INC., MORTGAGE INVESTORS GROUP, a general partnership, and DOES 1 -10, | ) Date:   May 30, 2008<br>) Time:   9:00 a.m.<br>) Crtrm: 3 |
|                Defendants. | ) Honorable Jeremy Fogel |
| | ) Complaint Filed:  January 24, 2008 |

## NOTICE OF MOTION AND MOTION

TO PLAINTIFF AND HIS ATTORNEY OF RECORD:

PLEASE TAKE NOTICE that on May 30, 2008 at 9:00 a.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Jeremy Fogel, United States District Court, Northern District of California, San Jose Division, Courtroom 3, 5th Floor, located at 280 South First Street, San Jose, California, defendants Mortgage Investors Group, a general partnership ("MIG") and Mortgage Investors Group, Inc. will and hereby do move the Court for an order dismissing the first, second, third, fourth, fifth, sixth, and seventh causes of action in the Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities in support hereof and Declaration in support hereof, the pleadings and other files herein, and such other written and oral argument as may be presented to the Court.

By this Motion, MIG and Mortgage Investors Group, Inc. seek an order from the Court that plaintiff's claim for damages under the Truth in Lending Act 15 U.S.C. §§ 1601 et seq. ("TILA") is barred by the statute of limitations and that plaintiff fails to state a claim for (1) violation of TILA, (2) violation of California Unfair Competition Law ("UCL") Business & Professions Code § 17200, predicated on TILA (3) violation of the UCL predicated on unfair and fraudulent practices, (4) fraudulent omission, (5) breach of contract, (6) breach of implied covenant, and (7) violation of the UCL predicated on Cal. Financial Services Code § 22302.

## STATEMENT OF ISSUES TO BE DECIDED

Pursuant to Civil Local Rule 7-4(a)(3), Mortgage Investors Group and Mortgage Investors Group, Inc. set forth the following statement of issues to be decided:

1.      Whether plaintiff's claim for damages under the Truth in Lending Act ("TILA") are time barred by the statute of limitations where plaintiff filed this action more than one year after the close of the loan at issue.

2.      Whether plaintiff's claim for violations of TILA should be dismissed for failure to state a claim where MIG's disclosures concerning the loan at issue complied with TILA and regulation Z.

3.      Whether plaintiff's second claim for violation of the Unfair Competition Law ("UCL") fails because the predicate TILA violation on which it is based fails.

4.      Whether plaintiff's third claim for violation of the UCL because of unfair or fraudulent practices fails because (1) TILA preempts the allegations of the claim and the TILA claim fails, (2) the claim attempts to improperly challenge and rewrite lawful contracts, and (3) the claim simply has insufficient factual charging allegations.

5.      Whether plaintiff's fourth claim for fraudulent omission is not actionable because MIG made all required admissions.

6.      Whether plaintiff's fifth claim for breach of contract is not actionable because plaintiff fails to identify any term of the agreement that was breached.

7.      Whether plaintiff's sixth claim for breach of implied covenant is not actionable because there is not a special relationship between the parties.

8.      Whether plaintiff's seventh claim for violation of the UCL predicated upon a breach of Cal. Financial Code § 22302 because the statute does not apply to a residential mortgage lender and plaintiff has not met the pleading standards for such a claim.

9.      Whether Mortgage Investors Group, Inc. (as distinguished from Mortgage Investors Group, a general partnership) should be dismissed because it did not make the loan in question.

# TABLE OF CONTENTS

NOTICE OF MOTION ................................................................................................................. ii

STATEMENT OF ISSUES TO BE DECIDED ....................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 1

I.     INTRODUCTION .......................................................................................................... 1

II.    FACTUAL ALLLEGATIONS ...................................................................................... 2

III.   STANDARD ON A MOTION TO DISMISS .............................................................. 2

IV.    PLAINTIFF'S TILA CLAIMS ARE TIME BARRED BY THE STATUTE OF
       LIMITATIONS ............................................................................................................... 3

V.     MIG MADE ALL REQUIRED DISCLOSURES ACCURATELY, AND
       PLAINTIFF'S ALLEGATIONS ABOUT TILA VIOLATIONS REFLECT A
       FUNDAMENTAL MISUNDERSTANDING OF THE REQUIREMENTS OF THE
       STATUTORY SCHEME. .............................................................................................. 4

       A.     Background of TILA ......................................................................................... 4

       B.     Plaintiff's Theory That MIG Violated TILA by Not Disclosing the Actual Interest
              Rate Is Incorrect. .............................................................................................. 5

       C.     The Loan Documents Fully Informed Plaintiff About Negative Amortization. ............ 7

       D.     The Disclosure on the Discounting of the Initial Interest Rate Complied with TILA. ... 9

VI.    PLAINITFF'S UCL CLAIM BASED ON TILA IS PREMPTED BY TILA AND
       FAILS TO STATE A CLAIM BECAUSE OF THE FAILURE TO STATE A TILA
       CLAIM. ........................................................................................................................... 9

VII.   PLAINTIFF'S THIRD CLAIM FOR BREACH OF UCL PREDICATED ON
       "UNFAIR" OR "FRAUDULENT" BUSINESS PRACTICES IS ALSO PREEMPTED
       AND FAILS TO STATE A CLAIM .......................................................................... 11

VIII.  THE ALLEGED FRAUDULENT OMISSIONS ARE NOT ACTIONABLE. ....... 12

IX.    PLAINTIFF'S BREACH OF CONTRACT CLAIM DOES NOT IDENTIFY ANY
       BREACHED TERMS. .................................................................................................. 15

X.     PLAINTIFF CANNOT IMPLY ANY COVENANTS INTO THE LOAN
       AGREEMENT. ............................................................................................................. 17

iv

1

2

XI.    THE UCL CLAIM PREDICATED ON CAL. FINANCIAL CODE § 22302 FAILS
       TO STATE A CLAIM. ................................................................................................ 18

XII.   MORTGAGE INVESTORS GROUP, INC. SHOULD BE DISMISSED AS IT DID
       NOT MAKE THE LOAN IN ISSUE ......................................................................... 211

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

## CASES

3

*Barbera v. WMC Mortgage Corp.*
4          No. C 04-3738 SBA, 2006 WL 167632 at *5 (N.D. Cal. Jan. 19, 2006)...................................3

5    *Barnett v. Fireman's Fund Ins. Co.,*
6          90 Cal.App.4th 500 (2001).........................................................................................15

7    *Bell Atlantic Corp. v. Twombley –*
          U.S.—127 S.Ct. 1955...........................................................................................2,12

8    *Bell Atlantic Corp. v. Twombly, --*
9          U.S.--, 127 S.Ct. 1955.........................................................................................2

10   *Berger v. Home Depot U.S.A., Inc.*
          476 F.Supp.2d 1174, 1177 (C.D. Cal. 2007).......................................................17
11

12   *Bionghi v. Metro. Water Dist.,*
          70 Cal.App.4rth 1358...........................................................................................18

13   *Bowen v. First Financial Services, Inc.,*
14          223 F3d 1331 (11th Cir. 2003)...........................................................................10

15   *Byars v. SCME Mortg. Bankers, Inc. (2003)*
          109 Cal.App.4th 1134.........................................................................................11
16

17   *California Grocers Assoc., Inc. v. Bank of America,*
          22 Cal.App.4th 205 (1994)...................................................................................19

18   *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.,*
19          222 Cal.App.3d 1371 (1990)...........................................................................15,18

20   *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999)*
          20 Cal.4th 163.........................................................................................10,12
21

22   *Cleghorn v. Blue Shield of California,*
          408 F.3d 1222 (9th Cir. 2005)...........................................................................10

23   *Copesky v. Sup. Ct.,*
24          229 Cal.App.3d 678 (1991)...................................................................................18

25   *First Comm. Mortgage Co. v. Reece,*
          89 Cal.App.4th 731, (2001)...........................................................................15
26

27   *Ford Motor Credit Co. v. Milhollin,*
          444 U.S. 555, 568 (1980)...................................................................................4,5

28

vi

*Fundin v. Chicago Pneumatic Tool Co.,*
 152 Cal.App.3d 951 (1984) ................................................................................... 15

*Grimes v. New Century Mortgage Corp.,*
 340 F.3d 1007, 1011 (9th Cir. 2003) .......................................................................... 4

*Guz v. Bechtel National, Inc.,*
 24 Cal.4th 317 (2000) ............................................................................................ 17

*Harpeneau v. Massachusetts Mut. Life Ins. Co.,*
 No. C-96-4619 MHP, 1998 WL 30056, at *6-7 (N.D. Cal. Jan. 5, 1998) ............... 17

*Hess v. Transamerica Occidental Life Ins. Co.,*
 190 Cal.App.3d 941 (1987) ................................................................................... 17

*Household Credit Servs. V. Pfennig,*
 541 U.S. 232, 235 (2004) ......................................................................................... 4

*In re Late Fee & Over-Limit Fee Limits.,*
 528 F.Supp.2d 953, at *34 (N.D. Cal. Nov. 16, 2007) .......................................... 11

*Kunert Mv. Mission Fin'l Services Crop.* (2003)
 110 Cal.App.4th 242 .............................................................................................. 12

*Martinez v. Socoma Companies, Inc.,*
 11 Cal.3d 398, 408 (1974) ..................................................................................... 15

*MGIC Indem. Co. v. Weisman,*
 803 F2d 500, 504 (9th Cir. 1986) ............................................................................ 3

*Mitsui Mfrs. Bank. v. Sup.Ct.,*
 212 Cal.App.3d 726, 795 (1989) ............................................................................ 18

*Navarro v. Block,*
 250 F.3d 729, 732 (9th Cir. 2001) ............................................................................ 2

*Neitzke v. Williams,*
 490 U.S. 319, 326 (1989) ......................................................................................... 2

*Parrino v. FHP, Inc.,*
 146 F.3d 699 ........................................................................................................... 2

*Pokolksy v. First Healthcare Corp.* (1996)
 50 Cal.App.4th 632 ............................................................................................... 12

*Postow v. OBA Fed. Sav. & Loan Assoc.,*
 627 F.2d 1370, 1380 (D.C. Cir. 1980) ...................................................................... 3

*Price v. Wells Fargo Bank,*
    213 Cal.App.3d 465, 476 (1989)....................................................................... 18

*Roberts v. Corrothers,*
    812 F.2d 1173, 1177 (9th Cir. 1987)................................................................. 3

*Robertson v. Dean Witter Reynolds, Inc.,*
    749 F.2d 530, 534 (9 th Cir. 1984) ..................................................................... 2

*Scripps Clinic v. Sup. Ct.,*
    108 Cal.App.4[th] 917, 940 (2003) ...................................................................... 12

*Searle v. Wyndham Int'l, Inc.,*
    102 Cal.App.4th 1327 (2002)..................................................................... 12, 20

*Shadoan v. World Sav. & Loan Assoc.,*
    219 Cal.App.3d 97 (1990)............................................................................... 20

*Silvas v. E\*Trade Mortg. Corp.,*
    514 F.3d 1001, 1006-1007 (9th Cir. 2008) ...................................................... 15

*Smith v. State Farm Mut. Auto. Ins. Co.,*
    93 Cal.App.4[th] 700, 718 (2001)...................................................................... 10

*South Bay Chevrolet v. General Motors Acceptance Corp.,*
    72 Cal.App.4[th] 861 (1999) ........................................................................ 12, 20

*Stetler v. Greenpoint Mortgage Funding, Inc.,*
    No. 07-0123-DLB, 2008 WL 192405, at \*7 (E.D. Cal. Jan. 23, 2008) ............ 13

*Szummy v. Am. Gen. Fin. Inc.,*
    246 F.3d 1065, 1070 (7th Cir. 2001).............................................................. 4,7

*Van Buskirk v. CNN,*
    284 F.3d 977, 980 (9th Cir. 2002)..................................................................... 2

*Western Mining Council v, Watt,*
    643 F.2d 618, 624 (9th Cir. 1981)..................................................................... 3

*Williams v. Walker-Thomas Furniture Company,*
    350 F.2d 445 (D.C. Cir. 1975) ....................................................................... 20

**STATUTES**

12 C.F.R

    § 226.17-24 ..................................................................................................... 5

12 C.F.R.

§ 226.4.................................................................................................................. 7

§ 226.19................................................................................................................ 8

§ 226.19(b)(2) ...................................................................................................... 9

§ 226.22................................................................................................................ 7

§ 226.23(a)(3) ...................................................................................................... 3

§ 226.23(a)(3) n.48 .............................................................................................. 4

§ 226.30................................................................................................................ 5

§§ 226.1 *et seq.* ................................................................................................... 4

pt. 226.................................................................................................................. 7

pt. 226, Supp. I, §  226.23(a)(3) cmt 2 ............................................................... 4

15 U.S.C.

§ 1601 et seq. ...................................................................................................... 3

§ 1601(a) ............................................................................................................. 4

§ 1604(a) ............................................................................................................. 4

§ 1610(a)(1).......................................................................................................... 10

§ 1640................................................................................................................... 9, 15

§ 1603................................................................................................................... 10

§ 1640(a) ............................................................................................................. 3

§ 1605 (f) ............................................................................................................. 10

§1606(c) ............................................................................................................... 10

§ 1606(e) ............................................................................................................. 10

§ 1631(d) ............................................................................................................. 10

§ 1635................................................................................................................... 10

15 U.S.C.

§1640 .................................................................................................... 10

Cal. Bus. & Prof. Code § 17200 ............................................................... 10

Cal. Bus. & Prof. Code §§ 17204 ............................................................... 9

Cal. Code Civ. Proc. § 338(d) and (2) ...................................................... 15

Cal. Code Civ. Proc. § 338(d)(2) .............................................................. 15

Cal. Fin. Code § 1670.5…………………………………………… .......... 19

Cal. Fin. Code § 22060 ............................................................................. 19

Cal. Fin. Code § 22302 ....................................................................... 18, 19

Fed. R. Civ. P. 12(b)(6)............................................................................... 2

x

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

This action arises out of a mortgage loan made by defendant Mortgage Investor Group, a general partnership ("MIG") to plaintiff Jay J. Ralston ("Ralston"). The loan is of a type colloquially referred to as an Option ARM loan.  That is the loan has variable interest rate, and provides the borrower with different payment options on the loan. As was fully disclosed to Plaintiff some of those payment options would result in his principal loan balance growing, an effect known as negative amortization.  This is a legitimate loan product used uniformly nationwide in the mortgage lending industry.

Plaintiff's main contention is that MIG violated the Truth in Lending Act ("TILA").  The other state law claims made by Plaintiff are either predicated on the TILA violation or improperly seek to expand on the disclosure requirements made by the specific TILA statutory scheme. In actuality, Plaintiff's lawsuit is an attack on a loan product that he believes is unsuitable.  But TILA not regulate the terms of loans, only their disclosure. All TILA requirements were met by MIG.

First, Plaintiff's claim for damages under TILA is barred by the one year statute of limitations.  The claim for rescission under TILA would then remain. However, only certain types of TILA material non-disclosure violations can form the basis of a rescission claim, and the Plaintiff's claims about the failure to disclose interest rates properly cannot be the basis of a rescission. Further, all of the material terms were repeatedly and properly disclosed.

Plaintiff's claims under California's Unfair Competition Law ("UCL") fail because (1) the TILA claim on which they are predicated fails, (2) TILA preempts any attempt to require more disclosure than is required by the statute, (3) the UCL claims simply do not meet pleading standards of specificity, and (4) the UCL claim based on the California Finance Code is defective because the underlying statute is not applicable to this transaction.

Plaintiff attempts to state a breach contract claim, but simply makes up out of whole cloth new terms that are not in the Note and Adjustable Rate Rider, which documents must control. Lastly,

1

1  Plaintiff's claim for breach of the covenant of good faith and fair dealing fails because there is no

2  special relationship between and lender and borrower, which relationship would be necessary to

3  support the claim.

4  **II.    FACTUAL ALLLEGATIONS**

5      As required by the Federal Rules of Civil Procedure, MIG recites the allegations of the

6  Complaint, but does not thereby accept the truth thereof.  On or about July 20, 2005 Plaintiff

7  refinanced his existing home loan and borrowed $ 520,000.00 from MIG.  *Complaint* ¶ 5; *Complaint*

8  Exhibit 1; *Adjustable Rate Rider* (July 20, 2005) at 3 ("Rider") (copy attached to Declaration of

9  Christine C. Rhea ("Rhea Dec.") as Exhibit B); *Adjustable Rate Note* (July 20, 2005), 1-4 &

10 *Prepayment Penalty Addendum* (collectively "Note") (copy attached to Rhea Dec. as Exhibit A.)  In

11 connection with the making of the loan, the Plaintiff executed the Adjustable Rate Note, Adjustable

12 Rate Rider, Deed of Trust (not attached), Truth in Lending Disclosure Statement, and Adjustable

13 Rate Loan Program Disclosure. Rhea Dec. Exhibits A-D. This Court may properly consider the loan

14 documents concerning Plaintiff's transactions referenced herein in ruling on this Motion, because the

15 Complaint "refers extensively" to such documents and they "form the basis of" Plaintiff's claims.

16 *See, e.g., Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002); *see also, Parrino v. FHP, Inc.,* 146

17 F.3d 699, 705-706.

18 **III.    STANDARD ON A MOTION TO DISMISS**

19     A motion to dismiss under Fed. R. Civ. P. ("Rule") 12(b)(6) tests the sufficiency of the

20 complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  A claim may be dismissed under

21 Rule 12(b)(6) where the complaint lacks a cognizable legal theory.  *Robertson v. Dean Witter*

22 *Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984); *see Neitzke v. Williams*, 490 U.S. 319, 326 (1989)

23 ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law").

24 Alternatively, a claim may be dismissed where it presents a cognizable legal theory yet fails to plead

25 essential facts under that theory.  *Robertson*, 740 F.2d at 534.  A complaint that contains a "formulaic

26 recitation of the elements of the cause of action" will not suffice to overcome a motion to dismiss.

27 *Bell Atlantic Corp. v. Twombly*, -- U.S.--, 127 S.Ct. 1955, 1964-65 (citations omitted).

28

In reviewing a Rule 12(b)(6) motion, the court need not take as true legal conclusions cast in the form of factual allegations. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th cir. 1987); *Western Mining Council v, Watt*, 643 F.2d 618, 624 (9th Cir. 1981). The court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice. *See MGIC Indem. Co. v. Weisman*, 803 F2d 500, 504 (9th Cir. 1986).

## IV.    PLAINTIFF'S TILA CLAIMS ARE TIME BARRED BY THE STATUTE OF LIMITATIONS.

Plaintiff's first claim (improperly labeled as the "First Cause of Action") is for an alleged violation of Truth in Lending Laws, 15 U.S.C. § 1601 et seq. *Complaint* ¶¶ 62-76. Plaintiff's TILA claims are time barred. TILA provides that a borrower who does not receive certain receive disclosures may initiate an action for civil damages. 15. U.S.C. § 1640(a). The limitations action period for such action, however, is one year from the date of the alleged TILA violation. 15 U.S.C. § 1640(e). Plaintiff's TILA claims assert alleged violations of TILA's loan closing disclosure requirements. *Complaint* ¶¶ 64-74. At the latest, Plaintiff's TILA claims arose at the closing of his mortgage loan transaction on July 20, 2005. *Note* at p. 1 of 4; *see, e.g. Barbera v. WMC Mortgage Corp.* No. C 04-3738 SBA, 2006 WL 167632 at *5 (N.D. Cal. Jan. 19, 2006) (finding TILA claims for civil damages based on disclosure violations arose at closing of Plaintiff's loan); *see also Postow v. OBA Fed. Sav. & Loan Assoc.*, 627 F.2d 1370, 1380 (D.C. Cir. 1980)(same). Plaintiff did not file his claim until January 24, 2008—i.e., more than two years later.

The only TILA remedy aside from damages even theoretically available to Plaintiff at this juncture is the right to rescind the loan transaction, and even then only if that right was extended to the maximum three year period after his loan was consummated. But that three-year right to rescind applies only if "material disclosures" were not delivered. 12 C.F.R. § 226.23(a)(3). Even if otherwise legally and factually correct, none of Plaintiff's TILA claims about the disclosure of (1) the

3

applicable rate of interest in their Note, (2) the possibility of negative amortization, or (3) the fact that the initial interest rate was discounted would entitle him to rescind his loan.  12 C.F.R. § 226.23(a)(3) n.48 (listing the "material" disclosures that would trigger the right to rescind); 12 C.F.R. pt. 226, Supp. I, § 226.23(a)(3) cmt 2, 46 Fed. Reg. 50288, 50319 (Oct. 9, 1981).

## V.    MIG MADE ALL REQUIRED DISCLOSURES ACCURATELY, AND PLAINTIFF'S ALLEGATIONS ABOUT TILA VIOLATIONS REFLECT A FUNDAMENTAL MISUNDERSTANDING OF THE REQUIREMENTS OF THE STATUTORY SCHEME.

Plaintiff has theories about TILA violations that are contradicted by the plain face of the documents and that are not in accord with the specific statutory scheme.

### A.    Background of TILA

Congress enacted TILA to promote the informed use of credit.  It requires creditors to make specified disclosures so that consumers can more accurately compare the cost of credit.  *See* 15 U.S.C. § 1601(a).  TILA "focuses on disclosure and does not serve as an umbrella statute for consumer protection in real estate transactions." *Grimes v. New Century Mortgage Corp.*, 340 F.3d 1007, 1011 (9th Cir. 2003) (MeKeown, J., dissenting); *see also Szummy v. Am. Gen. Fin. Inc.*, 246 F.3d 1065, 1070 (7th Cir. 2001)( (TILA "is a disclosure statute; it does not regulate substantively consumer credit but rather requires disclosure of certain terms and conditions of credit before consummation of a consumer credit transaction."). TILA was designed to balance the competing considerations of complete disclosure and the need to avoid information overload.  As the Supreme Court has explained, TILA's purpose is to require "meaningful disclosure," not "more disclosure." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980).

To implement TILA, Congress delegated "expansive authority" to the Federal Reserve board "to enact appropriate regulations to advance this purpose." *Household Credit Servs. V. Pfennig*, 541 U.S. 232, 235 (2004); *Milhollin*, 444 U.S. at 559; 15 U.S.C. § 1604(a). Pursuant to this authority, the Federal Reserve Board has issued a set of comprehensive and highly detailed regulations, known as Regulations Z.  *See* 12 C.F.R. §§ 226.1 *et seq.*  These regulations, along with the Federal Reserve

4

Board's official staff commentary thereto, are entitled to judicial deference. *Milhollin*, 444 U.S. at 565-66. Regulation Z does much more than establish a set of standard for creditors to consider in making their disclosures. Indeed, Regulation Z sets forth a series of very specific instructions regarding when, where, and how the TILA disclosures are to be made.

**B.    Plaintiff's Theory That MIG Violated TILA by Not Disclosing the Actual Interest Rate Is Incorrect.**

Plaintiff has 12 separate paragraphs describing some sort of conduct which he contends violated TILA. *Complaint* ¶¶ 63-74. The allegations of violation are often unclear and couched in conclusory language and some overlap. First, Plaintiff contends that MIG failed to clearly and conspicuously disclose the interest rate actually applied to the loan and provided conflicting interest rates in the TILA Disclosure Statement and Note. *Complaint* ¶¶ 63-64. Plaintiff also alleges that MIG failed to disclose that a "teaser" rate only applies for a single month. *Complaint* ¶ 66. Plaintiff also alleges that MIG provided Plaintiff with conflicting information regarding the interest rate to be charged, setting out one rate in the Note and another in the Truth in Lending Disclosure Statement. *Complaint* ¶ 67.

These allegations belie a basic misunderstanding of TILA. First, the Note and the Rider explicitly reveal the interest rate. The TILA requirement that disclosure be clear and conspicuous is not even applicable to the interest rate. And the APR listed on the Truth in Lending Statement is not synonymous with the rate on the Note. In fact, the two are never the same.

The only section of Regulation Z that pertains to disclosures that must be made in a note is § 226.30 which states:

> A creditor shall include in any consumer credit contract secured by a dwelling and subject to the act and this regulation the maximum interest rate that may be imposed during the term of the obligation.

12 C.F.R. § 226.30. Plaintiff apparently seeks to ground his cause of action under the "clear and conspicuous" requirement of section 226.17. Section 226.17 applies only to disclosures required by this "Subpart," i.e., Subpart C, 12 C.F.R § 226.17-24. Subpart C does not address disclosures that must be made in a note, such as the interest rate. Thus section 226.17's "clearly and conspicuously"

1  language, upon which plaintiffs seek to ground their cause, does not even apply to interest rate

2  disclosures.

3      MIG clearly did reveal the interest rate. (*Complaint* Ex. 1 at Section 4(D); Rhea Dec. Ex. A

4  id. (informing Mr. Ralston that "my interest rate will never be greater than 9.950 %").

5      Moreover, plaintiff's Note and Rider clearly set forth the applicable contractual rate of

6  interest and specifies when that rate can change. (*Complaint* Ex. 1, Section; Rhea Dec. Ex 2, Para.

7  2(A)-(B).)  In this regard, both the Note and Rider inform plaintiff of his initial interest rate, 1% and.

8  (Complaint Ex. 1, at Para. 2; Rhea Dec. Ex. 2 Para. 2(A)  Both the Note and Rider also inform

9  plaintiff that "[t]he interest rate I will pay may change."  Paragraph 2(B) of the Note goes on to

10  specify when the interest rate may change:

> The interest rate I will pay ***may change on the 1st day of September, 2005***, and on the first day of every month thereafter.  Each date on which my interest rate could change is called an "Interest Rate Change Date."

14  (Complaint Ex. 1 at Paragraph 2(B) (emphasis added.); also Rhea Dec. Ex. A.) Paragraphs 2(C) and

15  (D) specify how the new interest rates will be computed:

> **(C)    Index**
> Beginning with the first Interest Rate Change Date, my adjustable rate will be based on an Index.  The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields").  The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date15 days before each Interest Rate Change Date is called the "Current Index."
>
> ***
>
> **(D)    Calculations of Interest Rate Changes**
> Before each Interest Rate Change Date, the Note Holder will calculate any new interest rate by adding THREE AND 075/100 percentage point(s) 3.075% ("Margin") to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than 9.950%.  Beginning with the first Interest Rate

6

Change Date, my interest rate will never be lower than the Margin.

(*Complaint* Ex. 1 at Paragraphs 2(C) and (D); and Rhea Dec. Ex. A Id.)

The Program Disclosure also emphasized the short-term nature of plaintiffs' initial interest rates:

> Your interest rate can change on your first payment and monthly thereafter.

(Rhea Dec. Ex. D).)

Plaintiff's further contention that the initial interest rate disclosed in his Note and Rider was improperly different from the APR set forth in the TILA Disclosure Statement, reflects an even more elementary misunderstanding of TILA. (*Complaint* ¶ 64.) The APR is by no means synonymous with the contractual interest rate. Instead, the APR is disclosed on the TILA Disclosure Statement, and its purpose is to permit borrowers to compare on an apples-to-apples basis the true costs of credit when shopping for loans. 12 C.F.R. § 226.22. As those costs involve more than the contractual interest rate, the APR calculations includes not only that rate, but also points, broker fees, and certain other credit charges, amortized over the term of the loan. *See* 12 C.F.R § 226.4. Regulation Z sets forth, over numerous page of the Federal Register, exactly how the APR must be calculated. 12 C.F.R. § 226.22 and 12 C.F.R. pt. 226, App. J.

As noted, the Note and Rider plainly disclosed that the initial rate would change. Further, nothing about what plaintiff calls this "teaser" rate feature of his loan was illegal. In any event, TILA only regulates disclosures, not loan terms. *See Szummy*. 246 F.3d at 1070 (TILA "is a disclosure statute; it does not regulate substantively consumer credit."). There is no provision of TILA that a low initial interest violates.

**C.    The Loan Documents Fully Informed Plaintiff About Negative Amortization.**

Plaintiff alleges that defendants failed to properly disclose negative amortization. *Complaint* ¶ 69. Like the rest of their TILA claims, plaintiff's attack on the negative amortization disclosure rests on a basis misunderstanding of Regulation Z. Plaintiff just makes a general allegation of failure to disclose the negative amortization. § 226.19 is the only provision of Regulation Z that addresses

7

negative amortization, and it only applies to the Program Disclosures, not the TILA Disclosure Statements and Notes. 12 C.F.R. § 226.19 (the "negative amortization" disclosure, cited by plaintiff, must be made in a "loan program disclosure for each variable-rate program in which the consumer expresses an interest").

Plaintiff makes no allegation that the Program Disclosure fails to meet the requirements of § 226.19, and for good reason.  The Program Disclosure clearly disclosed the fact that negative amortization was a possibility. More specifically, the Program Disclosure highlighted the fact that negative amortization would result if plaintiffs selected the minimum payment option.  The Program Disclosure explained how payments would be calculated and what the monthly payment options were, and how to use them to avoid negative amortization:

> Beginning with the 13th payment and every 12th month thereafter, we will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal balance in full by the maturity date in substantially equal payments at the interest rate in effect during the month preceding the payment change date.  This payment is called the "Full Payment." Except as otherwise provided you "Limited Payment" will be the payment amount for the month preceding the payment change date increased by no more than 7.5% ("Payment Cap").  Your new "Minimum Payment" will be the lesser of the Limited Payment and the Full Payment.  You also have the option to pay the Full Payment for your monthly payment.  If you pay less than the Full Payment, then the payment may not be to enough cover the interest due, and any difference will be added to your principal balance. **This means the balance of your loan could increase.  This is known as "negative amortization."**  During the loan term, we may provide you with other monthly payment options that are greater than the Minimum Payment ("Payment Options").  Please ask about these Payment Options.

(Rhea Dec. Ex. D, emphasis added).

Further, the Note and Rider clearly discuss negative amortization:  In its very first paragraph, the Note contains an express disclosure in all capital text that "THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED." This is an express disclosure of negative amortization.  Beyond this, there is also a provision in the Note entitled, "Additions to My Unpaid Principal" (Paragraph 3[E]) that discloses exactly what happens

8

1    when the borrower makes the minimum payment, including the fact that the principal amount of the

2    loan will increase:

3    > ...my Minimum Payment could be less than...the amount of the interest
4    > portion of the monthly payment that would be sufficient to repay the
5    > unpaid Principal I owe at the monthly payment date.... For each month
6    > that my monthly payment is less than the interest portion, the Note Holder
7    > will subtract the amount of my monthly payment from the amount of the
     > interest portion and will add the difference to my unpaid Principal, and
     > interest will accrue on the amount of this difference at the interest rate
     > required by section 2.

8

9    *Complaint*, Ex. 1 ¶ 3(E).

10       **D.    The Disclosure on the Discounting of the Initial Interest Rate Complied with
                 TILA.**

11       Plaintiff claims that MIG failed to disclose that the initial rate was discounted. *Complaint* ¶

12   65.  Again, there is no requirement of disclosure of such fact under the Regulation Z provision in

13   either the Note or the TILA Disclosure Statement, only under the loan program disclosure.  The

14   disclosures required under § 226.19, including the disclosure about any discounting of the initial rate,

15   are to be made in a "loan program disclosure," not in the Note or the TILA Disclosure Statement. 12

16   C.F.R. § 226.19(b)(2).  Plaintiffs make no claim that MIG's program disclosure was non-compliant.

17   **VI.   PLAINITFF'S UCL CLAIM BASED ON TILA IS PREMPTED BY TILA AND FAILS
            TO STATE A CLAIM BECAUSE OF THE FAILURE TO STATE A TILA CLAIM.**

18

19       The second claim of the Complaint is a UCL claim based on the alleged TILA violations

20   alleged in the first claim.  Complaint ¶¶ 77-88.  The evident purpose of bringing a duplicative cause

21   of action is to add to the remedies that TILA provides for a violation of federal law---presumably, to

22   increase available types of relief (from actual and statutory damages, the latter capped at $500,000.00

23   in a class action, to an uncapped amount of restitution and injunctive relief under the UCL).

24   *Compare* 15 U.S.C. § 1640 *with* Cal. Bus. & Prof. Code §§ 17204, 17208. Yet, this intention is

25   precisely what bars the second claim.

26       TILA provides significant federal regulation in the area of consumer credit disclosures.

27   Among TILA's provisions are ones that provide for remedies that carefully balance the rights and

28

9

1  interests of consumers and creditors, allowing actual damages and statutory damages for certain types

2  of violations, a class action cap of $500,000.00, loan rescission on an individual basis for a more

3  limited range of disclosure violations, and a complex web of safe harbors and exceptions. 15 U.S.C.

4  §§ 1603, 1604(b), (f) & (g), 1605 (f), 1606(c) & (e), 1631(d), 1633, 1635, and 1640. It is well settled

5  that TILA thus strikes a balance in these provisions that was carefully constructed as an integral part

6  of the entire statutory scheme. *Bowen v. First Financial Services, Inc.,* 223 F3d 1331, 1337 (11th Cir.

7  2003).

8         Any state law or other requirement that is inconsistent with TILA is preempted. *Cleghorn v.*

9  *Blue Shield of California,* 408 F.3d 1222 (9th Cir. 2005); 15 U.S.C. § 1610(a)(1). Plaintiff's attempt

10 to bootstrap a UCL claim on top of TILA, in order to greatly expand and distort the federal statute's

11 closely drawn remedial scheme, is inconsistent with TILA.

12        Plaintiff is likely to contend that the UCL's additional remedies are not inconsistent with

13 TILA because state law does not require any conduct TILA proscribes or prohibit any conduct that

14 TILA allows. There is no reason to read TILA's preemption rules, or to apply conflict preemption

15 principles, so narrowly. TILA has a variety of highly technical requirements whose violation often

16 leads to near automatic liability. Congress' choice to temper those rules with some limits on liability,

17 such as the short statute of limitations and the $500,000.00 liability cap, are not only an integral part

18 of the law, they are the product of a sensible judgment that injury can be redressed and compliance

19 urged by something less than ruinous liability. Plaintiff's UCL claim seeks to add to what Congress

20 decided was appropriate, and so should not be entertained.

21        Further, an "unlawful" business practice under the UCL must be a practice that violates

22 another law. *Cel-Tech Commc'ns, Inc. v. L.A. Co.,* 20 Cal.4[th] 163, 180 (1999) ("by proscribing 'any

23 unlawful' business practice, Cal. Bus. & Prof. Code § 17200 'borrows' violations of other laws and

24 treats them as unlawful practices that the unfair competition law makes independently

25 actionable.")(internal quotation marks omitted). However, if the plaintiff's claim would fail under

26 the "borrowed" law, the UCL claim fails too. *See, e.g. Smith v. State Farm Mut. Auto. Ins. Co.,* 93

27 Cal.App.4[th] 700, 718 (2001).

28

10

As set forth in the previous section, Plaintiff's TILA claim fails. Moreover, TILA is the sole predicate alleged for the UCL violation contained in the second claim of the Complaint. As MIG did not violate TILA, Plaintiff's UCL claim predicated on this supposed violation fails and must be dismissed. *See In re Late Fee & Over-Limit Fee Limits*., 528 F.Supp.2d 953, at *34 (N.D. Cal. Nov. 16, 2007)(finding that the defendant banks "could not properly be deemed to have engaged in unfair or deceptive practices under the [UCL] by acting consistently with all existing legal interpretations of the NBA and with express disclosures of their contracts concerning late fee and over-limit fees").

## VII.    PLAINTIFF'S THIRD CLAIM FOR BREACH OF UCL PREDICATED ON "UNFAIR" OR "FRAUDULENT" BUSINESS PRACTICES IS ALSO PREEMPTED AND FAILS TO STATE A CLAIM

The Complaint's third claim is a UCL claim predicated on "unfair" or "fraudulent" business practices. The Complaint has a laundry list of conclusory statements regarding what those practices were: MIG "misrepresented material [unspecified] facts to Plaintiff. *Complaint* ¶ 92. MIG "engaged in a pattern of deceptive conduct and concealment aimed at maximizing the number of borrowers who would accept their ARM loans." *Complaint* ¶ 93. MIG sold Plaintiff a deceptively devised financial product" (*Complaint* ¶ 94), and disguised from Plaintiff that the ARM loan was designed to, and did cause negative amortization to occur." *Complaint* ¶ 95. Once Plaintiff entered into his loan, MIG "switched the interest rated charged on the loans to a much higher one that advertised and promised...." *Complaint* ¶ 96. MIG failed to disclose and concealed from Plaintiff the interest was discounted and would increase substantially after thirty (30) days. *Complaint* ¶ 97. MIG failed to disclose or concealed that Plaintiff's interest rate "would increase substantially years before [he] could extricate [himself] from the loan which was subject to an extremely burdensome prepayment penalty." *Complaint* ¶ 98. MIG perpetrated an unexplained "bait and switch scheme" on Plaintiff (*Complaint* ¶ 99), and MIG's failure to disclose unspecified material facts "was and continues to be unfair, fraudulent, untrue, and/or deceptive." *Complaint* ¶ 100.

First, to the extent that this UCL claim purports to allege that even though MIG abided by all required TILA disclosure, that the disclosures or omissions were unlawful, such a theory cannot be supported by a UCL claim. *Byars v. SCME Mortg. Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1148-

11

1149 (where mortgage lender's disclosure of a "yield spread premium" was disclosed to buyer in the "HUD-1 Settlement Statement in a lawful manner as required by federal law, lender's failure to itemize broker's services "cannot constitute the basis of a Section 17200 claim"); *accord Kunert Mv. Mission Fin'l Services Crop.* (2003) 110 Cal.App.4th 242, 264-265.  Further, to be unfair under the UCL, the conduct must be "substantially injurious to consumers." *See Pokolksy v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647.  Where MIG is in complete TILA compliance, MIG cannot ipso facto be engaging in conduct that is substantially injurious to consumers.

Second, this UCL claim is at its core an attempt to challenge the fairness of the Plaintiff's mortgage contract. It is, however, well-settled that the UCL is not to be used for that purpose. *See, e.g., South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal.App.4th 861 (1999)(the UCL "does not give the courts a general license to review the fairness of contracts.")(internal citations omitted); *Searle v. Wyndham Int'l, Inc.* 102 Cal.App.4th 1327, (2002)(same).

Third, this UCL claim fails because the Complaint is devoid of the allegations necessary to state a plausible claim for under the unfairness or fraud prongs of the UCL.  *Bell Atlantic Corp. v. Twombley* —U.S.—127 S.Ct. 1955, 1965-65 (motion to dismiss should be granted where plaintiff's allegations are not "enough to raise a right to relief above the speculative level.")  Plaintiff has merely made amorphous conclusionary allegations of bad behavior. The California Supreme Court has criticized allowing such "amorphous" allegations to form the basis of a claim. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 167.  Further, the unfair practice must be "tethered" to specific constitutional, statutory or regulatory provisions." *Scripps Clinic v. Sup. Ct.,* 108 Cal.App.4th 917, 940 (2003).  Plaintiff does not make material factual allegations that reach these pleading standards. Rather, Plaintiff just makes conclusory statements, such as that MIG engaged in a "bait and switch" scheme without any factual supporting statement at all.

## VIII.   THE ALLEGED FRAUDULENT OMISSIONS ARE NOT ACTIONABLE.

The fourth claim of the Complaint alleges three omissions in connection with Plaintiff's loan. Specifically, it alleges that MIG failed to disclose (1) the "actual interest rate being charged on the

12

Note(s)"; (2) that "negative amortization would occur and that the 'principle balance will increase;'" and (3) that "the initial interest rate on the note was discounted." *Complaint* ¶ 108. These allegations all fail because the Plaintiff received the Rider that expressly disclosed the facts allegedly concealed.

Not surprisingly, it is well-settled that a non-disclosure claim fails where the information at issue was disclosed in a document signed by the plaintiff. *See, e.g. Stetler v. Greenpoint Mortgage Funding, Inc.*, No. 07-0123-DLB, 2008 WL 192405, at *7 (E.D. Cal. Jan. 23, 2008) (disclosures in loan documents were sufficient where "plaintiff read and signed the documents that disclosed the issues he now complains of"; "[t]hat he may not have understood the meaning of those documents, as he now seems to contend, does not render otherwise sufficient disclosures ineffective"). That is the case here.

First, Plaintiff's allegations of non-disclosure of the actual interest rate being charged are belied by detailed interest rate disclosure in the Note and Rider.    Indeed, the Note is entitled "Adjustable Rate Note" and contains, in its very first paragraph, an express disclosure, in all capital letter text that "THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT." Paragraph 2 of the Note then contains the loan terms relating "Interest." Note ¶ 2. In Paragraph 2(A), the Note discloses (1) the yearly "Interest Rate" the borrower will pay "until the full amount of Principal has been paid," and (2) that the disclosed interest rate may change. And in Paragraphs 2(B)-(D), the Note discloses the adjustable rate features of the loan, including that the interest rate set forth in Paragraph 2(A) is subject to change monthly starting on September 1, 2005. Plaintiff's non-disclosure allegations are refuted by the express terms of the Note, and therefore cannot state a valid calm for fraudulent omission.

Second, Plaintiffs' non-disclosure allegations concerning negative amortization are likewise belied by the Note and Rider. In its very first paragraph, the note contains an express disclosure in all capital text that "THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED." This is an express disclosure of negative amortization. Beyond this, there is also a provision in the Note entitled, "Additions to My Unpaid Principal (Paragraph 3[E]) that discloses exactly what happens when the borrower makes the minimum

payment, including the fact that the principal amount of the loan will increase:

> ...my Minimum Payment could be less than...the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date.... For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by section 2.

Note ¶ 3(E).

The Note also discloses in Paragraph 3(C) that, "[i]f the Minimum Payment is not sufficient to cover the interest due[,] then negative amortization will occur"—the precise disclosure Plaintiff alleges was not made.

Further, the Adjustable Rate Rider, also executed by Plaintiff has the same language. The first paragraph of the Rider states in capital text that, "THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED." Paragraph 2(B) states that "the [i]f the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization." (The line under this langue on the Rider contains Plaintiff's handwritten initials"). Likewise, Paragraph 3(E) of the Rider contains the same language quoted above from Paragraph 3(E) of the Note. The Note and the Rider thus foreclose any claim that Plaintiff was not told of the negative amortization.

Finally, Plaintiff's allegations concerning the discounted initial rate also runs counter to the Complaint and the detailed interest rate disclosures in the Note and Rider. There are express disclosures in that it "CONTAINS PROVISIONS THAT WILL CHANGE HE INTERST RATE AND THE MONTHLY PAYMENT." *Note* in the first paragraph. In Paragraph 2, the Note discloses that the initial interest rate is subject to monthly change beginning on September 1, 2006.

Plaintiff also fails to state a claim because it is preempted by TILA. The claim purports that insufficient or incorrect disclosure was made. The evident purpose of bringing a duplicative action is to use it to pursue claims and remedies not available under TILA.

Specifically, as Plaintiff's TILA claim for  civil damages is time barred and the statute caps

14

damages in class actions, this claim is a thinly veiled attempt (1) to increase the statute of limitations period (from one year for TILA violation to three years for fraud under California law (Cal. Code Civ. Proc. § 338(d) and (2) to increase the available types of relief (for example, from actual and statutory damages, the latter capped at $500,000.00 in class actions (15 U.S.C. § 1640), to an uncapped amount or restitution and injunctive relief under California law). Plaintiff's attempt to use this claim to add to TILA's remedies is further revealed by his prayer for a mandatory injunction requiring MIG to make particularized disclosures in every arm loan disclosure statement. It is exactly Plaintiff's intention to expand TILA's closely drawn remedial scheme that bars this claim. Plaintiff's attempt to bootstrap a fraudulent omission claim on top of TILA, in order to greatly expand and distort the federal statute's closely-drawn remedial scheme, is inconsistent with TILA and thus preempted. *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1006-1007 (9th Cir. 2008)(finding an attempt to go outside TILA's limitations period is an attempt to enforce a state regulation in an area expressly preempted by federal law).

## IX.    PLAINTIFF'S BREACH OF CONTRACT CLAIM DOES NOT IDENTIFY ANY BREACHED TERMS.

It is black-letter law, that to state a claim for breach of contract, a plaintiff must first allege a breach. *First Comm. Mortgage Co. v. Reece*, 89 Cal.App.4th 731, 745, 108 Cal.Rptr. 23 (2001); *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal.App.3d 1371 (1990). Further a trial court must dismiss contract claims when the agreement is not reasonably susceptible to any interpretations that could support the plaintiff's legal theories. *See Martinez v. Socoma Companies, Inc.*, 11 Cal.3d 398 (1974).

Here, plaintiff pleads no specific facts that MIG breached the Note (or Deed of Trust), the alleged contracts at issue. Complaint, ¶¶ 120-124. Indeed, plaintiff simply makes up out of whole cloth terms that are not contained in the Note and then alleges that MIG breached the terms. "[I]f there are inconsistencies between the complaint and the written instrument, the written instrument controls." *Fundin v. Chicago Pneumatic Tool Co.*, 152 Cal.App.3d 951, 955 (1984*); see Barnett v. Fireman's Fund Ins. Co.*, 90 Cal.App.4th 500 (2001) ("[T]o the extent the factual allegations conflict

1   with the content of the exhibits to the complaint, we rely on and accept as true the contents of the

2   exhibits and treat as surplusage the pleader's allegations as to the legal effect of the exhibits.")

3   First, Plaintiff alleges that the loan includes "a promise of a low, fixed interest rate, when in

4   fact, Plaintiff and Class members were charged a different, much greater interest rate than promised."

5   *Complaint* ¶ 120.  In fact, the Note states on the first line that it is an "Adjustable Rate Note."  As

6   noted previously, the Note contains, in its very first paragraph, an express disclosure, in all capital

7   letter text that "THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST

8   RATE AND THE MONTHLY PAYMENT." Paragraph 2 of the Note then contains the loan terms

9   relating "Interest." Note ¶ 2.  In Paragraph 2(A), the Note discloses (1) the yearly "Interest Rate" the

10  borrower will pay "until the full amount of Principal has been paid," and (2) that the disclosed

11  interest rate may change.  And in Paragraphs 2(B)-(D), the Note discloses the adjustable rate features

12  of the loan, including that the interest rate set forth in Paragraph 2(A) is subject to change monthly

13  starting on September 1, 2005.

14  Next, Plaintiff alleges that the "payment schedule" MIG provided represents that the

15  "monthly obligations are the exact payments necessary to pay off all principal and interest during the

16  terms of the loans if the interest rate actually charged by Defendants was the low interest rate

17  promised."  *Complaint* ¶ 121-122.  In fact, there is no payment schedule per se in the Note. If

18  Plaintiff is referring to the schedule on the Truth in Lending Statement ("TIL"), the TIL is not part of

19  the contract, so it cannot form the basis of a breach of contract claim.

20  Next, Plaintiff's allegation of breach in Paragraph 123 of the Complaint is simply not

21  comprehensible but concludes by alleging that the loan was "designed making negative amortization

22  certain to occur even though plaintiff …paid the designated monthly amounts. Again, the Note

23  controls.   There is nothing unlawful about having a negative amortization feature in a loan. The Note

24  explicitly discloses this feature. At Paragraph 3 (E), there is a whole paragraph titled "Additions to

25  My Principal" which states, in part, that for "each month that my monthly payment is less than the

26  interest portion, Note Holder will subtract the amount of my monthly payment from the amount of

27  the interest portion and will add the difference to my unpaid Principal…." Further, Paragraph 3(H)

28

16

gives the borrower different payment options, including "Interest Only Payment", Fully Amortized Payment", and "15 Year Amortized Payment".    At Paragraph 3(C), the Adjustable Rate Rider provides that the "Minimum Payment is the minimum amount that the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur." The Note and Rider both state that interest accrues at a variable rate and that negative amortization may occur if the minimum payment is made by the borrower. Plaintiff does not explain how MIG breached any terms. Rather, Plaintiff seems to want to imply vague new terms.

Likewise, Plaintiff impliedly alleges that MIG promised that Plaintiff's monthly payment would cover both principal and interest. *Complaint* ¶ 123.  As set forth above, no such promise was made in the Note or Rider and the exact opposite possibility was noted.  The promises that Plaintiff claims that MIG made simply do not exist. The written agreement controls, and no breach of contract claim has been stated.

## X.    PLAINTIFF CANNOT IMPLY ANY COVENANTS INTO THE LOAN AGREEMENT.

It is black-letter law that, to state a claim for breach of the implied covenant, a plaintiff must allege a *breach of contract*. *Berger v. Home Depot U.S.A., Inc.* 476 F.Supp.2d 1174, 1177 (C.D. Cal. 2007); *Harpeneau v. Massachusetts Mut. Life Ins. Co.*, No. C-96-4619 MHP, 1998 WL 30056, at *6-7 (N.D. Cal. Jan. 5, 1998) Further, a party "cannot base a claim for breach of the implied covenant on acts that occurred in pre-contract dealings." *Harpeneu,* 1998 WL 30056, at *6 (citing *Hess v. Transamerica Occidental Life Ins. Co.*, 190 Cal.App.3d 941, 945, 235 Cal.Rptr. 715 (1987)); *Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 349, 100 Cal.Rptr.2d 352 (2000) (stating that the implied covenant "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made.*") (emphasis in original).

Further, to the extent that the Plaintiff is attempting to allege a tortious breach of the implied covenant of good faith and fair dealing (as opposed to implying some specific term into the contract),

a special relationship must exist between the parties. "[T]ort recovery for breach of the covenant [of good faith and fair dealing] is available only in limited circumstances, generally involving a special relationship between the contracting parties, such as the relationship between an insured and its insurer." *Bionghi v. Metro. Water Dist.*, 70 Cal.App.4rth 1358, 1370 (1999).

Where, as here, the disputed transactions occurred in a typical commercial context and the contracting parties were in an ordinary bank-customer relationship, tort remedies are precluded. No special relationship exists. This is well-settled under California law. *Mitsui Mfrs. Bank. v. Sup.Ct.*, 212 Cal.App.3d 726, 795 (1989)("We reject real parties' argument that the tort doctrine which has been extended only to situations where there are unique fiduciary-like relationships between the parties, should encompass normal commercial banking transactions.")(rejecting borrower's claim against bank for tortious breach of implied covenant of good faith and fair dealing); *Price v. Wells Fargo Bank*, 213 Cal.App.3d 465, 476 (1989) ("'A debt is not a trust and there is not a fiduciary relationship between debtor and creditor as such.' The same principle should apply with even greater clarity to the relationship between a bank and its loan customers.")(rejecting same claim by individual borrowers against bank)(internal citation omitted); *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal.App.3d 1371 (1990)("[R]ecognition of a tort remedy for breach of the implied covenant in a noninsurance context has little authoritative support.")(sustaining demurrer on same claim by commercial borrower against bank); see *Copesky v. Sup. Ct.*, 229 Cal.App.3d 678, 694 (1991)("It is thus our conclusion that the bank-depositor relationship is not a 'special relationship' under the *Wallis* test, or any other test, such as to rise to tort damages when the implied contractual covenant of good faith is broken.") The same logic applies here. Apparently appreciating this, Plaintiff makes no attempt to allege a special relationship. Accordingly, the claim for tortious breach of the implied covenant of good faith and fair dealing must be dismissed.

## XI. THE UCL CLAIM PREDICATED ON CAL. FINANCIAL CODE § 22302 FAILS TO STATE A CLAIM.

In the seventh claim, Plaintiff alleges that MIG "engaged in unfair competition" under the UCL because it engaged in "unlawful" conduct, one of the familiar three possible arguments for a

UCL claim. The alleged predicate for the "unlawfulness" is that the subject mortgage contract is purportedly "unconscionable," and therefore in violation of Sections 22302 and 1670.5. *Complaint*, ¶¶ 145-149. But Sections 22302 and 1670.5 are inapplicable under the facts alleged, and Plaintiff has failed to plead sufficient facts to establish unconscionability. In addition, Plaintiff's claim fails because it is, at heart, a disguised contract claim to which the UCL does not speak.

Neither Section 22302 nor Section 1670.5 is implicated by the Complaint. Section 22302 does not cover Plaintiff's loan. This is because the statute is part of a section of the Finance Code (Division 2) that applies to finance lenders, not residential mortgage lenders. In fact, the Section specifically exempts from its reach "*loan[s] made or arranged by a licensed residential mortgage lender … acting under the authority of its license.*" Cal. Fin. Code § 22060 (emphasis added). Here Plaintiff alleges no facts to establish that this exemption does not extend to this loan and MIG. To the contrary, the reasonable inference to be drawn from Plaintiff's allegations is that the loan falls within the exemption.[1] And, for this reason, Plaintiff's conclusory allegations concerning Section 22302 are not "enough to raise [Plaintiff's] right to relief [under the seventh claim] above the speculative level" necessary to overcome a Rule 12(b)(6) motion. *Twombly*, 127 at 1964-65.

Section 1670.5 is also inapplicable to the loan for a different reason. By its terms, the statute is simply a codification of the contract defense of unconscionability. *Id.*; *see also California Grocers Assoc., Inc. v. Bank of America*, 22 Cal.App.4th 205, 217, 27 Cal.Rptr.2d 396, 403-04 (1994) (stating "[S]ection 1670.5 does not in itself create an affirmative cause of action but merely codified the defense of unconscionability"). It does not create a cause of action, and thus cannot be violated. As such, the statute cannot form the predicate statutory violation necessary to sustain Plaintiff's UCL claim.

Even assuming *arguendo* that Section 22302 and/or Section 1670.5 are properly invoked here, the claim still fails because the Complaint is devoid of the allegations necessary to state a plausible unconscionability claim. *Twombly*, 127 at 1964-65 (motion to dismiss should be granted where

---

[1] If Plaintiff's claim proceeds beyond this stage (and it should not), MIG will demonstrate that it was a licensed mortgage lender in California at the time of closing of the loan.

19

1  plaintiff's allegations are not "enough to raise a right to relief above the speculative level").
2  "Unconscionability has generally been recognized to include an absence of meaningful choice on the
3  part of one of the parties together with contract terms which are unreasonably favorable to the other
4  party." *Shadoan v. World Sav. & Loan Assoc.*, 219 Cal.App.3d 97 (1990) (citing *Williams v. Walker-*
5  *Thomas Furniture Company*, 350 F.2d 445 (D.C. Cir. 1975)). Among many other elements in this
6  fact-based legal theory, unconscionability requires a showing that "a party to a bargain has little
7  choice but to accept the terms stated by the other party" and "is wholly unable to obtain the same
8  consideration on other terms." *Shadoan*, 219 Cal.App.3d at 102-03, 268 Cal.Rptr. at 207 (citations
9  omitted and emphasis added). But the Complaint pleads no specific fact establishing either of these
10  elements.

11        The plaintiffs in *Shadoan*, like Plaintiff here, had alleged that the defendant – lender
12  "committed an unfair business practice by including in its loan agreement both a prepayment penalty
13  clause, and a clause permitting the lender to 'unilaterally call' the loan." *Id.* And, as with Plaintiff's
14  UCL claim here, the plaintiffs' claim in *Shadoan* was also predicated upon the UCL and Section
15  1670.5. The trial court in *Shadoan*, however, dismissed plaintiffs' UCL claim. In affirming that
16  decision, the Court of Appeal explained that plaintiffs' complaint did not state a claim for
17  unconscionability because Plaintiffs have "alleged no facts that they were unable to receive more
18  favorable terms from another lender." *Id.* at 103. Plaintiff's pleading in the Complaint is likewise
19  deficient, See *Complaint* ¶¶ 146-149.

20        Finally, the claim should be dismissed because it is, at its core, an attempt to challenge the
21  fairness of the Plaintiffs' mortgage contracts. It is, however, well settled that the UCL is not to be
22  used for that purpose. *See e.g., South Bay Chevrolet v. General Motors Acceptance Corp.*, 72
23  Cal.App.4th 861, 887, 85 Cal.Rptr.2d 301 (1999) (the UCL "does not give the courts a general
24  license to review the fairness of contracts") (internal citations omitted); *Searle v. Wyndham Int'l, Inc.*,
25  102 Cal.App.4th 1327, 1334, 126 Cal.Rptr.2d 231 (2002) (same).

26

27

28

## XII.  MORTGAGE INVESTORS GROUP, INC. SHOULD BE DISMISSED AS IT DID NOT MAKE THE LOAN IN ISSUE

Although Plaintiff sues both Mortgage Investors Group and Mortgage Investors Group, Inc., Plaintiff makes no specific allegations as between them, merely alleging that the collective "Defendants" committed all of the acts and omissions. In fact, all of the loan documents before the Court reflect that only Mortgage Investors Group made the loan, including the disclosures to Plaintiff. Since the written instruments must control over any allegations of the pleading, Mortgage Investors Group, Inc. should be dismissed as having absolutely no involvement in the transaction that is the subject of this action.

Dated: March 28, 2008                        PFEIFER & REYNOLDS, LLP

                                    By:      /s/ Roland P. Reynolds
                                             ROLAND P. REYNOLDS, Esq.
                                             Attorneys for Defendants MORTGAGE
                                             INVESTORS GROUP, INC. and MORTGAGE
                                             INVESTORS GROUP

1  ROLAND P. REYNOLDS, ESQ., (SBN 150864)
   rreynolds@pfeiferlaw.com
2  ANNABELLE DE LA MORA, ESQ. (SBN 117649)
   adelamora@pfeiferlaw.com
3  PFEIFER & REYNOLDS, LLP
   765 The City Drive, Suite 380
4  Orange, CA 92868
   Telephone:    (310) 788-3900
5  Facsimile:    (310) 388-5416
6

7  Attorneys for Defendants MORTGAGE INVESTORS
8  GROUP, INC. and MORTGAGE INVESTORS GROUP,
   A General Partnership
9

10            UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN JOSE DIVISION

13

14  JAY J. RALSTON, On Behalf Of Himself       )  Civil Case No. CV 08-00536 JF
    And All Others Similarly Situated;         )
15                                             )
                           Plaintiff,          )  **DECLARATION OF CHRISTINE C. RHEA**
16        vs.                                  )  **IN SUPPORT OF DEFENDANTS' MOTION**
                                               )  **TO DISMISS PLAINTIFF'S COMPLAINT**
17  MORTGAGE INVESTORS GROUP,                  )
18  INC., MORTGAGE INVESTORS                   )  Date:   May 30, 2008
    GROUP, a general partnership, and DOES     )  Time:  9:00 a.m.
19  1 -10,                                     )  Crtrm:  3
                           Defendants.         )
20                                             )  Honorable Jeremy Fogel
                                               )
21                                             )  Complaint Filed:  January 24, 2008

22

23

24  _____

25  ///

26  ///

27

28                                1

I, Christine C. Rhea, declare:

1.      I am President of Mortgage Investors Group, Inc.  I have personal knowledge of the facts set forth in this declaration, and, if called as a witness, could and would testify competently thereto.

2.      Mortgage Investors Group, Inc. is a general partner of Mortgage Investors Group, a general partnership ("MIG").  As part of my job responsibilities I am directly knowledgeable about the origination of loans by MIG.  I have reviewed the loan files maintained by MIG in connection with the origination of the loan to Jay J. Ralston. The following documents were executed by Mr. Ralston as part of the loan transaction.  Attached hereto as Exhibit "A" and incorporated herein by this reference is a true and correct copy of the Adjustable Rate Note executed by Mr. Ralston. Attached hereto as Exhibit "B" and incorporated herein by this reference is and true and correct copy of the Adjustable Rate Rider executed by Mr. Ralston.  Attached hereto as Exhibit "C" and incorporated herein by this reference is a true and correct copy of the Truth in Lending Disclosure Statement executed by Mr. Ralston.  Attached hereto as Exhibit "D" and incorporated herein by this reference is a true and correct copy of the Adjustable Rate Loan Program Disclosure executed by Mr. Ralston.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of March 2008 at Knoxville, Tennessee.

Christine C. Rhea

2

# *EXHIBIT A*

## *(Adjustable Rate Note)*

# *EXHIBIT A*

## *(Adjustable Rate Note)*

MIN: 1001095-0001044120-9                    Loan Number: 1044120

## ADJUSTABLE RATE NOTE
(MTA-Twelve Month Average Index - Payment Caps)

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT
THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE
PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT
ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT
STATED IN THIS NOTE.

JULY 20, 2005                IRVINE                    CALIFORNIA
     [Date]                    [City]                      [State]

731 COLUMBIA AVENUE, SALINAS, CALIFORNIA 93901
                    [Property Address]

1.  BORROWER'S PROMISE TO PAY
    In return for a loan that I have received, I promise to pay U.S. $520,000.00    (this amount is
called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under
the terms of this Note but will never exceed (ONE HUNDRED FIFTEEN PERCENT    ) of the
Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is MORTGAGE
INVESTORS GROUP, A GENERAL PARTNERSHIP
I will make all payments under this Note in the form of cash, check or money order.
    I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who
is entitled to receive payments under this Note is called the "Note Holder."

2.  INTEREST
    (A)  Interest Rate
    Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay
interest at a yearly rate of  1.000 %. The interest rate I will pay may change.
    The interest rate required by this Section 2 is the rate I will pay both before and after any default described
in Section 7(B) of this Note.

    (B)  Interest Rate Change Dates
    The interest rate I will pay may change on the   1st     day of SEPTEMBER, 2005 , and on that
day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change
Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may
change monthly, but the monthly payment is recalculated in accordance with Section 3.

    (C)  Index
    Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index.
The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury
Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal
Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month
Average is determined by adding together the Monthly Yields for the most recently available twelve months and
dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change
Date is called the "Current Index".
    If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable
information. The Note Holder will give me notice of this choice.

    (D)  Calculation of Interest Rate Changes
    Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding
THREE AND 075/1000     percentage point(s)  3.075 % ("Margin") to the Current Index. The
Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point
(0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My
interest will never be greater than  9.950 %. Beginning with the first Interest Rate Change Date, my interest
rate will never be lower than the Margin.

3.  PAYMENTS
    (A)  Time and Place of Payments
    I will make a payment every month.
    I will make my monthly payments on the   1st     day of each month beginning on SEPTEMBER 1,
2005     . I will make these payments every month until I have paid all the Principal and interest
and any other charges described below that I may owe under this Note. Each monthly payment will be applied as
of its scheduled due date and will be applied to interest before Principal. If, on AUGUST 1, 2036    , I
still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity
Date."
    I will make my monthly payments at 16257 LAGUNA CANYON ROAD #100, IRVINE,
CALIFORNIA 92618
or at a different place if required by the Note Holder.
Borrower Initials: JVC
PayOption ARM Note - MTA Index
FE-5312 (0412)                         Page 1 of 4                                        10/04

(B)  Amount of My Initial Monthly Payments
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $1,672.53          unless adjusted under Section 3 (F).

(C)  Payment Change Dates
My monthly payment may change as required by Section 3(D) below beginning on the     1st        day of SEPTEMBER,  2006 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.
I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D)  Calculation of Monthly Payment Changes
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

(E)  Additions to My Unpaid Principal
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

(F)  Limit on My Unpaid Principal; Increased Monthly Payment
My unpaid Principal can never exceed the Maximum Limit equal to     115.000   percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

(G)  Required Full Payment
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

(H)  Payment Options
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:
(i)    Interest Only Payment:  the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
(ii)   Fully Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.
(iii)  15 Year Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.
These Payment Options are only applicable if they are greater than the Minimum Payment.

Borrower Initials: _____
PayOption ARM Note - MTA Index
FE-5312 (0412)                    Page 2 of 4

4.  NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5.  BORROWER'S RIGHT TO PREPAY  ** See attached Prepayment Note Addendum.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.  BORROWER'S FAILURE TO PAY AS REQUIRED

(A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

(B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

8.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

Borrower Initials: _JR_   _____   _____   _____   _____

PayOption ARM Note - MTA Index
FE-5312 (0412)                     Page 3 of 4                              10/04

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ _Jay J. Ralston_ _____ (Seal)
JAY J. RALSTON                                        -Borrower

_____ (Seal)
                                                     -Borrower

_____ (Seal)
                                                     -Borrower

_____ (Seal)
                                                     -Borrower

CERTIFIED TO BE A TRUE CORRECT AND COMPLETE COPY OF THE ORIGINAL DOCUMENT [illegible] COMPANY

Pay to the order of

_____

_____

Without Recourse
MORTGAGE INVESTORS GROUP
By Mortgage Investors Group, Inc.

_____
Charles E. Tonkin, II
President



THIS IS CERTIFIED TO BE
A TRUE AND CORRECT COPY
OF THE ORIGINAL

MORTGAGE INVESTORS GROUP

DATE: JULY 20, 2005
BORROWER:   JAY J. RALSTON

LOAN #:  1044120
PROPERTY ADDRESS:   731 COLUMBIA AVENUE
 SALINAS, CALIFORNIA 93901
MIN: 1001095-0001044120-9

# PREPAYMENT PENALTY ADDENDUM

THIS PREPAYMENT PENALTY ADDENDUM is dated JULY 20, 2005 , and is incorporated into and amends and supplements the Note of the same date (the "Note") given by MORTGAGE INVESTORS GROUP, A GENERAL PARTNERSHIP
(the "Lender"). The Note is secured by a Mortgage or Deed of Trust or comparable security instrument (the "Security Instrument") covering the property (the "Property") identified in the Security Instrument.

The section of the Note entitled "Borrower's Right to Prepay" is replaced with the following new section:

BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid Principal is known as a "Full Prepayment." A prepayment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Partial or Full Prepayment, I will tell the Note Holder in writing that I am doing so.

Subject to the Prepayment Penalty specified below, I may make a Full Prepayment or Partial Prepayments of my obligation. The Note Holder will use all of my prepayments to reduce the amount of Principal that I owe under the Note. If I make a Partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment.

If within the first     THIRTY-SIX     months after the execution of this Note, I make prepayment(s), the total of which exceeds twenty (20) percent of the original Principal amount of this Note, I agree to pay a Prepayment Penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) during the twelve (12) month period immediately preceding the date of the prepayment exceeds twenty (20) percent of the original Principal amount of this Note. Interest will be calculated using the rate in effect at the time of prepayment. I will pay this Prepayment Penalty regardless of whether I sell the Property or refinance the loan with the same Lender or Note Holder.

All other terms and conditions of the above referenced Note remain in full force and effect.

_____
JAY J  RALSTON                                        Borrower

_____
                                                      Borrower

_____
                                                      Borrower

_____
                                                      Borrower

Multistate Prepayment Penalty Addendum - (H-PPP)
FE-5201 (0412)

U55201.cw

# *EXHIBIT B*

## *(Adjustable Rate Rider)*

# *EXHIBIT B*

## *(Adjustable Rate Rider)*

MIN: 1001095-0001044120-9          Loan Number: 1044120
Doc ID#:

## ADJUSTABLE RATE RIDER
### (MTA-Twelve Month Average Index - Payment Caps)

THIS ADJUSTABLE RATE RIDER is made this      20th        day of JULY
    2005          , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by
the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
MORTGAGE INVESTORS GROUP, A GENERAL PARTNERSHIP
("Lender") of the same date and covering the property described in the Security Instrument and
located at:

731 COLUMBIA AVENUE, SALINAS, CALIFORNIA 93901
[Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT
THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL
AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY
BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agrees as follows:

A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

2.   INTEREST
(A)  Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I
will pay interest at a yearly rate of     1.000 %.  The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of the Note.

(B)  Interest Rate Change Dates
The interest rate I will pay may change on the      1st        day of SEPTEMBER
    2005          , and on that day every month thereafter. Each date on which my interest
rate could change is called an "Interest Rate Change Date." The new rate of interest will become
effective on each Interest Rate Change Date. The interest rate may change monthly, but the
monthly payment is recalculated in accordance with Section 3.

Borrower Initials: _JR_   _____  _____  _____

PayOption MTA ARM Rider
FE-5315 (0505)                    Page 1 of 5

Ut53351.cw

(C)  Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D)  Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 075/1000        percentage point(s)    3.075 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than   9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

3.  PAYMENTS
    (A)  Time and Place of Payments
    I will make a payment every month.
    I will make my monthly payments on the     1st         day of each month beginning on SEPTEMBER 1, 2005     .  I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on AUGUST 1, 2035      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
    I will make my monthly payments at 16257 LAGUNA CANYON ROAD #100, IRVINE, CALIFORNIA 92618
or at a different place if required by the Note Holder.

    (B)  Amount of My Initial Monthly Payments
    Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $1,672.53          unless adjusted under Section 3 (F).

    (C)  Payment Change Dates
    My monthly payment may change as required by Section 3(D) below beginning on the  1st
day of SEPTEMBER,  2006 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.
Borrower Initials: _____
PayOption MTA ARM Rider
FE-5315 (0505)                        Page 2 of 5

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D)  Calculation of Monthly Payment Changes
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

(E)  Additions to My Unpaid Principal
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

(F)  Limit on My Unpaid Principal; Increased Monthly Payment
My unpaid Principal can never exceed the Maximum Limit equal to ONE  HUNDRED FIFTEEN AND 000/1000 percent ( 115.000 %)of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% monthly Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

(G)  Required Full Payment
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

Borrower Initials: _clK_  _____  _____  _____  _____

PayOption MTA ARM Rider
FE-5315 (0505)                           Page 3 of 5

Us53153.cw

(H) Payment Options

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)    Interest Only Payment:  the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)    Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii)    15 Year Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

Borrower Initials: _JK_  _____   _____   _____
PayOption MTA ARM Rider
FE-5315 (0505)                    Page 4 of 5

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____    _____
JAY J. RALSTON                                                              -Borrower

_____    _____
                                                                                     -Borrower

_____    _____
                                                                                     -Borrower

_____    _____
                                                                                     -Borrower

PayOption MTA ARM Rider
FE-5315 (0505)                        Page 5 of 5



UxS31SS.cu

# *EXHIBIT C*

## *(Federal Truth-in-Lending Disclosure Statement)*

# *EXHIBIT C*

## *(Federal Truth-in-Lending Disclosure Statement)*

FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Loan Number: 1044120                                    Date: JULY 20, 2005
Creditor:   MORTGAGE INVESTORS GROUP
Address: 16257 LAGUNA CANYON ROAD #100, IRVINE, CALIFORNIA 92618

Borrower(s):   JAY J. RALSTON

Address:   731 COLUMBIA AVENUE, SALINAS, CALIFORNIA 93901

Lines containing an "x" are applicable:

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | ☐ Total Sale Price The total cost of your purchase on credit including your down-payment of $ |
|---|---|---|---|---|
| 5.756 % | $ 649,165.76 | $ 517,557.27 | $ 1,166,723.03 | $ |

PAYMENTS: Your payment schedule will be:

| Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning | | | Monthly Beginning | | | Monthly Beginning |
| 1 | 1,672.53 | 09/01/05 | | | | | | |
| 11 | 1,672.53 | 10/01/05 | | | | | | |
| 12 | 1,797.97 | 09/01/06 | | | | | | |
| 12 | 1,932.82 | 09/01/07 | | | | | | |
| 12 | 2,077.78 | 09/01/08 | | | | | | |
| 12 | 2,233.61 | 09/01/09 | | | | | | |
| 299 | 3,500.49 | 09/01/10 | | | | | | |
| 1 | 3,500.00 | 08/01/35 | | | | | | |

_____ DEMAND FEATURE: This obligation has a demand feature.

__X__ VARIABLE RATE FEATURE: Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

INSURANCE: The following insurance is required to obtain credit:
_____ Credit life insurance and credit disability __X__ Property Insurance _____ Flood Insurance _____ Private Mortgage Insurance
You may obtain property insurance from any insurer that is acceptable to the Lender.
SECURITY: You are giving a security interest in: 731 COLUMBIA AVENUE, SALINAS, CALIFORNIA 93901
_____ The goods or property being purchased __X__ Real property you already own.
FILING FEES: $
LATE CHARGE: If payment is more than _____ 15 _____ days late, you will be charged _____ 5.000 % of the payment.
PREPAYMENT: If you pay off early, you                                     * or $5.00 (whichever is greater)
__X__ may _____ will not   have to pay a penalty.
_____ may __X__ will not   be entitled to a refund of part of the finance charge.
ASSUMPTION: Someone buying your property
_____ may _____ may, subject to conditions __X__ may not   assume the remainder of your loan on the original terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.
__X__ "e" means an estimate _____ all dates and numerical disclosures except the late payment disclosures are estimates.
Each of the undersigned acknowledge receipt of a complete copy of this disclosure. The disclosure does not constitute a contract or a commitment to lend.

_____  7-22-05    _____
Applicant  JAY J. RALSTON         Date    Applicant                          Date

_____  _____    _____  _____
Applicant                 Date    Applicant                          Date

_____  _____    _____  _____
Applicant                 Date    Applicant                          Date

** NOTE: Payments shown above do not include reserve deposits for taxes, assessments, and property or flood insurance.

# EXHIBIT D

## *(Adjustable Rate Mortgage Loan Program Disclosure)*

# EXHIBIT D

## *(Adjustable Rate Mortgage Loan Program Disclosure)*

DATE: JULY 20, 2005
BORROWER: JAY J. RALSTON
CASE #:
LOAN #: 1044120
PROPERTY ADDRESS: 731 COLUMBIA AVENUE, SALINAS, CALIFORNIA 93901

### ADJUSTABLE RATE MORTGAGE LOAN PROGRAM DISCLOSURE
### MONTHLY TREASURY AVERAGE INDEX - PAYMENT CAPS
### ALL STATES EXCEPT NEW YORK

This disclosure describes the features of an Adjustable Rate Mortgage (ARM) program you are considering. Information about our other ARM programs will be provided upon request.

| HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED | | |
|---|---|---|
| • Your interest rate will be based on an index rate plus a margin. Please ask us for our current interest rate and margin.<br>• The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.<br>• Your initial interest rate is not based on the index used to make later adjustments. Please ask us for the amounts of your current interest rate discounts.<br>• For the first year of your loan, your payment will be based on the initial interest rate, loan amount and loan term. After the first year, your payment will be calculated as described below. | | |
| | **MTA ARM (Initial rate change at 1 month)** | **MTA ARM (Initial rate change at 3 months)** |
| Your interest rate can change: | On your first payment date and monthly thereafter | On your 3rd payment date and monthly thereafter |
| Each time your interest rate changes, the new interest rate will equal the sum of the index plus the margin, subject to the following limits: | • Your interest rate will be rounded to the nearest 1/8%.<br>• Your interest rate will never exceed the maximum set forth in your loan documents.<br>The maximum rate in effect as of the first business day of January 2005 is 9.95%. Please ask us for our current maximum rate. | |
| How Your Payment Can Change | | |
| Your payment can change: | • Every year and can increase or decrease substantially based on changes in the interest rate.<br>• At every 5th scheduled payment adjustment, you will need to pay the Full Payment until the next payment adjustment date. | |
| | You will be notified in writing at least 25, but no more than 120 days, before the due date of a payment at a new level. This notice will contain information about the index, your interest rates, payment amount and loan balance. | |
| Your payment will be calculated as follows: | Beginning with the 13th payment and every 12 months thereafter, we will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal balance in full by the maturity date in substantially equal payments at the interest rate in effect during the month preceding the payment change date. This payment is called the "Full Payment." Except as otherwise provided, your "Limited Payment" will be the payment amount for the month preceding the payment change date increased by no more than 7.5% ("Payment Cap"). Your new "Minimum Payment" will be the lesser of the Limited Payment and the Full Payment. You also have the option to pay the Full Payment for your monthly payment. If you pay less than the Full Payment, then the payment may not be enough to cover the interest due, and any difference will be added to your principal balance. This means the balance of your loan could increase. This is known as "negative amortization." During the loan term, we may provide you with other monthly payment options that are greater than the Minimum Payment ("Payment Options"). Please ask us about these Payment Options. | |
| The unpaid principal of your loan: | Can never exceed 115% (110% in New York) of the original amount borrowed. This means that your monthly payment may change more frequently than annually and the payment change will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to pay off the unpaid principal balance over the remaining life of the loan at the current interest rate. | |
| | The examples below illustrate interest rate and payment changes based on a $10,000, 30-year loan. These examples use an initial interest rate in effect on the first business day of January 2005, and assume the maximum periodic increases in rates and payments. | |
| | Examples of loans with a discounted interest rate (below sum of index and margin) | |
| Initial Interest Rate | 1.00% | 1.75% |
| Maximum Interest Rate | 9.95% | 9.95% |
| First Year Payment | $32.16 | $35.72 |
| Maximum payment | $101.46 in the 3rd year | $102.14 in the 3rd year |

CONV
• ARM MTA PayOption Disclosure
FE-4273 (0505)                    Page 1 of 2

D42731.cw



| | Examples of loans with a premium interest rate (above sum of index and margin) | |
|---|---|---|
| Initial Interest Rate | N/A | N/A |
| Maximum Interest Rate | N/A | N/A |
| First Year Payment | N/A | N/A |
| Maximum payment | N/A | N/A |

NOTE: To see what your payment would be, divide your mortgage amount by $10,000, then multiply the monthly payment by that amount. (For example, the monthly payment for a $60,000 MTA ARM Index - Payment Cap loan with a discounted interest rate would be: $60,000 / $10,000 = 6; 6 x $32.16 = $192.96 per month)

Applicant JAY J RALSTON                    7-22-05
                                            Date

Applicant                                   Date

Applicant                                   Date

Applicant                                   Date

1   ROLAND P. REYNOLDS, ESQ., (SBN 150864)
    rreynolds@pfeiferlaw.com
2   ANNABELLE DE LA MORA, ESQ. (SBN 117649)
    adelamora@pfeiferlaw.com
3   PFEIFER & REYNOLDS, LLP
4   765 The City Drive, Suite 380
    Orange, CA 92868
5   Telephone:    (310) 788-3900
    Facsimile:    (310) 388-5416
6

7
    Attorneys for Defendants MORTGAGE INVESTORS
8   GROUP, INC., and MORTGAGE INVESTORS GROUP,
    A General Partnership
9

10              UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN JOSE DIVISION

13

14  JAY J. RALSTON, On Behalf Of Himself   ) Civil Case No. CV 08-00536 JF
    And All Others Similarly Situated;      )
15                                          )
                        Plaintiff,          ) **COMPENDIUM OF CASES CITED TO**
16          vs.                             ) **WESTLAW IN SUPPORT OF DEFENDANTS'**
                                            ) **MOTION TO DISMISS PLAINTIFF'S**
17  MORTGAGE INVESTORS GROUP,               ) **COMPLAINT**
    INC., MORTGAGE INVESTORS              )
18  GROUP, a general partnership, and DOES ) Date:  May 30, 2008
19  1 -10,                                  ) Time:  9:00 a.m.
                        Defendants.         ) Crtrm: 3
20                                          )
                                            ) Honorable Jeremy Fogel
21                                          ) Complaint Filed : January 24, 2008
                                            )
22                                          ) [Filed Concurrently with Defendants' Notice of
23                                          ) Motion and Motion to Dismiss Plaintiff's
                                            ) Complaint]
24  _____)

25

26

27

28                                1

1        Defendants Mortgage Investors Group, a general partnership, and Mortgage Investors Group,

2    Inc., hereby submit a list of cases, with copies attached, cited to Westlaw in Defendants' Notice of

3    Motion and Motion to Dismiss Plaintiff's Complaint, filed concurrently herewith.

4        A.    *Barbera v. WMC Mortgage Corp.*, No. C 04-3738 SBA; 2006 WL 167632 (N.D.

5    Cal.)(January 19, 2006) – attached as Exhibit A.

6        B.    *Stetler v. Greenpoint Mortgage Funding, Inc.*, No. 1:07cv0123 DLB; 2008 WL

7    192405 (E.D.Cal.)(January 23, 2008) – attached as Exhibit B.

8        C.    *Harpeneau v. Massachusetts Mut. Life Ins. Co.*; No. C-96-4619 MHP; 1998 WL

9    30056 (N.D.Cal.)(January 5, 1998) – attached as Exhibit C.

10

11    Dated: March 28, 2008                PFEIFER & REYNOLDS, LLP

12

13                        By:     /s/ Roland P. Reynolds
                            ROLAND P. REYNOLDS, Esq.

14                                Attorneys for Defendants MORTGAGE
                            INVESTORS GROUP, INC. and MORTGAGE

15                                INVESTORS GROUP

16

17

18

19

20

21

22

23

24

25

26

27

28                            2

# EXHIBIT A

Not Reported in F.Supp.2d                                                                                                Page 1
Not Reported in F.Supp.2d, 2006 WL 167632 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

**C**Barbera v. WMC Mortg. Corp.
N.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Patricia BARBERA, Plaintiff,
v.
WMC MORTGAGE CORP., et al., Defendants.
**No. C 04-3738 SBA.**

Jan. 19, 2006.

Patricia C. Barbera, Novato, CA, pro se.
Michael J. Agoglia, Stephen E. Paffrath, Morrison &
Foerster LLP, San Francisco, CA, Daniel A. Garner,
San Rafael, CA, for Defendants.

ORDER

SAUNDRA BROWN ARMSTRONG, J.

[Docket No. 111]

*1 This matter is before the Court on Defendants'
WMC Mortgage Corp., WMC Finance Co., and
WMCDirect (collectively "Defendants") motion to
dismiss Plaintiff Patricia Barbera's ("Plaintiff")
Second Amended Complaint ("SAC") for failure to
state a claim upon which relief can be granted.
Having read and considered the arguments presented
by the parties in the papers submitted to the Court,
the Court finds this matter appropriate for resolution
without a hearing. The Court hereby GRANTS
Defendants' motion to dismiss. Plaintiff's third, fourth
and fifth claims are DISMISSED WITH
PREJUDICE. The case is REMANDED to the
Superior Court of the State of California in and for
the County of San Francisco.

*BACKGROUND*

A. *Factual Background*[FN1]

> FN1. The following facts are taken from
> Plaintiff's SAC.

1. The Parties

Plaintiff is a 73-year old woman residing at all
material times in the County of Marin, California.

Defendant WMC Mortgage Corp. ("WMC") is an
entity formed in part by Defendant Apollo
Management L.P. WMC is in the business of making
subprime loans on residential property and also acts
as the administrator for those loans. Defendant
WMCDirect, owned and operated by WMC, is an
online nationwide business services website for
mortgage brokers. SAC ¶ 3. On June 14, 2004,
Defendant GE Consumer Finance Co., the consumer
lending unit of the General Electric Company,
purchased Defendant WMC Finance Co., including
Defendants WMC and WMCDirect, from affiliates of
Apollo Management L.P. SAC ¶ 4.

2. Allegations

In June of 1997, Plaintiff was in a "desperate
financial situation" and obtained a loan from WMC
for $322,500. SAC ¶ 13. On June 12, 1997, Plaintiff
executed the loan documents, at which time
"defendants failed to provide to Plaintiff two written
notices of Plaintiff's right to rescind within three days
of closing, and defendants failed to prepare and
deliver accurate disclosures that were mandated"
under the Truth in Lending Act, 15U.S.C. section
1601*et seq.* SAC ¶ 14.

On May 19, 1998, WMC notified Plaintiff that it had
not received proof of her renewal of the hazard
insurance policy on Plaintiff's home. SAC ¶ 15.
Despite numerous telephone calls from Plaintiff to
WMC, and verification provided to WMC by
Plaintiff's insurance company that a copy of
Plaintiff's insurance policy had been mailed to WMC,
WMC "force-place[d] a substitute policy from
another hazard insurance company at Plaintiff's
expense."*Id.* This new policy had a premium of
$2,242, nearly three times the annual premium of
Plaintiff's policy. *Id.*

In January of 1999, Plaintiff received a letter from
WMC stating that WMC had received confirmation
of Plaintiff's hazard insurance coverage and that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 167632 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

WMC had cancelled both the force-placed insurance and its charge to Plaintiff for that policy. *Id.* ¶ 16.However, WMC in fact did not cancel the $2,242 charge to Plaintiff's account and continued to impose an annual charge on Plaintiff's account for this hazard insurance. *Id.* ¶ 17.

**\*2** On August 19, 1999, WMC served on Plaintiff a ten-day default notice, listing the amount alleged due on Plaintiff's mortgage, but, according to Plaintiff, the listed amounts due were false. *Id.* ¶ 18.On November 5, 1999, using these excessive amounts as a pretext, WMC and its foreclosure agent, Millennium Foreclosure Services, LLC ("Millennium"),[FN2] served Plaintiff with a notice of default in the amount of $42,114.79. *Id.* On December 4, 1999, Plaintiff sent a detailed letter to WMC and Millennium, which constituted a "qualified written request" within the meaning of Real Estate Settlement Procedures Act ("RESPA") 12 U.S.C. section 2605(e), whereby she denied owing the amount shown in the default notice and renewed her previous oral requests to WMC for an accurate accounting. *Id.* ¶ 19.Plaintiff alleges WMC violated RESPA beginning in June of 1999 through March 1, 2002 by failing to respond to Plaintiff's oral requests for an accounting, and failing to acknowledge or to respond within the statutory time limits to Plaintiff's "qualified written request." [FN3]*Id.* ¶ 21.Furthermore, WMC continued to bill Plaintiff for improper charges and began to carry out a foreclosure sale of Plaintiff's home based upon these improper charges. *Id.*

> FN2. Millennium is not a party in this action.

> FN3.12 U.S.C. section 2605(e) of RESPA states a loan servicer shall provide a written response acknowledging receipt of the "qualified written request" within 20 days, and shall respond to such a request within 60 days, excluding legal public holidays, Saturdays, and Sundays. *See*12 U.S.C. § 2605(e); SAC ¶ 20.

On February 11, 2000, Plaintiff received from Millennium a Notice of Trustee's sale, recorded on February 7, 2000 citing a sale date of March 2, 2000 in the amount of $372,316.39. *Id.* ¶ 23.

On February 27, 2000, Plaintiff sent via facsimile to

WMC a copy of a telegram informing WMC that it had failed to respond to Plaintiff's previous letters, had failed to provide an accurate accounting, and had violated various laws and regulations. *Id.* ¶ 24.On March 1, 2000, WMC supplied Plaintiff with a statement of history of payments on the loan, but Plaintiff contends the statement was incomprehensible. *Id.* ¶ 25.

On March 2, 2000, Plaintiff notified WMC that she had filed a Chapter 13 bankruptcy petition and verified that the foreclosure had been cancelled.*Id.* ¶ 26.On April 11, 2000, Plaintiff asserts that, in violation of the automatic bankruptcy stay, WMC filed a Notice of Trustee's Sale scheduled for May 10, 2000. *Id.*[FN4]

> FN4. Plaintiff alleges additional facts raised for the first time in her opposition to Defendants' motion. Specifically, Plaintiff alleges: (1) Defendants "postdated receipt of payments, to make it appear that they were delinquent and late charges are applied in addition to other obtuse designations" (Pl. Opp. filed Oct. 11, 2005, ¶ 5); (2) Defendants "misapplied the extra which I included with my payments"(*Id.* ¶ 7); (3) Defendants "had [Plaintiff's] bankruptcy stay lifted by use of false figures"(*Id.* ¶ 8); (4) "on adjustable interest rate notices, [Defendants] failed to include: index used, index rate, interest rate, (current and projected), and margin applied"(*Id.* ¶ 10); (5) Defendants harassed Plaintiff with automatic message telephone calls (*Id.* ¶ 11); (6) Defendants refused to provide Plaintiff with information concerning the amount due under her loan (*Id.* ¶ 12); (7) on February 24, 2000, Plaintiff's attorney "faxed a factual protest and 'let's talk' letter" to Defendants regarding the February 11, 2000 Notice of Trustee's Sale, to which there was no response (*Id.* ¶ 19); (8) on March 2, 2000 Plaintiff was informed by her attorney that her attorney had spoken with a representative of Defendants who stated "the total arrears is $68,811.61, which includes an advance for homeowners insurance in the amount of $7,411.04 and foreclosures fees of $3,403.29"(*Id.* ¶ 21); (9) in May 2000 WMC "reported to the Credit Bureaus that

Not Reported in F.Supp.2d                                                                                                          Page 3
Not Reported in F.Supp.2d, 2006 WL 167632 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

[Plaintiff] was delinquent in the amount of $72,050"(*Id.* ¶ 26); (10) on December 15, 2000, Plaintiff sent WMC "a one line notice of rescission taken verbatim from the unexecuted form which [she] had received, 'I wish to cancel' "(*Id.* ¶ 29); (11) On January 5, 2001, Plaintiff received a letter dated January 2, 2001, from WMC Senior Vice President & General Counsel, Michael L. Mayer, which included an executed Notice of Right to Cancel and informed Plaintiff that her cancellation notice was "invalid and of no legal effect."(*Id.* ¶ 30).

None of the above facts are alleged in Plaintiff's SAC but are raised for the first time in her opposition. "It is axiomatic that the complaint may not be amended by briefs in opposition to a motion to dismiss."*Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir.1984).* That Plaintiff is proceeding *in pro per* does not render the rules of the Court inapplicable. *See King v. Atiyeh, 814 F.2d 565, 567 (9th Cir.1987)* (Pro per litigants must follow the same procedural rules as represented parties.) Consequently, the Court shall limit its review to those facts properly alleged in the SAC, and not those newly raised in Plaintiff's opposition.

B. *Procedural History*

Plaintiff filed the initial complaint in this case on July 23, 2004 in San Francisco Superior Court against WMC, WMC Finance Co., Apollo Management L.P., WMCDirect, GE Consumer Finance, Fairbanks Capital Corp., Fairbanks Capital Holding Corp., and California Land Title Company of Marin ("Cal Land"). On September 3, 2004, the action was removed to this Court. On January 7, 2005, after several stipulated extensions of time to respond to the complaint, Cal Land filed an Answer to the Complaint.

On January 10, 2005, then defendants Fairbanks Capital Corporation and Fairbanks Capital Holding Corporation (collectively "Fairbanks") filed a motion for summary judgment, in which they claimed Plaintiff's suit was barred under the principles of res judicata and release because Plaintiff was a member of a nationwide class action, which challenged the same conduct, and which was subsequently settled. Because Plaintiff did not dispute that she was a member of the prior class action against Fairbanks,

which involved identical claims and ended in a final judgment on the merits, by Order dated March 7, 2005, the Court granted Fairbanks' motion for summary judgment, finding that Plaintiff's claims against Fairbanks were barred by the doctrines of res judicata and release [docket no. 71.]

*3 On March 15, 2005, Plaintiff filed a First Amended Complaint ("FAC"). The FAC included additional allegations against Defendant WMC, an additional cause of action for an accounting against WMC and Fairbanks, named Cal Land in the third cause of action for violations of, *inter alia,* the Truth in Lending Act, and added two additional causes of action against Cal Land for breach of fiduciary duty and negligence. On March 21, 2005, Fairbanks filed a motion for entry of final judgment pursuant to Federal Rule of Civil Procedure 54. On April 12, 2005, Plaintiff filed an opposition to Fairbanks' motion, and also filed a motion for leave to amend the FAC. In her request for leave to amend the FAC, Plaintiff sought to add new allegations against Fairbanks and the other defendants. On May 26, 2005, the Court denied Plaintiff's Motion for Leave to Amend the FAC, struck those portions of the FAC that added allegations against Fairbanks and Cal Land, and granted Fairbanks' motion for entry of final judgment [docket no. 96.] Plaintiff was ordered to file a Second Amended Complaint that removed the stricken allegations.

On June 1, 2005, Plaintiff substituted herself as counsel in place of her previously retained counsel [docket no. 97.]

Plaintiff filed the SAC on August 10, 2005 [docket no. 108.] On August 25, 2005, Defendants filed the instant motion to dismiss. Defendants also filed a Request for Judicial Notice.[FN5]Plaintiff filed an opposition with this Court on October 11, 2005.[FN6]

> FN5. In Defendants' Request for Judicial Notice, Defendants request that the Court take judicial notice of exhibits: (A) Plaintiff's complaint on file in state court, *Barbera v. WMC Mortgage. Corp.,* San Francisco Superior Court Civil Action No. 322066, filed June 11, 2001; (B) this Court's Order dated March 1, 2005, Granting Fairbanks' Motion for Summary Judgment; (C) this Court's Order dated May 26, 2005,

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 167632 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Granting Fairbanks' Motion for Entry of Final Judgment; (D-E) Copies of Assembly Bill No. 292 (1970 Reg. Sess. (Jan. 21, 1970)) and Assembly Bill No. 292 (1970)) (as amended Aug. 7, 1970); (F) Notice of Entry of Order Granting Defendant WMC's Motions *In Limine* Nos. 1, 2 & 4, Denying WMC's Motion *In Limine* 3, and Denying Plaintiff's Motion for Leave to Amend, entered by Judge Busch in Plaintiff's action in San Francisco Superior Court; (G) text of Proposition 2; and (H) California Department of Real Estate website printout.

Federal Rule of Evidence 201 authorizes the court to judicially notice only those "adjudicative facts" that are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by sources whose accuracy cannot reasonably be questioned."Fed.R.Evid. 201(b)."Adjudicative facts are usually those facts that are in issue in a particular case."*Korematsu v. United States,* 584 F.Supp. 1406, 1414 (N.D.Cal.1984) (Patel, J.).

With regard to Exhibit A, Defendants do not make clear to this Court for what purpose they are requesting this Court take judicial notice of Plaintiff's state court complaint. Defendants simply state Plaintiff has filed, with and without counsel, several civil actions against WMC and the parties have conducted considerable discovery since the first action was filed in June of 2001. Defs. Mot. 2:14-20. The existence of Plaintiff's state court complaint does not concern any "facts in issue" in this case, nor is it relevant to the instant motion to dismiss. Consequently, the request is DENIED as to Exhibit A.

As the March 1, 2005 and May 26, 2005 Orders are part of the Court's own docket in this matter, a formal request for judicial notice is unnecessary.

Defendants cite to Exhibits D, E and F in support of their argument that Plaintiff's Consumer Legal Remedies Act ("CLRA") claim must fail because credit transactions do not fall within CLRA's purview. Defs. Mot 13:5-24. The CLRA is a California statute which was irrelevant to the Court's analysis and disposition of Plaintiff's federal claims. Therefore, the request for judicial notice is DENIED as to Exhibits D, E & F.

Finally, Defendant cites to Exhibits G & H in support of their argument that Plaintiff's claim of usury must fail as California has exempted from the usury laws licensed real estate brokers by the State of California, and, Defendants argue, WMC was a licensed real estate broker at the time the loan was made. The usury cause of action is based on state law. Again, given the Court's focus upon Plaintiff's federal claims, these exhibits are irrelevant. For these reasons, the request for judicial notice is DENIED as to Exhibits G & H.

FN6. Defendants contend Plaintiff served upon them a different version of her opposition brief than the one she filed with this Court. Defendants attached the version of the opposition they received as Exhibit A to the Declaration of Seta Arabian in Support of Defendants' Reply ("Arabian Decl.") In the version filed with the Court on October 11, 2005, in the "Foreclosure-bankruptcy issues" section, Plaintiff includes two new paragraphs that are not present in the copy faxed to the Defendants and attached to the Arabian Decl. These new sections concern Plaintiff's research into WMC's past and current litigation, and what Plaintiff believes to be the relevant California laws that have been violated by the conduct of Defendants alleged in the SAC. Additionally, in the opposition filed with the Court but not in the version faxed to Defendants, Plaintiff attached copies of: 1) an article entitled "Loans Cost Minorities More" by David Olinger and Jeffrey A. Roberts, Denver Post Staff Writers, Feb. 27, 2001; 2) a transcript of the testimony of Professor Cathy Lesser Mansfield before the Committee on Banking and Financial Services, United States House of Representatives, May 24, 2000, at the Rayburn House Office Building; and 3) copies of statements received by Plaintiff from WMC and Select Portfolio Servicing, Inc.

These additional paragraphs and material were the only differences between the briefs received by Defendants and filed with the Court and were not germane to the Court's analysis of Defendants' motion to dismiss as they did not address the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 167632 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

substantive issues raised by Defendants' in their motion. Consequently, for purposes of deciding this motion, the Court restricted its review to the opposition served upon Defendants.

*LEGAL STANDARD*

A. *Rule 12(b)(6)*

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss may be granted if it appears beyond a doubt that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). For purposes of such a motion, the complaint is construed in a light most favorable to the plaintiff and all properly pleaded factual allegations are taken as true.*Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Everett and Jennings, Inc. v. American Motorists Ins. Co.,* 23 F.3d 226, 228 (9th Cir.1994). All reasonable inferences are to be drawn in favor of the plaintiff. *Jacobson v. Hughes Aircraft,* 105 F.3d 1288, 1296 (9th Cir.1997).

When a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."*Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986). The court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment."*Moore v. Kayport Package Express,* 885 F.2d 531, 538 (9th Cir.1989). Of these factors, prejudice to the opposing party is the most important. *See Jackson v. Bank of Hawaii,* 902 F.2d 1385, 1387 (9th Cir.1990) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330-31, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)). Leave to amend is properly denied "where the amendment would be futile."*DeSoto Yellow Freight Sys.,* 957 F.2d 655, 658 (9th Cir.1992).

*ANALYSIS*

*4 The SAC asserts the following federal claims against WMC: (1) violation of the Truth in Lending

Act ("TILA"), 15 U.S.C. §§ 1601*et seq.,*; (2) violation of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq.;* and (3) violation of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692*et seq.* ("FDCA").

A. *Plaintiff's First Federal Claim-Violation of the Truth In Lending Act*

1. *The Statutes*

In her third cause of action Plaintiff alleges violation of the Truth in Lending Act ("TILA"), HOEPA, and Regulation Z.[FN7] SAC, ¶ ¶ 41-43. 15 U.S.C. § 1635(a), the provision of TILA upon which Plaintiff relies, states in full:

> FN7. The acronym "HOEPA" stands for "Home Ownership and Equity Protection Act" of 1994. HOEPA, which took effect on October 1, 1995, provides special protections for consumers who obtain high-rate or high-fee loans secured by their principal dwellings by requiring creditors to provide certain material information at least three days before the loan is consummated, prohibiting the use of certain loan terms, and barring specified practices.

Disclosure of obligor's right to rescind. Except as otherwise provided in this section, in the case of any consumer credit transaction (including opening or increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, *the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter,* [15 U.S.C. §§ 1601 et seq.] whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 6
Not Reported in F.Supp.2d, 2006 WL 167632 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

15 U.S.C. § 1635(a) (emphasis added).15 U.S.C. § 1639(a)(1), the provision of HOEPA upon which Plaintiff relies, states in relevant part:

Specific disclosures. In addition to other disclosures required under this subchapter [15 U.S.C. §§ 1601 et seq.], for each mortgage referred to in section 1602(aa) of this title, the creditor shall provide ... disclosures in conspicuous type size ...

15 U.S.C. § 1639(a)(1). Finally, Regulation Z requires a "business which offers or extends credit" to make certain disclosures:Purpose. The purpose of this regulation is to promote the informed use of consumer credit by requiring disclosures about its terms and cost. The regulation also gives consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling, regulates certain credit card practices, and provides a means for fair and timely resolution of credit billing disputes.

12 C.F.R. § 226.1(b) & (c).

2. *Analysis*

**\*5** Plaintiff seeks both rescission of her loan and damages. 15 U.S.C. § 1640(e). Plaintiff's right of rescission is governed by 15 U.S.C. § 1635(f). This section provides, in relevant part:

An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to the obligor.

15 U.S.C. § 1635(f). Civil penalties under TILA and HOEPA are subject to a one-year statute of limitations. Plaintiff's loan closed in June of 1997. Plaintiff filed suit in state court on July 23, 2004, which was removed to this Court in September of 2004, over seven years later. Consequently, both Plaintiff's claim for damages, as well as her right to

rescind, are time-barred by these sections.

Plaintiff's SAC conclusorily asserts "[a]ny statute of limitations applicable to these violations has been tolled under the doctrine of what is called equitable tolling."SAC ¶ 42.[FN8]Plaintiff's defense to the statute of limitations is unpersuasive. "The equitable tolling doctrine has been applied by the Supreme Court in certain circumstances, [ ] but it has been applied sparingly."*Scholar v. Pacific Bell*, 963 F.2d 264, 268 (9th Cir.1992) (citing *Irwin v. Veterans Admin.*, 498 U.S. 89, 111 S.Ct. 453, 457-58, 112 L.Ed.2d 435 (1990))."Courts have been generally unforgiving, however, when a late filing is due to claimant's failure 'to exercise due diligence in preserving his legal rights.'"*Id.* (citing *Irwin*, 111 S.Ct. at 458)."Equitable tolling focuses primarily on the plaintiff's excusable ignorance of the limitations period."*Lehman v. United States*, 154 F.3d 1010, 1016 (9th Cir.1998).

> **FN8.** In her opposition she states 11 U.S.C. § 108 extends the statute of limitations for commencing or continuing an action by the debtor. However, as Plaintiff concedes, that statute is available for trustees suing to protect a bankruptcy estate. Plaintiff does not assert she is a trustee.

Additionally, Plaintiff argues that the force-placed insurance charge "could constitute a new transaction which would require new disclosures and a new consummation date."Pl. Opp. Sec. IV ¶ 6. Plaintiff does not indicate when that consummation date would have occurred, either the date of the charge or the date Plaintiff discovered the charge on her account. Construing the facts in the most favorable light to Plaintiff, the latest date for which she could allege the force-placed insurance charge constituted a new transaction would be the date she learned of it, March 2, 2000. That was over four years prior to the filing of the instant complaint in state court. Therefore, even if Plaintiff were able to argue that imposition of the force-placed insurance charge constitutes a new transaction requiring new disclosures and a new consummation date, she is nevertheless barred by the statute of limitations.

Here, Plaintiff's SAC fails to plead such facts. As a preliminary matter, the factual predicate for her claim that WMC failed to provide her with certain

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 167632 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

documents should have been known to her in 1997, well before July 2004. In her opposition, Plaintiff states that she signed the "Notice of Right to Cancel" on June 12, 1997 and acknowledged, by her signature, receipt of two copies of the this notice. Pl. Opp. ¶ 1. This acknowledgment is evidence that Plaintiff received two copies of this notice, or, at a minimum, was aware that she was entitled to two copies of this notice at the time of the loan closing. Plaintiff alleges that she was not given any documents on June 12, 1997, contrary to her signed acknowledgment, but concedes that when she did receive her copy of her loan documents on June 19, 1997, she "put it away without inspecting it," and years passed before she inspected what those documents contained. *Id.* Plaintiff's failure to inspect the documents, especially in light of her signed acknowledgment, does not constitute "excusable ignorance of the limitations period" justifying imposition of equitable tolling. Thus, this claim is barred by the statute of limitations and is DISMISSED with prejudice.

### B. *Plaintiff's Second Federal Claim-Violation of the Real Estate Settlement Procedures Act*

*6 In her fourth cause of action, Plaintiff alleges the following acts by WMC violated the Real Estate Settlement Procedures Act ("RESPA"): "kickbacks, referral fees, unnecessary escrow accounts for taxes and hazard insurance, improper or inaccurate reporting to credit bureaus, failure to disclose the transfer of the servicing of Plaintiff's loan account, failure to respond to acknowledge 'payments from a borrower' and to acknowledge 'making the payments of principal and interest as may be required pursuant to the terms of the loan,' and other home mortgage lending practices that tend to cause excessive borrowing costs for home loan borrowers."SAC ¶ 47. Plaintiff additionally alleges that WMC violated RESPA "[b]eginning June 1999, through March 1, 2002" by failing to respond to Plaintiff's oral requests and failing to acknowledge or respond to Plaintiff's qualified written requests." SAC ¶ 21. Defendants respond that this claim is time barred.

The applicable statutes of limitations for claims brought pursuant to RESPA are found in 12 U.S.C. section 2614. "Any action pursuant to the provisions of section 2605, 2607, or 2608 of this title may be brought in the United States district court within 3

years in the case of a violation of section 2605 of this title and 1 year in the case of a violation of section 2607 or 2608 of this title from the date of the occurrence of the violation."*See*12 U.S.C. § 2614.

### 1. *Section 2607*

Plaintiff's allegations of kickbacks and referral fees are covered under section 2607(a).[FN9] By its terms, section 2607(a) prohibits the giving or receipt of fees or kickbacks "incident to or part of a real estate settlement service involving a federally related mortgage loan."*See*12 U.S.C. § 2607(a). "Settlement services" is defined as any "service provided in connection with a real estate settlement."*See*12 U.S.C. § 2602(3). No where in Plaintiff's SAC does she allege where, when, how or from whom WMC received kickbacks or referral fees. Rather it is a bald assertion unsupported by facts. The facts alleged by Plaintiff fail to demonstrate the inapplicability of the statute of limitations. Plaintiff received her mortgage loan in June of 1997.Section 2614 required her to bring her claim alleging kickbacks or referral fees within one year, by June of 1998. This claim is time barred and is therefore DISMISSED with prejudice.

> FN9. This provision states: "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."12 U.S.C. § 2607(a).

### 2. *Section 2605*

The remaining RESPA allegations are subject to the 3-year statute of limitations as the conduct she alleges by WMC concerns "servicing of mortgage loans and administration of escrow accounts."*See*12 U.S.C. § 2605. [FN10]

> FN10. The other statute referenced in section 2614, section 2608, is inapplicable to this case. Section 2608 states: "No seller of property that will be purchased with the assistance of a federally related mortgage loan shall require directly or indirectly, as a condition to selling the property, that title insurance covering the property be

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 167632 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

purchased by the buyer from any particular title company."Plaintiff's complaint does not involve the sale of her home or allegations that she was required to purchase title insurance from a particular company.

Plaintiff's allegations are inconsistent and insufficient to overcome the time bar for several reasons. First, the latest date for which Plaintiff alleges violative conduct on the part of WMC is April 11, 2000, over four years prior to the filing the instant complaint. Thus, her claims are time-barred. Second, Plaintiff's loan was transferred to another entity for servicing in July of 2000; Plaintiff does not explain, in her SAC or opposition, how WMC violated RESPA through March 1, 2002, *after* the loan had been transferred. Third, RESPA imposes obligations upon a party upon written requests, not oral. *See* 12 U.S.C. § 2605(e)(1)(B).[FN11] The only qualified written request Plaintiff asserts in her SAC occurred on December 4, 1999, more than three years prior to the filing of the instant complaint. Fourth, even assuming Plaintiff's delayed discovery of the transfer of her loan in September, 2003 was reasonable such that the doctrine of equitable tolling applied, Plaintiff learned of the transfer ten months prior to the filing of this suit. *See Santa Maria v. Pac. Bell,* 202 F.3d 1170, 1178 (9th Cir.2000) ("[E]quitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs.") Plaintiff does not provide any justification for the delay between her discovery of the transfer, and the filing of the instant complaint. Therefore, she has not proven she is entitled to invoke the doctrine of equitable tolling.

> FN11.12 U.S.C. 2605(e)(1)(B) states in relevant part: "For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower."

*7 For all these reasons, this claim is DISMISSED with prejudice.

C. *Plaintiff's Third Federal Claim-Violation of the Fair Debt Collection Practices Act*

In her fifth cause of action, Plaintiff alleges WMC's acts and conduct violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692*et seq.* SAC ¶ 51. Plaintiff generally alleges all of the acts and conduct by WMC violate the FDCPA, including "the improper or inaccurate reports to credit borrowers" by WMC.[FN12]*Id.*Here, again, WMC responds that Plaintiff's claim is time-barred. Additionally, even if the claim were not time-barred, WMC argues it is misplaced since the FDCPA only prohibits certain activities of debt collectors, not creditors such as WMC.

> FN12. Plaintiff references 12 U.S.C. § 2605(3)(d) with respect to her allegation of "improper or inaccurate reports to credit borrowers."SAC ¶ 51. There is no 12 U.S.C. § 2605(3)(d). In this same paragraph of the SAC, Plaintiff asserts a "loan servicer may not provide information regarding any overdue payment to any consumer reporting agency."*Id.* The SAC does not allege when, to whom, nor what information WMC provided to any consumer reporting agency regarding any overdue payments. Thus the SAC is completely devoid of facts to support these allegations.

1. *Statute of Limitations*

"An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d). As with her other allegations, Plaintiff merely asserts that the violations giving rise to the claim "continue through the present time." SAC ¶ 51. She does not offer any evidence of the nature of the acts of WMC which form the basis of the assertion, nor when they occurred. Moreover, given WMC's transfer of the servicing of Plaintiff's loan to another party in 2000, the Court is unaware of any facts Plaintiff could allege that would fall within the year prior to her

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 167632 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

filing the instant complaint.

2. *FDCPA Applies Only to "Debt Collectors"*

Alternatively, WMC argues that even were this cause of action not time barred by the statute of limitations, Plaintiff's claim still fails as the FDCPA is inapplicable to parties collecting their own debt.

The FDCPA regulates debt collectors rather than creditors. *Thomas v. Law Firm of Simpson & Cyback,* 392 F.3d 914, 916-17 (7th Cir.2004). The term "debt collector" means any person who "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due to *another.* "15 U.S.C. § 1692a(6) (emphasis added). The term "creditor" means "any person who offers or extends credit creating a debt or to whom a debt is owed...."15 U.S.C. 1692a(4). Furthermore, the FDCPA exempts from its definition of debt collectors, "any officer or employee of a creditor while, *in the name of the creditor,* collecting debts for such creditor."15 U.S.C. § 1692a(6)(A) (emphasis added). Because Plaintiff alleges activities by WMC regarding collection of payments owed to it under the loan, i.e., it was WMC's debt it sought to recover from Plaintiff, WMC was not a "debt collector" for purposes of the FDCPA. Thus, Plaintiff has no cognizable claim against WMC on this ground.

For these reasons, this claim is DISMISSED with prejudice.

D. *Supplemental State Causes of Action*

*8 When a case is properly removed on the basis of federal question jurisdiction, but the federal claims are subsequently eliminated from the case, the district court retains the discretion to remand the action to state court. *See Carnegie-Mellon Univ. v. Cahill,* 484 U.S. 343, 348, 108 S.Ct. 614, 98 L.Ed.2d 720 (9th Cir.1991). In each case, and at every stage of the litigation, the federal court must consider and weigh the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case involving pendent state-law claims. *Id.* at 349.When the balance of the relevant factors indicates that a case properly belongs in state court, such as when the federal claims have been resolved in the early stages of the litigation, the district court may decline the exercise of jurisdiction

and remand the action to state court. *Id.* As the United States Supreme Court recognized in *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the district court's jurisdiction over state law claims "need not be exercised in every case in which it is found to exist.... Needless decisions of state law should be avoided as a matter of comity[.]"*Id.*

Plaintiff's third, fourth and fifth claims are the only claims alleged over which the Court has original jurisdiction. Those claims have been dismissed with prejudice. Moreover, since this litigation is in its initial stage, the concerns of "economy, convenience, fairness and comity" weigh in favor of declining to retain jurisdiction. *See Imagineering, Inc. v. Kiewit Pacific Co.,* 976 F.2d 1303, 1309 (9th Cir.1992), *cert. denied,*507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993). Therefore, the Court exercises its discretion and declines to assert supplemental jurisdiction over the remaining state law claims.

*CONCLUSION*

For the reasons stated above,

IT IS HEREBY ORDERED THAT Defendants' motion to dismiss is GRANTED. Plaintiff's third, fourth and fifth claims are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED THAT the case is REMANDED to the Superior Court of the State of California in and for the County of San Francisco. The clerk is directed to terminate any pending matters and to close the file.

IT IS SO ORDERED.

IT IS SO ORDERED.

N.D.Cal.,2006.
Barbera v. WMC Mortg. Corp.
Not Reported in F.Supp.2d, 2006 WL 167632 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Slip Copy                                                                Page 1
Slip Copy, 2008 WL 192405 (E.D.Cal.)
**(Cite as: Slip Copy)**

**H**Stetler v. Greenpoint Mortg. Funding Inc.
E.D.Cal.,2008.
Only the Westlaw citation is currently available.
United States District Court,E.D. California.
Donell Glen STETLER, Plaintiff,
v.
GREENPOINT MORTGAGE FUNDING INC.,
Patrick Mitchell, Defendants.
**No. 1:07cv0123 DLB.**

Jan. 23, 2008.

Randall Martin Rumph, Law Office of Randy
Rumph, Bakersfield, CA, for Plaintiff.
Gary L. Huss, Wild Carter and Tipton, Fresno, CA,
Ronald Marc Arlas, Arlas & Smithton, Novato, CA,
for Defendants.

ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

DENNIS L. BECK, United States Magistrate Judge.
*1 Defendant Patrick Mitchell ("Defendant
Mitchell") filed the instant motion for summary
judgment on November 28, 2007. The matter came
on for hearing on January 11, 2008, and the parties
agreed to submit the motion on the briefing before
the Court. Gary Huss appeared on behalf of
Defendant Mitchell. Randy Rumph appeared on
behalf of Plaintiff Donell Glen Stetler ("Plaintiff").
Ron Arlas appeared on behalf of Defendant
Greenpoint Mortgage Funding, Inc. ("Greenpoint").

***BACKGROUND***

Plaintiff filed this action on January 22, 2007. He
names Greenpoint and Defendant Mitchell as
Defendants (collectively, "Defendants") and alleges
causes of action pursuant to the Real Estate
Settlement Procedure Act ("REPSA"), *12 U.S.C. §
2601,* et seq., and California law.

Plaintiff filed a first amended complaint on March
28, 2007. Pursuant to this Court's September 11,
2007, order, Plaintiff filed a second amended
complaint ("SAC") that provided a more definite
statement as to the First Cause of Action. According

to the SAC, the transactions at issue took place in
Kern County, and the loans are secured by property
located in Kern County. Plaintiff borrowed funds
from Greenpoint on January 26, 2006, pursuant to
two loan agreements secured by residential real
property.

In the First Cause of Action for violation of REPSA's
Antikickback provision, *12 U.S.C. § 2607,* Plaintiff
alleges that Greenpoint paid Defendant Mitchell "a
fee, kickback or thing of value related to making the
loans" in the form of a yield spread premium
("YSP") [FN1] in the amount of $3,120.00 on one loan
and $195.00 on the other. In the Second Cause of
Action, Plaintiff alleges that Defendant Mitchell
breached his fiduciary duties by failing to inform
Plaintiff that he was receiving money from
Greenpoint, failing to inform Plaintiff that the loan
was a reverse amortization loan or that the payments
increased, and by informing Plaintiff that the loans
were used on all his properties and that they were the
best deal for Plaintiff. In the Third Cause of Action
for constructive fraud, Plaintiff alleges that
Defendant Mitchell intentionally failed to disclose
that he was receiving funds from Greenpoint and that
the loan was a reverse amoritization loan. In the
Fourth Cause of Action for violation of the California
Unfair Trade Practices Act, Plaintiff alleges that
Defendants provided settlement statements in
violation of *12 U.S.C. § 2603* and *24 C.F.R. §
3500.7-3500.8.* Specifically, he contends that the
statements failed to disclose that Defendant Mitchell
would be receiving funds from the escrow involved
in the loans. Plaintiff seeks statutory, exemplary and
punitive damages as well as attorneys' fees and costs.

> FN1. A YSP is a fee paid by mortgage
> lenders to mortgage brokers based on the
> difference between the interest rate at which
> the broker originates the loan and the par, or
> market rate offered by the lender. *Schuetz v.
> Banc One Mortg. Corp., 292 F.3d 1004 (9th
> Cir.2002).*

Defendant Mitchell filed his answer on September
17, 2007. Greenpoint filed its answer on October 2,
2007.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

On November 28, 2007, Defendant Mitchell filed the instant motion for summary judgment. Plaintiff filed his opposition on December 28, 2007, and Defendant Mitchell filed his reply on January 7, 2008.

### UNDISPUTED MATERIAL FACTS

*2 The Court finds that the following facts are undisputed. Defendant Mitchell conducted business as a loan broker in Kern County in 2006. Declaration of Patrick Mitchell ("Mitchell Dec."), ¶ 2.

According to Imogene Doerfler, Plaintiff's mother, she suggested that Plaintiff use his good credit to purchase a home in 2004, and then allow his brother to live in the home and make payments. Declaration of Imogene Doerfler ("Doerfler Dec."), ¶ 2. She used Defendant Mitchell to find a mortgage for the purchase and was actively involved with the process as Plaintiff travels with his job. Doerfler Dec., ¶ 3. In 2005, the parties decided to refinance the home.

Plaintiff entered into a Mortgage Loan Origination Agreement ("Agreement") with Defendant Mitchell. Mitchell Dec., ¶ 3; Ex. B, attached to Motion. The Agreement is signed by Plaintiff and dated December 5, 2005. The Agreement states that Defendant Mitchell is an independent contractor and not Plaintiff's agent, and explains that Defendant Mitchell will be compensated by the lender or borrower, or a combination of both. Ex. B.

In processing the loan,[FN2] Defendant Mitchell provided services to Plaintiff and the lender, including analyzing Plaintiff's income and debt, explaining the loan products and process to Plaintiff and his mother, collecting Plaintiff's financial information, obtaining a credit report, obtaining an appraisal, and preparing a loan package for Plaintiff and submitting it to Greenpoint. Mitchell Dec., ¶ 6; Deposition of Patrick Mitchell ("Mitchell Dep."), at 56-64.

> FN2. There were two components to Plaintiff's loan product. The first was a traditional loan in the amount of $312,000, and secured by a Deed of Trust on the property. The second was Home Equity Line of Credit ("HELOC") in the amount of $39,000, and secured by a Second Deed of Trust on the property. The YSP tied to the

traditional loan was in the amount of $3,120.00, which represents one percent of the loan amount. The YSP tied to the HELOC was $195.00, which represents .05 percent of the HELOC.

An Estimated Closing Statement that identified all estimated settlement charges was provided to Plaintiff. Ex. G, attached to Motion. Specifically, the Estimated Closing Statement dated January 19, 2006, and signed by Plaintiff, discloses YSPs in the amounts of $3,120.00 and $195.00. Ex. G.

The closing documents were signed by Plaintiff on January 20, 2006, at his home in Colorado.[FN3] Ex. H, attached to Motion. Plaintiff admits that he reviewed the documents before signing them, and admits that he could have taken more time to review them if he wanted to do so. Deposition of Donell Glenn Stetler ("Plaintiff's Dep."), at 34, 49-53.

> FN3. There appears to be a disagreement as to the closing date. Plaintiff believes that the loan closed on January 20, 2006, the day he signed the documents at his home in Colorado. Defendant Mitchell states that the loan closed on January 27, 2006. Although Plaintiff may have signed the documents on January 20, it is possible that the loan did not actually close until January 26 or 27. Both Estimated Closing Statements cite a closing date of January 27, 2006. Ex. G. Similarly, the Lender's Closing Instructions cite an estimated closing date of January 21, 2006. Ex. J. The final Settlement Statement (HUD-1) and Final Closing Statement have a closing date of January 26, 2006. Ex. J. The actual date of closing, though, is not as relevant as Plaintiff would have this Court believe. Prior to January 20, 2006, there were numerous disclosures in the documents Plaintiff received and signed. The Court discusses this in detail throughout this opinion.

Defendant Mitchell received fees for his services as a loan broker from Greenpoint in the form of YSPs. Mitchell Dec., ¶ 11. Defendant Mitchell disclosed to Plaintiff before closing that Greenpoint was the lender and that the loan in question was a reverse amortization loan or that payments could increase.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 192405 (E.D.Cal.)
**(Cite as: Slip Copy)**

Mitchell Dec., ¶ 10. Exhibit E is a copy of the Loan Program disclosure form, sent by Defendant Mitchell and signed and returned by Plaintiff on January 20, 2006. The form explains the Adjustable Rate Mortgage as well as the negative amortization aspect of the loan. Exhibit I is the Adjustable Rate Note signed by Plaintiff (but not dated), which sets forth the interest rate (2.5 percent) as well as notice that the rate may change. It also explains that when the monthly payment is less than the interest portion of the monthly payment, the difference will be added to the unpaid principle (i.e., negative amortization).

### *DISCUSSION*

A. *Summary Judgment Standard*

**\*3** Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.*Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).*"If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the material on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production shifts and "the non moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'"*T.W. Electric Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.1987)* (quoting Fed.R.Civ.P. 56(e)). As to the specific facts offered by the nonmoving party, the court does not weigh conflicting evidence, but draws all inferences in the light most favorable to the nonmoving party. *Id. at 630-31.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).*

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.Rule 56(e); *Matsushita, 475 U.S. at 586 n. 11.* The opposing

party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); T.W. Elec. Serv., 809 F.2d at 630,* and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir.1987).*

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."*T.W. Elec. Serv., 809 F.2d at 631.* Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"*Matsushita, 475 U.S. at 587* (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The evidence of the opposing party is to be believed, *Anderson, 477 U.S. at 255,* and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita, 475 U.S. at 587* (citing *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam).* Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines, 602 F.Supp. 1224, 1244-45 (E.D.Cal.1985), aff'd, 810 F.2d 898, 902 (9th Cir.1987).*

**\*4** Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' "*Matsushita, 475 U.S. at 587* (citation omitted).

B. *Analysis*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 192405 (E.D.Cal.)
(Cite as: Slip Copy)

Page 4

Defendant Mitchell's motion for summary judgment is based on his argument that he did not have a fiduciary relationship with Plaintiff and, in any event, all required disclosures were made.

In opposition, Plaintiff argues mainly that neither he nor his mother "fully comprehended" the loan and that Defendant Mitchell did not explain the specifics to them. Even though he signed the documents, he did not read them because the "notary merely handed him documents and stated for him to 'sign here.' " Opposition, at 3; Deposition of Imogene Doerfler ("Doerfler Dep."), at 45-46, 54.[FN4]

> FN4. The Court notes that despite Ms. Doerfler's contention that they did not read the documents, Plaintiff testified that he did in fact read them. Plaintiff's Dep., at 34. Plaintiff acknowledges this discrepancy in his opposition.

1. *First Cause of Action*

In the First Cause of Action, Plaintiff alleges that Greenpoint violated REPSA's Antikickback provision, *12 U.S.C. § 2607*, by paying Defendant Mitchell "a fee, kickback or thing of value related to making the loans" in the form of YSPs.

Section 8(a) provides "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."*12 U.S.C. § 2607(a).Section 8(c)(2)* provides: "Nothing in this section shall be construed as prohibiting ... the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed ...."*12 U.S.C. § 2607(c)(2).*

Defendant Mitchell argues that summary judgment should be granted because Plaintiff alleges only a "subjective, self-serving claim that the compensation paid to Defendant Mitchell by the lender was an illegal 'kickback' under RESPA."Motion, at 7. In *Schuetz v. Banc One Mortg. Corp., 292 F.3d 1004, 1014 (9th Cir.2002)*, after reviewing HUD policy statements and cases from the Eleventh Circuit, the court determined that YSPs are not per se illegal and

that the two-prong test contained in HUD's 2001 Statement of Policy provides the appropriate standard of liability for YSPs under RESPA. "The HUD test focuses on whether compensable services of the sort identified in the 1999 Statement [FN5] are provided, and if they are, then on whether the total compensation (without regard to whether it comes from the borrower, the lender, or both) is reasonably related to the services provided."*Id. at 1013.*

> FN5. Permissible services include taking information from the borrower and filling out the application, analyzing the prospective borrower's income and debt and pre-qualifying the borrower, educating the prospective borrower in the home buying and financing process, advising the borrower about the different types of loan products available, collecting financial information, initiating/ordering verifications of employment, initiating/ordering requests for mortgage and other loan verifications, initiating/ordering appraisals, initiating/ordering inspections or engineering reports, providing disclosures (truth in lending, good faith estimate, and others) to the borrower, maintaining regular contact with the borrower, realtors and lender, and participating in the loan closing.*Schuetz, 292 F.3d at 1007, n. 1.*

Plaintiff correctly argues that whether the YSPs violated RESPA is a fact intensive inquiry, but the undisputed facts before the Court demonstrate that there has been no violation. Plaintiff's argument is based mainly on his mother's belief that Defendant Mitchell spent less than one hour on the loan because he used an application for a prior loan. Doerfler Dec., ¶ 5; Plaintiff's Dep., at 19. Having obtained a prior loan for Plaintiff, Defendant Mitchell explained at his deposition that his processor uses computer software to generate loan documents that collects and stores information to assist in generating future applications. Mitchell Dep., at 15. He testified that the loan documents referenced the prior address possibly because his processor did not update the address in the computer files. Mitchell Dep., at 55. Although his processor created the documents, Defendant Mitchell performed all the research for the loan, obtained the necessary information, opened escrow, and ensured that all escrow instructions were

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

completed. Mitchell Dep., at 56-63. When asked how much time he spent on this loan, Defendant Mitchell testified that he couldn't give an exact estimate, but that it was many hours. Mitchell Dep., at 65. He further explained that he spent much more time on this loan than most because it involved two loans and went through many revisions before the final product. Mitchell Dep., at 77-78.

*5 Plaintiff's belief that Defendant Mitchell spent less than one hour in completing his loan transaction is untenable, given Defendant Mitchell's testimony to the contrary and, more importantly, the fact that the loan in question was for a different loan product and a different property than the prior loan. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita, 475 U.S. at 587* (citation omitted). Therefore, based on the record before the Court, the YSPs were paid to Defendant Mitchell ion exchange for services actually rendered, and he is entitled to summary judgment on the first cause of action for violation of RESPA.

2. *Second Cause of Action*

In the Second Cause of Action, Plaintiff alleges that Defendant Mitchell breached his fiduciary duties by failing to inform Plaintiff that he was receiving money from Greenpoint, failing to inform Plaintiff that the loan was a reverse amortization loan or that the payments increased, and by informing Plaintiff that the loans were used on all of Defendant Mitchell's properties and that they were the best deal for Plaintiff.

Citing the Mortgage Loan Origination Agreement, Defendant Mitchell contends that no agency relationship existed and therefore, there was no fiduciary relationship. Ex. B to Motion. Indeed, the Agreement clearly states that Defendant Mitchell was acting as an independent contractor and not as an agent. It also explains that Defendant Mitchell will be receiving compensation from either the borrower or the lender, or both. Ex. B to Motion. Plaintiff signed this Agreement on December 5, 2005.

Although Plaintiff contends that this document is forged, he submits no convincing supporting evidence. He points to his mother's statement that she keeps copies of all documents and that she doesn't

have a copy of this document in her files. Plaintiff then leaps to the conclusion that it must be forged, notwithstanding the fact that the signature is unmistakably Plaintiff's. Doerfler Dec., ¶ 5. Such speculative, unsupported statements are not sufficient to render a fact disputed. Moreover, Defendant Mitchell testified at his deposition that he did not have "somebody else" sign the document. Mitchell Dep., at 43.

The Court therefore finds that Defendant Mitchell did not owe a fiduciary duty to Plaintiff. Pursuant to the terms of the Mortgage Loan Origination Agreement, he was not acting as Plaintiff's agent.

Perhaps anticipating that this Court would find no reason to doubt the validity of Exhibit B, Plaintiff attempts to establish a fiduciary duty nonetheless by relying on *Wyatt v. Union Mortgage Co., 24 Cal.3d 773, 782, 157 Cal.Rptr. 392, 598 P.2d 45 (1979)*, an action against a mortgage loan broker seeking damages for breach of duties allegedly owed to plaintiffs during the negotiation of a second mortgage loan. There, the court explained that the general principles of agency combine with statutory duties created by California Real Estate Law "to impose upon mortgage loan brokers an obligation to make a full and accurate disclosure of the terms of a loan to borrowers and to act always in the utmost good faith toward their principals."This includes a duty to disclose all material facts which might affect the principal's decision. *Id.* In *Wyatt*, the plaintiffs testified that they did not read the stack of written loan documents before signing them, but asked the broker specific questions about the interest rate, etc. In response to their questions, they received "materially misleading and incomplete information," which justified the jury's conclusion that the broker did not satisfy his fiduciary obligations of disclosure and good faith. *Id. at 783.*The court explained:
*6 Here, the record discloses that respondents were persons of modest means and limited experience in financial affairs, whose equity in their home was their principal asset. They retained a mortgage loan broker to negotiate for them highly complex loan terms and they may be assumed to have justifiably relied on the latter's expertise. Against such a backdrop, the broker's failure to disclose orally the true rate of interest, the penalty for late payments or the swollen size of the balloon payment clearly constituted breach of the broker's fiduciary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

obligations. It is noteworthy also that the provisions regarding interest rate, late charges and balloon payment were highly unfavorable to the borrower and yet the broker made no attempt to draw his clients' attention to these matters.

*Id.* at 783-784.

Neither the Court nor the parties dispute that Defendant Mitchell owed certain duties to Plaintiff. These duties, however, arise from a prohibition against making affirmative misrepresentations rather than from a duty to explain the ins and outs of each loan product. Certainly, Defendant Mitchell had a duty to exhaustively explain issues that Plaintiff now alleges he did not understand. In this regard, Plaintiff and his mother were free to ask questions, and the evidence shows that they often asked questions. Defendant Mitchell had a duty to respond to Plaintiff's inquiries with truthful, straightforward responses, and there is no evidence that he did anything to the contrary. Plaintiff's amorphous statements that Defendant Mitchell led him to believe that this was the "best" loan for him is not sufficient to overcome the lack of credible evidence of an affirmative misrepresentation.

In any event, the evidence before the Court demonstrates that the issues identified by Plaintiff were in fact disclosed. In addition to the Mortgage Loan Origination Agreement, which spelled out the relationship between the parties and explained that Defendant Mitchell may be compensated by the lender, Plaintiff signed a document entitled "Loan Program Disclosure," which explained how the interest rate and monthly payment could change, and, more importantly, defined "negative amortization" and explained how it could affect his loan, i.e., that the principle balance of the loan could increase if monthly payments did not cover the interest due. Plaintiff signed this document on December 5, 2005. Ex. E to Motion.

Plaintiff also signed the Adjustable Rate Note, which sets forth the interest rate as well as notice that the rate may change. Ex. I, attached to Motion. It also explains:

(E) Additions to My Unpaid Principal

My monthly payment could be less than the amount of the interest portion of the monthly

payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly pa7ument is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal.

*7 Ex. I, at 2.

Plaintiff signed an Estimated Closing Statement dated January 19, 2006, which discloses YSPs in the amounts of $3,120.00 and $195.00. Ex. G. Although there is another Estimated Closing Statement dated January 25, 2006, five days after Plaintiff signed a majority of the closing documents, it does not negate the disclosure made in the January 19, 2006, document.

Plaintiff does not necessarily dispute the contents of the documents relied upon by Mr. Mitchell and the Court. Rather, Plaintiff's argument focuses on his belief that the disclosures were somehow insufficient to satisfy the duties he attempts to assign to Defendant Mitchell. It is undisputed, though, that Plaintiff reviewed the documents before signing them, and he admits that he could have taken more time to review them if he wanted to do so. Plaintiff's Dep., at 34, 49-53. Insofar as Plaintiff contends that certain disclosures were insufficient because they were signed either on the closing date (using Plaintiff's January 20 closing date) or the day before, and/or they were "slipp [ed] in ... among a myriad of documents signed by Plaintiff," his argument fails. Opposition, at 6. Plaintiff read and signed the documents that disclosed the issues that he now complains of. That he may not have understood the meaning of the documents, as he now seems to contend, does not render otherwise sufficient disclosures ineffective.

Nor does *Wyatt* compel a different result. Although *Wyatt* recognized that in some circumstances, a fiduciary's duty may extend beyond written disclosures in loan documents, the holding was based in large part on the *Wyatt* plaintiffs' specific situation. There, the plaintiffs testified that they did not read the written loan documents before signing them, but did ask specific questions of their broker. In response, they received "materially misleading and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

incomplete information." *Wyatt, 24 Cal.3d at 782-783, 157 Cal.Rptr. 392, 598 P.2d 45*. The duty to go beyond written disclosures was therefore based in part on affirmative misrepresentations. The facts before this Court do not suggest that Defendant Mitchell made any misrepresentations or otherwise attempted to mislead Plaintiff. Given the absence of any affirmative misrepresentations and Plaintiff's testimony that he *did* read the documents that he signed and understood that he could have had more time to review them, the Court refuses to extend *Wyatt* to the facts of this case. Therefore, based on the record before the Court, Defendant Mitchell is entitled to summary judgment on the second cause of action.

### 3. *Third Cause of Action*

The Third Cause of Action alleges constructive fraud insofar as Defendant Mitchell intentionally failed to disclose that he was receiving funds from escrow by Greenpoint and that the loan was a reverse amoritization loan.

As discussed above, the evidence before the Court demonstrates that Defendant Mitchell did not owe Plaintiff a fiduciary duty and that there was no intentional failure to disclose information. Therefore, Defendant Mitchell is entitled to summary judgment on the third cause of action.

### 4. *Fourth Cause of Action*

**\*8** In the final cause of action, Plaintiff alleges violations of the California Unfair Trade Practices Act. Specifically, he alleges that Defendants violated *12 U.S.C. § 2603* and *24 C.F.R. § 3500.7-3500.8* by providing settlement statements that failed to disclose that Defendant Mitchell would be receiving funds from the escrow involved in the loans.

According to Plaintiff's opposition, this claim is based on Defendant Mitchell's alleged (1) failure to disclose his compensation from Greenpoint; (2) failure to advise Plaintiff that the loan was a negative amortization loan; (3) fraudulent representation that the loan was the "best loan for Plaintiff;" and (4) violation RESPA's settlement statement requirements. As to the first three issues, Defendant Mitchell did not owe Plaintiff a fiduciary duty and these claims fail, as detailed above.

With regard to the settlement statement, Plaintiff contends that Defendants violated *24 C.F.R. § 3500.7* and *3500.8. Section 3500.7* requires that a Good Faith Estimate be provided to the applicant no later than three business days after the application is received or prepared, and that it contain the following information:

> (c) Content of good faith estimate. A good faith estimate consists of an estimate, as a dollar amount or range, of each charge which:
>
> (1) Will be listed in section L of the HUD-1 or HUD-1A in accordance with the instructions set forth in Appendix A to this part; and
>
> (2) That the borrower will normally pay or incur at or before settlement based upon common practice in the locality of the mortgaged property. Each such estimate must be made in good faith and bear a reasonable relationship to the charge a borrower is likely to be required to pay at settlement, and must be based upon experience in the locality of the mortgaged property. As to each charge with respect to which the lender requires a particular settlement service provider to be used, the lender shall make its estimate based upon the lender's knowledge of the amounts charged by such provider.

Plaintiff attaches a Good Faith Estimate to his opposition, which he signed and dated on December 5, 2005. Ex. 1. While he admits that this was provided within the correct time frame, he argues that it is insufficient because it does not contain any information of the YSPs. This estimate shows a loan amount of $38,500, and therefore appears to be connected only with the HELOC. The YSP related to the HELOC was $195.00, and this amount could be wrapped into certain amounts identified on the estimate, i.e., a $350.00 lenders' fee or a $250.00 closing/escrow fee. Moreover, the Good Faith Estimate is just that-an *estimate* of the costs a borrower will have at closing. The estimates often go through several revisions, as they did here, and the earliest estimates are generally the least accurate. Indeed, the estimates provided as the closing date approached became more concrete. Absent a showing of bad faith or some affirmative misrepresentation, the Court will not find a violation of RESPA based on the December 5, 2005, Good Faith Estimate.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*9 For the above reasons, Defendant Mitchell is entitled to summary judgment on the fourth cause of action.

### ORDER

Therefore, IT IS HEREBY ORDERED that Defendant Mitchell's motion for summary judgment be GRANTED.

IT IS SO ORDERED.

E.D.Cal.,2008.
Stetler v. Greenpoint Mortg. Funding Inc.
Slip Copy, 2008 WL 192405 (E.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Not Reported in F.Supp.                                    Page 1
Not Reported in F.Supp., 1998 WL 30056 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

**H** Harpeneau v. Massachusetts Mut. Life Ins. Co.
N.D.Cal.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. California.
Lisa HARPENEAU, D.D.S., Plaintiff,
v.
MASSACHUSETTS MUTUAL LIFE INSURANCE
COMPANY, a Massachusetts corporation; Treloar
and Heisel, Inc., a Pennsylvania corporation,
Defendants.
No. C-96-4619 MHP.

Jan. 5, 1998.

**MEMORANDUM AND ORDER**

PATEL, J.

*1 Plaintiff Lisa Harpeneau brought this action
against defendants Massachusetts Mutual Life
Insurance Company ("Mass Mutual") and Treloar
and Heisel, Inc. ("Treloar") seeking damages for
breach of contract, breach of the covenant of good
faith and fair dealing and professional negligence.
This case is before the court pursuant to the court's
diversity jurisdiction. 28 U.S.C. § 1332. This court
granted Mass Mutual's motion to dismiss for failure
to state a claim on April 25, 1997 (the "April 25
Order").FN1 Now before the court is defendant
Treloar's motion to dismiss.

> FN1. Portions of this order are taken from
> the April 25, 1997 order.

Having considered the parties' arguments and
submissions, and for the reasons set forth below, the
court enters the following memorandum and order.

**BACKGROUND** FN2

> FN2. All facts are taken from the plaintiff's
> complaint unless otherwise indicated.

Plaintiff is a periodontal surgeon who purchased
disability insurance from Connecticut Mutual Life
Insurance Company ("Connecticut Mutual") after
being solicited by its duly appointed general agent,
defendant Treloar, in August 1992. Plaintiff is both

the owner and named insured under this policy,
which insures plaintiff as a practicing periodontal
surgeon and provides for the payment of benefits
should she become unable to perform the material
duties of this profession. Attached to the policy are
four "riders," including a lifetime total disability
benefits rider and a future insurability rider. See
Compl., Exh. A. In 1996, defendant Mass Mutual
merged with Connecticut Mutual and assumed all of
that company's liabilities.

Plaintiff lived and practiced in Texas when she
purchased the policy in August 1992. She moved to
California in 1993. On June 14, 1993, plaintiff
received a solicitation from Treloar advising her of
the availability of a cost of living adjustment rider
("COLA rider") that would increase monthly benefits
by three or five percent annually.FN3 See Pl.'s Fax,
Exh. 2.FN4 In mid-June 1993, plaintiff contacted the
Dallas office of Treloar and requested an application
form for the COLA rider. She was told that because
she lived in California, she would have to request an
application from Jeffrey Whirry, the West Coast
agent in Treloar's California office. Plaintiff then
called Mr. Whirry and requested a COLA rider
application. She made repeated requests for an
application during the months of July, August and
September 1993, but she did not receive an
application. During the summer of 1993, plaintiff
also contacted Treloar's offices in Dallas and
Pennsylvania, but was advised that she would have to
make her request with the California office and Mr.
Whirry.

> FN3. In her opposition brief, plaintiff states
> that in her application for the COLA rider
> she requested a five percent adjustment.

> FN4. Plaintiff provided to the court via
> facsimile several documents that were
> referred to and incorporated by reference
> into plaintiff's complaint but which were not
> attached to it. These documents are referred
> to as exhibits to plaintiff's fax.

On December 10, 1993, plaintiff received a COLA
rider application, with a cover letter from Mr. Whirry
apologizing for the "lengthy delay" in sending the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 30056 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

application. *See* Pl.'s Fax, Exh. 3. Upon receiving the application, plaintiff asked Mr. Whirry additional questions, which he took several weeks to answer. On January 7, 1994, she sent the completed COLA rider application to Connecticut Mutual. *See* Pl.'s Fax, Exh. 4.

**\*2** On January 10, 1994, plaintiff became totally disabled under the terms of the policy. On January 20, 1994, she advised Connecticut Mutual of her disability and applied for benefits under the policy. Because of her disability, plaintiff was no longer eligible to purchase additional insurance benefits and Connecticut Mutual took no further steps to process plaintiff's COLA rider application. On February 3, 1994, Treloar acknowledged that plaintiff was totally disabled and began paying her monthly benefits in the amount of $4,200. Plaintiff will be entitled to receive these monthly benefits until she reaches age 65.

Plaintiff alleges that Mr. Whirry was an agent of both Connecticut Mutual and Treloar, acting in the course and scope of this agency. She also states that Treloar was an agent of Connecticut Mutual and was acting within the course and scope of this agency. Plaintiff brought this complaint against defendants Treloar and Mass Mutual on December 24, 1996. In its April 25 Order, this court granted Mass Mutual's motion to dismiss for failure to state a claim. On July 25, 1997 defendant Treloar filed the instant motion to dismiss plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

*LEGAL STANDARD*

A motion to dismiss for failure to state a claim will be denied unless it appears that the plaintiff can prove no set of facts which would entitle him or her to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Fidelity Financial Corp. v. Federal Home Loan Bank of San Francisco,* 792 F.2d 1432, 1435 (9th Cir.1986), *cert. denied,*479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987). All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents are deemed part

of the complaint and may be considered in evaluating the merits of a Rule 12(b)(6) motion. *Durning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th Cir.), *cert. denied sub. nom. Wyoming Community Dev. Auth. v. Durning,* 484 U.S. 944, 108 S.Ct. 330, 98 L.Ed.2d 358 (1987).

*DISCUSSION*

Plaintiff alleges three causes of action against Treloar: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; and (3) professional negligence. Treloar argues that because Connecticut Mutual had no contractual obligation under the policy to provide plaintiff with an application for an additional rider and would not have been required to approve any application that was submitted, Treloar cannot be held liable for any of plaintiff's stated claims. Treloar also argues that plaintiff cannot prevail on her tortious bad faith claim, and that the bad faith claim and negligence claim are barred by the statutes of limitations.

I. *Breach of Contract*

In her complaint, plaintiff appears to seek damages calculated to provide her with the amount of money she would receive had the COLA rider been added to the policy.[FN5] Plaintiff is, in effect, asking the court to reform her policy and enforce a COLA rider against the defendants. Treloar argues that this cannot be done because Mass Mutual and plaintiff never entered into a contract for a COLA rider, as the COLA rider application constituted a mere *offer* to enter into a contract for this additional rider. Defendant is correct. Considering plaintiff's request for relief, it appears that the contract on which plaintiff bases her complaint is an unformed COLA rider contract.

> FN5. Plaintiff seeks $882,000 in compensatory damages. Compl. Prayer ¶ 1. Presumably, this figure is based on a calculation of disability benefits in the amount of $4,200 per month with a five percent cost of living adjustment annually until plaintiffs sixty-fifth birthday.

**\*3** Plaintiff argues that her breach of contract claims are based on a perceived breach of a provision in the policy entitled "Right To Apply For Additional

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 30056 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

Monthly Benefits." However, this provision does not apply to applications for additional *riders*. The additional benefits provision refers to requests to increase the monthly benefit that may be received under the policy by a specific dollar amount per month, *not* to requests for additional riders. This provision cannot be used as the basis for plaintiffs breach of contract claim because it does not govern applications for additional riders. For example, this provision states that "to buy additional benefits, the Insured must qualify for a minimum of $100 of additional monthly benefits." Compl., Exh. A at 14. In addition, the provision refers to policy specifications that include a column entitled "Monthly Benefit" and show a series of six predetermined dollar amounts for the different policy coverages. Id. at 3. In contrast, riders may have no direct effect on the dollar amount of the monthly benefit, as evidenced by the riders which plaintiff has already contracted for and which are attached to the policy. *See* Compl., Exh. A. For example, none of the four riders currently attached to plaintiff's policy provide for specific dollar increases in plaintiff's monthly benefit. Applying for additional monthly benefits is different from applying for additional riders. Accordingly, the additional monthly benefit provision cannot provide the basis for plaintiff's breach of contract claim.

Plaintiff asserts that in its April 25 Order this court interpreted the policy in accord with the meaning an insurance expert or attorney would give the monthly benefit provision, and not in accord with the meaning a layperson would attach to it. Plaintiff states that "[t]he 'clear and explicit' meaning of [[[written] provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage,' controls judicial interpretation." *Waller v. Truck Ins. Exchange*, 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995) (quoting *AIU Ins. Co. v. Superior Court (FMC Corp.)*, 51 Cal.3d 807, 821-22, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990)) (citing Cal.Civ.Code §§ 1644, 1638) (internal citations omitted). Plaintiff asserts that the plain meaning of "The Right to Apply for Additional Monthly Benefits" implies a right to apply for COLA coverage, and that the court mistakenly defined "Monthly Benefits" as a term of art. Plaintiff urges the court to follow the general rule of contract interpretation that "as between the mere heading and the specific provision, if there be any conflict, an interpretation made only from a reading of the document would be in favor of the specific provision." *McNeely v. Claremont Management Co.*, 210 Cal.App.2d 749, 753, 27 Cal.Rptr. 87 (1962).

However, the clear and explicit meaning of "Monthly Benefits," interpreted in its ordinary and popular sense, cannot be said to include COLA rider coverage. This is made clear from reading the document as a whole. The "Coverage Summary" of the policy, under the headings "Policy Coverage" and "Rider Coverage" lists set dollar amounts in a column entitled "Monthly Benefit." Compl., Exh. A at 3. This intertextual reference supports the plain meaning and ordinary interpretation asserted by Treloar: that the right to apply for "Additional Monthly Benefits" refers to the right to apply for a specific dollar amount to be added to the base benefit payable monthly on existing categories of coverage, which are listed in the clearly titled "Monthly Benefit" column of the coverage summary. As alleged in the complaint, the COLA rider provides a three or five percent increase in the existing monthly benefit amount, payable upon disability, and not a dollar amount increase in the base amount of the monthly benefit. The fact that COLA coverage, if applied, would yield a benefit increase of a specifically calculable monthly amount does not overcome the plain meaning of "Additional Monthly Benefit" such to transform the "Right to Apply for Monthly Benefits" into the alleged right to apply for additional riders. Thus, Plaintiff cannot rely upon the "Additional Monthly Benefit" provision of her contract for the alleged right to apply for a COLA rider.

*4 Additionally, nothing in the policy or the other documents referenced in the complaint suggests that plaintiff was automatically entitled to receive a COLA rider upon submission of her application. Nothing in the June 14, 1993 letter plaintiff refers to in her complaint suggests that she was "pre-approved" or "guaranteed" receipt of the COLA rider simply upon submission of her application. *See* Pl.'s Fax, Exh. 2. Plaintiff states in her complaint that defendants "solicited" her to apply for a COLA rider in their June 1993 letter. Compl. ¶ 20. This is incorrect. In fact, this letter speaks in very general terms about various insurance plans available to plaintiff and does not even mention COLA riders or their availability. Pl.'s Fax, Exh. 2. Moreover,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.    Page 4
Not Reported in F.Supp., 1998 WL 30056 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

language in the policy and in the COLA rider application itself clearly states that any and all changes to the policy are subject to the approval of the insurance company. The policy provides that "[a]n authorized officer of Our [[sic]] company must approve any change to the provisions of this Policy. Our agents are not authorized to make changes or waive any provisions of this Policy." Compl., Exh. A at 14. The conditional advance premium receipt, attached to the COLA rider application, also states that a COLA rider would only become effective upon the insurance company's acceptance of her application. Pl.'s Fax, Exh. 4 at 19 (stating that "limited coverage" may end on several dates, including "the date we reject your Application"). Accordingly, plaintiff had no reason to believe that by simply submitting her application, she would enter into a contract with Connecticut Mutual for a COLA rider.

Further, it does not appear that plaintiff's application for the COLA rider was supported by any consideration at all. A rider is an additional contract between the insured and the insurer that is separate from, but incorporated into, the policy. As evidenced by the riders plaintiff already possesses, riders to the policy must be supported by additional consideration. For example, the lifetime total disability benefits, own occupation and future insurability option riders state that "[t]his Rider is made a part of Your Policy in consideration of the application and premium payments." Compl., Exh. A. Similarly, Connecticut Mutual's COLA rider application also required additional consideration. The COLA rider application plaintiff submitted includes a "Conditional Advance Premium Receipt" form that plaintiff signed. Pl.'s Fax, Exh. 4 at 19. This document requires that a premium be paid in support of the application. However, the portion of the document that should be filled in to denote the amount of advanced premium paid was left blank. *Id.* There is nothing in the record to suggest that plaintiff ever paid any premium in consideration of her COLA rider application. Moreover, at the hearing, plaintiff did not know whether any premium had been paid or whether any agent had signed the receipt acknowledging that a premium had been paid. Therefore, it appears that plaintiff's COLA rider application was not supported by any additional consideration by plaintiff.

*5 In the absence of consideration, no COLA rider

may be enforced against Treloar or Mass Mutual. Insurance policies are written contracts governed by the same rules governing contracts generally, and therefore insurance contracts must be supported by consideration and express the mutual intent of the parties. *See Bassi v. Springfield Fire & Marine Ins. Co.,* 57 Cal.App. 707, 712, 208 P. 154 (1922) (finding a rider to an insurance policy unenforceable for lack of consideration). Thus, plaintiff's COLA rider application cannot be considered an enforceable contract. It is at best a mere offer for a COLA rider that, under the terms of the policy, could not be enforced until Connecticut Mutual approved the application. *See* Compl., Exh. A at 8; Pl.'s Fax, Exh. 4 at 19. There is no guarantee that plaintiff would have received the COLA rider, even if she had submitted her application earlier and Treloar and Connecticut Mutual had processed it.[FN6] Without mutuality of intent or consideration, plaintiff may not seek enforcement of a COLA rider.

> FN6. For example, in plaintiff's COLA rider application, the medical report she submits with her application discloses an injury to her right arm in August 1993. Pl.'s Fax, Exh. 4. This information was not present in plaintiff's application for the policy. Compl., Exh. A. The effect this might have had on Mass Mutual's decision to approve or deny her COLA application cannot be known. Moreover, the court cannot and will not speculate as to whether Mass Mutual would have approved plaintiff's COLA rider application.

Plaintiff asserts that she is not alleging that a contract for COLA benefits was ever formed, and therefore that the question of consideration for the COLA rider application is irrelevant. Rather, plaintiff contends that Treloar breached an implied term of the existing insurance contract when the agent through whom she was required to deal failed properly to assist her in making a timely application for the COLA rider. However, because the court finds that a duty to timely provide a COLA rider application cannot be implied from plaintiff's insurance contract, the existence of an enforceable contract for the COLA rider would be relevant. In the absence of both a valid and enforceable contract for a COLA rider and a provision in the policy on which to base her claims, plaintiff's breach of contract claim necessarily fails

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 30056 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

Case 5:08-cv-00536-JF    Document 10-10    Filed 03/28/2008    Page 6 of 11    Page 5

and must be dismissed.

Plaintiff asserts that this court failed to fully consider the nature of the insurer-insured relationship in the disability context, a relationship which, according to plaintiff, supports an implied contractual duty to provide the COLA application form. Plaintiff states that since California imposes a duty upon all insurers to act promptly upon an application for insurance, it is logical to impose upon the insurer a greater duty to act upon requests by its existing insureds for assistance in applying for modifications of their policies. Plaintiff is correct that "having solicited and obtained an application for insurance and having received payment of a premium, [insurers] are bound either to furnish indemnity or to decline to do so within a reasonable time." *Barrera v. State Farm Mut. Auto. Ins. Co.*, 71 Cal.2d 659, 673, 79 Cal.Rptr. 106, 456 P.2d 674 (1969); *see also Stark v. Pioneer Cas. Co.*, 139 Cal.App. 577, 580, 34 P.2d 731 (1934).

Here, however, plaintiff does not complain that Treloar violated the long-established duty reiterated by the California Supreme Court in *Barrera.* Instead, plaintiff asks that this court impose a new and greater duty upon insurers to furnish to existing insureds applications for additional benefits, even though the insurance contract in question contains no such obligation. Plaintiff asks that this court greatly expand insurers' duty of care to insureds by threatening insurers with negligence liability for the failure to do acts which they have not promised to do and for which they have received no consideration. Plaintiff cites no cases which support such an expansion of liability.

*6 Plaintiff asserts that the quasi-public nature of the insurance business and the relationship between insurer and insured supports such a duty, because it requires that courts "look to the reasonable expectation of the public and the type of service which the entity holds itself out as ready to offer." *See Barrera,* 71 Cal.2d at 669, 79 Cal.Rptr. 106, 456 P.2d 674. "The reasonable expectation ... is that the insurer will duly perform its basic commitment: to provide insurance ."*Id.* The necessity of ensuring that this core commitment be fulfilled stems from the unequal bargaining power of insurer and insured and the fundamental unfairness which results if the insured is left to suffer personal injuries without compensation while the insurer receives a windfall in

avoiding liability for a risk it has been paid to assume. *See id.* at 669-670, 79 Cal.Rptr. 106, 456 P.2d 674. For this reason, any ambiguity or uncertainty in an insurance policy will be resolved against the insurer to achieve the policy's object of providing indemnity, "to give the insured the protection he had a right to expect." *White v. Western Title Ins. Co.*, 40 Cal.3d 870, 881, 221 Cal.Rptr. 509, 710 P.2d 309 (1985). The insurer's duty to act upon an application, having solicited and obtained it along with consideration for it, also stems from this reasonable expectation; insurers cannot delay the consummation of a contract for an unreasonable length of time and then, in the event of loss, repudiate it. *See Barrera,* 71 Cal.2d at 674, 79 Cal.Rptr. 106, 456 P.2d 674. Otherwise, the insurer could take the chances of a loss and retain the premium if none occurred, while repudiating the contract if a loss did occur. *Id.*

Here, however, Treloar did not retain a premium from plaintiff and then cause a delay in order to avoid consummating the COLA rider. Rather, Treloar's only delay was in sending the COLA application to plaintiff. Plaintiff points to no precedent for her proposition that the above principles be applied to require an insurer timely to send applications for additional, nonessential insurance benefits (such as the COLA rider) upon request and, in the event that the insurer fails to do so, to hold it liable for paying greater benefits even though the insurer never had an eligible application for such benefits before it. Plaintiff cannot reasonably expect to gain benefits for which she has not even sent an eligible application, even if the delay in getting the application (and thus the lack of eligibility) is due to Treloar's lack of diligence. Thus this court finds that neither insurers' duty to timely process applications for which consideration has been received, not the insurer-insured relationship, may serve to imply the duty proposed by plaintiff.

II. *Breach of Covenant of Good Faith and Fair Dealing*

Plaintiff's claim for breach of the covenant of good faith and fair dealing is similarly flawed. In the absence of a breach of contract claim, there can be no breach of the implied covenant. *Waller,* 11 Cal.4th at 36, 44 Cal.Rptr.2d 370, 900 P.2d 619 (so finding in the context of third party insurance). Furthermore, as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

discussed above, Connecticut Mutual and plaintiff never entered into a contract for the COLA rider. An insured cannot base a claim for breach of the implied covenant on acts that occurred in pre-contract dealings. *Hess v. Transamerica Occidental Life Ins. Co., 190 Cal.App.3d 941, 945, 235 Cal.Rptr. 715 (1987).* Accordingly, plaintiff's claim for breach of the implied covenant claim must also be dismissed.

*7 Plaintiff states that she does not seek damages for tortious breach of the covenant of good faith and fair dealing. Instead, plaintiff asserts that this claim is merely a refinement of the breach of contract claim. Plaintiff asserts that the implied covenant of good faith supports her interpretation of the written contract, as well as her contention that a duty to assist insureds in applying for COLA riders should be implied by the insurance contract. Nonetheless, the implied covenant is based on the existence of a contract. Here, plaintiff contends that the implied covenant of good faith in her pre-existing contract supports her attempt to find an implied duty to provide the COLA application. However, because the court finds that no such implied duty exists, the implied covenant of good faith cannot aid plaintiff in her attempt to impose this duty upon Treloar.

III. *Professional Negligence*

Plaintiff's claim for professional negligence is based on the acts of Treloar, who plaintiff claims acted negligently by sending her the COLA rider application six months after her initial request. Plaintiff contends that this cause of action is governed by the two-year statute of limitations set forth in California Civil Procedure Code section 339(1), which governs actions "founded upon a contract, obligation or liability not founded upon an instrument in writing." Cal.Code.Civ.P. § 339(1). Defendant contends that the professional negligence claim is governed by California Civil Procedure Code section 340(3), which provides a one-year statute of limitations for "injury to ... one caused by the wrongful act or neglect of another...."*Id.*§ 340(3).

Plaintiff is correct that section 339(1) applies to her professional negligence claim. Section 339(1)"is a catchall for unusual tort actions" which not only governs unwritten contract and quasi-contract actions, but also governs actions "based on negligent wrongs not involving injuries to person or real or

tangible personal property, e.g., negligent performance of professional services." 3 Witkin, Cal. Procedure, Actions, §§ 574, 576 at 727, 730 (4th ed.1996); *see also Stark,* 139 Cal.App. at 582, 34 P.2d 731 (holding that limitations period contained in section 339(1), not section 340(3), applies to a claim for negligence in processing an application for liability insurance); *Harrison v. County of Alameda, 720 F.Supp. 783, 789 (N.D.Cal.1989)* ("As Witkin notes, very few tort actions are covered by section 339(1); examples include intentional wrongs involving intangibles such as literary property, and negligent performance of professional services").

In *Stark,* the court found undisputed evidence that the insurer made representations upon which the plaintiff was entitled to rely in believing that she was insured. *Stark,* 139 Cal.App. at 579, 34 P.2d 731. Finding that plaintiff stated a claim for losses incurred through the neglect of the insurer in failing to timely process her insurance application, the court held that the claim was governed by the section 339(1), not section 340(3), because plaintiff claimed loss not from another's tort, but rather loss of security due to the insurer's negligence. *Id.* at 582,34 P.2d 731. Further, as plaintiff indicates, unless a specific statute provides another limitations period, section 339(1) has been applied generally to professional negligence actions not causing direct personal injury. *See e.g., International Engine Parts v. Feddersen & Co., 9 Cal.4th 606, 608, 38 Cal.Rptr.2d 150, 888 P.2d 1279 (1995)* (negligence of accountant); *Herbert A. Crocker & Co. v. Transamerica Title Ins. Co., 27 Cal.App.4th 1722, 1727, 33 Cal.Rptr.2d 313 (1994)* (negligence of title insurer); *Slavin v. Trout, 18 Cal.App.4th 1536, 23 Cal.Rptr.2d 219 (1993)* (negligence of real estate appraiser). For the foregoing reasons, the court applies the two-year statute of limitations of section 339(1).

*8 The parties dispute the date on which plaintiff's claims accrued. Treloar argues that plaintiff's claims accrued between June and December 1993, the period during which she requested and received the COLA rider application. Plaintiff argues that her claims could not have accrued until she suffered the contingency against which she sought to insure herself, namely a period of disability exceeding one year. It appears that this one-year period is based on the policy provision which states that adjustments to pre-disability income would be increased by the same

Not Reported in F.Supp.                                                                                         Page 7
Not Reported in F.Supp., 1998 WL 30056 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

percentage as the Consumer Price Index after each twelve months of disability. Compl., Exh. A at 4. Plaintiff argues that she was not "actually injured" by defendants' acts until she was denied the cost of living adjustment to which she would be entitled under a COLA rider-in other words, until after the first twelve months of disability, the point at which she would have started to receive the COLA benefits had the application been approved. Plaintiff thus contends that her cause of action did not begin to accrue until January 20, 1995.

Plaintiff is correct that "if [ ] allegedly negligent conduct does not cause damage, it generates no cause of action in tort. The mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm-not yet realized-does not suffice to create a cause of action for negligence,"*Budd v. Nixen*, 6 Cal.3d 195, 200-201, 98 Cal.Rptr. 849, 491 P.2d 433 (1971) (citations and quotations omitted) (holding as to attorney malpractice superseded by statute, as stated most recently in *Adams v. Paul*, 11 Cal.4th 583, 46 Cal.Rptr.2d 594, 904 P.2d 1205 (1995.)) [FN7] However, when actual damage is the last element to occur giving rise to a cause of action for negligence, "the infliction of appreciable and actual harm, however uncertain in amount, will commence the statutory period. Under present authority, neither uncertainty as to the amount of damages nor difficulty in proving damages tolls the period of limitations." *Davies v. Krasna*, 14 Cal.3d 502, 514, 121 Cal.Rptr. 705, 535 P.2d 1161 (1975); *see also Budd*, 6 Cal.3d at 201, 98 Cal.Rptr. 849, 491 P.2d 433 ("the cause of action arises [[ ] before the plaintiff sustains all, or even the greater part, of the damages occasioned by the professional negligence. Any appreciable and actual harm flowing from the negligent conduct establishes a cause of action upon which the [plaintiff] may sue").

> FN7. The holding in Budd has been superseded by the enactment of California Code of Civil Procedure section 340.6 insofar as it relates to attorney malpractice. *See Laird v. Blacker*, 2 Cal.4th 606, 7 Cal.Rptr.2d 550, 828 P.2d 691 (1992). Section 340.6 applies to the statute of limitations for malpractice actions as to attorneys only.

Here, plaintiff alleges that Treloar had a duty to supply her a COLA application and that Treloar breached that duty by failing to timely supply the application. Treloar's allegedly negligent act resulted in plaintiff's failure to secure the COLA rider, because by the time the application was received, filled out and returned plaintiff had already become disabled and thus was disqualified from applying for additional benefits. Thus, Treloar's delay in providing an application (the negligent act upon which plaintiff bases her claim) caused her "actual harm" when the delay made her ineligible for COLA benefits. At that point, she lost the right she alleges to have lost-the ability to obtain the benefit she sought-and with it the added security and protection afforded by the COLA rider. The fact that almost all the pecuniary harm plaintiff would suffer was over one year away does not negate the actual harm suffered when her application was rendered ineligible, because at that point Treloar's negligent act gave rise to plaintiff's potential cause of action. *See id.* In other words, because the negligence sued upon is Treloar's delay, the harm is the result of that delay-inability to be considered for COLA benefits-even though the pecuniary benefit of an approved application would not be missed until later. Thus, plaintiff's suffered actual harm on January 10, 1994, the date on which she became totally disabled and thus no longer eligible for the COLA rider.

\*9 Several recent California cases support this interpretation. In *Foxborough v. Van Atta*, 26 Cal.App.4th 217, 31 Cal.Rptr.2d 525 (1994), a developer sued his attorney for malpractice for his negligent failure to secure certain development rights for a condominium project. The developer asserted that he did not suffer "actual injury" until he lost third-party litigation which could have recouped the losses from the failure to secure the development rights, thus "curing" the attorney's negligence. *Id.* at 222-25, 31 Cal.Rptr.2d 525. The court disagreed, finding that the developer "sustained actual injury" when he lost the development rights he had retained the attorney to secure, *before* he sustained definite pecuniary harm from that loss. *Id .* at 227, 31 Cal.Rptr.2d 525. The developer sued for the attorney's negligence in failing to secure the development rights, so the developer suffered actual injury when that failure came to pass. *See id.* In arriving at this result, the court stated that "actual injury need not be defined in terms of a monetary amount.... Thus, when malpractice results in the loss

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 30056 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

of a right, remedy or interest, or in the imposition of a liability, there has been actual injury regardless of whether future events may affect the permanency of the injury or the amount of monetary damages eventually incurred." *Id*.

More on point is *Sirott v. Latts*, 6 Cal.App.4th 923, 8 Cal.Rptr.2d 206 (1992), in which a doctor sued his attorney for the attorney's allegedly negligent advice which led the doctor to lose his entitlement to purchase "tail" malpractice insurance coverage from his insurer. The doctor asserted that he was not "actually harmed" and that the negligence was not remediable until he agreed to pay to settle a malpractice action against him which would have been covered by the insurance he failed to secure. Before that date, he asserted, his liability for medical negligence was speculative and he could have prevailed in the action, with the result that he would not have been harmed by the attorney's negligent advice. *Id.* at 929, 8 Cal.Rptr.2d 206. The court disagreed, finding that the doctor "sustained actual damage" upon entry of a judgment determining that he was not entitled to the tail insurance coverage and would be compelled to bear the expenses of defending the malpractice suit against him, whatever its outcome. *Id.* at 929-930, 8 Cal.Rptr.2d 206. In so finding, the court stated that on the date of the judgment, "plaintiff suffered actual damage by the irretrievable loss of the right to tail medical malpractice insurance coverage-the very purpose for which plaintiff consulted defendants and the subject of their allegedly negligent advice." *Id.* Thus, the loss of the right to the insurance coverage was "actual damage" triggering the statute of limitations, even though the plaintiff did not incur liability in the underlying malpractice action or pay the bills for his defense until a later date. *See id*. It was the obligation to bear the expense of his own defense and liability, and not the actual payment of those expenses, which constituted the first instance of actual harm. *See id.*

*10 Similarly, in *Sindell v. Gibson, Dunn & Crutcher*, 54 Cal.App.4th 1457, 63 Cal.Rptr.2d 594 (1997), also an attorney malpractice case, the court stated that where "the purpose of a lawyer's retention is to place the client and his or her intended beneficiaries in a posture of quiet ownership of assets, and the lawyer negligently fails to obtain a simple written consent which would all but preclude costly litigation, the mere fact of such litigation is the

unwanted consequence. The litigation represents the loss of the bargained for benefit; the litigation itself is the event that constitutes damage" before actual financial expenses for the litigation arise. *Id.* at 1469-70, 63 Cal.Rptr.2d 594.

In each of these cases, the loss of the benefit sought-whether a right or interest, insurance or protection, or security from litigation-was sufficient to constitute "actual damage" before any pecuniary harm was suffered as a result of that loss. Similarly, here, plaintiff allegedly lost her right to apply and presumably be granted a COLA rider to her insurance policy. The point at which Treloar's negligence actually harmed plaintiff was the point at which she lost that right, i.e., when she became disabled and it was clear that the delay in receiving the application resulted in plaintiff's inability to gain approval. The loss was not merely speculative. Rather, the loss of the alleged right to timely get an application so plaintiff could secure COLA benefits, and the resultant ineligibility for those benefits, actually harmed plaintiff on the very day she was disqualified from obtaining the rider. On that day, plaintiff lost the security of the benefits she sought. Moreover, at that point plaintiff was actually disabled, so there is no doubt that she knew at that point that she would not have the benefit of the COLA rider in one year. The fact that her disability might have been corrected does not lessen the harm, just as in the above cases, because the fact that later events might 'correct' or 'moot' the loss of the interest does not lessen the actuality of harm suffered at the time of the loss.

Plaintiff relies on *Walker v. Pacific Indem. Co.*, 183 Cal.App.2d 513, 6 Cal.Rptr. 924 (1960), a failure to insure case cited by the California Supreme Court in *Davies*, to support her interpretation of the present case. In *Walker*, the court considered the issue of accrual in connection with a claim brought against an insurer for negligently failing to obtain a policy of liability insurance with a limit of $50,000, as requested, instead obtaining a policy with a $15,000 limit. The 'wrong' ($15,000) policy issued in March 1952; the insured's vehicle was in an accident in July 1952; and the insured was found liable in an action brought by the party injured in the accident, claimant Walker, in December 1955. After the judgment, the insured assigned his negligence action to Walker, who brought suit on the claim in December 1956. Walker recovered a judgment against the insurer,

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 30056 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

who appealed asserting that the insured's negligence claim on which Walker sued was barred by the statute of limitations. *Walker,* 183 Cal.App.2d at 518-19, 6 Cal.Rptr. 924.

**\*11** The court of appeal affirmed, finding that the limitations period did not commence to run until the insured suffered actual injury-in that case, the adverse judgment in the original action, in which the insured was found liable for amounts in excess of his $15,000 insurance liability policy. Even though the insured knew before the accident and finding of liability that he had already suffered a loss of security (i.e., coverage above $15,000), "whether that loss would constitute any ultimate injury or damage remained to be determined." *Id.* at 516, 6 Cal.Rptr. 924. The court found that "at that stage, [the insured] had suffered no recoverable loss. He had merely suffered an exposure to liability beyond his insurance coverage-a mere possibility that he might suffer liability beyond the indemnity afforded him."

Plaintiff asserts that *Walker* is indistinguishable from the present case. As in *Walker,* where the insured could not obtain greater liability protection once the accident occurred and the insured was found liable, here the onset of disability precluded plaintiff from obtaining the COLA rider. However, had plaintiff recovered from the disability within the first year, she would not suffer any damages due to Treloar's alleged negligence. Thus, plaintiff asserts that the economic damages were merely potential and speculative until the disability exceeded one year in duration-the point at which the increase in benefits would have taken effect if the COLA rider had been approved.

However, in *Walker* it was the uncertainty as to the fact of damage rather than the amount which negated the existence of a cause of action. *See United States Liability-Ins. Co. v. Haidinger-Hayes,* 1 Cal.3d 586, 597, 83 Cal.Rptr. 418, 463 P.2d 770 (1970) (citing *Walker,* 183 Cal.App.2d 513, 516-518, 6 Cal.Rptr. 924)). Thus, there was a sound reason for recognizing an exception to the general rule and provide that "the cause of action does not accrue prior to the maturation of perceptible harm, to the injured person's awareness of it ..."*Id.*Here, the harm to plaintiff from Treloar's alleged negligence was only potential and speculative when she was still eligible for the COLA rider. At that point, despite the

delay in receiving an application, she still could have secured the additional benefits she sought. Once she became disabled and her application became ineligible, on the other hand, Treloar's alleged negligence resulted in the denial of the benefit or interest sought and the definite knowledge that she would lack that added security. This is not a case, like *Walker,* where the existence or effect of the professional negligence depended upon a litigated or negotiated determinations outcome such that actual injury would occur only when that determination was made. *See Van Dyke v. Dunker and Aced,* 46 Cal.App.4th 446, 452-55, 53 Cal.Rptr.2d 862 (1996). Here, plaintiff was fully aware of the harm suffered as a result of Treloar's alleged negligence when she became ineligible for the COLA rider, long before the COLA benefits would have been available to her.

**\*12** Finally, to accept plaintiff's theory would result in an open-ended statute of limitation. If accrual depended on when plaintiff actually suffered a disability that would trigger benefits under the COLA rider, she could assert her claim ten, twenty, thirty years or more after the negligent act-the failure to send her an application-even though she knew throughout that time that she had not received the application and would not be receiving the COLA benefits. This theory stands the doctrine of repose, for which statutes of limitation are intended, on its head.

For the foregoing reasons, the court finds that plaintiff's cause of action accrued and the statute of limitations started to run, at the latest, when plaintiff's COLA application was removed from consideration on January 20, 1994, the date on which plaintiff knew conclusively that the delay in receiving the application resulted in her ineligibility for COLA benefits. While plaintiff may have suffered actual harm before that date, it is at that point, at the latest, when plaintiff became fully aware of the harm suffered. *See Budd,* 6 Cal.3d at 203, 98 Cal.Rptr. 849, 491 P.2d 433 ("discovery rule" applies to toll statute of limitations, which accrues when plaintiff sustains harm and discovers or should discover the cause of action). Thus the two year statute of limitations on plaintiff's claim of professional negligence expired on January 20, 1996 and plaintiff's complaint, filed on December 24, 1996 is dismissed as time-barred.

CONCLUSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 30056 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

For the foregoing reasons, the court GRANTS defendant Treloar's motion to dismiss. To the extent the court's April 25, 1997 Order against co-defendant Mass Mutual is inconsistent with this order, the April 25 Order is deemed amended by this order.

IT IS SO ORDERED.

N.D.Cal.,1998.
Harpeneau v. Massachusetts Mut. Life Ins. Co.
Not Reported in F.Supp., 1998 WL 30056 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ROLAND P. REYNOLDS, ESQ., (SBN 150864)
rreynolds@pfeiferlaw.com
ANNABELLE DE LA MORA, ESQ. (SBN 117649)
adelamora@pfeiferlaw.com
PFEIFER & REYNOLDS, LLP
765 The City Drive, Suite 380
Orange, CA 92868
Telephone:    (310) 788-3900
Facsimile:    (310) 388-5416

Attorneys for Defendants MORTGAGE INVESTORS
GROUP, INC., and MORTGAGE INVESTORS GROUP,
A General Partnership

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAY J. RALSTON, On Behalf Of Himself And All Others Similarly Situated; | Civil Case No. CV 08-00536 JF |
| Plaintiff, | **[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |
| vs. | |
| MORTGAGE INVESTORS GROUP, INC., MORTGAGE INVESTORS GROUP, a general partnership, and DOES 1 -10, | Date:  May 30, 2008<br>Time:  9:00 a.m.<br>Crtrm: 3 |
| Defendants. | Honorable Jeremy Fogel |
| | Complaint Filed:  January 24, 2008 |

///

///

///

1

1

2          The motion of defendants Mortgage Investors Group and Mortgage Investors Group, Inc.,

3   pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, to dismiss the Complaint

4   of plaintiff Jay J. Ralston came on for hearing on May 30, 2008 at 9:00 a.m.  Counsel for all parties

5   appeared.

6          Based on the supporting and opposing memoranda and other related documents filed with the

7   Court in connection with motion, and papers and records on file in this action, defendants' motion to

8   dismiss the Complaint is hereby granted without leave to amend.

9          **IT IS SO ORDERED.**

10

11   Dated: _____, 2008

12                                                    _____
                                                      The Honorable Jeremy Fogel
13                                                    United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                    2

[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT