1   ROLAND P. REYNOLDS, ESQ., (SBN 150864)
    rreynolds@pfeiferlaw.com
2   ANNABELLE DE LA MORA, ESQ. (SBN 117649)
    adelamora@pfeiferlaw.com
3   PFEIFER & REYNOLDS, LLP
4   765 The City Drive, Suite 380
    Orange, CA 92868
5   Telephone:    (310) 788-3900
    Facsimile:    (310) 388-5416
6

7
    Attorneys for Defendants MORTGAGE INVESTORS
8   GROUP, INC., and MORTGAGE INVESTORS GROUP,
    A General Partnership
9

10              UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                  SAN JOSE DIVISION

13

14  JAY J. RALSTON, On Behalf Of Himself        ) Civil Case No. CV 08-00536 JF
    And All Others Similarly Situated;          )
15                                              )
                                                )
                          Plaintiff,            ) **NOTICE OF MOTION AND MOTION OF**
16                                              ) **DEFENDANTS TO DISMISS PLAINTIFF'S**
          vs.                                   ) **FIRST AMENDED COMPLAINT**
17                                              )
    MORTGAGE INVESTORS GROUP,                   )
18  INC., MORTGAGE INVESTORS                    ) Date:    August 8, 2008
    GROUP, a general partnership, and DOES      ) Time:    9 a.m.
19  1 -10,                                      ) Crtrm:   3
                          Defendants.           )
20                                              ) Honorable Jeremy Fogel
                                                )
21                                              ) Complaint Filed:  January 24, 2008
                                                )
22                                              )
                                                )
23                                              )

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO PLAINTIFF AND HIS ATTORNEY OF RECORD:

PLEASE TAKE NOTICE that on August 8, 2008 at 9:00 a.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Jeremy Fogel, United States District Court, Northern District of California, San Jose Division, Courtroom 3, 5th Floor, located at 280 South First Street, San Jose, California, defendants Mortgage Investors Group, a general partnership ("MIG") and Mortgage Investors Group, Inc. will and hereby do move the Court for an order dismissing the first, second, third, fourth, fifth, and sixth causes of action in the First Amended Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities in support hereof and Declaration in support hereof, the pleadings and other files herein, and such other written and oral argument as may be presented to the Court.

By this Motion, MIG and Mortgage Investors Group, Inc. seek an order from the Court that plaintiff's claim for damages under the Truth in Lending Act 15 U.S.C. §§ 1601 et seq. ("TILA") is barred by the statute of limitations and that plaintiff fails to state a claim for (1) violation of TILA, (2) violation of California Unfair Competition Law ("UCL") Business & Professions Code § 17200, predicated on TILA (3) fraudulent omission, (4) violation of California Unfair Competition Law ("UCL") Business & Professions Code § 17200, predicated on unlawful business acts, (5) breach of contract, and (6) tortious breach of implied covenant of good faith and fair dealing.

## STATEMENT OF ISSUES TO BE DECIDED

Pursuant to Civil Local Rule 7-4(a)(3), Mortgage Investors Group and Mortgage Investors Group, Inc. set forth the following statement of issues to be decided:

1.      Whether plaintiff's claim for violation of the Truth in Lending Act fails to state a claim because it does not contain a plain statement of the case, including the parties, jurisdiction, venue, and the loan involved.

2.      Whether plaintiff's claim for damages under the Truth in Lending Act ("TILA") are time barred by the statute of limitations where plaintiff filed this action more than one year after the close of the loan at issue.

3.      Whether plaintiff's claim for violations of TILA should be dismissed for failure to state a claim where MIG's disclosures concerning the loan at issue complied with TILA and Regulation Z.

4.      Whether plaintiff's second claim for violation of the Unfair Competition Law ("UCL") fails because the predicate TILA violation on which it is based fails.

5.      Whether plaintiff's third claim for fraudulent omission is not actionable because MIG because the "omissions" were made or need not be made under TILA and because plaintiff does not meet the heightened pleading standard for fraud.

6.      Whether plaintiff's fourth claim for violation of the UCL because of unfair or fraudulent practices fails because (1) TILA preempts the allegations of the claim and the TILA claim fails, (2) the claim attempts to improperly challenge and rewrite lawful contracts, and (3) the claim simply has insufficient factual charging allegations.

7.      Whether plaintiff's fifth claim for breach of contract (mistakenly labeled the fourth cause of action) is not actionable because plaintiff fails to identify any term of the written agreement that was breached.

8.      Whether plaintiff's sixth claim for tortious breach of the implied covenant of good faith and fair dealing is not actionable because there is not a special relationship between the parties and the conduct complained of concerns pre-contract formation activities.

iii

# TABLE OF CONTENTS

**Page No.**

NOTICE OF MOTION .................................................................................................. ii

STATEMENT OF ISSUES TO BE DECIDED ........................................................... iii

TABLE OF AUTHORITIES .......................................................................................... vi

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

I.      INTRODUCTION ............................................................................................. 1

II.     FACTUAL ALLLEGATIONS .......................................................................... 2

III.    STANDARD ON A MOTION TO DISMISS .................................................. 2

IV.     PLAINTIFF'S TILA CLAIM DOES NOT PLEAD THE BASIC UNDERLYING
        FACTS, OF JURISDICTION, VENUE, OR PARTIES SUFFICIENT TO STATE A
        TILA CLAIM ....................................................................................................... 3

V.      PLAINTIFF'S TILA CLAIMS ARE TIME BARRED BY THE STATUTE OF
        LIMITATIONS .................................................................................................... 4

VI.     MIG MADE ALL REQUIRED DISCLOSURES ACCURATELY, AND
        PLAINTIFFS ALLEGATIONS ABOUT TILA VIOLATIONS REFLECT A
        FUNDAMENTAL MISUNDERSTANDING OF THE REQUIREMENTS OF THE
        STATUTORY SCHEME ..................................................................................... 5

        A.      Background of TILA ............................................................................... 5

        B.      Plaintiff's Theory That MIG Violated TILA by Not Disclosing the Actual Interest
                Rate Is Incorrect ..................................................................................... 6

        C.      The Schedule of Payments on the TIL Did Not Violate TILA ........................ 7

        D.      The Loan Documents Fully Informed Plaintiff About Negative Amortization ............ 9

        E.      Plaintiff Does Not State a Claim for Failure to Disclose the Legal Obligation .......... 12

        F.      Plaintiff Does Not State a Claim for Failure to Disclose the Composite APR ........... 12

G.    The Disclosure on the Discounting of the Initial Interest Rate Complied with TILA. 12

H.    The Effect of the Payment Cap is Fully Disclosed. ....................................................... 13

VII.    PLAINITFF'S UCL CLAIM BASED ON TILA IS PREMPTED BY TILA AND FAILS TO STATE A CLAIM BECAUSE OF THE FAILURE TO STATE A TILA CLAIM. ................................................................................................................. 13

VIII.    THE ALLEGED FRAUDULENT OMISSIONS ARE NOT ACTIONABLE ..................... 15

IX.    PLAINTIFF'S THIRD CLAIM FOR BREACH OF UCL PREDICATED ON "UNFAIR" OR "FRAUDULENT" BUSINESS PRACTICES IS ALSO PREEMPTED AND FAILS TO STATE A CLAIM ..................................................................... 18

X.    PLAINTIFF'S BREACH OF CONTRACT CLAIM DOES NOT IDENTIFY ANY BREACHED TERMS. .................................................................................................... 20

XI.    PLAINTIFF CANNOT IMPLY ANY COVENANTS INTO THE LOAN AGREEMENT. ................................................................................................................ 21

XII.    MORTGAGE INVESTORS GROUP, INC. SHOULD BE DISMISSED AS IT DID NOT MAKE THE LOAN IN ISSUE ....................................................................... 23

# TABLE OF AUTHORITIES

**Page No.**

## CASES

*Balistreri v. Pacifica Police Department*, 901 F.2d 696, 699 (9th Cir. 1990)......................... 4

*Barbera v. WMC Mortgage Corp.* No. C 04-3738 SBA, 2006 WL 167632 at *5 (N.D. Cal. Jan. 19, 2006) .................................................................................................. 5

*Barnett v. Fireman's Fund Ins. Co.*, 90 Cal.App.4[th] 500 (2001) .......................................... 21

*Bautista v. Las Angeles County* (9th Cir. 2000) 216 F3d 837.............................................. 4

*Bell Atlantic Corp. v. Twombley* –U.S.—127 S.Ct. 1955 ............................................... 3, 20

*Berger v. Home Depot U.S.A., Inc.* 476 F.Supp.2d 1174, 1177 (C.D. Cal. 2007)................ 22

*Bionghi v. Metro. Water Dist.*, 70 Cal.App.4rth 1358 ......................................................... 23

*Bowen v. First Financial Services, Inc.*, 223 F3d 1331 (11th Cir. 2003) ............................. 15

*Byars v. SCME Mortg. Bankers, Inc.* (2003) 109 Cal.App.4[th] 1134 ................................... 19

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal.App.3d 1371 (1990) ....................... 23

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal.App.3d 1371, (1990) ...................... 20

*Cel-Tech Commc'ns, Inc. v. L.A. Co.*, 20 Cal.4[th] 163, 180 (1999) .............................. 15,20

*Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994)................................. 4

*Cleghorn v. Blue Shield of California*, 408 F.3d 1222 (9th Cir. 2005)............................... 15

*Copesky v. Sup. Ct.*, 229 Cal.App.3d 678 (1991) ............................................................. 23

*First Comm. Mortgage Co. v. Reece*, 89 Cal.App.4[th] 731, (2001)................................... 20

*Fong v. Unites States*, 300 F.2d 400, 413 (9th Cir. 1962) ............................................... 4

*Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980) ...................................... 6

*Fundin v. Chicago Pneumatic Tool Co.*, 152 Cal.App.3d 951 (1984)................................. 21

*Grimes v. New Century Mortgage Corp.*,  340 F.3d 1007, 1011 (9th Cir. 2003) .................. 6

*Guz v. Bechtel National, Inc.*, 24 Cal.4th 317................................................................. 22

*Harpeneau v. Massachusetts Mut. Life Ins. Co.*, No. C-96-4619 MHP, 1998 WL 30056, at *6-7 (N.D. Cal. Jan. 5, 1998) ................................................................... 22

*Hess v. Transamerica Occidental Life Ins. Co.*, 190 Cal.App.3d 941 ................................ 22

*Household Credit Servs. V. Pfennig*, 541 U.S. 232, 235 (2004) ......................................... 6

*In re Late Fee & Over-Limit Fee Limits.*, 528 F.Supp.2d 953, at *34 (N.D. Cal. Nov. 16, 2007) ......................................................................................................................... 16

*Johnson v. Bank One Acceptance Corp.*, 278 F.Supp.2d 450, 456 (E.D. PA 2003)............... 9

*Kunert Mv. Mission Fin'l Services Crop.* (2003) 110 Cal.App.4th 242 ............................. 19

*Martinez v. Socoma Companies, Inc.*, 11 Cal.3d 398, 408 (1974) ..................................... 21

*McGlinchy v. Shell Chemical Co.*, 845 F.3d 802, 810 (9th Cir. 1988) ............................... 4

*MGIC Indem. Co. v. Weisman*, 803 F2d 500, 504 (9th Cir. 1986) ................................... 3

*Milhollin*, 444 U.S. at 559 ................................................................................................ 6

*Mitsui Mfrs. Bank. v. Sup.Ct.*, 212 Cal.App.3d 726, 795 (1989) ..................................... 23

*Moore v. Kayport Package Express, Inc.* 885 F.2d 531, 541 (9th Cir. 1989).................... 19

*Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) ....................................................... 3

*Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ................................................................. 3

*Parrino v. FHP, Inc.*, 146 F.3d 699 ................................................................................... 3

*Pokolksy v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632 ..................................... 19

*Postow v. OBA Fed. Sav. & Loan Assoc.*, 627 F.2d 1370, 1380 (D.C. Cir. 1980) ............. 5

*Price v. Wells Fargo Bank*, 213 Cal.App.3d 465, 476 (1989) ......................................... 23

*Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th cir. 1987)........................................... 3

*Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984) .................. 3

*Scripps Clinic v. Sup. Ct.*, 108 Cal.App.4th 917, 940 (2003) ......................................... 20

*Searle v. Wyndham Int'l, Inc.* 102 Cal.App.4th 1327 (2002)......................................... 20

*Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1006-1007 (9th Cir. 2008) .................. 18

*Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal.App.4[th] 700, 718 (2001) ............................................ 15

*South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal.App.4[th] 861 (1999) .................... 20

*Stetler v. Greenpoint Mortgage Funding, Inc.*, No. 07-0123-DLB, 2008 WL 192405, at *7 (E.D. Cal. Jan. 23, 2008) ............................................................................................. 16

*Stone Mountain Game Ranch Inc. v. Hunt* (5th Cir. 1984) 746 F2d 761 ................................................ 4

*Szummy v. Am. Gen. Fin. Inc.*, 246 F.3d 1065, 1070 (7th Cir. 2001) .............................................. 6,8

*Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002) ........................................................................ 3

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) .............................................. 19

*Western Mining Council v, Watt*, 643 F.2d 618, 624 (9th Cir. 1981) ................................................... 3

# STATUTES

12 C.F.R § 226.4 ..................................................................................................... 6

12 C.F.R. § 226.17(c) ............................................................................................ 11

12 C.F.R. § 226.17-24 ............................................................................................ 7

12 C.F.R. § 226.18(g) ............................................................................................ 7

12 C.F.R. § 226.19 .................................................................................................. 9

12 C.F.R. § 226.22 .................................................................................................. 6

12 C.F.R. § 226.23(a)(3) ........................................................................................ 4

12 C.F.R. § 226.23(a)(3) n.48 ................................................................................ 5

12 C.F.R. § 226.30 .................................................................................................. 6

12 C.F.R. §§ 226.1 *et seq.* ..................................................................................... 5

12 C.F.R. pt. 226 ..................................................................................................... 6

12 C.F.R. pt. 226, Supp. I, §  226.23(a)(3) cmt 2 ................................................. 5

12 C.F.R. pt. 226, SuppI, cmt 17(c)(1) ............................................................... 12

12. C.F.R. § 226.17(a)(1)-1 ................................................................................... 6

15 U.S.C §§1606(c) & (e) .................................................................................... 14

15 U.S.C §1605(f) ................................................................................................ 14

15 U.S.C. § 1601(a) ............................................................................................... 5

15 U.S.C. § 1603 .................................................................................................. 14

15 U.S.C. § 1604(a) ............................................................................................... 5

15 U.S.C. § 1610(a)(1) ........................................................................................ 14

15 U.S.C. § 1631(d) ............................................................................................. 14

15 U.S.C. § 1640(a) ............................................................................................... 4

ix

15 U.S.C. § 1640(e) ........................................................................................... 4

15 U.S.C. §1633 ............................................................................................... 14

15 U.S.C. §1635 ............................................................................................... 14

15 U.S.C. §1640 .................................................................................... 13, 14, 17

15. U.S.C. § 1604(b), (f) & (g) ......................................................................... 14

C.F.R. § 226.19(b)(2) ....................................................................................... 12

Cal. Bus. & Prof. Code § 17200 ...................................................................... 14

Cal. Bus. & Prof. Code §§ 17204 .................................................................... 13

Cal. Code Civ. Proc. § 338(d) and (2) ............................................................. 17

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 2

CV08-00536 JF
DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This action arises out of a mortgage loan made by defendant Mortgage Investor Group, a general partnership ("MIG") to plaintiff Jay J. Ralston ("Ralston"). The loan is of a type colloquially referred to as a Pay Option ARM loan. That is, the loan has variable interest rate, and provides the borrower with different payment options on the loan. As was fully disclosed to Plaintiff, some of those payment options would result in his principal loan balance growing, an effect known as negative amortization. This is a legitimate loan product used uniformly nationwide in the mortgage lending industry.

Plaintiff's main contention is that MIG violated the Truth in Lending Act ("TILA"). The other state law claims made by Plaintiff are either predicated on the TILA violation or improperly seek to expand on the disclosure requirements made by the specific TILA statutory scheme. In actuality, Plaintiff's lawsuit is an attack on a loan product that he believes is unsuitable. But TILA does not regulate the terms of loans, only their disclosure. All TILA requirements were met by MIG.

First, the TILA claim is deficient because Plaintiff did not incorporate by reference the opening paragraphs of the First Amended Complaint. Therefore, Plaintiff has not alleged the parties, jurisdiction, venue, or the fact of the loan, which are all necessary to state his TILA claim. Further, Plaintiff's claim for damages under TILA is barred by the one year statute of limitations. The claim for rescission under TILA would then remain. However, only certain types of TILA material non-disclosure violations can form the basis of a rescission claim, and the Plaintiff's claims about the failure to disclose interest rates properly cannot be the basis of a rescission. Further, all of the material terms were repeatedly and properly disclosed.

Plaintiff's claims under California's Unfair Competition Law ("UCL") fail because (1) the TILA claim on which they are predicated fails, (2) TILA preempts any attempt to require more disclosure than is required by the statute, and (3) the UCL claims simply do not meet pleading standards of specificity.

Plaintiff attempts to state a breach contract claim, but simply makes up out of whole cloth

1

1  new terms that are not in the Note and Adjustable Rate Rider, which documents must control. Lastly,

2  Plaintiff's claim for tortious breach of the covenant of good faith and fair dealing fails because there

3  is no special relationship between and lender and borrower, which relationship would be necessary to

4  create a duty by MIG and support the claim.

5  **II.    FACTUAL ALLLEGATIONS**

6      As required by the Federal Rules of Civil Procedure, MIG recites the allegations of the

7  Complaint, but does not thereby accept the truth thereof.  On or about July 20, 2005 Plaintiff

8  refinanced his existing home loan and borrowed $ 520,000.00 from MIG.  *First Amended Complaint*

9  *("FAC")* ¶ 5; *FAC* Exhibit 1; *Adjustable Rate Rider* (July 20, 2005) at 3 ("Rider") (copy attached to

10 Declaration of Christine C. Rhea ("Rhea Dec.") as Exhibit B); *Adjustable Rate Note* (July 20, 2005),

11 1-4 & *Prepayment Penalty Addendum* (collectively "Note") (copy attached to Rhea Dec. as Exhibit

12 A.)  In connection with the making of the loan, the Plaintiff executed the Adjustable Rate Note,

13 Adjustable Rate Rider, Deed of Trust (not attached), Truth in Lending Disclosure Statement, and

14 Adjustable Rate Loan Program Disclosure. Rhea Dec. Exhibits A-D. This Court may properly

15 consider the loan documents concerning Plaintiff's transactions referenced herein in ruling on this

16 Motion, because the Complaint "refers extensively" to such documents and they "form the basis of"

17 Plaintiff's claims. *See, e.g., Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002); *see also, Parrino*

18 *v. FHP, Inc.*, 146 F.3d 699, 705-706.

19 **III.    STANDARD ON A MOTION TO DISMISS**

20      A motion to dismiss under Fed. R. Civ. P. ("Rule") 12(b)(6) tests the sufficiency of the

21 complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  A claim may be dismissed under

22 Rule 12(b)(6) where the complaint lacks a cognizable legal theory.  *Robertson v. Dean Witter*

23 *Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984); *see Neitzke v. Williams*, 490 U.S. 319, 326 (1989)

24 ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law").

25 Alternatively, a claim may be dismissed where it presents a cognizable legal theory yet fails to plead

26 essential facts under that theory. *Robertson*, 740 F.2d at 534. A complaint that contains a "formulaic

27 recitation of the elements of the cause of action" will not suffice to overcome a motion to dismiss.

28

2

1  *Bell Atlantic Corp. v. Twombly*, -- U.S.--, 127 S.Ct. 1955, 1964-65 (citations omitted).

2          In reviewing a Rule 12(b)(6) motion, the court need not take as true legal conclusions cast in

3  the form of factual allegations.  *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th cir. 1987); *Western*

4  *Mining Council v, Watt*, 643 F.2d 618, 624 (9th Cir. 1981).  The court may consider the facts alleged

5  in the complaint, documents attached to the complaint, documents relied upon but not attached to the

6  complaint when authenticity is not contested, and matters of which the court takes judicial notice.

7  *See MGIC Indem. Co. v. Weisman*, 803 F2d 500, 504 (9th Cir. 1986).

8  **IV.    PLAINTIFF'S TILA CLAIM DOES NOT PLEAD THE BASIC UNDERLYING**

9         **FACTS, OF JURISDICTION, VENUE, OR PARTIES SUFFICIENT TO STATE A**

10        **TILA CLAIM.**

11         The Plaintiff's claim for violation of TILA begins at paragraph 53 of the FAC and does not

12  include by reference or otherwise any of the preceding 52 paragraphs of the FAC. Paragraphs 53

13  through 110 of the FAC proceed to detail various circumstances in which "Defendants" allegedly

14  failed to make the statutory disclosures required by TILA.

15         Federal Rules of Civil Procedure, Rule 8(a) requires that a complaint contain a "short and

16  plain statement of the claims showing that the pleader is entitled to relief."  Further, "each claim

17  founded on a separate transaction or occurrence…shall be stated in a separate count…whenever a

18  separation facilitates the clear presentation of the matters set forth." (Federal Rules of Civil

19  Procedure, Rule 10(b); *Bautista v. Las Angeles County* (9th Cir. 2000) 216 F3d 837, 840-841; see

20  *Stone Mountain Game Ranch Inc. v. Hunt* (5th Cir. 1984) 746 F2d 761, 763 fn.1 (plaintiff improperly

21  mixed breach of contract and tort law concepts" in same count.)

22         Rule 12(b)(6) authorizes a court to dismiss a claim based on the lack of a cognizable legal

23  theory or the absence of sufficient facts alleged under a cognizable legal theory. *See, Balistreri v.*

24  *Pacifica Police Department*, 901 F.2d 696, 699 (9th Cir. 1990).  Conclusory allegations without

25  more are insufficient to defeat a motion to dismiss for failure to state a claim. *See, McGlinchy v.*

26  *Shell Chemical Co.*, 845 F.3d 802, 810 (9th Cir. 1988).  A court is not required to accept legal

27  conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn

28

3

from the facts alleged. *See, Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994).

> ...[T]he rule is that different causes of action must not only be separately stated, but also that each 'must contain in itself sufficient averments to constitute a good cause of action', and that a valid 'objection to one count is not' overcome 'by an averment in another count.' That was the common law rule, and it is the same under modern code pleadings systems, with this condition that allegations of one county may be incorporated by reference into another cause of action in the same complaint. [Citation omitted.]

*Fong v. Unites States*, 300 F.2d 400, 413 (9th Cir. 1962) (affirming dismissal of fourth count of a complaint which failed to incorporate by reference earlier counts of the complaint.)

The first cause of action of the FAC does not reference the previous 52 paragraphs and is therefore deficient. The TILA claim does not allege the identity of the plaintiff, the defendants or their relationship. The TILA claim does not allege any facts showing the standing of the Plaintiff or the jurisdiction of the Court or any facts showing that venue is proper in this Court. The TILA claim does not identify that a loan subject to TILA was even made or by whom. Even under the barest notice pleading standard, the TILA claim fails to allege facts sufficient to state a cause of action.

## V.    PLAINTIFF'S TILA CLAIMS ARE TIME BARRED BY THE STATUTE OF LIMITATIONS.

Plaintiff's TILA claims are time barred. TILA provides that a borrower who does not receive certain receive disclosures may initiate an action for civil damages. 15 U.S.C. § 1640(a). The limitations action period for such action is one year from the date of the alleged TILA violation. 15 U.S.C. § 1640(e). Plaintiff's TILA claims assert alleged violations of TILA's loan closing disclosure requirements. *FAC* ¶¶ 53-106. At the latest, Plaintiff's TILA claims arose at the closing of his mortgage loan transaction on July 20, 2005. *Note* at p. 1 of 4; *see, e.g. Barbera v. WMC Mortgage Corp.* No. C 04-3738 SBA, 2006 WL 167632 at *5 (N.D. Cal. Jan. 19, 2006) (finding TILA claims for civil damages based on disclosure violations arose at closing of Plaintiff's loan); *see also Postow v. OBA Fed. Sav. & Loan Assoc.*, 627 F.2d 1370, 1380 (D.C. Cir. 1980)(same). Plaintiff did not file

his claim until January 24, 2008—i.e., more than two years later.

The only TILA remedy aside from damages even theoretically available to Plaintiff at this juncture is the right to rescind the loan transaction, and even then only if that right was extended to the maximum three year period after his loan was consummated. But that three-year right to rescind applies only if "material disclosures" were not delivered. 12 C.F.R. § 226.23(a)(3). Even if otherwise legally and factually correct, none of Plaintiff's TILA claims about the disclosure of (1) the applicable rate of interest in their Note, (2) the possibility of negative amortization, or (3) the fact that the initial interest rate was discounted would entitle him to rescind his loan. 12 C.F.R. § 226.23(a)(3) n.48 (listing the "material" disclosures that would trigger the right to rescind); 12 C.F.R. pt. 226, Supp. I, § 226.23(a)(3) cmt 2, 46 Fed. Reg. 50288, 50319 (Oct. 9, 1981).

## VI.    MIG MADE ALL REQUIRED DISCLOSURES ACCURATELY, AND PLAINTIFF'S ALLEGATIONS ABOUT TILA VIOLATIONS REFLECT A FUNDAMENTAL MISUNDERSTANDING OF THE REQUIREMENTS OF THE STATUTORY SCHEME.

The FAC asserts seven alleged theories about how defendants violated TILA. Each of the theories either bears no relation to the specific statutory scheme or is contradicted by the plain face of the documents in issue.

### A.    Background of TILA

Congress enacted TILA to promote the informed use of credit. It requires creditors to make specified disclosures so that consumers can more accurately compare the cost of credit. *See* 15 U.S.C. § 1601(a). TILA "focuses on disclosure and does not serve as an umbrella statute for consumer protection in real estate transactions." *Grimes v. New Century Mortgage Corp.,* 340 F.3d 1007, 1011 (9th Cir. 2003) (MeKeown, J., dissenting); *see also Szummy v. Am. Gen. Fin. Inc.,* 246 F.3d 1065, 1070 (7th Cir. 2001)( (TILA "is a disclosure statute; it does not regulate substantively consumer credit but rather requires disclosure of certain terms and conditions of credit before consummation of a consumer credit transaction."). TILA was designed to balance the competing

considerations of complete disclosure and the need to avoid information overload. As the Supreme Court has explained, TILA's purpose is to require "meaningful disclosure," not "more disclosure." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568 (1980).

To implement TILA, Congress delegated "expansive authority" to the Federal Reserve board "to enact appropriate regulations to advance this purpose." *Household Credit Servs. v. Pfennig*, 541 U.S. 232, 235 (2004); *Milhollin*, 444 U.S. at 559; 15 U.S.C. § 1604(a). Pursuant to this authority, the Federal Reserve Board has issued a set of comprehensive and highly detailed regulations, known as Regulations Z. *See* 12 C.F.R. §§ 226.1 *et seq.* These regulations, along with the Federal Reserve Board's official staff commentary thereto, are entitled to judicial deference. *Milhollin*, 444 U.S. at 565-66. Regulation Z does much more than establish a set of standards for creditors to consider in making their disclosures. Indeed, Regulation Z sets forth a series of very specific instructions regarding when, where, and how the TILA disclosures are to be made.

**B.    Plaintiff's Theory That MIG Disclosed Two Conflicting APR's Is Contradicted by the Documents and TILA, Which Provides for Only One APR Disclosure.**

Plaintiff contends that the defendants violated 12 C.F.R. § 226.17(a)(1)-1 by listing two different Annual Percentage Rates ("APR"), one in the Truth in Lending Statement ("TIL") and one in the Note and that the two APR's conflicted. Specifically, the APR on the TIL was 5.756% and the alleged "APR" (actually the contractual note rate) on the Note was 1%. *FAC* ¶ 60. The important point for the Court's analysis is that assuming all these facts are true, as matter of law, this theory (an APR on a TIL which conflicts with a contractual rate on a note) does not state a claim under TILA under any circumstances whatsoever.

This allegation belies a basic misunderstanding of TILA. The APR is not synonymous with the contractual interest rate listed in the note. The APR and the rate on the note are never the same. If Plaintiff's theory of TILA's requirements were correct, every single closed end loan in the country subject to TILA has been improperly disclosed to the borrowers. In fact the APR is required to be disclosed only on the TIL, and its purpose is to permit borrowers to compare on an apples-to-apples basis the true costs of credit when shopping for loans. 12 C.F.R. § 226.22. As those costs involve

6

more than the contractual interest rate, the APR calculations includes not only the contractual rate, but also points, broker fees, and certain other credit charges, amortized over the term of the loan. *See* 12 C.F.R § 226.4. Regulation Z sets forth, over numerous pages of the Federal Register, exactly how the APR must be calculated. 12 C.F.R. § 226.22 and 12 C.F.R. pt. 226, App. J.

The only section of Regulation Z that pertains to disclosures that must be made in a note is § 226.30 which states:

> A creditor shall include in any consumer credit contract secured by a dwelling and subject to the act and this regulation the maximum interest rate that may be imposed during the term of the obligation.

12 C.F.R. § 226.30.    MIG clearly did reveal the maximum interest rate. (*Complaint* Ex. 1 at Section 4(D); Rhea Dec. Ex. A id. (informing Mr. Ralston that "my interest rate will never be greater than 9.950 %").

Also, the Plaintiff repeatedly alleges that disclosures in the Note were not "clear and conspicuous." Plaintiff apparently seeks to employ the "clear and conspicuous" requirement of section 226.17. Section 226.17 applies only to disclosures required by this "Subpart," i.e., Subpart C, 12 C.F.R. § 226.17-24. Subpart C does not address disclosures that must be made in a note, such as the interest rate. Thus section 226.17's "clearly and conspicuously" language, upon which plaintiffs seek to ground their cause, does not even apply to interest rate disclosures. The TILA requirement that disclosure be clear and conspicuous is simply not applicable to the contractual interest rate.

Only one APR was required to be stated—on the TIL. The APR was listed on the TIL, as the FAC admits. Plaintiff's allegation that defendants violated TILA because the APR and contractual note rate conflicted is meaningless, and certainly not a TILA violation.

### C.    The Schedule of Payments on the TIL Did Not Violate TILA.

§ 226.18(g) explains that a creditor must disclose the "number, amounts, and timing of payments scheduled to repay the obligations." Plaintiff picks seemingly out of the air a theory as to what the payment schedule in the TIL must contain. Specifically, Plaintiff argues that the TIL was not clear and conspicuous and was deceptive because the payment schedule was not based on the APR listed in the TIL. FAC ¶¶ 66, 73, 76. (Plaintiff also alleges that the payment schedule was not

based on the "annual interest rate" listed in the TIL. As noted above, the APR is a number based on a several different factors and there is no "annual interest rate" listed in a TIL). Again, the theory on which Plaintiff's base their TILA claim does not create liability under any circumstances. In fact, to state the payment schedule based on the APR would be a violation of TILA.

The Federal Reserve Board's ("FRB") Official Commentary ("Commentary") provides an "authoritative interpretation" of Regulation Z that is binding on the Court. *Szumny v. Am.Gen.Fin,* 246 F.3d 1065, 1069 (7th Cir. 2001). The Commentary provides that loans must be based on terms in effect at the time of the consummation, and instructs that the disclosures should be based on the initial interest rate.

> The disclosures for a variable-rate transaction must be given for the full term of the transaction and must be based on the terms in effect at the time of consummation. Creditors should base the disclosure only on the initial rate and should not assume that this rate will increase.

Commentary § 17(c)(1)(8).

Moreover, the Commentary provides specific guidance for variable rate transactions where, like here, the initial interest rate is "not determined by the index or formula used to make the later interest rate adjustments." Commentary § 17(c)(1)(10). The Commentary requires that the payment schedule in such transactions must reflect the effect of multiple rates:

> The effect of multiple rates must also be reflected in the calculation and disclosure of the finance charge, total of payments, and payment schedule.

Commentary § 17(c)(1)(10)(ii). *See, Johnson v. Bank One Acceptance Corp.,* 278 F.Supp.2d 450, 456 (E.D. PA 2003) (granting defendant's motion to dismiss defendants' motion to dismiss TILA claim because its payment schedule consisting of 79 low payments and 1 large payment satisfied TILA requirements since the payment schedule accurately reflected plaintiffs' obligation to payoff their loan).

In the instant matter the payment schedule on the TIL is properly based on the initial contract rate for the first 60 payments, at which time the Note requires that the Full Payment, not the

Minimum Payment be made. The TIL discloses the payment schedule as it is required to by Regulation Z.

More importantly, Plaintiff's theory of violation is simply in contradiction with TILA. MIG could not due as Plaintiff's whish and base the payment schedule on the APR. So regardless of what MIG actually disclosed, Plaintiffs theory of liability does not state a claim.

**D.    The Loan Program Disclosure Fully Disclosed the Plaintiff Negative Amortization.**

Plaintiff alleges that defendants failed to properly disclose negative amortization. *FAC* ¶ 81-84. Like the rest of their TILA claims, plaintiff's attack on the negative amortization disclosure rests on a basis misunderstanding of Regulation Z. . § 226.19 is the only provision of Regulation Z that addresses negative amortization, and it only applies to the Program Disclosures, not the TIL Disclosure Statements and not the Note or other loan documents. 12 C.F.R. § 226.19 (the "negative amortization" disclosure, cited by plaintiff, must be made in a "loan program disclosure for each variable-rate program in which the consumer expresses an interest"). Therefore, any allegation that either the TIL or the Note violated TILA because of the manner in which they disclosed or failed to disclose negative amortization is simply irrelevant. So on its face, the Plaintiffs allegations, even without looking to the documents, do not state a claim.

Plaintiff makes no allegation that the Program Disclosure fails to meet the requirements of § 226.19, and for good reason. The Program Disclosure clearly disclosed the fact that negative amortization was a possibility. More specifically, the Program Disclosure highlighted the fact that negative amortization would result if plaintiffs selected the minimum payment option. The Program Disclosure explained how payments would be calculated and what the monthly payment options were, and how to use them to avoid negative amortization:

> Beginning with the 13th payment and every 12th month thereafter, we will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal balance in full by the maturity date in substantially equal payments at the interest rate in effect during the month preceding the payment change date. This payment is called the "Full Payment." Except as otherwise provided your "Limited

9

Payment" will be the payment amount for the month preceding the payment change date increased by no more than 7.5% ("Payment Cap"). Your new "Minimum Payment" will be the lesser of the Limited Payment and the Full Payment. You also have the option to pay the Full Payment for your monthly payment. If you pay less than the Full Payment, then the payment may not be to enough cover the interest due, and any difference will be added to your principal balance. **This means the balance of your loan could increase. This is known as "negative amortization."** During the loan term, we may provide you with other monthly payment options that are greater than the Minimum Payment ("Payment Options"). Please ask about these Payment Options.

(Rhea Dec. Ex. D, emphasis added).

Further, the Note and Rider clearly discuss negative amortization. Again, there is no requirement in TILA that they do so. Nonetheless, defendants show how negative amortization was more fully disclosed than even required. In its very first paragraph, the Note contains an express disclosure in all capital text that "THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED." This is an express disclosure of negative amortization. Beyond this, there is also a provision in the Note entitled, "Additions to My Unpaid Principal" (Paragraph 3[E]) that discloses exactly what happens when the borrower makes the minimum payment, including the fact that the principal amount of the loan will increase:

…my Minimum Payment could be less than…the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date…. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by section 2.

*FAC*, Ex. 1 ¶ 3(E).

Moreover, plaintiff's Note and Rider clearly set forth the applicable contractual rate of interest and specifies when that rate can change. (*Complaint* Ex. 1, Section; Rhea Dec. Ex 2, Para. 2(A)-(B).) In this regard, both the Note and Rider inform plaintiff of his initial interest rate, 1% and. (Complaint Ex. 1, at Para. 2; Rhea Dec. Ex. 2 Para. 2(A) Both the Note and Rider also inform

10

plaintiff that "[t]he interest rate I will pay may change."  Paragraph 2(B) of the Note goes on to specify when the interest rate may change:

> The interest rate I will pay *may change on the 1st day of September, 2005*, and on the first day of every month thereafter.  Each date on which my interest rate could change is called an "Interest Rate Change Date."

(Complaint Ex. 1 at Paragraph 2(B) (emphasis added.); also Rhea Dec. Ex. A.) Paragraphs 2(C) and (D) specify how the new interest rates will be computed:

> **(C)   Index**
> Beginning with the first Interest Rate Change Date, my adjustable rate will be based on an Index.  The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields").   The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."
>
> ***
>
> **(D)   Calculations of Interest Rate Changes**
> Before each Interest Rate Change Date, the Note Holder will calculate any new interest rate by adding THREE AND 075/100 percentage point(s) 3.075% ("Margin") to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than 9.950%.  Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

(*Complaint* Ex. 1 at Paragraphs 2(C) and (D); and Rhea Dec. Ex. A Id.)

The Program Disclosure also emphasized the short-term nature of plaintiffs' initial interest rates:

> Your interest rate can change on your first payment and monthly thereafter.

(Rhea Dec. Ex. D).)

As noted, the Note and Rider plainly disclosed that the initial rate would change.

11

Further, nothing about what plaintiff calls this "teaser" rate feature of his loan was illegal. In any event, TILA only regulates disclosures, not loan terms. *See Szummy*. 246 F.3d at 1070 (TILA "is a disclosure statute; it does not regulate substantively consumer credit."). There is no provision of TILA that a low initial interest violates. Further, there is no requirement in TILA that the negative amortization discussed in the Note and Rider can even be a violation of the TILA.

E.     **Plaintiff Does Not State a Claim for Failure to Disclose the Legal Obligation**

Plaintiff's next contention that MIG failed to adequately disclose Plaintiff's "legal obligations" in contravention of § 226.17(c), hardly warrants discussion. *FAC* ¶¶ 85-89.   As the Commentary explains, "legal obligation" means that the disclosures must generally "reflect the credit terms to which the parties are legally bound when the disclosures are provided." 12 C.F.R. pt. 226, SuppI, cmt 17(c)(1).   These credit terms are, of course, contained, in the Notes and Rider.   Plaintiff fails to point to any specific provision of the credit contract that is not accurately reflected in the TIL and the Program Disclosure.   To the extent Plaintiff is pointing to the payment schedule or the APR, MIG has already explained why those disclosures are made as specifically required. Plaintiff has failed to state a claim.

F.     **Plaintiff Does Not State a Claim for Failure to Disclose the Composite APR.**

Plaintiff's next allegation is that defendants failed to state a composite APR.   Again, these allegations are vague and simply make no sense under the TILA statutory scheme. The allegations also seemed to contradicted Plaintiff's earlier allegations that there was problem with the TILA disclosures because the APR and the contractual rate on the Note differed!   In this allegation, Plaintiff says that defendants put a low, short term rate on the Note.  Then, Plaintiff alleges that that defendants failed to "clearly and conspicuously disclose the composite annual percentage rate on these loans and instead listed a different interest rate in the documents provided to consumers...." FAC ¶ 94. A different interest rate than what? As noted below, the APR is a composite number. The APR is clearly and boldly displayed on the TIL. Plaintiff simply has not pled how this disclosure of the APR violates TILA.

G.     **The Disclosure on the Discounting of the Initial Interest Rate Complied with TILA.**

12

Plaintiff claims that MIG failed to disclose that the initial rate was discounted. *FAC* ¶¶ 96-103. Again, there is no requirement of disclosure of such fact under the Regulation Z provision in either the Note or the TILA Disclosure Statement. The disclosures required under § 226.19, including the disclosure about any discounting of the initial rate, are to be made in a "loan program disclosure," not in the Note or the TILA Disclosure Statement. 12 C.F.R. § 226.19(b)(2). Plaintiffs make no claim that MIG's program disclosure was non-compliant. Therefore, Plaintiff has not stated a claim under TILA.

## II.    The Effect of the Payment Cap is Fully Disclosed.

Plaintiff's last TILA allegation is that MIG failed to disclose the effect of the payment cap in the loan. *FAC* ¶¶ 104-109. Again the requirement of § 226.17)(c)(1)-10.iii is simply that the "effect" of the payment cap be disclosed in the disclosures. TILA imposes no requirements for putting anything about the payment cap in the note. So the Plaintiff's allegations about the extent of the disclosure in the Note are per se irrelevant. Also, Plaintiff fails to specify a single part of the disclosure statements that are somehow insufficient.

The Loan Disclosure Program does specifically advise the borrower of the affect of the payment cap. As quoted in subsection "D" above, across from the heading: Your Payment Will Be Calculated as Follows:" , the Loan Disclosure Program discusses at length the 7.5% Payment Cap, and the effect that it may have on the loan, including negative amortization. Defendants have plainly shown that they made all the disclosures required by TILA as a matter of law, and Plaintiff's meandering First Amended Complaint which contradicts both its self and the plain requirements of the statutory scheme created by TILA ought not to be allowed to go forward.

## VII.    PLAINITFF'S UCL CLAIM BASED ON TILA IS PREMPTED BY TILA AND FAILS TO STATE A CLAIM BECAUSE OF THE FAILURE TO STATE A TILA CLAIM.

The second claim of the FAC is a UCL claim based on the alleged TILA violations alleged in the first claim. *FAC* ¶¶ 111-121. The evident purpose of bringing a duplicative cause of action is to add to the remedies that TILA provides for under federal law---presumably, to increase the available

13

types of relief (from actual and statutory damages, the latter capped at $500,000.00 in a class action, to an uncapped amount of restitution and injunctive relief under the UCL). *Compare* 15 U.S.C. § 1640 *with* Cal. Bus. & Prof. Code §§ 17204, 17208. Yet, this intention is precisely what bars the second claim.

TILA provides significant federal regulation in the area of consumer credit disclosures. Among TILA's provisions are ones that provide for remedies that carefully balance the rights and interests of consumers and creditors, allowing actual damages and statutory damages for certain types of violations, a class action cap of $500,000.00, loan rescission on an individual basis for a more limited range of disclosure violations, and a complex web of safe harbors and exceptions. 15 U.S.C. §§ 1603, 1604(b), (f) & (g) , 1605(f), 1606(c) & (e), 1631(d) , 1633, 1635, and 1640. It is well settled that TILA thus strikes a balance in these provisions that was carefully constructed as an integral part of the entire statutory scheme. *Bowen v. First Financial Services, Inc.,* 223 F3d 1331, 1337 (11th Cir. 2003).

Any state law or other requirement that is inconsistent with TILA is preempted. *Cleghorn v. Blue Shield of California,* 408 F.3d 1222 (9th Cir. 2005); 15 U.S.C. § 1610(a)(1). Plaintiff's attempt to bootstrap a UCL claim on top of TILA, in order to greatly expand and distort the federal statute's closely drawn remedial scheme, is inconsistent with TILA.

Plaintiff is likely to contend that the UCL's additional remedies are not inconsistent with TILA because state law does not require any conduct TILA proscribes or prohibit any conduct that TILA allows. There is no reason to read TILA's preemption rules, or to apply conflict preemption principles, so narrowly. TILA has a variety of highly technical requirements whose violation often leads to near automatic liability. Congress' choice to temper those rules with some limits on liability, such as the short statute of limitations and the $500,000.00 liability cap, are not only an integral part of the law, they are the product of a sensible judgment that injury can be redressed and compliance urged by something less than ruinous liability. Plaintiff's UCL claim seeks to add to what Congress decided was appropriate, and so should not be entertained.

Further, an "unlawful" business practice under the UCL must be a practice that violates

14

1   another law. *Cel-Tech Commc'ns, Inc. v. L.A. Co.*, 20 Cal.4th 163, 180 (1999) ("by proscribing 'any

2   unlawful' business practice, Cal. Bus. & Prof. Code § 17200 'borrows' violations of other laws and

3   treats them as unlawful practices that the unfair competition law makes independently

4   actionable.")(internal quotation marks omitted). However, if the plaintiff's claim would fail under

5   the "borrowed" law, the UCL claim fails too. *See, e.g. Smith v. State Farm Mut. Auto. Ins. Co.*, 93

6   Cal.App.4th 700, 718 (2001).

7   As set forth in the previous section, Plaintiff's TILA claim fails. Moreover, TILA is the sole

8   predicate alleged for the UCL violation contained in the second claim of the FAC. As MIG did not

9   violate TILA, Plaintiff's UCL claim predicated on this supposed violation fails and must be

10   dismissed. *See In re Late Fee & Over-Limit Fee Limits.*, 528 F.Supp.2d 953, at *34 (N.D. Cal. Nov.

11   16, 2007)(finding that the defendant banks "could not properly be deemed to have engaged in unfair

12   or deceptive practices under the [UCL] by acting consistently with all existing legal interpretations of

13   the NBA and with express disclosures of their contracts concerning late fee and over-limit fees").

14

15   **VIII.   THE ALLEGED FRAUDULENT OMISSIONS ARE NOT ACTIONABLE.**

16   The third claim of the FAC alleges three omissions in connection with Plaintiff's loan.

17   Specifically, it alleges that MIG failed to disclose (1) the "actual interest rate being charged on the

18   Note(s)"; (2) that "negative amortization would occur and that the 'principle balance will increase;'"

19   and (3) that "the initial interest rate on the note was discounted." *FAC* ¶ 124. These allegations all

20   fail because the Plaintiff received the Note and Rider that expressly disclosed the facts allegedly

21   concealed.

22   Not surprisingly, it is well-settled that a non-disclosure claim fails where the information at

23   issue was disclosed in a document signed by the plaintiff. *See, e.g. Stetler v. Greenpoint Mortgage*

24   *Funding, Inc.*, No. 07-0123-DLB, 2008 WL 192405, at *7 (E.D. Cal. Jan. 23, 2008) (disclosures in

25   loan documents were sufficient where "plaintiff read and signed the documents that disclosed the

26   issues he now complains of"; "[t]hat he may not have understood the meaning of those documents, as

27

28

15

he now seems to contend, does not render otherwise sufficient disclosures ineffective"). That is the case here.

First, Plaintiff's allegations of non-disclosure of the actual interest rate being charged are belied by detailed interest rate disclosure in the Note and Rider.    Indeed, the Note is entitled "Adjustable Rate Note" and contains, in its very first paragraph, an express disclosure, in all capital letter text that "THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT." Paragraph 2 of the Note then contains the loan terms relating "Interest." Note ¶ 2.  In Paragraph 2(A), the Note discloses (1) the yearly "Interest Rate" the borrower will pay "until the full amount of Principal has been paid," and (2) that the disclosed interest rate may change.  And in Paragraphs 2(B)-(D), the Note discloses the adjustable rate features of the loan, including that the interest rate set forth in Paragraph 2(A) is subject to change monthly starting on September 1, 2005.  Plaintiff's non-disclosure allegations are refuted by the express terms of the Note, and therefore cannot state a valid calm for fraudulent omission.

Second, Plaintiffs' non-disclosure allegations concerning negative amortization are likewise belied by the Note and Rider. In its very first paragraph, the note contains an express disclosure in all capital text that "THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED."  This is an express disclosure of negative amortization. Beyond this, there is also a provision in the Note entitled, "Additions to My Unpaid Principal (Paragraph 3[E]) that discloses exactly what happens when the borrower makes the minimum payment, including the fact that the principal amount of the loan will increase:

> …my Minimum Payment could be less than…the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date…. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by section 2.

Note ¶ 3(E).

The Note also discloses in Paragraph 3(C)  that, "[i]f the Minimum Payment is not sufficient

16

to cover the interest due [,] then negative amortization will occur"—the precise disclosure Plaintiff alleges was not made.

Further, the Adjustable Rate Rider, also executed by Plaintiff has the same language. The first paragraph of the Rider states in capital text that, "THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED."    Paragraph 2(B) states that "the [i]f the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization." (The line under this language on the Rider contains Plaintiff's handwritten initials"). Likewise, Paragraph 3(E) of the Rider contains the same language quoted above from Paragraph 3(E) of the Note.  The Note and the Rider thus foreclose any claim that Plaintiff was not told of the negative amortization.

Also, Plaintiff's allegations concerning the discounted initial rate also runs counter to the FAC and the detailed interest rate disclosures in the Note and Rider.  There are express disclosures in that it "CONTAINS PROVISIONS THAT WILL CHANGE HE INTERST RATE AND THE MONTHLY PAYMENT." *Note* in the first paragraph.  In Paragraph 2, the Note discloses that the initial interest rate is subject to monthly change beginning on September 1, 2006.

Plaintiff also fails to state a claim because it is preempted by TILA. The claim purports that insufficient or incorrect disclosure was made.  The evident purpose of bringing a duplicative action is to use it to pursue claims and remedies not available under TILA.

Specifically, as Plaintiff's TILA claim for civil damages is time barred and the statute caps damages in class actions, this claim is a thinly veiled attempt (1) to increase the statute of limitations period (from one year for TILA violation to three years for fraud under California law (Cal. Code Civ. Proc. § 338(d) and (2) to increase the available types of relief (for example, from actual and statutory damages, the latter capped at $500,000.00 in class actions (15 U.S.C. § 1640), to an uncapped amount or restitution and injunctive relief under California law).  Plaintiff's attempt to use this claim to add to TILA's remedies is further revealed by his prayer for a mandatory injunction requiring MIG to make particularized disclosures in every arm loan disclosure statement.  It is exactly Plaintiff's intention to expand TILA's closely drawn remedial scheme that bars this claim.

Plaintiff's attempt to bootstrap a fraudulent omission claim on top of TILA, in order to greatly expand and distort the federal statute's closely-drawn remedial scheme, is inconsistent with TILA and thus preempted. *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1006-1007 (9th Cir. 2008)(finding an attempt to go outside TILA's limitations period is an attempt to enforce a state regulation in an area expressly preempted by federal law).

Finally, this fraud based claim does not reach the high pleading standard required of Rule 9(b). Under Rule 9(b), all averments of fraud ...shall be stated with particularity." It is well-established that "Rule9(b)'s particularity requirement applies to state-law causes of action" where the action is pursued in federal court. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). The FAC must at a minimum "state the time, place and specific content of the false representations" purportedly giving rise to the claim. *Moore v. Kayport Package Express, Inc.* 885 F.2d 531, 541 (9th Cir. 1989). The FAC does not approach this standard of pleading, and the fraudulent omission claim should be dismissed.

## IX. PLAINTIFF'S FOURTH CLAIM FOR BREACH OF UCL PREDICATED ON "UNFAIR" OR "FRAUDULENT" BUSINESS PRACTICES IS ALSO PREEMPTED AND FAILS TO STATE A CLAIM

The FAC's third claim is a UCL claim predicated on "unfair" or "fraudulent" business practices. The FAC has a laundry list of conclusory statements regarding what those practices were: MIG misrepresented that the "teaser" rate was not the "fixed" rate that MIG would actually charge to Plaintiff. *FAC* ¶ 147. The FAC then contradicts itself and alleges that the loans had a low fixed payment but not a low fixed interest rate. *FAC* ¶ 147. MIG perpetrated an unexplained "bait and switch scheme" on Plaintiff "and to describe the loan as having a fixed interest rate was deceptive and unfair." *FAC* ¶ 151. Of course, the Note that Plaintiff attaches to the FAC contradicts these allegations of being sold a fixed loan product, and Plaintiff himself argues in the TILA claim that the loan had a variable rate.

First, to the extent that this UCL claim purports to allege that even though MIG abided by all required TILA disclosures, the disclosures or omissions were unlawful, such a theory cannot be

18

supported by a UCL claim. *Byars v. SCME Mortg. Bankers, Inc.* (2003) 109 Cal.App.4[th] 1134, 1148-1149 (where mortgage lender's disclosure of a "yield spread premium" was disclosed to buyer in the "HUD-1 Settlement Statement in a lawful manner as required by federal law, lender's failure to itemize broker's services "cannot constitute the basis of a Section 17200 claim"); *accord Kunert Mv. Mission Fin'l Services Crop.* (2003) 110 Cal.App.4th 242, 264-265. Further, to be unfair under the UCL, the conduct must be "substantially injurious to consumers." *See Pokolksy v. First Healthcare Corp.* (1996) 50 Cal.App.4[th] 632, 647. Where MIG is in complete TILA compliance, MIG cannot ipso facto be engaging in conduct that is substantially injurious to consumers.

Second, this UCL claim is at its core an attempt to challenge the fairness of the Plaintiff's mortgage contract. It is, however, well-settled that the UCL is not to be used for that purpose. *See, e.g., South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal.App.4[th] 861 (1999)(the UCL "does not give the courts a general license to review the fairness of contracts.")(internal citations omitted); *Searle v. Wyndham Int'l, Inc.* 102 Cal.App.4[th] 1327, (2002)(same).

Third, this UCL claim fails because the Complaint is devoid of the allegations necessary to state a plausible claim for under the unfairness or fraud prongs of the UCL. *Bell Atlantic Corp. v. Twombley* –U.S.–127 S.Ct. 1955, 1965-65 (motion to dismiss should be granted where plaintiff's allegations are not "enough to raise a right to relief above the speculative level.") Plaintiff has merely made amorphous conclusionary allegations of bad behavior. The California Supreme Court has criticized allowing such "amorphous" allegations to form the basis of a claim. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4[th] 163, 167. Further, the unfair practice must be "tethered" to specific constitutional, statutory or regulatory provisions." *Scripps Clinic v. Sup. Ct.,* 108 Cal.App.4[th] 917, 940 (2003). Plaintiff does not make material factual allegations that reach these pleading standards. Rather, Plaintiff just makes conclusory statements, such as that MIG engaged in a "bait and switch" scheme without any factual supporting statement at all or statements that are contradicted by the loan documents and the other allegations of the FAC.

**X.    PLAINTIFF'S BREACH OF CONTRACT CLAIM DOES NOT IDENTIFY ANY BREACHED TERMS.**

It is black-letter law, that to state a claim for breach of contract, a plaintiff must first allege a breach. *First Comm. Mortgage Co. v. Reece,* 89 Cal.App.4th 731, 745, 108 Cal.Rptr. 23 (2001); *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.,* 222 Cal.App.3d 1371 (1990). Further a trial court must dismiss contract claims when the agreement is not reasonably susceptible to any interpretations that could support the plaintiff's legal theories. *See Martinez v. Socoma Companies, Inc.,* 11 Cal.3d 398 (1974).

Here, plaintiff pleads no specific facts that MIG breached the Note (or Deed of Trust), the alleged contracts at issue. Complaint, ¶¶ 120-124. Indeed, plaintiff simply makes up out of whole cloth terms that are not contained in the Note and then alleges that MIG breached the terms. "[I]f there are inconsistencies between the complaint and the written instrument, the written instrument controls." *Fundin v. Chicago Pneumatic Tool Co.,* 152 Cal.App.3d 951, 955 (1984*); see Barnett v. Fireman's Fund Ins. Co.,* 90 Cal.App.4th 500 (2001) ("[T]o the extent the factual allegations conflict with the content of the exhibits to the complaint, we rely on and accept as true the contents of the exhibits and treat as surplusage the pleader's allegations as to the legal effect of the exhibits.")

First, Plaintiff alleges that the defendants expressly or through their conduct and actions agreed that plaintiffs "monthly payment obligations" would be sufficient to pay both the principal and interest owed on his loans. *FAC* ¶ 166. It is unclear what this term is, but to the extent it is not in the contract, it cannot serve as the basis of a breach. Plaintiff also alleges that defendants failed to apply any portion of the payment to principal. The Note states on the first line that it is an "Adjustable Rate Note." As noted previously, the Note contains, in its very first paragraph, an express disclosure, in all capital letter text that "THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT." Paragraph 2 of the Note then contains the loan terms relating "Interest." Note ¶ 2. In Paragraph 2(A), the Note discloses (1) the yearly "Interest Rate" the borrower will pay "until the full amount of Principal has been paid," and (2) that the disclosed interest rate may change. And in Paragraphs 2(B)-(D), the Note discloses

20

the adjustable rate features of the loan, including that the interest rate set forth in Paragraph 2(A) is subject to change monthly starting on September 1, 2005.

Next, Plaintiff alleges that the "payment schedule" MIG provided represents that the "monthly obligations are the exact payments necessary to pay off all principal and interest during the terms of the loans if the interest rate actually charged by Defendants was the low interest rate promised." *FAC* ¶ 167. In fact, there is no payment schedule per se in the Note. If Plaintiff is referring to the schedule on the Truth in Lending Statement ("TIL"), the TIL is not part of the contract, so it cannot form the basis of a breach of contract claim.

The Note and Rider do not promised that Plaintiff's monthly payment would cover both principal and interest. As set forth above, no such promise was made in the Note or Rider and the exact opposite possibility was noted. The Notes explicitly says that payments are applied to interest first. The promises that Plaintiff claims that MIG made simply do not exist. The written agreement controls, and no breach of contract claim has been stated.

## XI.    PLAINTIFF CANNOT IMPLY ANY COVENANTS INTO THE LOAN AGREEMENT.

Plaintiff's sixth cause of action (mistakenly labeled as the fifth cause of action) is for tortuous (sic) breach of the implied covenant of good faith and fair dealing. It appears that Plaintiff is not trying to allege a breach contractual breach of the covenant of good faith and fair dealing. But as a precaution, defendants note that it is black-letter law that, to state a claim for breach of the implied covenant in a contract, a plaintiff must allege a *breach of contract*. *Berger v. Home Depot U.S.A., Inc.* 476 F.Supp.2d 1174, 1177 (C.D. Cal. 2007); *Harpeneau v. Massachusetts Mut. Life Ins. Co.*, No. C-96-4619 MHP, 1998 WL 30056, at *6-7 (N.D. Cal. Jan. 5, 1998) Further, a party "cannot base a claim for breach of the implied covenant on acts that occurred in pre-contract dealings." *Harpeneu,* 1998 WL 30056, at *6 (citing *Hess v. Transamerica Occidental Life Ins. Co.*, 190 Cal.App.3d 941, 945, 235 Cal.Rptr. 715 (1987)); *Guz v. Bechtel National, Inc.*, 24 Cal.4th 317, 349, 100 Cal.Rptr.2d 352 (2000) (stating that the implied covenant "exists merely to prevent one contracting party from

unfairly frustrating the other party's right to receive the *benefits of the agreement actually made.*") (emphasis in original). Plaintiff only alleges pre-formation allegations of what the contract would contain. ("Defendants expressly represented that ...the loans would have a fixed interest rate at promised low interest rate for a period of three (3) to five (5) years." *FAC* ¶ 176.)

To the extent that the Plaintiff is attempting to allege a tortious breach of the implied covenant of good faith and fair dealing (as opposed to implying some specific term into the contract), a special relationship must exist between the parties. "[T]ort recovery for breach of the covenant [of good faith and fair dealing] is available only in limited circumstances, generally involving a special relationship between the contracting parties, such as the relationship between an insured and its insurer." *Bionghi v. Metro. Water Dist.*, 70 Cal.App.4rth 1358, 1370 (1999).

Where, as here, the disputed transactions occurred in a typical commercial context and the contracting parties were in an ordinary bank-customer relationship, tort remedies are precluded. No special relationship exists. This is well-settled under California law. *Mitsui Mfrs. Bank. v. Sup.Ct.*, 212 Cal.App.3d 726, 795 (1989)("We reject real parties' argument that the tort doctrine which has been extended only to situations where there are unique fiduciary-like relationships between the parties, should encompass normal commercial banking transactions.") (rejecting borrower's claim against bank for tortuous breach of implied covenant of good faith and fair dealing); *Price v. Wells Fargo Bank*, 213 Cal.App.3d 465, 476 (1989) ("'A debt is not a trust and there is not a fiduciary relationship between debtor and creditor as such.' The same principle should apply with even greater clarity to the relationship between a bank and its loan customers.") (rejecting same claim by individual borrowers against bank) (internal citation omitted); *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal.App.3d 1371 (1990)("[R]ecognition of a tort remedy for breach of the implied covenant in a noninsurance context has little authoritative support.")(sustaining demurrer on same claim by commercial borrower against bank); see *Copesky v. Sup. Ct.*, 229 Cal.App.3d 678, 694 (1991) ("It is thus our conclusion that the bank-depositor relationship is not a 'special relationship' under the *Wallis* test, or any other test, such as to rise to tort damages when the implied contractual covenant of good faith is broken.") The same logic applies here. Apparently appreciating this, Plaintiff makes no

22

attempt to allege a special relationship. Accordingly, the claim for tortious breach of the implied covenant of good faith and fair dealing must be dismissed.

## XII.    MORTGAGE INVESTORS GROUP, INC. SHOULD BE DISMISSED AS IT DID NOT MAKE THE LOAN IN ISSUE

Although Plaintiff sues both Mortgage Investors Group and Mortgage Investors Group, Inc., Plaintiff makes no specific allegations as between them, merely alleging that the collective "Defendants" committed all of the acts and omissions. In fact, all of the loan documents before the Court reflect that only Mortgage Investors Group made the loan, including the disclosures to Plaintiff. Since the written instruments must control over any allegations of the pleading, Mortgage Investors Group, Inc. should be dismissed as having absolutely no involvement in the transaction that is the subject of this action.

Dated: May 21, 2008                            PFEIFER & REYNOLDS, LLP

                                               By:      /s/ Roland P. Reynolds
                                                        ROLAND P. REYNOLDS, Esq.
                                                        Attorneys for Defendants MORTGAGE
                                                        INVESTORS GROUP, INC. and MORTGAGE
                                                        INVESTORS GROUP

1  ROLAND P. REYNOLDS, ESQ., (SBN 150864)
   rreynolds@pfeiferlaw.com
2  ANNABELLE DE LA MORA, ESQ. (SBN 117649)
   adelamora@pfeiferlaw.com
3  PFEIFER & REYNOLDS, LLP
4  765 The City Drive, Suite 380
   Orange, CA 92868
5  Telephone:     (310) 788-3900
   Facsimile:     (310) 388-5416
6

7  Attorneys for Defendants MORTGAGE INVESTORS
8  GROUP, INC., and MORTGAGE INVESTORS GROUP,
   A General Partnership
9

10                UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN JOSE DIVISION

13

14  JAY J. RALSTON, On Behalf Of Himself   ) Civil Case No. CV 08-00536 JF
    And All Others Similarly Situated;      )
15                                          )
                        Plaintiff,          ) **[PROPOSED] ORDER GRANTING**
16          vs.                             ) **DEFENDANTS' MOTION TO DISMISS**
                                            ) **PLAINTIFF'S FIRST AMENDED**
17  MORTGAGE INVESTORS GROUP,               ) **COMPLAINT**
18  INC., MORTGAGE INVESTORS               )
    GROUP, a general partnership, and DOES ) Date:    August 8, 2008
19  1-10,                                   ) Time:    9:00 a.m.
                        Defendants.         ) Crtrm:   3
20                                          )
                                            ) Honorable Jeremy Fogel
21                                          )
                                            ) Complaint Filed: January 24, 2008
22                                          )
                                            )
23                                          )
                                            )
24  _____

25
    ///
26
    ///
27
    ///
28                                    1

1

2        The motion of defendants Mortgage Investors Group and Mortgage Investors Group, Inc.,

3   pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, to dismiss the First

4   Amended Complaint of plaintiff Jay J. Ralston came on for hearing on August 8, 2008 at 9:00 a.m.

5   Counsel for all parties appeared.

6        Based on the supporting and opposing memoranda and other related documents filed with the

7   Court in connection with the motion, and the papers and records on file in this action, defendants'

8   motion to dismiss the First Amended Complaint is hereby granted without leave to amend.

9        **IT IS SO ORDERED.**

10

11  Dated: _____            _____

12                                      The Honorable Jeremy Fogel
                                        United States District Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

ROLAND P. REYNOLDS, ESQ., (SBN 150864)
rreynolds@pfeiferlaw.com
ANNABELLE DE LA MORA, ESQ. (SBN 117649)
adelamora@pfeiferlaw.com
PFEIFER & REYNOLDS, LLP
765 The City Drive, Suite 380
Orange, CA 92868
Telephone:    (310) 788-3900
Facsimile:    (310) 388-5416


Attorneys for Defendants MORTGAGE INVESTORS
GROUP, INC. and MORTGAGE INVESTORS GROUP,
A General Partnership

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAY J. RALSTON, On Behalf Of Himself And All Others Similarly Situated; | ) Civil Case No. CV 08-00536 JF |
| Plaintiff, | ) |
| vs. | ) **DECLARATION OF CHRISTINE C. RHEA** |
| | ) **IN SUPPORT OF DEFENDANTS' MOTION** |
| | ) **TO DISMISS PLAINTIFF'S FIRST** |
| MORTGAGE INVESTORS GROUP, | ) **AMENDED COMPLAINT** |
| INC., MORTGAGE INVESTORS GROUP, a general partnership, and DOES 1 -10, | ) Date:    August 8, 2008 |
| | ) Time:    9:00 a.m. |
| | ) Crtrm: 3 |
| Defendants. | ) |
| | ) Honorable Jeremy Fogel |
| | ) Complaint Filed:  January 24, 2008 |

///

1

/// 

I, Christine C. Rhea, declare:

1.      I am President of Mortgage Investors Group, Inc.  I have personal knowledge of the facts set forth in this declaration, and, if called as a witness, could and would testify competently thereto.

2.      Mortgage Investors Group, Inc. is a general partner of Mortgage Investors Group, a general partnership ("MIG").  As part of my job responsibilities I am directly knowledgeable about the origination of loans by MIG.  I have reviewed the loan files maintained by MIG in connection with the origination of the loan to Jay J. Ralston. The following documents were executed by Mr. Ralston as part of the loan transaction.  Attached hereto as Exhibit "A" and incorporated herein by this reference is a true and correct copy of the Adjustable Rate Note executed by Mr. Ralston. Attached hereto as Exhibit "B" and incorporated herein by this reference is and true and correct copy of the Adjustable Rate Rider executed by Mr. Ralston.  Attached hereto as Exhibit "C" and incorporated herein by this reference is a true and correct copy of the Truth in Lending Disclosure Statement executed by Mr. Ralston.  Attached hereto as Exhibit "D" and incorporated herein by this reference is a true and correct copy of the Adjustable Rate Loan Program Disclosure executed by Mr. Ralston.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of May 2008 at Knoxville, Tennessee.

Christine C. Rhea

2

# *EXHIBIT A*

## *(Adjustable Rate Note)*

# *EXHIBIT A*

## *(Adjustable Rate Note)*

MIN: 1001095-0001044120-9                    Loan Number: 1044120

# ADJUSTABLE RATE NOTE
### (MTA-Twelve Month Average Index - Payment Caps)

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.

JULY 20, 2005                 IRVINE                      CALIFORNIA
   [Date]                      [City]                        [State]

731 COLUMBIA AVENUE, SALINAS, CALIFORNIA 93901
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $520,000.00     (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed (ONE HUNDRED FIFTEEN PERCENT     ) of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is MORTGAGE INVESTORS GROUP, A GENERAL PARTNERSHIP
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

(A)  Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  1.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

(B)  Interest Rate Change Dates

The interest rate I will pay may change on the  1st     day of SEPTEMBER, 2005 , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

(C)  Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D)  Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 075/1000     percentage point(s)  3.075 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than  9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3.  PAYMENTS

(A)  Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the  1st     day of each month beginning on SEPTEMBER 1, 2005     . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on AUGUST 1, 2035     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 16257 LAGUNA CANYON ROAD #100, IRVINE, CALIFORNIA 92618
or at a different place if required by the Note Holder.

Borrower Initials: JVR

PayOption ARM Note - MTA Index
FE-5312 (0412)                    Page 1 of 4                                              10/04

**(B)  Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,672.53        unless adjusted under Section 3 (F).

**(C)  Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the        1st        day of SEPTEMBER, 2006 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.
I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to  115.000  percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)  Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:
(i)    Interest Only Payment:  the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
(ii)    Fully Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.
(iii)    15 Year Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.
These Payment Options are only applicable if they are greater than the Minimum Payment.

Borrower Initials:  JR

PayOption ARM Note - MTA Index
FE-5312 (0412)                                        Page 2 of 4

4.  NOTICE OF CHANGES
The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5.  BORROWER'S RIGHT TO PREPAY  ** See attached Prepayment Note Addendum.
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.
I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6.  LOAN CHARGES
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.  BORROWER'S FAILURE TO PAY AS REQUIRED
(A)  Late Charges for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5 . 000 % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

(B)  Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C)  Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D)  No Waiver By Note Holder
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E)  Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

8.  GIVING OF NOTICES
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE
If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

Borrower Initials: _LR_  _____  _____  _____
PayOption ARM Note - MTA Index
FE-5312 (0412)                    Page 3 of 4                    10/04

UA5322.ow

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
JAY J. RALSTON                           -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

CERTIFIED TO BE A TRUE CORRECT AND COMPLETE COPY OF THE ORIGINAL
...COUNT...
...COMPANY

Pay to the order of

Without Recourse
MORTGAGE INVESTORS GROUP
By Mortgage Investors Group, Inc.

Charles B. Tonkin, II
President



THIS IS CERTIFIED TO BE
A TRUE AND CORRECT COPY
OF THE ORIGINAL

MORTGAGE INVESTORS GROUP

# *EXHIBIT B*

## *(Adjustable Rate Rider)*

# *EXHIBIT B*

## *(Adjustable Rate Rider)*

MIN: 1001095-0001044120-9                    Loan Number: 1044120
Doc ID#:

### ADJUSTABLE RATE RIDER
(MTA-Twelve Month Average Index - Payment Caps)

THIS ADJUSTABLE RATE RIDER is made this        20th        day of JULY
2005            , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by
the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
MORTGAGE INVESTORS GROUP, A GENERAL PARTNERSHIP
("Lender") of the same date and covering the property described in the Security Instrument and
located at:

731 COLUMBIA AVENUE, SALINAS, CALIFORNIA 93901
[Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT
THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL
AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY
BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agrees as follows:

A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

2.   INTEREST
(A)  Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I
will pay interest at a yearly rate of     1.000 %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of the Note.

(B)  Interest Rate Change Dates
The interest rate I will pay may change on the        1st        day of SEPTEMBER
2005            , and on that day every month thereafter. Each date on which my interest
rate could change is called an "Interest Rate Change Date." The new rate of interest will become
effective on each Interest Rate Change Date. The interest rate may change monthly, but the
monthly payment is recalculated in accordance with Section 3.



Borrower Initials: _JR_  _____  _____  _____
PayOption MTA ARM Rider
FE-5315 (0505)                    Page 1 of 5

(C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 075/1000     percentage point(s)    3.075 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than   9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

3.   PAYMENTS

(A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the     1st       day of each month beginning on SEPTEMBER 1, 2005    . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on AUGUST 1, 2035    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 16257 LAGUNA CANYON ROAD #100, IRVINE, CALIFORNIA 92618 or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,672.53     unless adjusted under Section 3 (F).

(C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the   1st   day of SEPTEMBER, 2006  , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

Borrower Initials: _____  _____  _____  _____
PayOption MTA ARM Rider
FE-5315 (0505)                           Page 2 of 5

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D) Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

(E) Additions to My Unpaid Principal

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

(F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN AND 000/1000 percent ( 115.000 %)of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

(G) Required Full Payment

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

Borrower Initials: ____

PayOption MTA ARM Rider
FE-5315 (0505)                    Page 3 of 5

**(H)  Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)  Interest Only Payment:  the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)  Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii)  15 Year Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial Interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

Borrower Initials: _JR_

PayOption MTA ARM Rider
FE-5315 (0505)                    Page 4 of 5

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.



_____
JAY  J.  RALSTON                                                    -Borrower

_____
                                                                   -Borrower

_____
                                                                   -Borrower

_____
                                                                   -Borrower

PayOption MTA ARM Rider
FE-5315 (0505)                    Page 5 of 5



# *EXHIBIT C*

## *(Federal Truth-in-Lending Disclosure Statement)*

# *EXHIBIT C*

## *(Federal Truth-in-Lending Disclosure Statement)*

# FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Loan Number: 1044120

Date: JULY 20, 2005

Creditor: MORTGAGE INVESTORS GROUP

Address: 16257 LAGUNA CANYON ROAD #100, IRVINE, CALIFORNIA 92618

Borrower(s): JAY J. RALSTON

Address: 731 COLUMBIA AVENUE, SALINAS, CALIFORNIA 93901

Lines containing an "x" are applicable:

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | ☐ Total Sale Price The total cost of your purchase on credit including your down-payment of $ |
|---|---|---|---|---|
| 5.756 % | $ 649,165.76 | $ 517,557.27 | $ 1,166,723.03 | $ |

**PAYMENTS: Your payment schedule will be:**

| Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning | | | Monthly Beginning | | | Monthly Beginning |
| 1 | 1,672.53 | 09/01/05 | | | | | | |
| 11 | 1,672.53 | 10/01/05 | | | | | | |
| 12 | 1,797.97 | 09/01/06 | | | | | | |
| 12 | 1,932.82 | 09/01/07 | | | | | | |
| 12 | 2,077.78 | 09/01/08 | | | | | | |
| 12 | 2,233.61 | 09/01/09 | | | | | | |
| 299 | 3,500.49 | 09/01/10 | | | | | | |
| 1 | 3,500.00 | 08/01/35 | | | | | | |

_____ DEMAND FEATURE: This obligation has a demand feature.

__X__ VARIABLE RATE FEATURE: Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

INSURANCE: The following insurance is required to obtain credit:

_____ Credit life insurance and credit disability   __X__ Property Insurance   _____ Flood Insurance   _____ Private Mortgage Insurance

You may obtain property insurance from any insurer that is acceptable to the Lender.

SECURITY: You are giving a security interest in: 731 COLUMBIA AVENUE, SALINAS, CALIFORNIA 93901

_____ The goods or property being purchased   __X__ Real property you already own.

FILING FEES: $

LATE CHARGE: If payment is more than ____15____ days late, you will be charged ____5.000__% of the payment.   * or $5.00 (whichever is greater)

PREPAYMENT: If you pay off early, you

__X__ may   _____ will not   have to pay a penalty.

_____ may   __X__ will not   be entitled to a refund of part of the finance charge.

ASSUMPTION: Someone buying your property

_____ may   _____ may, subject to conditions   __X__ may not   assume the remainder of your loan on the original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.

__X__ "e" means an estimate   _____ all dates and numerical disclosures except the late payment disclosures are estimates.

Each of the undersigned acknowledge receipt of a complete copy of this disclosure. The disclosure does not constitute a contract or a commitment to lend.

| Applicant JAY J. RALSTON | 7-22-05 Date | Applicant | Date |
|---|---|---|---|
| Applicant | Date | Applicant | Date |
| Applicant | Date | Applicant | Date |

** NOTE: Payments shown above do not include reserve deposits for taxes, assessments, and property or flood insurance.

# *EXHIBIT D*

## *(Adjustable Rate Mortgage Loan Program Disclosure)*

# *EXHIBIT D*

## *(Adjustable Rate Mortgage Loan Program Disclosure)*

DATE: JULY 20, 2005
BORROWER: JAY J. RALSTON
CASE #:
LOAN #: 1044120
PROPERTY ADDRESS: 731 COLUMBIA AVENUE, SALINAS, CALIFORNIA 93901

ADJUSTABLE RATE MORTGAGE LOAN PROGRAM DISCLOSURE
MONTHLY TREASURY AVERAGE INDEX - PAYMENT CAPS
ALL STATES EXCEPT NEW YORK

This disclosure describes the features of an Adjustable Rate Mortgage (ARM) program you are considering. Information about our other ARM programs will be provided upon request.

| HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED | | |
|---|---|---|
| • Your interest rate will be based on an index rate plus a margin. Please ask us for our current interest rate and margin. <br> • The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. <br> • Your initial interest rate is not based on the index used to make later adjustments. Please ask us for the amounts of our current interest rate discounts. <br> • For the first year of your loan, your payment will be based on the initial interest rate, loan amount and loan term. After the first year, your payment will be calculated as described below. | | |
| | **MTA ARM (initial rate change at 1 month)** | **MTA ARM (initial rate change at 3 months)** |
| Your interest rate can change: | On your first payment date and monthly thereafter | On your 3rd payment date and monthly thereafter |
| Each time your interest rate changes, the new interest rate will equal the sum of the index plus the margin, subject to the following limits: | • Your interest rate will be rounded to the nearest 1/8%. <br> • Your interest rate will never exceed the maximum set forth in your loan documents. The maximum rate in effect as of the first business day of January 2005 is 9.95%. Please ask us for our current maximum rate. | |
| | How Your Payment Can Change | |
| Your payment can change: | • Every year and can increase or decrease substantially based on changes in the interest rate. <br> • At every 5th scheduled payment adjustment, you will need to pay the Full Payment until the next payment adjustment date. | |
| | You will be notified in writing at least 25, but no more than 120 days, before the due date of a payment at a new level. This notice will contain information about the index, your interest rates, payment amount and loan balance. | |
| Your payment will be calculated as follows: | Beginning with the 13th payment and every 12 months thereafter, we will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal balance in full by the maturity date in substantially equal payments at the interest rate in effect during the month preceding the payment change date. This payment is called the "Full Payment." Except as otherwise provided, your "Limited Payment" will be the payment amount for the month preceding the payment change date increased by no more than 7.5% ("Payment Cap"). Your new "Minimum Payment" will be the lesser of the Limited Payment and the Full Payment. You also have the option to pay the Full Payment for your monthly payment. If you pay less than the Full Payment, then the payment may not be enough to cover the interest due, and any difference will be added to your principal balance. This means the balance of your loan could increase. This is known as "negative amortization." During the loan term, we may provide you with other monthly payment options that are greater than the Minimum Payment ("Payment Options"). Please ask us about these Payment Options. | |
| The unpaid principal of your loan: | Can never exceed 115% (110% in New York) of the original amount borrowed. This means that your monthly payment may change more frequently than annually and the payment change will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to pay off the unpaid principal balance over the remaining life of the loan at the current interest rate. | |
| | The examples below illustrate interest rate and payment changes based on a $10,000, 30-year loan. These examples use an initial interest rate in effect on the first business day of January 2005, and assume the maximum periodic increases in rates and payments. | |
| | Examples of loans with a discounted interest rate (below sum of index and margin) | |
| Initial Interest Rate | 1.00% | 1.75% |
| Maximum Interest Rate | 9.95% | 9.95% |
| First Year Payment | $32.16 | $35.72 |
| Maximum payment | $101.46 in the 3rd year | $102.14 in the 3rd year |

CONV
• ARM MTA PayOption Disclosure
FE-4273 (0505)                                                Page 1 of 2

| | Examples of loans with a premium interest rate (above sum of index and margin) ||
|---|---|---|
| Initial Interest Rate | N/A | N/A |
| Maximum Interest Rate | N/A | N/A |
| First Year Payment | N/A | N/A |
| Maximum payment | N/A | N/A |

NOTE: To see what your payment would be, divide your mortgage amount by $10,000, then multiply the monthly payment by that amount. (For example, the monthly payment for a $60,000 MTA ARM Index - Payment Cap loan with a discounted interest rate would be: $60,000 / $10,000 ≈ 6; 6 x $32.16 =$192.96 per month)

Applicant JAY J RALSTON                               7-22-05
Applicant                                             Date

_____                      _____
Applicant                                             Date

_____                      _____
Applicant                                             Date

_____                      _____
Applicant                                             Date