Lori E. Andrus (SBN 205816)
Micha Star Liberty (SBN 215687)
Jennie Lee Anderson (SBN 203586)
**ANDRUS LIBERTY & ANDERSON LLP**
1438 Market Street
San Francisco, CA 94102
Telephone: (415) 896-1000
Facsimile: (415) 896-2249
lori@libertylaw.com
micha@libertylaw.com
jennie@libertylaw.com

David M. Arbogast (SBN 167571)
Jeffrey K. Berns (SBN 131351)
**ARBOGAST & BERNS LLP**
19510 Ventura Boulevard, Suite 200
Tarzana, California 91356
Telephone: (818) 961-2000
Facsimile: (310) 861-1775
darbogast@law111.com
jberns@law111.com

*Attorneys for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAY RALSTON, On Behalf Of Himself And All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MORTGAGE INVESTORS GROUP, INC., MORTGAGE INVESTORS GROUP, A General Partnership, AND DOES 1-10,<br><br>Defendants. | Civil Case No.: CV 08-00536 JF<br><br>**DECLARATION OF JENNIE LEE ANDERSON IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date: August 15, 2008<br>Time: 9:00 a.m.<br>Courtroom: 3<br>Honorable Jeremy Fogel<br><br>Complaint filed January 24, 2008 |

I, Jennie Lee Anderson, do hereby declare and state as follows:

1. I am a partner at law in the law firm of Andrus Liberty & Anderson LLP, duly admitted to practice before the courts of the State of California, including the United States District Court for the Northern District of California. I am an attorney of record for Plaintiff in the above-captioned matter. I make this declaration based on my personal knowledge of the facts contained herein.

2. Attached hereto as Exhibit A is a true and correct copy of excerpts from the Federal Reserve Board's Official Staff Commentary on Regulation Z, 12 C.R.F. §226, issued by the Board of Governors of the Federal Reserve System to implement the Federal Truth in Lending Act, 15 U.S.C. 1601 *et seq*., and published in A.S. Pratt & Sons, Truth-in-Lending Manual: Text and Forms, Ralph C. Clontz, Jr. & James H. Pannabecker, Appendix B (2006).

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on July 25, 2008 at San Francisco, California.

                                                      _____*/s/ Jennie Lee Anderson*_____
                                                           Jennie Lee Anderson

ANDRUS LIBERTY & ANDERSON LLP
1438 Market Street
San Francisco, CA 94102
Telephone: (415) 896-1000
Facsimile: (415) 896-2249
jennie@libertylaw.com

- 1-

**DECLARATION OF JENNIE LEE ANDERSON
ISO PLTF'S OPP. TO DEFS' MOTION TO DIMISS
FIRST AMENDED COMPLAINT**

# **CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2008, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 25, 2008                                                    */s/ Jennie Lee Anderson*
                                                                                        Jennie Lee Anderson

ANDRUS LIBERTY & ANDERSON LLP
1438 Market Street
San Francisco, CA  94102
Telephone:  (415) 896-1000
Facsimile:  (415) 896-2249
jennie@libertylaw.com

- 2-

**DECLARATION OF JENNIE LEE ANDERSON
ISO PLTF'S OPP. TO DEFS' MOTION TO DIMISS
FIRST AMENDED COMPLAINT**

Westlaw.

TILNDM APP B                                                                                                                    Page 1
Truth-in-Lending Man. Appendix B

**A.S. Pratt & Sons**
**Truth-In-Lending Manual: Text and Forms**
Ralph C. Clontz, Jr. & James H. Pannabecker
**Current through the November 2006 Update**

APPENDIX B. REGULATION Z, ANNOTATED WITH OFFICIAL STAFF COMMENTARY

SUBPART A--GENERAL

§ 226.1. Authority, purpose, coverage, organization, enforcement and liability.

   (a) *Authority*. This regulation, known as Regulation Z, is issued by the Board of Governors of the Federal Reserve System to implement the Federal Truth in Lending Act, which is contained in title I of the Consumer Credit Protection Act, as amended (15 U.S.C. 1601 *et seq*.). This regulation also implements title XII, section 1204 of the Competitive Equality Banking Act of 1987 (Pub. L. 100-86, 101 Stat. 552). Information-collection requirements contained in this regulation have been approved by the Office of Management and Budget under the provisions of 44 U.S.C. 3501 *et seq*. and have been assigned OMB number 7100-0199.

   (b) The purpose of this regulation is to promote the informed use of consumer credit by requiring **disclosures** about its terms and cost. The regulation also gives consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling, regulates certain credit card practices, and provides a means for fair and timely resolution of credit billing disputes. The regulation does not govern charges for consumer credit. The regulation requires a maximum interest rate to be stated in variable-rate contracts secured by the consumer's dwelling. It also imposes limitations on home equity plans that are subject to the requirements of Sec. 226.5b and mortgages that are subject to the requirements of Sec. 226.32. The regulation prohibits certain acts or practices in connection with credit secured by a consumer's principal dwelling.

   (c) *Coverage*. (1) In general, this regulation applies to each individual or business that offers or extends credit when four conditions are met: (1) The credit is offered or extended to consumers; (ii) the offering or extension of credit is done regularly; [FN1] (iii) the credit is subject to a finance charge or is payable by a written agreement in more than 4 installments; and (iv) the credit is primarily for personal, family, or household purposes.

   (2) If a credit card is involved, however, certain provisions apply even if the credit is not subject to a finance charge, or is not payable by a written agreement in more than 4 installments, or if the credit card is to be used for business purposes.

   (3) In addition, certain requirements of §  226.5b apply to persons who are not creditors but who provide applications for home equity plans to consumers.

   (d) *Organization*. The regulation is divided into subparts and appendices as follows:

   (1) Subpart A contains general information. It sets forth: (i) The authority, purpose, coverage, and organization of the regulation; (ii) the definitions of basic terms; (iii) the transactions that are exempt from coverage; and (iv) the method of determining the finance charge.

   (2) Subpart B contains the rules for open-end credit. It requires that initial **disclosures** and periodic statements be provided, as well as additional **disclosures** for credit and charge card applications and solicitations and for home equity plans subject to the requirements of § §  226.5a and 226.5b, respectively.

   (3) Subpart C relates to closed-end credit. It contains rules on **disclosures,** treatment of credit balances, annual percentage rate calculations, rescission requirements, and advertising.

   (4) Subpart D contains rules on oral **disclosures,** Spanish language **disclosure** in Puerto Rico, record retention, effect on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1) The consumer has approved in writing the annual percentage rate or rates, the range of balances to which they apply, and the method of treating any unearned finance charge on an existing balance.

(2) The creditor retains no security interest in any property after the creditor has received payments equal to the cash price and any finance charge attributable to the sale of that property. For purposes of this provision, in the case of items purchased on different dates, the first purchased is deemed the first item paid for; in the case of items purchased on the same date, the lowest priced is deemed the first item paid for.

(i) *Interim student credit extensions.* For each transaction involving an interim credit extension under a student credit program, the creditor need not make the following **disclosures:** the finance charge under § 226.18(d), the payment schedule under § 226.18(g), the total of payments under § 226.18(h), or the total sale price under § 226.18(j).

[46 FR 20892, Apr. 7, 1981, as amended at 52 FR 48670, Dec, 24, 1987; 61 FR 49246, Sept. 19, 1996]

Official Staff Commentary:

17(a) Form of **disclosures.**

Paragraph 17(a)(1).

1. *Clear and conspicuous*. This standard requires that **disclosures** be in a reasonably understandable form. For example, while the regulation requires no mathematical progression or format, the **disclosures** must be presented in a way that does not obscure the relationship of the terms to each other. In addition, although no minimum type size is mandated, the **disclosures** must be legible, whether typewritten, handwritten, or printed by computer.

2. *Segregation of disclosures*. The **disclosures** may be grouped together and segregated from other information in a variety of ways. For example, the **disclosures** may appear on a separate sheet of paper or may be set off from other information on the contract or other documents:

• By outlining them in a box

• By bold print dividing lines

• By a different color background

• By a different type style

(The general segregation requirement described in this subparagraph does not apply to the **disclosures** required under § § 226.19(b) and 226.20(c) although the **disclosures** must be clear and conspicuous.)

3. *Location*. The regulation imposes no specific location requirements on the segregated **disclosures.** For example:

• They may appear on a **disclosure** statement separate from all other material.

• They may be placed on the same document with the credit contact or other information, so long as they are segregated from that information.

• They may be shown on the front or back of a document.

• They need not begin at the top of a page.

• They may be continued from one page to another.

4. *Content of segregated disclosures*. Footnotes 37 and 38 contain exceptions to the requirement that the **disclosures** under § 226.18 be segregated from material that is not directly related to those **disclosures.** Footnote 37 lists the items that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

• Capitalized when other **disclosures** are printed in capital and lower case.

• Printed in larger type, bold print or different type face.

• Printed in a contrasting color.

• Underlined.

• Set off with asterisks.

17(b) Time of **disclosures.**

1. *Consummation*. As a general rule, **disclosures** must be made before "consummation" of the transaction. The **disclosures** need not be given by any particular time before consummation, except in certain mortgage transactions and variable-rate transactions secured by the consumer's principal dwelling with a term greater than one year under § 226.19. (See the commentary to § 226.2(a)(13) regarding the definition of consummation.)

2. *Converting open-end to closed-end credit*. Except for home equity plans subject to § 226.5b in which the agreement provides for a repayment phase, if an open-end credit account is converted to a closed-end transaction under a written agreement with the consumer, the creditor must provide a set of closed-end credit **disclosures** before consummation of the closed-end transaction. (See the commentary to § 226.19(b) for the timing rules for additional **disclosures** required upon the conversion to a variable-rate transaction secured by a consumer's principal dwelling with a term greater than one year.) If consummation of the closed-end transaction occurs at the same time as the consumer enters into the open-end agreement, the closed-end credit **disclosures** may be given at the time of conversion. If **disclosures** are delayed until conversion and the closed-end transaction has a variable-rate feature, **disclosures** should be based on the rate in effect at the time of conversion. (See the commentary to § 226.5 regarding conversion of closed-end to open-end credit.)

3. ***Disclosures*** *provided on credit contracts*. Creditors must give the required **disclosures** to the consumer in writing, in a form that the consumer may keep, before consummation of the transaction. See § 226.17((a)(1) and (b). Sometimes the **disclosures** are placed on the same document with the credit contract. Creditors are not required to give the consumer two separate copies of the document before consummation, one for the consumer to keep and a second copy for the consumer to execute. The **disclosure** requirement is satisfied if the creditor gives a copy of the document containing the unexecuted credit contract and **disclosures** to the consumer to read and sign; and the consumer receives a copy to keep at the time the consumer becomes obligated. It is not sufficient for the creditor merely to show the consumer the document containing the **disclosures** before the consumer signs and becomes obligated. The consumer must be free to take possession of and review the document in its entirety before signing.

i. *Example*. To illustrate: A creditor gives a consumer a multiple-copy form containing a credit agreement and TILA **disclosures.** The consumer reviews and signs the form and returns it to the creditor, who separates the copies and gives one copy to the consumer to keep. The creditor has satisfied the **disclosure** requirement.

17(c) Basis of **disclosures** and use of estimates.

Paragraph 17(c)(1).

1. *Legal obligation*. The **disclosures** shall reflect the credit terms to which the parties are legally bound as of the outset of the transaction. In the case of **disclosures** required under § 226.20(c), the **disclosures** shall reflect the credit terms to which the parties are legally bound when the **disclosures** are provided. The legal obligation is determined by applicable state law or other law. (Certain transactions are specifically addressed in this commentary. See, for example, the discussion of buy-down transactions elsewhere in the commentary to § 226.17(c).)

• The fact that a term or contract may later be deemed unenforceable by a court on the basis of equity or other grounds does not, by itself, mean that **disclosures** based on that term or contract did not reflect the legal obligation.

2. *Modification of obligation*. The legal obligation normally is presumed to be contained in the note or contract that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidences the agreement. But this presumption is rebutted if another agreement between the parties legally modifies that note or contract. If the parties informally agree to a modification of the legal obligation, the modification should not be reflected in the **disclosures** unless it rises to the level of a change in the terms of the legal obligation. For example:

• If the creditor offers a preferential rate, such as an employee preferred rate, the **disclosures** should reflect the terms of the legal obligation. (See the commentary to § 226.19(b) for an example of a preferred-rate transaction that is a variable-rate transaction.)

• If the contract provides for a certain monthly payment schedule but payments are made on a voluntary payroll deduction plan or an informal principal-reduction agreement, the **disclosures** should reflect the schedule in the contract.

• If the contract provides for regular monthly payments but the creditor informally permits the consumer to defer payments from time to time, for instance, to take account of holiday seasons or seasonal employment, the **disclosures** should reflect the regular monthly payments.

3. *Third-party buydowns*. In certain transactions, a seller or other third party may pay an amount, either to the creditor or to the consumer, in order to reduce the consumer's payments or buy down the interest rate for all or a portion of the credit term. For example, a consumer and a bank agree to a mortgage with an interest rate of 15% and level payments over 25 years. By a separate agreement, the seller of the property agrees to subsidize the consumer's payments for the first 2 years of the mortgage, giving the consumer an effective rate of 12% for that period.

• If the lower rate is reflected in the credit contract between the consumer and the bank, the **disclosures** must take the buydown into account. For example, the annual percentage rate must be a composite rate that takes account of both the lower initial rate and the higher subsequent rate, and the payment schedule **disclosures** must reflect the 2 payment levels. However, the amount paid by the seller would not be specifically reflected in the **disclosures** given by the bank, since that amount constitutes seller's points and thus is not part of the finance charge.

• If the lower rate is not reflected in the credit contract between the consumer and the bank and the consumer is legally bound to the 15% rate from the outset, the **disclosures** given by the bank must not reflect the seller buydown in any way. For example, the annual percentage rate and payment schedule would not take into account the reduction in the interest rate and payment level for the first 2 years resulting from the buydown.

4. *Consumer buydowns*. In certain transactions, the consumer may pay an amount to the creditor to reduce the payments or obtain a lower interest rate on the transaction. Consumer buydowns must be reflected in the **disclosures** given for that transaction. To illustrate, in a mortgage transaction, the creditor and consumer agree to a note specifying a 14 percent interest rate. However, in a separate document, the consumer agrees to pay an amount to the creditor at consummation in return for a reduction in the interest

rate to 12 percent for a portion of the mortgage term. The amount paid by the consumer may be deposited in an escrow account or may be retained by the creditor. Depending upon the buydown plan, the consumer's prepayment of the obligation may or may not result in a portion of the amount being credited or refunded to the consumer. In the **disclosures** given for the mortgage, the creditor must reflect the terms of the buydown agreement. For example:

• The amount paid by the consumer is a prepaid finance charge (even if deposited in an escrow account).

• A composite annual percentage rate must be calculated, taking into account both interest rates, as well as the effect of the prepaid finance charge.

• The payment schedule must reflect the multiple payment levels resulting from the buydown.

The rules regarding consumer buydowns do not apply to transactions known as "lender buydowns." In lender buydowns, a creditor pays an amount (either into an account or to the party to whom the obligation is sold) to reduce the consumer's payments or interest rate for all or a portion of the credit term. Typically, these transactions are structured as a buydown of the interest rate during an initial period of the transaction with a higher than usual rate for the remainder of the term. The **disclosures** for lender buydowns should be based on the terms of the legal obligation between the consumer and the creditor. (See comment 17(c)(l)-3 for the analogous rules concerning third-party buydowns.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

    5. *Split buydowns*. In certain transactions, a third party (such as a seller) and a consumer both pay an amount to the creditor to reduce the interest rate. The creditor must include the portion paid by the consumer in the finance charge and disclose the corresponding multiple payment levels and composite annual percentage rate. The portion paid by the third party and the corresponding reduction in interest rate, however, should not be reflected in the **disclosures** unless the lower rate is reflected in the credit contract. (See the discussion on third-party and consumer buydown transactions elsewhere in the commentary to § 226.17(c).)

    6. *Wrap-around financing*. Wrap-around transactions, usually loans, involve the creditor's wrapping the outstanding balance on an existing loan and advancing additional funds to the consumer. The pre-existing loan, which is wrapped, may be to the same consumer or to a different consumer. In either case, the consumer makes a single payment to the new creditor, who makes the payments on the pre-existing loan to the original creditor. Wrap-around loans or sales are considered new single-advance transactions, with an amount financed equaling the sum of the new funds advanced by the wrap creditor and the remaining principal owed to the original creditor on the pre-existing loan. In disclosing the itemization of the amount financed, the creditor may use a label such as "the amount that will be paid to creditor X" to describe the remaining principal balance on the pre-existing loan. This approach to Truth in Lending calculations has no effect on calculations required by other statutes, such as state usury laws.

    7. *Wrap-around financing with balloon payments*. For wrap-around transactions involving a large final payment of the new funds before the maturity of the pre-existing loan, the amount financed is the sum of the new funds and the remaining principal on the pre-existing loan. The **disclosures** should be based on the shorter term of the wrap loan, with a large final payment of both the new funds and the total remaining principal on the pre-existing loan (although only the wrap loan will actually be paid off at that time).

    8. *Basis of **disclosures** in variable-rate transactions*. The **disclosures** for a variable-rate transaction must be given for the full term of the transaction and must be based on the terms in effect at the time of consummation. Creditors should base the **disclosures** only on the initial rate and should not assume that this rate will increase. For example, in a loan with an initial rate of 10 percent and a 5 percentage points rate cap, creditors should base the **disclosures** on the initial rate and should not assume that this rate will increase 5 percentage points. However, in a variable-rate transaction with a seller buydown that is reflected in the credit contract, a consumer buydown, or a discounted or premium rate, **disclosures** should not be based solely on the initial terms. In those transactions, the disclosed annual percentage rate should be a composite rate based on the rate in effect during the initial period and the rate that is the basis of the variable-rate feature for the remainder of the term. (See the commentary to § 226.17(c) for a discussion of buydown, discounted, and premium transactions and the commentary to section 226.19(a)(2) for a discussion of the redisclosure in certain residential mortgage transactions with a variable-rate feature.)

    9. *Use of estimates in variable-rate transactions*. The variable-rate feature does not, by itself, make the **disclosures** estimates.

    10. *Discounted and premium variable-rate transactions*. In some variable-rate transactions, creditors may set an initial interest rate that is not determined by the index or formula used to make later interest rate adjustments. Typically, this initial rate charged to consumers is lower than the rate would be if it were calculated using the index or formula. However, in some cases the initial rate may be higher. In a discounted transaction, for example, a creditor may calculate interest rates according to a formula using the six-month Treasury bill rate plus a 2 percent margin. If the Treasury bill rate at consummation is 10 percent, the creditor may forgo the 2 percent spread and charge only 10 percent for a limited time, instead of setting an initial rate of 12 percent.

    i. When creditors use an initial interest rate that is not calculated using the index or formula for later rate adjustments, the **disclosures** should reflect a composite annual percentage rate based on the initial rate for as long as it is charged and, for the remainder of the term, the rate that would have been applied using the index or formula at the time of consummation. The rate at consummation need not be used if a contract provides for a delay in the implementation of changes in an index value. For example, if the contract specifies that rate changes are based on the index value in effect 45 days before the change date, creditors may use any index value in effect during the 45 day period before consummation in calculating a composite annual percentage rate.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ii. The effect of the multiple rates must also be reflected in the calculation and **disclosure** of the finance charge, total of payments, and payment schedule.

iii. If a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the first adjustment, from changing to the rate determined by the index or formula at consummation, the effect of that rate or payment cap should be reflected in the **disclosures.**

iv. Because these transactions involve irregular payment amounts, an annual percentage rate tolerance of 1/4 of 1 percent applies, in accordance with § 226.22(a)(3).

v. Examples of discounted variable-rate transactions include:

A. A 30-year loan for $100,000 with no prepaid finance charges and rates determined by the Treasury bill rate plus 2 percent. Rate and payment adjustments are made annually. Although the Treasury bill rate at the time of consummation is 10 percent, the creditor sets the interest rate for one year at 9 percent, instead of 12 percent according to the formula. The **disclosures** should reflect a composite annual percentage rate of 11.63 percent based on 9 percent for one year and 12 percent for 29 years. Reflecting those two rate levels, the payment schedule should show 12 payments of $804.62 and 348 payments of $1,025.31. The finance charge should be $266,463.32 and the total of payments $366,463.32.

B. Same loan as above, except with a 2 percent rate cap on periodic adjustments. The **disclosures** should reflect a composite annual percentage rate of 11.53 percent based on 9 percent for the first year, 11 percent for the second year, and 12 percent for the remaining 28 years. Reflecting those three rate levels, the payment schedule should show 12 payments of $804.62, 12 payments of $950.09, and 336 payments of $1,024.34. The finance charge should be $265,234.76 and the total of payments $365,234.76.

C. Same loan as above, except with a 7 1/2 percent cap on payment adjustments. The **disclosures** should reflect a composite annual percentage rate of 11.64 percent, based on 9 percent for one year and 12 percent for 29 years. Because of the payment cap, five levels of payments should be reflected. The payment schedule should show 12 payments of $804.62, 12 payments of $864.97, 12 payments of $929.84, 12 payments of $999.58, and 312 payments of $1,070.04. The finance charge should be $277,040.60, and the total of payments $377,040.60.

vi. A loan in which the initial interest rate is set according to the index or formula used for later adjustments but is not set at the value of the index or formula at consummation is not a discounted variable-rate loan. For example, if a creditor commits to an initial rate based on the formula on a date prior to consummation, but the index has moved during the period between that time and consummation, a creditor should base its **disclosures** on the initial rate.

11. *Examples of variable-rate transactions*. Variable-rate transactions include:

• Renewable balloon-payment instruments where the creditor is both unconditionally obligated to renew the balloon-payment loan at the consumer's option (or is obligated to renew subject to conditions within the consumer's control) and has the option of increasing the interest rate at the time of renewal. **Disclosures** must be based on the payment amortization (unless the specified term of the obligation with renewals is shorter) and on the rate in effect at the time of consummation of the transaction. (Examples of conditions within a consumer's control include requirements that a consumer be current in payments or continue to reside in the mortgaged property. In contrast, setting a limit on the rate at which the creditor would be obligated to renew or reserving the right to change the credit standards at the time of renewal are examples of conditions outside a consumer's control.) If, however, a creditor is not obligated to renew as described above, **disclosures** must be based on the term of the balloon-payment loan. **Disclosures** also must be based on the term of the balloon-payment loan in balloon-payment instruments in which the legal obligation provides that the loan will be renewed by a "refinancing" of the obligation, as that term is defined by § 226.20(a). If it cannot be determined from the legal obligation that the loan will be renewed by a "refinancing," **disclosures** must be based either on the term of the balloon-payment loan or on the payment amortization, depending on whether the creditor is unconditionally obligated to renew the loan as described above. (This discussion does not apply to construction loans subject to § 226.17(c)(6).)

• "Shared-equity" or "shared-appreciation" mortgages that have a fixed rate of interest and an appreciation share based on the consumer's equity in the mortgaged property. The appreciation share is payable in a lump sum at a specified time.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1. *Determination of interest rate and payment*. This provision requires an explanation of how the creditor will determine the consumer's interest rate and payment. In cases where a creditor bases its interest rate on a specific index and adjusts the index through the addition of a margin, for example, the **disclosure** might read, "Your interest rate is based on the index plus a margin, and your payment will be based on the interest rate, loan balance, and remaining loan term." In transactions where paying the periodic payments will not fully amortize the outstanding balance at the end of the loan term and where the final payment will equal the periodic payment plus the remaining unpaid balance, the creditor must disclose this fact. For example, the **disclosure** might read, "Your periodic payments will not fully amortize your loan and you will be required to make a single payment of the periodic payment plus the remaining unpaid balance at the end of the loan term." The creditor, however, need not reflect any irregular final payment in the historical example or in the **disclosure** of the initial and maximum rates and payments. If applicable, the creditor should also disclose that the rate and payment will be rounded.

Paragraph 19(b)(2)(iv).

1. *Current margin value and interest rate*. Because the **disclosures** can be prepared in advance, the interest rate and margin may be several months old when the **disclosures** are delivered. A statement, therefore, is required alerting consumers to the fact that they should inquire about the current margin value applied to the index and the current interest rate. For example, the **disclosure** might state, "Ask us for our current interest rate and margin."

Paragraph 19(b)(2)(v).

1. *Discounted and premium interest rate*. In some variable-rate transactions, creditors may set an initial interest rate that is not determined by the index or formula used to make later interest rate adjustments. Typically, this initial rate charged to consumers is lower than the rate would be if it were calculated using the index or formula. However, in some cases the initial rate may be higher. If the initial interest rate will be a discount or a premium rate, creditors must alert the consumer to this fact. For example, if a creditor discounted a consumer's initial rate, the **disclosure** might state, "Your initial interest rate is not based on the index used to make later adjustments." (See the commentary to § 226.17(c)(1) for a further discussion of discounted and premium variable-rate transactions.) In addition, the **disclosure** must suggest that consumers inquire about the amount that the program is currently discounted. For example, the **disclosure** might state, "Ask us for the amount our adjustable rate mortgages are currently discounted." In a transaction with a consumer buydown or with a third-party buydown that will be incorporated in the legal obligation, the creditor should disclose the program as a discounted variable-rate transaction, but need not disclose additional information regarding the buydown in its program **disclosures.** (See the commentary to § 226.19(b)(2)(viii) for a discussion of how to reflect the discount or premium in the historical example or the maximum rate and payment **disclosure**.)

Paragraph 19(b)(2)(vi).

1. *Frequency*. The frequency of interest rate and payment adjustments must be disclosed. If interest rate changes will be imposed more frequently or at different intervals than payment changes, a creditor must disclose the frequency and timing of both types of changes. For example, in a variable-rate transaction where interest rate changes are made monthly, but payment changes occur on an annual basis, this fact must be disclosed. In certain ARM transactions, the interval between loan closing and the initial adjustment is not known and may be different from the regular interval for adjustments. In such cases, the creditor may disclose the initial adjustment period as a range of the minimum and maximum amount of time from consummation or closing. For example, the creditor might state: "The first adjustment to your interest rate and payment will occur no sooner than 6 months and no later than 18 months after closing. Subsequent adjustments may occur once each year after the first adjustment." (See comments 19(b)(2)(viii)(A)-7 and 19(b)(2)(viii)(B)-4 for guidance on other **disclosures** when this alternative **disclosure** rule is used.)

Paragraph 19(b)(2)(vii).

1. *Rate and payment caps*. The creditor must disclose limits on changes (increases or decreases) in the interest rate or payment. If an initial discount is not taken into account in applying overall or periodic rate limitations, that fact must be disclosed. If separate overall or periodic limitations apply to interest rate increases resulting from other events, such as the exercise of a fixed-rate conversion option or leaving the creditor's employ, those limitations must also be stated. Limitations do not include legal limits in the nature of usury or rate ceilings under state or Federal statutes or regulations. (See § 226.30

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for the rule requiring that a maximum interest rate be included in certain variable-rate transactions.) The creditor need not disclose each periodic or overall rate limitation that is currently available. As an alternative, the creditor may disclose the range of the lowest and highest periodic and overall rate limitations that may be applicable to the creditor's ARM transactions. For example, the creditor might state: "The limitation on increases to your interest rate at each adjustment will be set at an amount in the following range: Between 1 and 2 percentage points at each adjustment. The limitation on increases to your interest rate over the term of the loan will be set at an amount in the following range: Between 4 and 7 percentage points above the initial interest rate." A creditor using this alternative rule must include a statement in its program **disclosures** suggesting that the consumer ask about the overall rate limitations currently offered for the creditor's ARM programs. (See comments 19(b)(2)(viii)(A)-6 and 19(b)(2)(viii)(B)-3 for an explanation of the additional requirements for a creditor using this alternative rule for **disclosure** of periodic and overall rate limitations.)

   2. *Negative amortization and interest rate carryover*. A creditor must disclose, where applicable, the possibility of negative amortization. For example, the **disclosure** might state, "If any of your payments is not sufficient to cover the interest due, the difference will be added to your loan amount." Loans that provide for more than one way to trigger negative amortization are separate variable-rate programs requiring separate **disclosures.** (See the commentary to § 226.19(b)(2) for a discussion on the definition of a variable-rate loan program and the format for **disclosure**.) If a consumer is given the option to cap monthly payments that may result in negative amortization, the creditor must fully disclose the rules relating to the option, including the effects of exercising the option (such as negative amortization will occur and the principal loan balance will increase); however, the **disclosure** in § 226.19(b)(2)(viii) need not be provided.

   3. *Conversion option*. If a loan program permits consumers to convert their variable-rate loans to fixed-rate loans, the creditor must disclose that the interest rate may increase if the consumer converts the loan to a fixed-rate loan. The creditor must also disclose the rules relating to the conversion feature, such as the period during which the loan may be converted, that fees may be charged at conversion, and how the fixed rate will be determined. The creditor should identify any index or other measure or formula used to determine the fixed rate and state any margin to be added. In disclosing the period during which the loan may be converted and the margin, the creditor may use information applicable to the conversion feature during the six months preceding preparation of the **disclosures** and state that the information is representative of conversion features recently offered by the creditor. The information may be used until the program **disclosures** are otherwise revised. Although the rules relating to the conversion option must be disclosed, the effect of exercising the option should not be reflected elsewhere in the **disclosures,** such as in the historical example or in the calculation of the initial and maximum interest rate and payments.

   4. *Preferred-rate loans*. Section 226.19(b) applies to preferred-rate loans, where the rate will increase upon the occurrence of some event, such as an employee leaving the creditor's employ, whether or not the underlying rate is fixed or variable. In these transactions, the creditor must disclose the event that would allow the creditor to increase the rate such as that the rate may increase if the employee leaves the creditor's employ. The creditor must also disclose the rules relating to termination of the preferred rate, such as that fees may be charged when the rate is changed and how the new rate will be determined.

   Paragraph 19(b)(2)(viii).

   1. *Historical example and initial and maximum interest rates and payments*. A creditor may disclose both the historical example and the initial and maximum interest rates and payments.

   Paragraph 19(b)(2)(viii)(A).

   1. *Index movement*. This section requires a creditor to provide an historical example, based on a $10,000 loan amount originating in 1977, showing how interest rate changes implemented according to the terms of the loan program would have affected payments and the loan balance at the end of each year during a 15-year period. (In all cases, the creditor need only calculate the payments and loan balance for the term of the loan. For example, in a five-year loan, a creditor would show the payments and loan balance for the five-year term, from 1977 to 1981, with a zero loan balance reflected for 1981. For the remaining ten years, 1982-1991, the creditor need only show the remaining index values, margin and interest rate and must continue to reflect all significant loan program terms such as rate limitations affecting them.) Pursuant to this section, the creditor must provide a history of index values for the preceding 15 years. Initially, the **disclosures** would give the index values from 1977 to the present. Each year thereafter, the revised program **disclosures** should include an additional year's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

any credit or charge card application or solicitation that is subject to the requirements of section 127(c) of chapter 2 of the act (§ 226.5a of the regulation) or in any renewal notice for a credit or charge card that is subject to the requirements of section 127(d) of chapter 2 of the act (§ 226.9(e) of the regulation) are preempted. State laws relating to the enforcement of section 127(c) and (d) of the act are not preempted.

[Reg. Z, 46 FR 20892, Apr. 7, 1981, as amended at 54 FR 13867, Apr. 6, 1989; 54 FR 32954, Aug. 11, 1989; 60 FR 15471, Mar. 24, 1995]

Official Staff Commentary:

28(a) Inconsistent **disclosure** requirements

1. *General*. There are 3 sets of preemption criteria: 1 applies to the general **disclosure** and advertising rules of the regulation, and 2 apply to the credit billing provisions. Section 226.28 also provides for Board determinations of preemption.

2. *Rules for chapters 1, 2, and 3*. The standard for judging whether State laws that cover the types of requirements in chapters 1 (General provisions), 2 (Credit transactions), and 3 (Credit advertising) of the Act are inconsistent and therefore preempted, is contradiction of the Federal law. Examples of laws that would be preempted include:

• A State law that requires use of the term *finance charge*, but defines the term to include fees that the Federal law excludes, or to exclude fees the Federal law includes.

• A State law that requires a label such as *nominal annual interest rate* to be used for what the Federal law calls the *annual percentage rate.*

3. *Laws not contradictory to chapters 1, 2, and 3*. Generally, State law requirements that call for the **disclosure** of items of information not covered by the Federal law, or that require more detailed **disclosures,** do not contradict the Federal requirements. Examples of laws that are not preempted include:

• A State law that requires **disclosure** of the minimum periodic payment for open-end credit, even though not required by § 226.7.

• A State law that requires contracts to contain warnings such as: "Read this contract before you sign. Do not sign if any spaces are left blank. You are entitled to a copy of this contract."

Similarly, a State law that requires itemization of the amount financed does not automatically contradict the permissive itemization under § 226.18(c). However, a State law requirement that the itemization appear with the **disclosure** of the amount financed in the segregated closed-end credit **disclosures** is inconsistent, and this location requirement would be preempted.

4. *Creditor's options*. Before the Board makes a determination about a specific State law, the creditor has certain options. Since the prohibition against giving the State **disclosures** does not apply until the Board makes its determination, the creditor may choose to give State **disclosures** until the Board formally determines that the State law is inconsistent. (The Board will provide sufficient time for creditors to revise forms and procedures as necessary to conform to its determination.)

• Under this first approach, as in all cases, the Federal **disclosures** must be clear and conspicuous, and the closed-end **disclosures** must be properly segregated in accordance with § 226.17(a)(1).

• This ability to give State **disclosures** relieves any uncertainty that the creditor might have prior to Board determination of inconsistency.

As a second option, the creditor may apply the preemption standards to a State law, conclude that it is inconsistent, and choose not to give the state-required **disclosures.** However, nothing in § 226.28(a) provides the creditor with immunity for violations of State law if the creditor chooses *not* to make State **disclosures** and the Board later determines that the State law is not preempted.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5. *Rules for correction of billing errors and regulation of credit reports*. The preemption criteria for the fair credit billing provisions set forth in § 226.28 have 2 parts. With respect to the rules on correction of billing errors and regulation of credit reports (which are in § 226.13), § 226.28(a)(2)(i) provides that a State law is inconsistent and preempted if its requirements are different from the Federal law. An exception is made, however, for State laws that allow the consumer to inquire about an account and require the creditor to respond to such inquiries beyond the time limits in the Federal law. Such a State law is not preempted with respect to the extra time period. For example, § 226.13 requires the consumer to submit a written notice of billing error within 60 days after transmittal of the periodic statement showing the alleged error. If a State law allows the consumer 90 days to submit a notice, the State law remains in effect to provide the extra 30 days. Any State law **disclosures** concerning this extended state time limit must reflect the qualifications and conform to the format specified in § 226.28(a)(2)(i). Examples of laws that would be preempted include:

• A State law that has a narrower or broader definition of *billing error*.

• A State law that requires the creditor to take different steps to resolve errors.

• A State law that provides different timing rules for error resolution (subject to the exception discussed above).

6. *Rules for other fair credit billing provisions*. The second part of the criteria for fair credit billing relates to the other rules implementing chapter 4 of the Act (addressed in § § 226.4(c)(8), 226.5(b)(2)(ii), 226.6(d), 226.7(k), 226.9(a), 226.10, 226.11, 226.12 (c) through (f), 226.13, and 226.21). Section 226.28(a)(2)(ii) provides that the test of inconsistency is whether the creditor can comply with State law without violating Federal law. For example:

• A State law that allows the card issuer to offset the consumer's credit-card indebtedness against funds held by the card issuer would be preempted, since § 226.12(d) prohibits such action.

• A State law that requires periodic statements to be sent *more* than 14 days before the end of a free-ride period would not be preempted.

• A State law that permits consumers to assert claims and defenses against the card issuer without regard to the $50 and 100-mile limitations of § 226.12(c)(3)(ii) would not be preempted.

In the last 2 cases, compliance with State law would involve no violation of the Federal law.

7. *Who may receive a chapter 4 determination*. Only states (through their authorized officials) may request and receive determinations on inconsistency with respect to the fair credit billing provisions.

8. *Preemption determination--Arizona*. Effective October 1, 1983, the Board has determined that the following provisions in the State law of Arizona are preempted by the Federal law:

• Section 44-287 B.5--**Disclosure** of final cash price balance. This provision is preempted in those transactions in which the amount of the final cash price balance is the same as the Federal amount financed, since such transactions the State law requires the use of a term different from the Federal term to represent the same amount.

• Section 44-287 B.6--**Disclosure** of finance charge. This provision is preempted in those transactions in which the amount of the finance charge is different from the amount of the Federal finance charge, since in such transactions the State law requires the use of the same term as the Federal law to represent a different amount.

• Section 44-287 B.7--**Disclosure** of the time balance. The time balance **disclosure** provision is preempted in those transactions in which the amount is the same as the amount of the Federal total of payments, since in such transactions the State law requires the use of a term different from the Federal term to represent the same amount.

9. *Preemption determination--Florida*. Effective October 1, 1983, the Board has determined that the following provisions in the State law of Florida are preempted by the Federal law:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.