**ANDRUS ANDERSON LLP**
Jennie Lee Anderson (SBN 203586)
jennie@andrusanderson.com
Lori E. Andrus (SBN 205816)
lori@andrusanderson.com
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Tel:  (415) 986-1400
Fax:  (415) 986-1474

**ARBOGAST & BERNS LLP**
David M. Arbogast (SBN 167571)
darbogast@law111.com
Jeffrey K. Berns (SBN 131351)
jberns@law111.com
6303 Owensmouth Ave, 10th Floor
Woodland Hills, CA 91367
Telephone: (818) 961-2000
Facsimile:  (818) 936-0232

[Additional counsel listed on the signature page]
*Attorneys for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAY J. RALSTON, On Behalf Of Himself And All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MORTGAGE INVESTORS GROUP, INC., MORTGAGE INVESTORS GROUP, a general partnership, COUNTRYWIDE HOME LOANS, INC. AND DOES 3-10,<br><br>Defendants. | Case No.: CV 08-00536 JF-PVT<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**(1) Fraudulent Omissions; and**<br><br>**(2) Violation of Bus. & Prof. Code §17200, *et seq.* – "Unlawful," "Unfair," and "Fraudulent" Business Practices.**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**REDACTED PUBLICLY FILED VERSION**

1          Plaintiff, Jay Ralston, individually and on behalf of all others similarly situated, upon

2  personal knowledge as to himself of his own acts, and upon information and belief based upon the

3  investigation conducted by his counsel, which included a review of discovery produced in this

4  action, public documents concerning Countrywide Home Loans, Inc. and Countrywide

5  Warehouse Lending, documents filed in bankruptcy cases filed by mortgage originators,

6  Securities and Exchange Commission filings by entities related to Countrywide Home Loans,

7  Inc., news articles, complaints filed against Countrywide Home Loans, Inc. and related entities in

8  other litigations, public materials concerning Option ARM loans and the securitization process:

9
**I.**

10
**<u>INTRODUCTION</u>**

11       1.     This action is based upon a fraudulent scheme that was concocted and

12  implemented by Defendant Countrywide Home Loans, Inc. ("Countrywide"), with the assistance

13  and participation of mortgage originators such as Defendants Mortgage Investors Group, Inc. and

14  Mortgage Investors Group, a general partnership,[1] to exponentially increase the volume of

15  mortgage loans that would be available to Countrywide to sell to investors through the

16  securitization process.  By creating a division whose primary function was to purchase loans

17  issued by other originators, by preparing deceptive loan documents for Option Adjustable Rate

18  Mortgage ("Option ARM") loans, and by providing those deceptive loan documents to MIG and

19  other originators, Countrywide was able to generate substantial profits.  Indeed, Option ARM

20  loans comprised a significant portion of the loans that Countrywide purchased from mortgage

21  originators like MIG.  Those loans also were a substantial source of profit for the Countrywide

22  division responsible for securitizing and re-selling loans (in 2005 and 2006 alone, the division

23  generated a total of over $1 billion in pre-tax profits).

24       2.     MIG also profited substantially by originating Option ARM loans predestine to be

25  sold to Countrywide and other subsequent purchasers without regard to its own duties to

26  borrowers.  The majority of the Option ARM loans originated by MIG were sold to Countrywide.

27

28
---
[1] Defendants Mortgage Investors Group, Inc. and Mortgage Investors Group, a general partnership shall be referred to collectively as "MIG" or "Mortgage Investors Group".

3.       Plaintiff Jay Ralston ("Plaintiff"), individually, and on behalf of all other similarly situated borrowers whose Option ARM loans were 1) purchased by Countrywide; and/or 2) originated by MIG ("Class Members) brings this action for violations of California's Unfair Competition Law (the "UCL"), Bus. & Prof. Code §§ 17200, *et seq.,* and fraudulent omissions against Countrywide, MIG and Does 3-10 (collectively, "Defendants"), based upon Countrywide's conduct that encouraged and permitted MIG and other, similar, originators to issue Option ARM loans that failed to clearly, unambiguously and conspicuously disclose to Plaintiff and Class Members the following: (i) the low interest rate set forth in the Option ARM mortgage notes ("Notes") was only available for thirty days, if at all; (ii) the monthly payment amounts for the first three to five years provided to Plaintiff and Class Members on a Truth-In-Lending Disclosure Statement ("TILDS") were insufficient to pay both accrued interest and principal; (iii) negative amortization was absolutely certain to occur if Plaintiff and Class Members made payments according to the schedule of monthly payments provided in the TILDS; and that (iv) loss of equity and/or loss of Plaintiff's and Class Members' residences was certain to occur if Plaintiff and Class Members made payments according to the payment schedule.  Items (i) to (iv) above are referred to collectively as the "Material Omissions."

4.       As alleged below, without the active participation of Countrywide, MIG and other Option ARM loan originators would not have been able to issue Option ARM loans to Class Members.  Despite serving as loan originators and issuing Option ARM loans, MIG and other Option ARM loan originators did not use their own assets to fund Option ARM loans.  Instead, they borrowed money from warehouse lenders (which oftentimes were affiliates of Countrywide) to fund the loans at closing and then sold those loans to Countrywide shortly after closing.  The funds paid by Countrywide to purchase the loans were then paid to the warehouse lenders, with the remainder going to the Option ARM loan originator.  Because the loan originators' ability to issue Option ARM loans to Class Members was wholly dependent on Countrywide purchasing the loans shortly after origination, the originators did not have, or utilize, any discretion in the origination of Option ARM loans.  Instead, they were required to, and did, use loan documents and underwriting guidelines designed, approved and published by Countrywide.  Thus,

1  Countrywide is liable both directly and as an aider and abettor, for the damages caused by the

2  deceptive loan documents at issue in this action.

3                                      **II.**

4                              **THE PARTIES**

5         5.      Plaintiff Jay Ralston is, and at all relevant times was, an individual residing in

6  Salinas, California.  On or about July 20, 2005, Plaintiff refinanced his existing home loan and

7  entered into an Option ARM loan agreement with MIG, which, in order to comply with

8  requirements imposed by Countrywide, used loan documents designed and approved by

9  Countrywide.  The Option ARM loan was secured by Plaintiff's primary residence.  Attached

10 hereto as Exhibit 1 are true and correct copies of the Note and TILDS (collectively, the "Loan

11 Documents") for Mr. Ralston's loan.  Unbeknownst to Plaintiff, on or about August 15, 2005, his

12 Option ARM loan was sold to Defendant Countrywide Home Loans, Inc.  Shortly thereafter,

13 Countrywide placed the loan into a securitized trust with other loans and sold certificates in the

14 trust to investors.

15        6.      Defendant Mortgage Investors Group, Inc. is, and at all relevant times, was

16 qualified to do business in California, doing business in this District.  Defendant Mortgage

17 Investors Group, a general partnership, is a mortgage services company, which, at all times

18 material hereto, had offices in both Irvine and Roseville, California.  At all relevant times, MIG

19 was engaged in the business of originating and selling certain of the Option ARM loans that are

20 the subject of this Complaint, which, pursuant to prior agreement, were purchased by subsequent

21 purchasers, including Countrywide.  At all relevant times, MIG originated and sold Option ARM

22 loans throughout the United States, including in this District.

23        7.      Defendant Countrywide Home Loans, Inc. ("Countrywide"), previously named

24 and sued herein as DOE 1, is a California corporation and, at all relevant times, maintained its

25 headquarters and principal place of business in California.  Countrywide transacts and has

26 transacted significant business in California and in this District by entering into contracts with

27 MIG and other loan originators to purchase the Option ARM loans sold to Plaintiff and Class

28 Members.  During the relevant time period, Countrywide acquired from MIG at least 2,357

- 3 -

1   Option ARM loans.

2       8.      Plaintiff is informed, believes, and thereon alleges that Does 3 through 10,

3   inclusive, include other entities that are assignees of the loans that are the subject of this action

4   and/or other culpable corporate affiliates of the Defendants.  Plaintiff may seek leave of Court to

5   replace the fictitious names of these entities with their true names when they are discovered.

6       9.      The true names and capacities, whether individual, corporate, associate or

7   otherwise, of Defendants Does 3 through 10 inclusive, and each of them, are unknown to Plaintiff

8   at this time, and Plaintiff therefore sues said Defendants by such fictitious names.  Plaintiff

9   alleges, on information and belief, that each Doe defendant is responsible for the actions herein

10  alleged.  Plaintiff may seek leave of Court to amend this Complaint when the names and

11  culpability of said Doe Defendants have been ascertained.

12      10.     At all times mentioned herein, Defendants were engaged in the business of selling,

13  securitizing, and/or owning, and/or are or were the assignees of, the Option ARM loans that are

14  the subject of this Complaint, throughout the United States, including in this District.

15      11.     Each of the aforementioned Defendants are responsible in some manner, either by

16  act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat

17  superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiff's

18  injuries, as herein alleged, were proximately caused by the conduct of Defendants.

19      12.     Plaintiff is informed, believes, and thereon alleges, that at all times material hereto

20  and mentioned herein, each of the Defendants sued herein was the agent, servant, employer, joint

21  venturer, partner, division, owner, subsidiary, alias, aider and abettor, assignee and/or alter-ego of

22  each of the remaining Defendants and was at all times acting within the purpose and scope of

23  such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego,

24  partnership or employment and with the authority, consent, approval and ratification of each

25  remaining Defendant.

26      13.     Plaintiff is informed, believes, and thereon alleges that at all times herein

27  mentioned, each Defendant was acting in concert or participation with each other, and/or aided

28  and abetted the other Defendants, and/or was a joint participant and collaborator in the acts

- 4 -

1 complained of, and/or was the agent or employee of the others in doing the acts complained of

2 herein, each and all of them acting within the course and scope of said agency and/or employment

3 by the others, each and all of them acting in concert one with the other and all together.  Each

4 Defendant was the co-conspirator, aider and abettor, agent, servant, employee, assignee and/or

5 joint venturer of each of the other Defendants and was acting within the course and scope of said

6 conspiracy, agency, employment, assignment and/or joint venture and with the permission and

7 consent of each of the other Defendants.

8       14.    Pursuant to California Civil Code § 1459 and California Code of Civil Procedure §

9 368, Defendants Countrywide and Does 3 through 10, include the subsequent purchasers and/or

10 assignees of Plaintiffs and Class Members' Option ARM loans.  At all relevant times,

11 Defendants are and/or were sophisticated and knowledgeable entities whose businesses included

12 designing, purchasing, packaging, securitizing and selling interests in the subject Option ARM

13 loans.  Defendants purchased, packaged, directed, securitized and/or sold the subject Option

14 ARM loans with full knowledge of the failures to disclose and material omissions as alleged

15 herein.   Defendants therefore "stand in the shoes" of the assignor, taking their rights and

16 remedies, subject to any defenses that the obligor (Plaintiff and Class Members) have against the

17 assignor prior to notice of the assignment.

18 **III.**

19 **JURISDICTION AND VENUE**

20       15.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), the

21 "Class Action Fairness Act," as there are over 100 members in the proposed Class (as alleged

22 above, Countrywide purchased at least 2,357 of the subject Option ARM loans from MIG alone),

23 the amount in controversy exceeds $5,000,000.00, and at least one member of the Class is a

24 citizen of a state different from any defendant.  As this action concerns a nationwide class of

25 Option ARM borrowers, many Class Members are diverse from Defendants.

26       16.    This Court has personal jurisdiction over the parties in this action by the fact that

27 Defendants are corporations or other businesses duly licensed to do business in California, which

28 also regularly conduct business in this District.

17.     Venue is proper within this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this District, as Mr. Ralston's Option ARM loan was originated in this District.

**IV.**

**FACTS COMMON TO ALL CAUSES OF ACTION**

A.      **Defendants Concealed Material Information And The Loan Documents Were Deceptive.**

18.     The loans that are the subject of this Complaint are the Option ARM loans purchased by Countrywide from MIG and other originators, or originated by MIG and sold to other subsequent purchasers, based upon pre-existing arrangements with the following common characteristics: (i) the monthly payment amount in the Note is based upon a "teaser" interest rate which ranges from 1% to 3%; (ii) the payment schedule listed in the TILDS, for the first 3-5 years of the loan, is based upon a fully amortizing payment at the teaser interest rate; (iii) the interest rate adjusts after only one month to a rate which is the sum of the "index" and a "margin"; and (iv) after the first 3-5 years of the loan, the amount of the monthly payments increases substantially.

19.     The two most important pieces of information to Plaintiff and Class members when assessing a mortgage loan are the interest rate and the amount of the monthly payments. For the subject Option ARM loans, the disclosures regarding both pieces of information were misleading and omitted material facts.  The Loan Documents disclosed a teaser interest rate, but they did not disclose that the loan's interest rate would sharply increase after only one month. The Loan Documents disclosed a low monthly payment for the first 3-5 years of the loan, which was based on the teaser rate, but did not disclose that those payments would be insufficient to pay the actual amount of interest being charged or the amount Plaintiff and Class Members actually owed each month.  Nor did the Loan Documents disclose that those low monthly payments were based upon the teaser rate that was only in effect for one month.  Had the Loan Documents disclosed the payment amount sufficient to cover both principal and interest based upon the index and margin that would be used to calculate the payments after the first month, the payment

1   amounts would have been approximately double those listed in the TILDS.

2       20.    At all times relevant, Countrywide was aware of the Material Omissions alleged

3   herein when it created and designed the loans, and MIG was aware of the material omissions

4   when it originated the loans.  The concealment, omissions and partial representations set forth in

5   the Loan Documents were, therefore, made prior to the consummation of the loan transactions

6   with Plaintiff and Class Members.  Despite this, as alleged in greater detail below, the Loan

7   Documents made partial representations while suppressing material facts in the loan documents,

8   in violation of their duty to disclose material facts.

9       21.    At all times relevant, Defendants knew that for Plaintiff's and Class Members'

10  Option ARM loans the sum of the index and the margin would necessarily result in an interest

11  rate that always exceeded the "teaser" rate by several percentage points.  The "teaser" rate (1%

12  for Plaintiff) lasted only 30 days, but the Loan Documents also did not clearly disclose this

13  material fact to Plaintiff and the Class Members before they entered into the loans.   Instead, the

14  Loan Documents deceptively characterized the "teaser" rate as a "yearly rate" in the Note, when

15  Defendants knew that in fact it was by no means a "yearly rate" as that term is commonly

16  understood.

17      22.    The sole payment schedule provided to Plaintiff and Class Members, in the TILDS

18  accompanying the Note, was calculated based on a fully amortizing payment at the low,

19  temporary teaser rate.   Defendants knew, but the Loan Documents did not disclose, that the

20  payment schedule was calculated on the low, temporary teaser rate even though that rate would

21  only apply to the loan for a few weeks at most.  Instead, the TILDS referenced a different and

22  much higher "APR," or annual percentage rate, without any suggestion that the payment schedule

23  was based on a "teaser" rate of 1-2% that would in fact expire after only a month.  Borrowers

24  were not provided, before entering into the loans, with any other payment schedule or with any

25  informed option to make payments different than those listed in the payment schedule.  The

26  amount sufficient to avoid negative amortization from occurring on the subject Option ARM

27  loans was critically important information because without this withheld information, Plaintiff

28  and Class Members could not make an informed decision as to whether to enter the loans or not.

1   Had Defendants disclosed the payment amounts sufficient to avoid negative amortization from

2   occurring on the subject Option ARM loans, Plaintiffs and Class Members would not have

3   entered into the loans.

4          23.   Indeed, for Plaintiffs and Class Members' loans, it was certain that the true

5   interest rate on the loan would necessarily exceed the teaser rate by several percentage points.  As

6   a result, after only one month, the interest accruing on the Notes more than doubled from an

7   amount which was usually below 2% to an amount of at least 4%, and in some cases up to 8%.

8   Because of this dramatic interest rate adjustment after only one month, the monthly payment in

9   the Note and TILDS, which was calculated based on a fully amortizing payment at the low teaser

10  rate, was no longer sufficient to even pay the interest which accrued on the Note.  Thus, the

11  unpaid interest would be added to the principal balance of the loan.  Through this negative

12  amortization, Class Members' principal balances increased even as they made the scheduled

13  monthly payments in the Note and the TILDS.  Thus, each month, Class Members would owe

14  more money than they did at the start of the loan, and have less time to pay it back.  To make

15  matters worse, this "deferred interest" was added to the principal balance and, in turn accrued

16  more interest – in effect using compound interest to increase the balance owed by each borrower.

17         24.   Negative amortization was certain to occur because of the large spread between

18  the teaser rate and the actual interest rate, which was calculated by combining an index and a

19  margin.  Indeed the margin alone was consistently higher than the teaser rate.  For example,

20  Plaintiff Ralston's Note lists a teaser interest rate of 1% and a margin of 3.075%.  Thus, even if

21  the index went down to zero, the combined total of the margin and index would never be close to

22  the teaser rate, and thus, the Option ARM loans were certain to cause (and, indeed, designed to

23  cause) negative amortization.  The Loan Documents did not disclose this material information to

24  Plaintiff and Class Members.  Had the Loan Documents disclosed this material information,

25  Plaintiff and Class Members would not have purchased the subject Option ARM loans.

26         25.   Plaintiff and Class Members were not informed of the sharp increase in the interest

27  rate, and the fact that their monthly payments were not enough to pay the interest accruing on the

28  loan, until they had made at least several payments following the closing of the loan, at which

1  time they would receive a statement showing that the principal balance had increased with each

2  month that had passed since the loan closed, despite the fact that the borrower had made all

3  payments as scheduled.  By the time this material information was disclosed to Plaintiff and Class

4  Members, they were locked into the loans by a draconian prepayment penalty consisting of a

5  prepayment charge equal to the six months of interest.  This provision was designed to deter or

6  prevent borrowers from refinancing the loans during the first three years of while they were

7  incurring negative amortization.

8        26.     Although the Loan Documents provided that the monthly payment amount would

9  be adjusted every year to an amount that would fully amortize the remaining principal balance of

10  the loan at the existing interest rate, each Option ARM loan had a payment cap, which provided

11  that the monthly payment could only increase by 7.5% each year.  The payment cap insures that

12  negative amortization will continue to occur even after borrowers' payments are adjusted.  For

13  example, as discussed above, after one month, the actual interest rate being charged is typically at

14  least double that of the teaser rate, and often much higher than that.  Thus, a monthly payment in

15  year two of the loan that is only 7.5% higher than a monthly payment based upon the teaser rate is

16  not going to be close to sufficient to cover the monthly interest charged on the loan, let alone

17  amortize the principal balance that has already increased due to 11 months of negative

18  amortization.

19        27.     The payment caps are subject to an overall cap on principal of 115% of the

20  original loan amount.  Once the principal balance reaches this 115% cap, the 7.5% limitation on

21  payment increases no longer applies, and the payments are immediately recast to fully amortizing

22  payments of principal and interest.  To the extent that this built-in "payment shock" is more than

23  many Class Members can afford, they need to refinance 115% of the amount they initially

24  borrowed (despite having made all of the required payments) or risk losing their homes to

25  foreclosure.

26        28.     Despite the foregoing, the only places in the Notes that even inferentially reference

27  negative amortization suggest that negative amortization was only a mere possibility, rather than

28  an absolute certainty.  This was ambiguous, misleading and deceptive, because it implies that

negative amortization was subject to some future contingency, such as an increase in the index on which the adjustable rate was purportedly based, when, in fact, it was guaranteed to occur after only one month, even if the index stayed the same or went down.  For instance, the Notes, at ¶3(E), stated that the borrower's "Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment" (emphasis added).  *See, e.g.,* Ex. 1, ¶ 3(E).  This was a half-truth, because the Note did not disclose that the payment schedule provided would absolutely guarantee that negative amortization was going to occur on these loans.  *Id.*

29.     The undisclosed fact that negative amortization is certain to occur on the subject loans and information regarding the interest rate to be charged on the loan was information that Plaintiff and Class Members would have found material when deciding whether to purchase the subject Option ARM loans.  Nevertheless, the Loan Documents did not disclose this material information to Plaintiff and Class Members.  Had the Loan Documents disclosed this material information, Plaintiff and Class Members would not have purchased the subject Option ARM loans.

30.     The loan characteristics described above were true of Mr. Ralston's loan and were also common characteristics of all of the Option ARM loan documents used by MIG and approved by Countrywide for use by originators during the relevant time period.

**B.     Countrywide's Fraudulent Scheme**

31.     Prior to Bank of America's purchase of Countrywide Financial Corporation ("CFC") in 2008, CFC was a holding company, which through its subsidiaries, including Countrywide, was engaged in, among other things, real-estate financing businesses, including mortgage banking, mortgage warehouse lending, underwriting and securitization.  Countrywide was the loan production sector for CFC.  During the relevant time period, Countrywide was in the business of, among other things, securitizing home mortgage loans by packaging those loans into trusts or other vehicles so that it could sell bonds to investors based on the income to be derived from those loans.

32.     According to CFC's Form 10-K for 2006 filed with the Securities and Exchange Commission on March 1, 2007, CFC's businesses were broken down into five business segments

- 10 -

1   -- mortgage banking, banking, capital markets, insurance and global operations.  CFC's mortgage

2   banking segment purchased and sold mortgage loans.  Mortgage banking was CFC's core

3   business and in 2006, it generated 48% of CFC's pre-tax earnings.  CFC's banking unit invested

4   in mortgage loans and provided short-term secured financing to mortgage lenders, through

5   Countrywide Bank, N.A. and the Countrywide Warehouse Lending division.

6          33.     As part of CFC's mortgage banking division, Countrywide's Correspondent

7   Lending Channel was responsible for purchasing loans from other mortgage lenders.  The

8   majority of these loans were purchased in the name of Countrywide Home Loans, Inc.  As of

9   December 31, 2006, Countrywide had correspondent relationships with approximately 2,100

10  mortgage lenders and operated in all fifty states.  For 2006, *Inside Mortgage Finance* ranked

11  Countrywide as the largest correspondent lender, in terms of volume, among residential

12  correspondent mortgage lenders worldwide.  Countrywide's Correspondent Lending Channel

13  purchased 876,374 loans in 2006.

14         34.     According to CFC's 2006 Form 10-K, a significant portion of the loans that

15  Countrywide purchased for investment purposes consisted of Option ARM loans.  Countrywide

16  pooled most of the Option ARM loans it originated, as well as the Option ARM loans it

17  purchased from MIG and other originators, and sold them in secondary mortgage market

18  transactions.  Countrywide sold the pooled loans either through whole loan sales or securitization.

19  In whole loan sales, Countrywide sold the loans to investors and recorded gains on the sales.  In

20  securitizations, Countrywide sold interests in the pooled loans, *i.e.*, mortgage-backed securities.

21  Countrywide's loan sales were run out of its capital markets division.  In 2005, Countrywide

22  reported $451.6 million in pre-tax earnings from capital market sales, representing 10.9% of its

23  pre-tax earnings; and in 2006, it recognized $553.5 million in pre-tax earnings from that division,

24  representing 12.8% of its pre-tax earnings.

25         35.     In order to increase the number of loans it could securitize, Countrywide devised a

26  plan to have third party originators, such as MIG, sell loans that it would then purchase.

27  Countrywide, MIG and the other originators agreed that the originators would sell Option ARM

28  loans to homeowners.  Pursuant to that understanding, the originators would fund those Option

1    ARM loans using monies available to them through their warehouse lines of credit (often

2    provided by Countrywide or issued by another warehouse lender based upon Countrywide's

3    guarantee to purchase the loan after closing) or through other means, and Countrywide would

4    then purchase the loans from the originators.  Under that arrangement, the originators would

5    collect fees from the homeowners to whom they sold the Option ARM loans as well as from

6    Countrywide, while Countrywide would collect revenues through the securitization process and

7    in connection with servicing rights it retained on the loans after they were securitized.

8    Countrywide engaged in a systematic scheme, using MIG and other loan originators, to steer

9    borrowers into Option ARM loans because they were lucrative to Countrywide with respect to the

10   securitization revenue it could generate, while concealing and failing to clearly and concisely

11   disclose material information about the Option ARM loans sold to Plaintiff and Class Members.

12          36.     Countrywide's agreement to purchase the Option ARM loans sold by the

13   originators were critical to the originators' ability to sell those loans to Plaintiff and other

14   homeowners, since the originators lacked the financial resources to issue the Option ARM loans

15   without warehouse lines of credit.  As a condition to loaning MIG and other originators the funds

16   to issue Option ARM loans, warehouse lenders required a guarantee that the originators would be

17   able to promptly sell the loans to investors such as Countrywide, and typically received

18   repayment directly from those investors.

19          37.     As alleged below, while providing a stream of financing to the originators,

20   Countrywide was aware of the Material Omissions, and it created and/or approved the loan

21   documents that contained those omissions.  Countrywide did nothing to correct these omissions,

22   since it knew that unless the truth about these Option ARM loans was concealed from Plaintiff

23   and other borrowers, these loans could not be sold.

24          38.     To facilitate this arrangement, from its headquarters and principal place of

25   business in Calabasas, California, Countrywide created, approved, sold, controlled and dictated

26   the terms of Option ARM loans that are the subject of this complaint, including Plaintiff's loan,

27   with the understanding that Countrywide would purchase those loans shortly after funding.

28   Defendants sold a significant number of the subject Option ARM loans to California residents.

Plaintiffs are informed and believe and thereon allege that Countrywide's employees and/or agents responsible for the creation, approval and sale of the subject Option ARM loans are located in California and/or that the decisions concerning approval of the loan forms and/or approval of the Plaintiffs' and the Class Members' loans were authorized and/or approved by Countrywide's corporate officers, executives and employees located in California.

### 1. Countrywide Required All Originators to Comply With Its Seller's Manual.

39. By the commencement of the relevant time period, Countrywide's Correspondent Lending Channel had a longstanding relationship with MIG and other originators whereby Countrywide had purchased hundreds of thousands of mortgage loans.  In its Correspondent Lending Division Loan Purchase Program Seller's Manual that was provided to all originators including MIG (the "Seller's Manual"), Countrywide dictated the terms of and pre-approved the loan and disclosure documents, including the Option ARM Loan Documents at issue in this action, with the intention that the originators would provide them to Plaintiff and Class Members in connection with Option ARM loans provided by the originators.  Countrywide approved the characteristics and terms of the Option ARM loans that the originators sold to Plaintiff and Class Members.  The originators' compliance with this manual, including their use of pre-approved loan documents, was critical to their operations.  It was only by using the Countrywide pre-approved loan products and Loan Documents that the originators could be assured that they would be able to promptly resell the Option ARM loans they issued to Countrywide.

40. To insure compliance with the Seller's Manual, Countrywide requires each originator to enter into a form Loan Purchase Agreement (the "Countrywide LPA").  Among other things, the Countrywide LPA stated that Countrywide would only purchase individual loans if those loans were originated pursuant to the underwriting standards, lending requirements, and terms and conditions promulgated by Countrywide:

I.    ELIGIBLE LOANS

A.    Only those Loans fully complying with the standards for Conforming Conventional, Jumbo Conventional, Government and Second Mortgage Loan Programs set forth in the Mortgage Programs section of Countrywide's Correspondent Lending

- 13 -

Division Loan Purchase Program Seller's Manual, as amended from time to time (the "Manual") are eligible for purchase under this Agreement.  Seller must be approved, qualified and/or licensed to originate such Loans.

B.      Seller shall fully underwrite each Loan prior to submission to Countrywide in accordance with Underwriting Guidelines and Lending Requirements sections of the Manual, or, if available, use a Countrywide-approved automated underwriting system for underwriting the Loan.

C.      Seller shall be responsible for assuring that Loans submitted to Countrywide comply with all terms and conditions of this Agreement and the Manual.

Thus, pursuant to this paragraph, the Option ARM loans that MIG and others sold to borrowers, and all of the Option ARM loans that Countrywide purchased, were originated in compliance with the Seller's Manual.

41.     Similarly, the Countrywide LPA provided that a loan would only be deemed delivered to Countrywide if, among other things, "it is in compliance with the requirements set forth in the Delivery of Closed Loans and Funding Documentation sections of the Manual." Countrywide reinforced this requirement in the LPA by indicating that it would only pay an originator for a loan after it received "a Loan documentation package which fully complies with the requirements of the Manual."  Additionally, the originators were required to represent that as of the date of Countrywide's purchase of a loan, "each Loan is valid and complies with all criteria contained in the Manual."

42.     The Countrywide LPA did not permit the originators to deviate from the terms of the Countrywide LPA or the Seller's Manual in any way.  Indeed, the originators were obligated to repurchase any loan from Countrywide if they "fail[ed] to observe or perform or breaches in any material respect any of the representations, warranties or agreements contained in this Agreement or the Manual with respect to a particular Loan."  Moreover, while the LPA gave Countrywide discretion not to demand repurchase of loans even though it had the right to do so for specific reasons enumerated in the Countrywide LPA, that option expressly excluded loans that did not comply with the Countrywide LPA or Seller's Manual:

Notwithstanding that a Seller may be obligated pursuant to the terms of this Section 7 to repurchase a Loan, if such Loan is in

- 14 -

compliance with all requirements of this Agreement and the Manual at the time of its purchase by Countrywide and if there is no evidence of fraud or misrepresentation in connection with the Loan, Countrywide, in its sole discretion and on terms determined solely by Countrywide, may consider permitting Seller to indemnify Countrywide against all suits, costs, damages, losses, fees or claims, including without limitation reasonable attorneys' fees, which may be incurred by Countrywide in connection with such Loan.

43.     The Countrywide LPA also permitted Countrywide to suspend its obligation to commit to purchasing loans under the Countrywide LPA if the originator "breached an obligation . . . representation, warranty or covenant under the Agreement, or will be unable to fulfill any of its obligations under the Agreement or the Manual."

**2.     Countrywide Dictated The Terms Of the Loans And Provided Originators with Uniform Loan Documents.**

44.     Countrywide's correspondent lending program revolved around "Platinum Lender Access," a secure website created and maintained by its Correspondent Lending Channel (https://cld.countrywide.com).  The website enabled correspondent lenders to access Clout, Countrywide's loan origination and underwriting technology system, which was designed for use at the point of sale, to allow correspondent lenders to identify which particular Countrywide loan program  or loan version to offer to borrowers.  Countywide dictated the parameters and specific guidelines for the loan programs it would purchase, such as the introductory interest rate, the prepayment penalty, and the interest rate that would actually apply to the loan.

45.     On the Platinum Lender Access website, Countrywide identified the specific documents that it required correspondent lenders to use in order for Countrywide to purchase a loan.  Loan guidelines and worksheets for sellers were also available on the website.  This website allowed lenders to quickly generate loan documents that conformed to Countrywide-specific guidelines and receive the documents within seconds of requesting them.

46.     MIG's President has explained that Countrywide also made the pre-approved loan and disclosure documents available to originators through document service companies, including a company known as Doc Magic.  This allowed MIG and others to merely insert the monthly payment amounts, teaser interest rates and principal amounts— in compliance with Countrywide's

- 15 -

predetermined rate sheets, loan programs and underwriting guidelines provided to originators on

Countrywide's proprietary, secure website– into the pre-approved Countrywide loan documents,

print the loan documents and provide them to Plaintiff and Class Members.

**3.   Countrywide Knew That the Option ARM Loan Documents It Designed And Required MIG to Utilize Were Deceptive.**

47.      As Option ARM loans were fueling Countrywide's exploding securitization

business, Countrywide pushed the originators to issue as many Option ARM loans as possible.

For example, in July 2005, Mr. Michael B. Quinn, Executive Vice President of Countrywide's

Correspondent Lending Division, wrote to MIG stating,

Also, in June of 2005, James

St. Peter of Countrywide's Correspondent Lending Division wrote to MIG stating that

48.      While it was urging originators to increase their Option ARM loan volume,

Countrywide was well aware of how Option ARM loans actually worked even though these facts

were not clearly and conspicuously disclosed in the Option ARM Loan Documents.  This is

readily evidenced by a comparison of the Option ARM Loan Documents for Plaintiff's loan and a

prospectus for Countrywide's sale of mortgage-backed securities where Option ARM loans serve

as collateral.  For example, in a Prospectus Supplement dated March 28, 2007, for the offering of

certificates in a securitized trust (Series 2007-OA4) comprised of Option ARM loans,

Countrywide describes the Option ARM loans as "negative amortization mortgage loans":

> THE MORTGAGE LOANS
>
> The mortgage loans will consist of 30-year and 40-year
> conventional, adjustable rate, negative amortization mortgage loans

secured by first liens on one-to-four family residential properties.
The mortgage rate on each mortgage loan has an introductory fixed
rate period of zero, one or three months after origination.
Thereafter, the interest rate on each mortgage loan adjusts monthly
based on a specified index, but the scheduled monthly payments on
the mortgage loans adjust annually.

49.     In the Risk Factors section of the Prospectus Supplement, Countrywide explains to

prospective investors the relationship between the teaser rate and the scheduled monthly

payments.

All of the mortgage loans are "NEGATIVE AMORTIZATION
LOANS."  After an introductory period of zero, one or three
months after origination during which the interest rates on the
negative amortization loans are fixed, the interest rates on negative
amortization loans will adjust monthly but their monthly payments
and amortization schedules adjust annually and, under most
circumstances, are subject to payment caps. The interest rates on
negative amortization mortgage loans during their introductory
periods are lower than the sum of the indices applicable at
origination and the related margins, and may be as low as 1% per
annum.  Since the scheduled monthly payments on negative
amortization loans for the first year are set at their origination, the
scheduled monthly payments are based upon the introductory
interest rates.

50.     There is no similar language in Plaintiff's loan documents. *See* Exhibit 1.

51.     Then, in contrast to the loan documents that are the subject of this action,

Countrywide affirmatively states that negative amortization is certain to occur:

As a result, after the introductory interest rates expire and until the
initial annual adjustment to the scheduled monthly payment made
by the borrower (unless the fully indexed mortgage rate is a rate at
or below the introductory mortgage rate), ***the scheduled monthly
payment made by the borrower will not be sufficient to pay the
amount of interest accruing on the mortgage loan.***  Although
negative amortization loans provide for scheduled monthly
payments, the amount of interest that accrues and is ultimately due
on a negative amortization loan is based on the monthly interest
rate.  ***If borrowers only make their scheduled monthly payments, a
portion of the accrued interest on negatively amortizing loans will
become deferred interest.***

(emphasis added).  Rather than stating that negative amortization will occur if Plaintiff made his

scheduled payments, Plaintiff's Note states: "my Minimum Payment *could be less* than or greater

than the amount of the interest portion of the monthly payment that would be sufficient to repay

- 17 -

the unpaid Principal. . . . *If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur."* *See* Exhibit 1 ¶¶ 3(C) and (E) (emphasis added).

52.     In the description of the Option ARM loans in the Prospectus Supplement, Countrywide provided similar disclosure to potential investors regarding the certainty of negative amortization and explained how the loans worked:

> All of the Mortgage Loans are "NEGATIVE AMORTIZATION LOANS." The Mortgage Rates for the Negative Amortization Loans are generally fixed for a zero, one or three month period after origination (and the related Mortgage Rate during such time period generally is less than the sum of the applicable Mortgage Index and the related Gross Margin) and then they adjust monthly, but the scheduled payments on the Negative Amortization Loans adjust annually on a date specified in the related mortgage note, subject to the conditions (the "PAYMENT CAPS") that:
>
> --     the amount of the monthly payment (with the exception of the initial payment recast date and each fifth payment adjustment date thereafter, or the final payment adjustment date) will not increase or decrease by an amount that is more than 7.50% of the monthly payment prior to the adjustment,
>
> --     as of the initial payment recast date and on the same day every fifth year thereafter and on the last payment adjustment date, the monthly payment will be recast without regard to the limitation in the first bullet point above; and
>
> --     if the unpaid principal balance exceeds the applicable maximum negative amortization percentage of the original principal balance due to deferred interest, the monthly payment will be recast without regard to the limitation in the first bullet point to amortize fully the then unpaid principal balance of the Negative Amortization Loan over its remaining term of maturity.

53.     Countrywide's knowledge that its Option ARM Loan Documents were deceptive went to the highest levels of the corporation.  For example, on July 10, 2006, Angelo Mozilo, CFC's co-founder, Chairman and CEO, requested that Countrywide start informing new Option ARM borrowers of the dangers of negative amortization inherent in Countrywide's Option ARM loans and encouraging borrowers to make monthly payments that exceeded those identified in the TILDS.  However, this "request" did not result in any meaningful change in policy, and the unlawful Material Omissions continued.  Despite these concerns, Countrywide did nothing to

- 18 -

1   alter the unlawful disclosures being provided to Plaintiff and Class Members.

2       54.     In one internal email, Mozilo referred to a particularly profitable sub-prime

3   product as "toxic," and in another he stated that the company was "flying blind," and had "no

4   way" to predict the performance of its heralded product, the Option ARM loan.  Mozilo believed

5   that the risk was so high and that the secondary market had so mispriced Option ARM loans that

6   he repeatedly urged that Countrywide sell its entire portfolio of those loans.  Mozilo urged this

7   because he knew that Option ARM borrowers, including Plaintiff and Class Members, would

8   likely be unable to make monthly payments on their loans once they reset to include all of the

9   additional principal created by negative amortization and to finally reflect the interest rates

10  Countrywide was actually applying to the loans.

11      55.     In June 2005, CFC Risk Management warned senior executives, including

12  Sieracki, that action was needed to address the increasing pace of negative amortization and the

13  potential for payment shock associated with Pay-Option ARMs.  Specifically, in a June 28, 2005

14  meeting of the credit risk committee, Risk Management recommended that the rate used to

15  calculate the minimum payment on Option ARMs loans be raised to reduce negative amortization

16  and the severity of payment shock.  Risk Management explained that while the "teaser" rate

17  remained constant at 1%, short term rates (upon which borrowers' fully amortizing payments

18  were based) had risen steadily, thereby increasing the pace of negative amortization and the

19  severity of the resulting payment shock.

20      56.     Despite the repeated warnings of Mozilo and other executives, the clearly

21  identified risks of Option ARM loans were not disclosed to consumers or borrowers and

22  Countrywide (both directly and through MIG, acting as its agent and co-conspirator) continued to

23  sell new Option ARM loans without correcting the Material Omissions.  Despite his concerns,

24  Countrywide took no action because, as early as August 2006, Mozilo recognized that Option

25  ARM loans were one of the ***"only products left with margins [profit]."***  Similarly, the

26  originators, such as MIG, knew the contents of the Option ARM loan documents that they

27  provided to Plaintiff and Class Members and had opportunity to insure that those documents

28  clearly and conspicuously disclosed the true nature of the Option ARM loans, but chose instead to

- 19 -

1   provide the loan documents approved by Countrywide, rather than using documents necessary to

2   comply with the requirements of TILA or which disclosed the true nature of the Option ARM

3   loan product.

4                                                 **V.**

5                              **CLASS ACTION ALLEGATIONS**

6          57.     Plaintiff brings this action on behalf of himself, and on behalf of all others

7   similarly situated  pursuant to Federal Rule of Civil Procedure, Rules 23(a), and 23(b), and seeks

8   to represent the following class ("Class One") defined as follows:

9                  All individuals who, from January 24, 2004 through the date that
                   notice is mailed to the Class, have or had an Option ARM loan
10                 originated by a lender other than Countrywide Home Loans, Inc.
                   and subsequently assigned or sold to Countrywide Home Loans,
11                 Inc. on their home located in the State of California or for which the
                   loan documents were approved in or emanated from California or
12                 from a California Defendant, with the following characteristics:

13                 (i)      the monthly payment amount in the Note is based upon an
                            interest rate which ranges from 1% to 3%;
14

15                 (ii)     the payment schedule in the TILDS, for the first year or
                            more of the Note, is based upon a fully amortizing payment
                            at the teaser interest rate;
16

17                 (iii)    the interest rate adjusts after only one month to a rate which
                            is the sum of the "index" and the "margin"; and

18                 (iv)     after the first three to five years of the loan, the monthly
                            payment amount increases to a fully amortizing payment
19                          based upon the remaining principal balance at that time.

20

21         Plaintiff is also seeking certification of the following class ("Class Two") defined as

22   follows:

23

24                 All individuals who, from January 24, 2004 through the date that
                   notice is mailed to the Class, have or had an Option ARM loan
                   originated by Mortgage Investors Group on their home located in
25                 the State of California or for which the loan documents were
                   approved in or emanated from California or from a California
26                 Defendant, with the following characteristics:

27                 (i)      the monthly payment amount in the Note is based upon an
                            interest rate which ranges from 1% to 3%;
28

- 20 -

(ii)    the payment schedule in the TILDS, for the first year or more of the Note, is based upon a fully amortizing payment at the teaser interest rate;

(iii)   the interest rate adjusts after only one month to a rate which is the sum of the õindexö and the õmarginö; and

(iv)    after the first three to five years of the loan, the monthly payment amount increases to a fully amortizing payment based upon the remaining principal balance at that time.

Excluded from the Class One and Class Two (collectively, the õClassesö) are Defendantsø employees, officers, directors, agents, representatives, and their family members, as well as the Court and its officers, employees, and relatives.

58.    Plaintiff reserves the right to amend or otherwise alter the Class definitions of the Classes presented to the Court at the appropriate time, or propose subclasses, in response to facts learned through discovery, legal arguments advanced by Defendants or otherwise.

59.    Numerosity:  The Classes are so numerous that the individual joinder of all members is impracticable under the circumstances of this case.  While the exact number of Class Members is unknown at this time, the Classes consist of thousands of members.

60.    Commonality: Common questions of law or fact are shared by the Class Members. This action is suitable for class treatment because these common questions of fact and law predominate over any individual issues.  Such common questions include, but are not limited to, the following:

a)    Whether the Loan Documents failed to disclose to Plaintiff and Class Members that negative amortization was certain to occur if they made the required monthly payments;

b)    Whether the Loan Documents are non-negotiable instruments;

c)    Whether Defendants are liable for the fraudulent omissions and UCL violations alleged herein;

d)    Whether Countrywide knowingly assisted and aided and abetted the originators as part of its scheme to sell Option ARM loans to Plaintiff and Class Members without disclosing the material information described herein;

- 21 -

1                 e)      Whether Defendants had a duty to disclose material information regarding

2 the loans;

3                 f)      Whether Plaintiff and Class Members are entitled to damages; and

4                 g)      Whether Plaintiff and Class Members are entitled to punitive damages.

5      61.    <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the Class Members.

6 Plaintiff and the other Class Members were subjected to the same kind of unlawful conduct and

7 the claims of Plaintiff and the other Class Members are based on the same legal theories.

8      62.    <u>Adequacy</u>:  Plaintiff is an adequate representative of the Classes because his

9 interests do not conflict with the interests of the other members of the Classes.  Plaintiff has

10 retained counsel competent and experienced in complex class action litigation and Plaintiff has

11 been, and intends to continue prosecuting this action vigorously.   The interests of members of the

12 Classes will be fairly and adequately protected by Plaintiff and his counsel.

13      63.    <u>Ascertainable Class</u>:  The proposed Classes are ascertainable in that the members

14 can be identified and located using information contained in MIG's and Countrywide's records.

15      64.    <u>Predominant Questions of Law or Fact</u>:  Questions of law or fact common to the

16 Class Members, including those identified above, predominate over questions affecting only

17 individual Class Members (if any), and a class action is superior to other available methods for

18 the fair and efficient adjudication of the controversy.

19      65.    <u>Superiority and Substantial Benefit</u>: A class action is superior to other available

20 means for the fair and efficient adjudication of Plaintiff's and Class Members' claims.  The

21 damages suffered by each individual Class Member may be limited.  Given the burden and

22 expense of individual prosecution of the complex and extensive litigation necessitated by

23 Defendants' conduct, it would be virtually impossible for Class Members to redress the wrongs

24 done to them on an individual basis.  Even if members of the Classes could afford such individual

25 litigation, the court system could not.  Individualized litigation increases the delay and expense to

26 all parties and the court system, due to the complex legal and factual issues of the case.  By

27 contrast, the class action device presents far fewer management difficulties, and provides the

28 benefits of single adjudication, economy of scale, and comprehensive supervision by a single

court.

## VI.

## FIRST CAUSE OF ACTION

### Fraudulent Omissions

### (Plaintiff, On Behalf of Himself and Class One, Against Countrywide and, On Behalf of Himself and Class Two, Against MIG)

66.     Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

67.     Under California common law, the Loan Documents' partial representations that omitted material facts, created a duty to disclose all material facts concerning Plaintiff's and Class Members' Option ARM loans.  Further, Countrywide and MIG had exclusive knowledge of the undisclosed material facts and actively concealed those facts from Plaintiff and Class Members. Thus, Countrywide and MIG had a duty to disclose to Plaintiff and Class Members that: (i) the low interest rate in the Notes was only available for thirty days if at all; (ii) the monthly payment amounts for the first three to five years provided to Plaintiff and Class Members on the TILDS were insufficient to pay both principal and interest; (iii) negative amortization was absolutely certain to occur if Plaintiff and Class Members made payments according to the payment schedule provided in their Loan Documents; and that (iv) loss of equity and/or loss of Plaintiff's and Class Members' residences was certain to occur if Plaintiff and Class Members made payments according to the payment schedule.  To the degree the loans included "Payment Options" Countrywide and MIG also had a duty to disclose the details of the payments options, including the payment amount necessary to avoid negative amortization.  Instead, Countrywide and MIG concealed these material facts to Plaintiffs and Class Members in the loan documents.

68.     The Notes at issue state that the borrower will make a payment every month and that the borrower will make these payments every month until all the **Principal and Interest** and any other charges described under the Note are paid off   The Notes then state, while referencing the Payment Cap provision, that the Payment Cap applies only to the **Principal and Interest** payments.  Under the heading "BORROWERS FAILURE TO PAY AS REQUIRED," the Notes state that the amount of the charge will be 5.000% of the borrower's overdue payment of

- 23 -

1    principal and interest.ö  These partial representations failed to disclose that the payment amounts

2    prescribed in The Loan Documents, were certain to result in negative amortization.  Had The

3    Loan Documents disclosed this information, Plaintiff and Class members would not have

4    purchased the loans.

5           69.     The Notes further state that for each month that the monthly payment is less than

6    the interest portion, the Note Holder will subtract the amount of the monthly payment from the

7    amount of the interest portion and will add the difference to the unpaid principal, and interest will

8    accrue on the amount of this difference at the interest required by Section 2 or Section 4

9    depending on the Note version.  However, the Loan Documents failed to disclose the material fact

10   that the payment schedules in the TILDS could not possibly cover the amount of interest due

11   under any conceivable index rate plus the margin after the first thirty days.   To be accurate and

12   complete, the Notes should have disclosed that if the borrowers followed the payment schedules,

13   the monthly payments would not cover the amount of interest due and negative amortization

14   would occur.  Had the Loan Documents disclosed this information, Plaintiff and Class Members

15   would not have purchased the loans.

16          70.     The Notes further state, that the borrowers minimum payment or monthly ***could be***

17   ***less*** than or greater than the amount of the amount of the interest portion of the monthly payment.

18   And, under the öPayment Optionsö heading, the Notes further state that the Lender may provide

19   the borrower with additional payment options that are greater than the Minimum Payment.

20   However, the so-called öPayment Optionsö were not disclosed to Plaintiff and Class members

21   before they entered into the subject Option ARM loans, and it was only after Plaintiff and Class

22   members entered into the loan that they were provided crucial material information about the true

23   cost of the loan, and by then, it was too late as they were already hooked into the loan, with their

24   accompanying heavy prepayment penalties.  Had the Loan Documents disclosed this information,

25   Plaintiff and Class Members would not have purchased the loans.

26          71.     The Notes further state, under öAmount of My Initial Monthly Paymentsö that

27   each of the borrowerøs initial monthly payments until the first Payment Change Date will be a

28   specified amount and then, under öPayment Change Datesö it states that the borrowerøs monthly

payment *may* change.  However, under the terms of the subject Option ARM loan, Plaintiff's and Class Members' loan "payment" was *absolutely guaranteed to go up the very next month*.  In particular, the Loan Documents failed to disclose and omitted the material fact that while the initial monthly payment amount would remain constant, the actual amount owed each month for the loan was absolutely guaranteed to go up.  Had the Loan Documents disclosed this information, Plaintiff and Class Members would not have purchased the loans.

72.     Countrywide designed and approved, and MIG and other originators issued, marketed and sold, the Notes, which set forth a teaser rate that was only in effect for 30 days and approved the TILDS which set forth payments based upon those teaser rates for the first three to five years of the loan.  At all relevant times, Countrywide and MIG knew, but did not disclose in the Loan Documents, that these listed low payments in the TILDS were predicated on an interest rate which would not exist after the first thirty days of the loan.  Countrywide and MIG knew, but did not disclose in the Loan Documents, that negative amortization was *guaranteed* if borrowers made these listed low payments.  Countrywide and MIG further knew, but did not disclose in the Loan Documents, that the listed payments set forth in the TILDS were calculated such that, if the payments were made, borrowers actually would be paying off 115% of the original principal balance.  This information was material to any reasonable borrower, and the omission of such material information would cause a reasonable borrower to believe that the fully amortizing payments shown on the TILDS were in fact those payments necessary to pay off the balance of the original amount financed (*i.e.*, the original principal balance less principal payments made on account of that balance), rather than 115% of the amount financed.  Had the Loan Documents disclosed this information, Plaintiff and Class Members would not have purchased the loans.

73.     In addition to the breach of its duty to disclose the Material Omissions, Countrywide is liable under this Cause of Action (1) because it devised, designed and approved the deficient Loan Documents and terms, with the intention that those Loan Documents would be provided to Plaintiff and the members of Class One, intending that Plaintiff and the members of Class One would rely upon them, despite the Material Omissions, and (2) as purchaser and assignee of Plaintiff's and Class One Members' loans.

- 25 -

74.     Countrywide is also liable under this Cause of Action because it provided substantial assistance to MIG and the other originators in the form of day-to-day financing that permitted them to originate the subject Option ARM loans.  The originators did not fund the Option ARM loans they originated; rather, those funds were provided by warehouse lines of credit from Countrywide and others.  In circumstances where Countrywide did not provide the warehouse financing, the originators were only able to obtain that financing from other lenders because the Countrywide LPA provided the originators with a guarantee that Countrywide would purchase the Option ARM loans issued by the originators as long as they originated those loans in compliance with Countrywide's policies and procedures.  The originators paid back the warehouse lines of credit after Countrywide purchased the Option ARM loans from the originators pursuant to loan purchase agreements.

75.     In return for its guarantee to purchase the Option ARM loans as long as they complied with its policies and procedures, Countrywide was guaranteed access to a batch of mortgages to securitize.  During the relevant time period, Countrywide earned profits of well over $1 billion from securitizing residential mortgage loans.

76.     MIG is responsible for the omissions and misstatements alleged herein because it delivered the Loan Documents to Plaintiff and Class Members with the intention that they would rely upon the omissions and misstatements therein.

77.     At all times relevant, Defendants had exclusive knowledge of these materials facts, but actively concealed the material facts from Plaintiff and Class Members.  Where the Loan Documents made partial disclosures about the "subjects" at issue, the Loan Documents only made these partial representations while suppressing materials facts, as alleged herein.  The Loan Documents' concealment, omissions and partial representations occurred prior to the consummation of the loan transactions with Plaintiff and Class Members.

78.     The omitted information, as alleged herein, was objectively material to both the interest rate and the amount of payments, which are the two most important features of any mortgage loan.  Had the Loan Documents disclosed this information, Plaintiff and Class Members would not have purchased the loans.

79.     As a direct and proximate result of the Loan Documents' failures to disclose and omission of material facts, as alleged herein, Plaintiff and Class Members have suffered damages, including but not limited to, the loss of equity in their homes.

80.     The wrongful conduct of Countrywide and MIG as alleged herein, including placing their corporate and/or individual profits over the rights of others, was willful, oppressive, immoral, unethical, unscrupulous, substantially injurious, malicious and in conscious disregard for the well being of Plaintiff and Class Members, and particularly vile, base, contemptible, and wretched.  Such acts and/or omissions were performed on the part of officers, directors, and/or managing agents of Countrywide and MIG, and/or taken with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions.  Countrywide and MIG thereby acted with malice and complete indifference to and/or conscious disregard for the rights and safety of others, including Plaintiff and the general public.  Accordingly, Plaintiff and Class Members are entitled to an award of punitive damages against Countrywide and MIG in an amount to deter it from similar conduct in the future.

81.     WHEREFORE, Plaintiffs and Class Members are entitled to all legal and equitable remedies provided by law, including but not limited to actual damages, exemplary damages, unjust enrichment (legal restitution), prejudgment interest and costs.

**VII.**

**<u>SECOND CAUSE OF ACTION</u>**

**Violation of California's Unfair Competition Law, Bus. & Prof. Code §§ 17200 *et. seq.*
"Unlawful," "Unfair" Or "Fraudulent" Business Acts or Practices**

**(Plaintiff, On Behalf of Himself and Class One, Against Countrywide
and, On Behalf of Himself and Class Two, Against MIG)**

82.     Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

83.     Plaintiff brings this cause of action on behalf of himself, on behalf of the Class Members, and in his capacity as a private attorney general against Defendants for their unlawful, unfair, fraudulent and/or deceptive business acts and/or practices pursuant to California Business & Professions Code §§ 17200, *et seq.* ("UCL"), which prohibits all unlawful, unfair and/or fraudulent business acts and/or practices.

- 27 -

84.     Plaintiff asserts these claims as a representative of aggrieved groups and as private attorneys general on behalf of the general public and other persons who have expended funds that Countrywide and MIG should be required to pay or reimburse under the restitutionary remedy provided by the UCL.

85.     The instant claim is predicated on the generally applicable duty of any contracting party to not omit material facts, and on the duty to refrain from unlawful, unfair and deceptive business practices.  Plaintiff and Class Members hereby seek to enforce a general proscription of unfair business practices and the requirement to refrain from deceptive conduct.  The instant claim is predicated on duties that govern anyone engaged in any business and anyone contracting with anyone else.

86.     Plaintiff and Class Members include consumers who obtained Option ARM mortgage loans that were designed by Countrywide and made available to the originators to use for loan originations and/or applied for mortgage loans through MIG.  In each case, the uniform Loan Documents failed to disclose and omitted material information that was known only to Defendants and that could not reasonably have been discovered by Plaintiff and Class Members as set forth in the preceding counts.

87.     Based on the Material Omissions and the other partially true statements and failures to disclose as alleged herein, Plaintiff and Class Members agreed to finance their homes through the subject Option ARM loans, and have been actually harmed.

88.     Countrywide devised, designed, and approved the TILDS which set forth low monthly payments for the first three to five years of the loans.  MIG and other originators approved and provided these documents to borrowers.  Defendants knew, but did not clearly disclose in the Loan Documents, that these listed low payments in the TILDS were predicated on an interest rate which would not, in fact, exist after the first thirty days of the loans.  Defendants also knew, but did not disclose in the Loan Documents, that negative amortization was *guaranteed* if borrowers made these listed low payments.  Countrywide and the originators further knew, but did not disclose in the Loan Documents, that the listed payments set forth in the TILDS were calculated such that, if the payments were made, borrowers actually would be

1   paying off 115% of the original principal balance.  This information was material to any

2   reasonable borrower, and the omission of such material information would cause a reasonable

3   borrower to believe that the fully amortizing payments shown on the TILDS were in fact those

4   payments necessary to pay off the balance of the original amount financed (*i.e.*, the original

5   principal balance less principal payments made on account of that balance), rather than 115% of

6   the amount financed.  Countrywide and MIG could have easily disclosed in the Loan Documents,

7   and should have accurately and clearly disclosed in the Loan Documents, that if borrowers paid

8   the remaining payments listed on the TILDS they would in fact be paying 115% of the balance of

9   the original financed amount, rather than merely the balance of the original amount financed.

10           89.     Countrywide provided a stream of funding to the originators, including MIG, that

11   enabled them to originate the subject Option ARM loans.  As the originators did not use their own

12   assets to fund the loans that they originated, they relied on warehouse lenders such as

13   Countrywide to provide warehouse lines of credit that they used to originate Option ARM loans,

14   and upon Countrywide's agreements to purchase the Option ARM loans shortly after closing.

15           90.     By engaging in the above-described acts and practices, Countrywide and MIG

16   committed one or more acts of unfair competition within the meaning of Business & Professions

17   Code §§ 17200, *et seq.*

18           91.     The misconduct, as alleged herein, gave it an unfair competitive advantage over its

19   competitors.

20           92.     <u>Unlawful</u>:  The unlawful acts and practices of Countrywide and MIG alleged

21   above constitute unlawful business acts and/or practices within the meaning of the UCL.

22   Countrywide's and MIG's unlawful business acts and/or practice as alleged herein have violated

23   numerous laws and/or regulations ó federal and/or state, statutory and/or common law ó and said

24   predicate acts are *per se* violations of §17200, *et seq.*  Countrywide's and MIG's unlawful

25   business acts and/or practices include but are not limited to violations of common law, the

26   Federal Trade Commission Act, 15 U.S.C. §§ 41-58, California Civil Code §§ 1572 (Actual

27   Fraud - Omissions), and 1710 (Deceit).

28           93.     Plaintiff and Class Members have suffered an injury in fact, lost money and

- 29 -

incurred substantial financial injury because they have paid interest accumulated due to the undisclosed negative amortization and lost substantial equity in their homes due to the Option ARM loan scheme.  Thus, the acts and/or practices as alleged herein were unlawful within the meaning of Bus. & Prof. Code § 17200, *et seq.*

94.     <u>Unfair</u>: The misconduct as alleged herein was unfair because it is contrary to the public policy expressed in the UCL to protect consumers from ongoing wrongful business conduct in whatever context such activity may occur. The misconduct alleged is unethical, oppressive, and substantially injurious to consumers.

95.     Countrywide's and MIG's misconduct is also unfair because the Material Omissions and otherwise herein caused Plaintiff and Class Members substantial injury by a resulting loss of equity in their homes, because the Loan Documents failed to disclose and/or omitted material information that the Option ARM loans were, *inter alia*, certain to result in negative amortization if the disclosed payment schedule was followed.

96.     Plaintiff and Class Members have been substantially injured by Countrywide's and MIG's misconduct because they have lost substantial equity in their homes due to the Option ARM loan scheme.  Defendants' misconduct as alleged herein is contrary to the public policy expressed in the UCL because the Loan Documents devised, designed and approved by Countrywide and sold and provided to consumers by mortgage loan originators, including MIG, failed to disclose important material facts concerning the subject Option ARM loans, including that negative amortization was absolutely guaranteed to occur if Plaintiff and Class Members made payments according to the payment schedule provided in the Note and TILDS.  There is no countervailing benefit to consumers or competition that outweighs the substantial injury Plaintiff and Class Members have suffered.  Plaintiff and Class Members could not have avoided the substantial injury because Defendants had exclusive knowledge of the material facts but actively concealed these material facts from Plaintiff and Class Members through the Material Omissions.  Thus, the acts and/or practices as alleged herein were unfair within the meaning of Cal. Bus. & Prof. Code § 17200, *et seq.*

97.     The harm to Plaintiff, members of the general public and Class Members

1  outweighs the utility of Countrywide's and MIG's polices, act and/or practices, and consequently

2  Countrywide's and MIG's conduct herein constitutes an unfair business act or practice within the

3  meaning of the UCL.  The misconduct as alleged herein also gave Defendants an unfair

4  competitive advantage over its competitors that did not engage in similar conduct.

5         98.    <u>Fraudulent</u>: Through its omissions and/or acts, practices and non-disclosures as

6  alleged herein, Countrywide designed the Loan Documents that were likely to deceive the public

7  through the Material Omissions leading to consumer confusion, including, but not limited to the

8  fact that, for the first three to five years, the loans were negatively amortizing loans.  Said

9  omissions, acts, practices and non-disclosures as alleged herein therefore constitute fraudulent

10  business acts and/or practices within the meaning of the UCL.

11         99.    Defendants' misconduct, as fully described above, was designed to and was

12  therefore likely to deceive members of the consuming public, and at all times, Defendants'

13  failures to disclose and their omission of material facts have been and continue to be unfair,

14  fraudulent, untrue and/or deceptive.

15        100.    As a direct and proximate result of the aforementioned omissions, acts and

16  practices, Countrywide and MIG received monies and continue to hold the monies expended by

17  Plaintiff and Class Members similarly situated who purchased the Option ARM loans as

18  described herein.

19        101.    The unfair, deceptive and/or fraudulent business practices of Defendants, as fully

20  described herein, present a continuing threat to members of the public to be misled and/or

21  deceived by the Loan Documents at issue, as described herein.

22        102.    Plaintiff actually relied on the nondisclosures and fraudulent conduct when

23  deciding to purchase the Option ARM loan designed and created by Countrywide from MIG.

24  Had the Material Omissions been disclosed, Plaintiff would not have purchased the Option ARM

25  loan.

26        103.    Countrywide is liable under this Cause of Action (1) because it devised, designed

27  and approved the deficient Loan Documents and terms, with the intention that those Loan

28  Documents would be provided to Plaintiff and the members of Class One, intending that Plaintiff

1    and the members of Class One would rely upon them, despite the Material Omissions, and (2) as

2    purchaser and assignee of Plaintiffs and Class One Members' loans.

3          104.    Countrywide is also liable under this Cause of Action because it provided

4    substantial assistance to MIG and the other originators in the form of day-to-day financing that

5    permitted them to originate the subject Option ARM loans.  The originators did not fund the

6    Option ARM loans they originated; rather, those funds were provided by warehouse lines of

7    credit from Countrywide and others.  In circumstances where Countrywide did not provide the

8    warehouse financing, the originators were only able to obtain that financing from other lenders

9    because the Countrywide LPA provided the originators with a guarantee that Countrywide would

10   purchase the Option ARM loans issued by the originators as long as they originated those loans in

11   compliance with Countrywide's policies and procedures.  The originators paid back the

12   warehouse lines of credit after Countrywide purchased the Option ARM loans from the

13   originators pursuant to loan purchase agreements.

14         105.    In return for its guarantee to purchase the Option ARM loans as long as they

15   complied with its policies and procedures, Countrywide was guaranteed access to a batch of

16   mortgages to securitize.  During the relevant time period, Countrywide earned profits of well over

17   $1 billion from securitizing residential mortgage loans.

18         106.    MIG is responsible for the omissions and misstatements alleged herein because it

19   delivered the Loan Documents to Plaintiff and Class Members with the intention that they would

20   rely upon the omissions and misstatements therein.  .

21         107.    Plaintiff and other members of the general public have no other remedy of law that

22   will prevent the misconduct as alleged herein from occurring and/or reoccurring in the future.

23         108.    As a direct and proximate result of the unfair and/or fraudulent conduct alleged

24   herein, Plaintiff and Class Members have lost millions of dollars of equity in their homes.

25   Plaintiff and Class Members are direct victims of the Defendants' unlawful conduct, and each has

26   suffered injury in fact, and has lost money or property as a result of Countrywide's unfair

27   competition.

28         109.    WHEREFORE, Plaintiff and Class Members are entitled to equitable relief,

- 32 -

1  including restitution, restitutionary disgorgement of all profits accruing to Defendants because of

2  their unfair, unlawful and deceptive acts and/or practices, attorney's fees and costs, declaratory

3  relief, and a permanent injunction enjoining Defendants from engaging in the wrongful activity

4  alleged herein.

5  **<u>PRAYER FOR RELIEF</u>**

6  WHEREFORE, Plaintiff and Class Members pray for judgment against each Defendant,

7  jointly and severally, as follows:

8  A.  An order certifying this case as a class action and appointing Plaintiff and his

9  counsel to represent the Classes;

10  B.  For actual damages according to proof;

11  C.  For compensatory damages as permitted by law;

12  D.  For consequential damages as permitted by law;

13  E.  For punitive damages as permitted by law;

14  F.  For unjust enrichment and/or legal restitution;

15  G.  For equitable relief, including restitution;

16  H.  For restitutionary disgorgement of all profits Defendants obtained as a result of

17  their unfair competition;

18  I.  For interest as permitted by law;

19  J.  For declaratory relief;

20  K.  A permanent injunction enjoining the unfair, fraudulent and deceitful activity;

21  L.  For reasonable attorneys' fees and costs; and

22  M.  For such other relief as is just and proper.

23

24

25

26

27

28

- 33 -

Dated: April 28, 2010                    **ANDRUS ANDERSON LLP**

                                         By:    */s/ Jennie Lee Anderson*
                                                      Jennie Lee Anderson

                                         Lori E. Andrus (SBN 205816)
                                         Jennie Lee Anderson (SBN 203586)
                                         155 Montgomery Street, Suite 900
                                         San Francisco, CA 94104
                                         Telephone: (415) 986-1400
                                         Facsimile: (415) 986-1474
                                         lori@andrusanderson.com
                                         jennie@andrusanderson.com

                                         David M. Arbogast (SBN 167571)
                                         Jeffrey K. Berns, Esq. (SBN 131351)
                                         **ARBOGAST & BERNS LLP**
                                         19510 Ventura Boulevard, Suite 200
                                         Tarzana, CA 91356
                                         Phone: (818) 961-2000
                                         Fax:  (310) 861-1775
                                         darbogast@law111.com
                                         jberns@law111.com

                                         Gerson H. Smoger, Esq.
                                         Steven M. Bronson, Esq.
                                         **SMOGER & ASSOCIATES**
                                         3175 Monterey Blvd
                                         Oakland, CA 94602-3560
                                         Telephone:  (510) 531-4529
                                         Facsimile:   (510) 531-4377

                                         Eric M. George (SBN 166403)
                                         Michael A. Bowse (SBN 189659)
                                         **BROWNE WOODS GEORGE LLP**
                                         2121 Avenue of the Stars, Suite 2400
                                         Los Angeles, CA 90067
                                         Telephone:  (310) 274-71
                                         Facsimile:   (310) 275-5697
                                         egeorge@bwgfirm.com
                                         mbowse@bwgfirm.com

                                         Lee A. Weiss (*pro hac vice* pending)
                                         **BROWNE WOODS GEORGE LLP**
                                         49 West 37th Street, 15th Floor
                                         New York, NY 10018
                                         Telephone:  (212) 354-4901
                                         Facsimile:   (212) 354-4904
                                         lweiss@bwgfirm.com

                                         *Attorneys for Plaintiff and the Proposed Class*

# EXHIBIT 1

MIN: 1001095-0001044120-9                          Loan Number: 1044120

## ADJUSTABLE RATE NOTE
### (MTA-Twelve Month Average Index - Payment Caps)

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT
THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE
PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT
ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT
STATED IN THIS NOTE.

JULY 20, 2005                 IRVINE                    CALIFORNIA
     [Date]                    [City]                      [State]

          731 COLUMBIA AVENUE, SALINAS, CALIFORNIA 93901
                          [Property Address]

### 1.  BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $520,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed (ONE HUNDRED FIFTEEN PERCENT ) of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is MORTGAGE INVESTORS GROUP, A GENERAL PARTNERSHIP
I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.  INTEREST
(A)  Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   1.000 %.  The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

(B)  Interest Rate Change Dates
The interest rate I will pay may change on the   1st     day of SEPTEMBER, 2005 , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

(C)  Index
Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D)  Calculation of Interest Rate Changes
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 075/1000     percentage point(s)   3.075 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest rate will never be greater than   9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

### 3.  PAYMENTS
(A)  Time and Place of Payments
I will make a payment every month.
I will make my monthly payments on the   1st     day of each month beginning on SEPTEMBER 1, 2005     . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on AUGUST 1, 2035    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at 16257 LAGUNA CANYON ROAD #100, IRVINE, CALIFORNIA 92618
or at a different place if required by the Note Holder.

Borrower Initials: _____  _____  _____  _____                    10/04
PayOption ARM Note - MTA Index
FE-5312 (0412)                        Page 1 of 4

UuS3121.cw

(B)  Amount of My Initial Monthly Payments

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $1,672.53       unless adjusted under Section 3 (F).

(C)  Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the      1st         day of SEPTEMBER, 2006 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D)  Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

(E)  Additions to My Unpaid Principal

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

(F)  Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed the Maximum Limit equal to   115.000  percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

(G)  Required Full Payment

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

(H)  Payment Options

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

> (i)   Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
> (ii)  Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.
> (iii) 15 Year Amortized Payment:  the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

Borrower Initials: _____   _____   _____   _____   _____   _____

PayOption ARM Note - MTA Index                                                                    10/04
FE-5312 (0412)                            Page 2 of 4

4.   NOTICE OF CHANGES
    The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

5.   BORROWER'S RIGHT TO PREPAY   ** See attached Prepayment Note Addendum.
    I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.
    I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

6.   LOAN CHARGES
    If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.   BORROWER'S FAILURE TO PAY AS REQUIRED
    (A)  Late Charges for Overdue Payments
    If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

    (B)  Default
    If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    (C)  Notice of Default
    If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    (D)  No Waiver By Note Holder
    Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    (E)  Payment of Note Holder's Costs and Expenses
    If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

8.   GIVING OF NOTICES
    Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
    Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE
    If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

Borrower Initials: _____   _____   _____   _____   _____   _____

PayOption ARM Note - MTA Index                                          10/04
FE-5312 (0412)                        Page 3 of 4

U533H25.cw



## 10.   WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.   SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
JAY J. RALSTON                                          -Borrower

_____ (Seal)
                                                                   -Borrower

_____ (Seal)
                                                                   -Borrower

_____ (Seal)
                                                                   -Borrower

PayOption ARM Note - MTA Index
FE-5312 (0412)                              Page 4 of 4                              10/04

Us3312X.cw

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Loan Number: 1044120

Date: JULY 20, 2005

Creditor:   MORTGAGE INVESTORS GROUP
Address: 16257 LAGUNA CANYON ROAD #100, IRVINE, CALIFORNIA 92618

Borrower(s):   JAY J. RALSTON

Address:   731 COLUMBIA AVENUE, SALINAS, CALIFORNIA 93901

Lines containing an "x" are applicable:

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | ☐ Total Sale Price The total cost of your purchase on credit including your down-payment of $ |
|---|---|---|---|---|
| 5.756 % | $ 649,165.76 | $ 517,557.27 | $ 1,166,723.03 | $ |

PAYMENTS: Your payment schedule will be:

| Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning | | | Monthly Beginning | | | Monthly Beginning |
| 1 | 1,672.53 | 09/01/05 | | | | | | |
| 11 | 1,672.53 | 10/01/05 | | | | | | |
| 12 | 1,797.97 | 09/01/06 | | | | | | |
| 12 | 1,932.82 | 09/01/07 | | | | | | |
| 12 | 2,077.78 | 09/01/08 | | | | | | |
| 12 | 2,233.61 | 09/01/09 | | | | | | |
| 299 | 3,500.49 | 09/01/10 | | | | | | |
| 1 | 3,500.00 | 08/01/35 | | | | | | |

_____ DEMAND FEATURE:  This obligation has a demand feature.

___X___ VARIABLE RATE FEATURE:  Your loan contains a variable rate feature.  Disclosures about the variable rate feature have been provided to you earlier.

INSURANCE:  The following insurance is required to obtain credit:
_____ Credit life insurance and credit disability   ___X___ Property Insurance   _____ Flood Insurance   _____ Private Mortgage Insurance
You may obtain property insurance from any insurer that is acceptable to the Lender.
SECURITY:  You are giving a security interest in:  731 COLUMBIA AVENUE, SALINAS, CALIFORNIA 93901
_____ The goods or property being purchased   ___X___ Real property you already own.
FILING FEES:  $
LATE CHARGE.  If payment is more than _____15_____ days late, you will be charged _____5.000__% of the payment.
PREPAYMENT.  If you pay off early, you                                                    * or $5.00 (whichever is greater)
___X__ may   _____ will not   have to pay a penalty.
_____ may   ___X__ will not   be entitled to a refund of part of the finance charge.
ASSUMPTION:  Someone buying your property
_____ may   _____ may, subject to conditions   ___X___ may not   assume the remainder of your loan on the original terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.
___X__ "e" means an estimate   _____ all dates and numerical disclosures except the late payment disclosures are estimates.
Each of the undersigned acknowledge receipt of a complete copy of this disclosure.  The disclosure does not constitute a contract or a commitment to lend.


| Applicant   JAY J. RALSTON | Date | Applicant | Date |
|---|---|---|---|
| Applicant | Date | Applicant | Date |
| Applicant | Date | Applicant | Date |

** NOTE:  Payments shown above do not include reserve deposits for taxes, assessments, and property or flood insurance.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2010, I electronically filed the above document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 28, 2010                    */s/ Jennie Lee Anderson*
                                          Jennie Lee Anderson

ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 986-1400
Facsimile: (415) 986-1474
jennie@andrusanderson.com

- 35 -