# EXHIBIT W

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JAY J. RALSTON, On Behalf Of Himself And All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MORTGAGE INVESTORS GROUP, INC., MORTGAGE INVESTORS GROUP, a general partnership, COUNTRYWIDE HOME LOANS, INC., AND DOES 3-10,<br><br>Defendants. | Civil Case No.: 08-CV-00536-JF (PSGx)<br><br>**EXPERT REPORT OF**<br>**PROFESSOR ALAN M. WHITE** |

//
//
//
//
//
//
//
//
//
//

# REPORT OF ALAN M. WHITE

1.  I am a professor of law at Valparaiso University School of Law. My research specialty is the regulation of credit markets, and particularly empirical research on the subprime mortgage market and mortgage servicing. I have written and published a number of articles regarding empirical research into the mortgage market and, in particular, the subprime mortgage market. I submit this Report in the matter of *Ralston v. Mortgage Investors Group, et al.*, Case No. CV 08-00536 JF, at the request of attorneys for Plaintiff Jay J. Ralston, on behalf of himself and all others similarly situated, for expert analysis, advice and opinions on issues described herein.

2.  I served as a member of the Federal Reserve Board's Consumer Advisory Council from 2006 to 2008. I am currently a member of the American Law Institute, and the Research Advisory Council for the Center for Responsible Lending. I am also a past member of the Pennsylvania Joint State Government Commission Advisory Committee on Real Property Law, a past member of the Pennsylvania Banking Department Advisory Committee on Mortgage Foreclosures.

3.  I have testified before the House Committee on Financial Services regarding foreclosure prevention efforts, before the Federal Reserve Board in connection with its hearings on the Home Ownership and Equity Protection Act and before the Predatory Lending Task Force of the Departments of Housing and Urban Development and Treasury.

4.  Prior to becoming a professor of law, I was a practicing attorney representing consumers and homeowners in foreclosure and bankruptcy cases, and have over twenty-four years of experience reviewing mortgage loan files. A copy of my Curriculum Vitae and list of publications for the past ten years is attached hereto as Exhibit 1.

5.  In the previous four years, I have testified as an expert witness at trial in two cases: *Gray v. American General Finance* (Bky N.D. W.V) and *Asbury v. Countrywide Home Loans, Inc.* Civil Case 09-C-9 (Boone Cty WV Circuit Ct). I also testified at a deposition as an expert witness in *Wenger v. D.J. Harda Corp.* (08-C-205G Hancock Cty WV Circuit Ct).

## EDUCATION AND TRAINING

6. I obtained my Bachelor of Science degree from the Massachusetts Institute of Technology (MIT) in 1979, and was a National Merit Scholar. I obtained my Juris Doctor from New York University School of law in 1983, was Editor in Chief of the N.Y.U. Review of Law and Social Change and received the William Miller award for Scholarship in Municipal law.

7. I have no interest, either present or contemplated, in the parties to this litigation on which the declaration, analysis and testimony may be based. My billing rate is $300 per hour. My fees are not contingent on any particular outcome in this case.

## DOCUMENTS REVIEWED

8. In connection with the preparation of this declaration, I have analyzed numerous publications and scholarly studies relating to the mortgage lending industry and consumer behavior relating to mortgages. The opinions set forth below are based upon all the information available to me and on my experience and training.

9. Among other things, I have reviewed the Promissory Note between Jay Ralston and Mortgage Investors Group and the accompanying Truth In Lending Disclosure ("TILD") form, sample loan files produced in this case containing additional sample Pay Option ARM Promissory Notes and TILD forms, the Third Amended Complaint, multiple versions of promissory Notes produced by Countrywide Home Loans, Inc. ("Countrywide") in this case, two versions of Chapter 14 of the Countrywide Seller's Guide, a Bulletin amending Chapter 14, and data from Countrywide's loan database relating to the Pay Option ARM loans Countrywide purchased from originators. Attached hereto as Exhibit 2 is a list of materials produced or filed in this case that I reviewed.

10. In connection with this report, my review has also included the following publications and studies, which are among the types of materials I would typically rely upon to offer opinions on the topics addressed herein: Federal Reserve Consumer Advisory Council meeting materials related to nontraditional mortgages, Center for Responsible Lending various papers on mortgage brokers and nontraditional mortgages, Harvard Joint Center for Housing Studies various papers on mortgage market and mortgage brokers, the Mortgage Market

- 2 -

Statistical Annual various years, "Nontraditional Mortgages: Appealing but Misunderstood," by Shirley Chiu, Gov't Accountability Office, GAO No. 06-1021, Alternative Mortgage Products: Impact on Defaults Remains Unclear, but Disclosure of Risks to Borrowers Could Be Improved (2006), Interagency Guidance on Nontraditional Mortgage Product Risks, 71 Fed. Reg. 58,609 (Oct. 4, 2006), various Congressional hearings in 2006-2008 concerning nontraditional mortgages, Federal Trade Commission press releases and testimony concerning deceptive marketing practices in selling option ARM loans, and the Federal Reserve staff discussion and sources cited in the preamble to the 2008 HOEPA regulation regulating mortgage advertising.

## SUMMARY OF OPINIONS

11. Because of their unique features, particularly negative amortization combined with deeply discounted initial interest rates that adjust after one month, Countrywide Pay Option ARM loans were not appropriate for the vast majority of borrowers. Moreover, it is highly unlikely that brokers voluntarily provided this information to borrowers, since brokers typically disclaim any duty to make disclosures to borrowers, it was against the economic interests of brokers to disclose that information, and such disclosures by brokers would cause potential borrowers to not accept the terms of the proposed Pay Option ARM loan.

12. Countrywide's Pay Option ARM loans were inherently subject to misrepresentation. The empirical data demonstrate that the key features that attracted homeowners to Pay Option ARM loans were the low initial monthly payment and the accompanying low initial interest rate, which, in the absence of additional disclosures, appeared to be related. These invariably masked the enormous offsetting costs that resulted from negative amortization, transaction costs, and prepayment penalties, as well as the dramatic payment escalation built into this loan product.

///
///
///
///
///

## DISCUSSION AND OPINIONS

13. The Pay Option ARM loans that were sold and securitized between 2003 and 2007 through Countrywide's correspondent lender channel[1] (which I have reviewed), typically feature a deeply discounted initial interest rate as compared to prevailing market interest rates, but the rate increases to a much higher rate within a very short time, almost always one month after the loan term begins. As was the case with Plaintiff's loan in this case, a typical initial interest rate was 1%, but that rate is not a meaningful expression of the actual cost of the Pay Option ARM loan. Nevertheless, no other interest rate is disclosed or identified in the Promissory Note. Similarly, as was the case here, the monthly payment for the first year or longer is invariably based upon the initial interest rate, but is not a payment that will amortize the loan.

14. These features of Countrywide Pay Option ARM loans are highly likely to, and are designed to, lead to borrower misunderstanding. Studies have shown that consumers generally do not understand adjustable rate mortgage products. Behavioral and market research has also shown that consumers tend to use the monthly payment for credit as a proxy for the cost of credit, and will, therefore, tend to focus on the initial monthly payment unless they are clearly informed that other considerations are important. Research also shows that consumers tend to discount the risk of being unable to meet payment increases in the future. As a result, credit products such as Pay Option ARM loans that are structured with escalating payments—particularly where payments escalate at some distant point in the future—exploit well-known consumer biases.

15. If properly and fully informed regarding the true features and effects of these loans, all but the most exceptional consumer would not select a Countrywide Pay Option ARM product. This is because by their nature Countrywide Pay Option ARM loans are unsuitable for

---

[1] The Countrywide Pay Option ARM product was adapted from a much more conservative loan product model developed by World Savings, a California thrift, in the 1980s. The World Savings Option ARM product featured an initial rate that was usually no more than 2% lower than market rates, required the borrower to have enough income to pay the fully-amortizing payment, limited loan-to-value ratios to 80% and was kept in portfolio. World Savings also allowed ten years, rather than five years, before requiring a fully-amortizing payment, in order to minimize payment shocks. In fact the World Savings product was designed to allow the lender the reduced risk of an adjustable-rate product, while providing the borrower with a fixed payment largely protected from payment shocks, at least for the likely holding period of the loan. Countrywide's use of deeply discounted initial rates insuring negative amortization from the outset, created a very risky loan product.

- 4 -

all but a tiny proportion of borrowers. They are designed such that borrowers make payments that are less than the interest accruing each month, thus resulting in negative amortization. Indeed, because those payments are the only payment amounts reflected in the key loan documents and because these payment amounts are consistent with the initial interest rate, borrowers enter the loan understanding that these "minimum" or "limited" payments accurately reflect the cost of credit on Pay Option ARM loans. Recent data reflects that discounted Pay Option ARM borrowers are likely to make only those minimum payments. Pay Option ARM loans are also structured with very significant payment escalation after five years.[2] As a result of this, borrowers whose incomes are not likely to increase dramatically within five years (meaning all but the most exceptional borrower) are not well suited to the discounted Pay Option ARM loan product. Indeed, a discounted Pay Option ARM would only be suitable for a borrower with a demonstrated expectation of rapidly increasing income such as a medical resident.

16. Brokers and other mortgage originators who are aware of the deficiencies of discounted Pay Option ARM loans have significant incentives to increase sales by failing to make disclosures that would contradict consumers' incorrect impressions regarding the true nature of discounted Option ARM loans.

17. Most independent mortgage brokers in the alt-A market,[3] where discounted Pay Option ARM loans were sold, regarded themselves as independent intermediaries, with no fiduciary duties to the borrower. In particular, the commonly-used mortgage broker fee agreement spelled out the absence of any duty on the part of mortgage brokers to recommend suitable mortgage products or mortgage features for borrowers. This is in contrast to the general

---

[2] According to data provided by Countrywide, 95% of its Pay Option ARMs required fully amortizing payments after five years and 98% limited negative amortization to 115% of the original balance.

[3] "Alt-A" refers to mortgage loans that were not eligible for purchase by Federal National Mortgage Association or Federal Home Loan Mortgage Corporation, i.e. nonconforming, but that were not considered subprime, i.e. "B/C" loans, because the borrower's credit was at or above conforming standards. Alt-A loans were nonconforming because of their terms, as in the case of negative amortizing Pay Option ARMs, or reduced income documentation or other features that made them ineligible for GSE purchase.

- 5 -

1   practice for securities brokers, for example, who do have a duty to inform their customer of all
2   risks and recommend only suitable investment products.

3       18.    In an environment in which brokers commonly disclaimed any duty to inform or
4   counsel borrowers, there was little or no incentive for brokers to go beyond the legally-mandated
5   disclosures, consisting of the written disclosures required by TILA and RESPA, and which are
6   included in borrowers' loan files. Indeed, it was in broker's self interest to make no additional or
7   different disclosures. Brokers' economic incentives were driven largely by the size of the
8   mortgage loan and its ease of approval, as they were typically compensated by commissions that
9   were based on the amount of the loan. When borrowers were approved for discounted Pay
10  Option ARM loans based on the initial payment only, Pay Option ARMs provided the largest
11  loan amount available for a borrower with a given income, and thus, provided the brokers with
12  the highest possible commissions. Brokers were thus financially motivated to emphasize the
13  affordability of the initial payment and to remain silent regarding the negative amortization,
14  hidden interest rate increases and payment shock inherent in this loan product. Consequently, it is
15  not consistent with mortgage brokers' economic self-interest to volunteer negative information
16  about discounted Pay Option ARM loans in the period of their expanded use, primarily from
17  about 2003 through 2007.

18      19.    Countrywide was aware of and recognized consumers' misapprehension of the
19  true nature its Pay Option ARM loans and resisted efforts to curb the sales of these loan products.
20  In 2006 and 2007, for example, Countrywide and mortgage industry groups opposed efforts by
21  federal banking regulators to restrain the growth of "nontraditional" mortgages including Pay
22  Option ARMs by means of regulation or guidance.[4] In their public statements, lenders
23  acknowledged that these products were suitable only for exceptional borrowers. Despite their
24  recognition that Pay Option ARMs were a niche product that should have very limited
25  application, Countrywide encouraged and allowed this product to grow to a sizeable portion of
26  the loans purchased from its loan originators, often offering incentives to its correspondent

---

[4] KATHLEEN C. ENGEL & PATRICIA A. MCCOY, THE SUBPRIME VIRUS: RECKLESS CREDIT, REGULATORY FAILURE AND NEXT STEPS, at 201 (2010).

- 6 -

lenders and originators to sell more Countrywide Option ARM products—well beyond the extremely small number of such loans that would have been issued had they been sold only to the small category of borrowers for whom they were appropriate and far beyond the number of borrowers who empirical data indicate would have taking these loans had their true nature been disclosed.

Dated: April 4, 2011

_____
Alan M. White

-7-

# Exhibit 1

# ALAN M. WHITE

*Valparaiso University School of Law*
*656 S. Greenwich Street*
*• Valparaiso IN 46383 •*
*219 465 7842*
*Alan.White@valpo.edu*

EDUCATION

    NEW YORK UNIVERSITY SCHOOL OF LAW                 J.D. MAY, 1983

    Editor in Chief, N.Y.U. Review of Law and Social Change
    William Miller award for Scholarship in Municipal Law

    MASSACHUSETTS INSTITUTE OF TECHNOLOGY           B.S. JANUARY, 1979

    National Merit Scholar
    Undergraduate Research Grant, M.I.T. and Massachusetts Legislature, studied drug addiction treatment programs and access to employment and training.

    UNIVERSITY OF PARIS X - NANTERRE                        1978-77

    Completed first year as regularly enrolled student in history.

TEACHING EXPERIENCE

    PROFESSOR                                              (FALL 2007 - PRESENT)
    *Valparaiso University School of Law*                        *Valparaiso, IN*

    Teaching and Research interests: Credit Markets, Contracts, Property, Real Estate Finance, Bankruptcy, Commercial Law, Payment Systems, Financial Services Regulation, Consumer Protection, European and Comparative Law.

    ADJUNCT PROFESSOR                                       (2003 –2007)
    *Temple University Law School*                              *Philadelphia, PA*

    Taught Consumer Protection Law.

    ADJUNCT PROFESSOR                                   (SUMMER 2001, 2002)
    *Drake Law School*                                               *Nantes, France*

    Co-taught Comparative Consumer Law course on European, French and U.S. consumer protection laws.

PUBLICATIONS

*The Impact of State Anti-Predatory Lending Laws on the Foreclosure Crisis*, Cornell Journal of Law & Public Policy (forthcoming 2011) (with Lei Ding, Carolina Reid and Roberto Quercia)

*The Impact of Federal Pre-emption of State Anti-Predatory Lending Laws on the Foreclosure Crisis*, Journal of Policy and Management (forthcoming 2011) (with Lei Ding, Carolina Reid and Roberto Quercia)

*State Anti-Predatory Lending Laws and Neighborhood Foreclosure Rates*, Journal of Urban Affairs (forthcoming 2011) (with Lei Ding, Carolina Reid and Roberto Quercia)

*Deleveraging the American Homeowner: The Failure of 2008 Voluntary Mortgage Contract Modifications*, 41 Connecticut Law Review 1107 (2009)

*Borrowing While Black: Applying Fair Lending Laws To Risk-Based Mortgage Pricing*, 60 South Carolina Law Review 677 (2009)

*Rewriting Contracts Wholesale: Data on Voluntary Mortgage Modifications from 2007 and 2008 Remittance Reports*, 36 Fordham Urban Law Journal 509 (2009)

*Behavior and Contract*, 27 Law and Inequality 135 (2009)

*The Case for Banning Subprime Mortgages*, 77 University of Cincinnati Law Review 617 (2008)

*Surendettement Proceedings in French Law and Consumer Bankruptcy in the United States: The Social-Democratic and Free Market Approaches to Excessive Debt in Advanced Capitalist Consumer Economies*, in RISK AND CHOICE IN CONSUMER SOCIETY, (Ramsay, et. al., ed. Sakkoulas Pub. 2007).

*Risk-Based Pricing: Present and Future Research*, 15 Housing Policy Debate 503 (2004) (peer-reviewed economics journal)

*Literacy and Contract*, 13 Stanford Law & Policy Review 233 (2002) (with Cathy Lesser Mansfield)

*New Relief for Trade School Victims: Discharging Student Loans Based on False Certification of Ability to Benefit*, 29 Clearinghouse Review 1128 (April, 1996)

*Gentrification, Tipping and the National Housing Policy*, 11 N.Y.U. Rev. of Law & Soc. Change 255 (1982-83)

Contributing author, CARTER, ed., PENNSYLVANIA CONSUMER LAW

(Bisel 2006); NATIONAL CONSUMER LAW CENTER, STUDENT LOAN LAW (1st ed. 2001); TRUTH IN LENDING (4th ed. 1999); CONSUMER BANKRUPTCY LAW AND PRACTICE (6th ed. 2001).

WORKS IN PROGRESS (AVAIL. ON SSRN)

*Welfare Economics and Regulation of Small-Loan Credit: Lessons from Microcredit in Developing Nations*

PROFESSIONAL ACTIVITIES

Past member, Federal Reserve Board Consumer Advisory Council

Member, American Law Institute

Consumer Fellow, American Bar Association Business Law Section, UCC Committee

Member Research Advisory Council, Center for Responsible Lending

Past Member of the Pennsylvania Joint State Government Commission Advisory Committee on Real Property Law

Past Member of Pennsylvania Banking Department Advisory Committee on Mortgage Foreclosures

Past co-chair and member of the Education Committee of the Eastern District of Pennsylvania Bankruptcy Conference

Past Member of Advisory Council to Philadelphia Tax Reform Commission (2004)

Consumer representative in U.S. Education Department negotiated rulemaking proceedings under Higher Education Act in 1994, 2000 and 2002.

Testified before House Financial Services and Judiciary committees, April 14 2010, July 9, 2009, September 17, 2008

Testified before Federal Reserve Board (2000 hearings on the Home Ownership and Equity Protection Act)

Testified before the Predatory Lending Task Force of the Departments of Housing and Urban Development and Treasury (2000)

PRIOR PROFESSIONAL EXPERIENCE

SUPERVISING ATTORNEY (1983-2007)
*Community Legal Services, Inc.* Philadelphia, PA

Representation of several thousand low-income consumers in bankruptcy, mortgage foreclosure, commercial law, real estate, consumer credit, truth-in-lending, debt collection, utility, employment, trade school fraud, class action, civil rights and family law cases. Legislative and administrative advocacy in the areas of consumer credit regulation, bankruptcy, foreclosure law, federal higher education financing, and local taxation.

FELLOW AND CONSULTANT (2000-2003)
*National Consumer Law Center* Boston, MA

Research on consumer law and bankruptcy issues, coauthor or contributor to *Truth in Lending*, *Student Loans* and *Consumer Bankruptcy* manuals, preparation and presentation of testimony before Federal Reserve Board on predatory mortgage lending, expert testimony, case consulting, and research on mortgage foreclosures.

SELECTED PRESENTATIONS

AALS Financial Services Financial Institutions Committee, San Francisco, Welfare Economics and Regulation of Small-Loan Credit, January 2011

Conference on Empirical Legal Studies, New Haven CT November 2010, The Impact of State Anti-Predatory Lending Laws on the Foreclosure Crisis

Symposium, Anatomy of the Subprime Crisis: Empirical Studies of Loan Document Data, Valparaiso Law School, Organizer and Moderator, March 2010

Consumer Finance Post-Apartheid: The South African Experience, Hartford CT, Developments in U.S. Consumer Credit Regulation Roundtable, November 2009

Law and Society Conference, Denver, Power, Responsibility and the Legal Ideology of the Consumer, May 2009

Federal Reserve System Community Affairs Research Conference, Washington DC, Credit Market Structures and Outcomes: Discrimination, April 2009

University of Dayton Law School Symposium, Rethinking Lending Regulation after the 2008 Bailout, March 2009

International Association of Consumer Law, Hyderabad India, Microcredit and Poverty, February 2009

U. of Connecticut Law Review Symposium, Deleveraging American Homeowners, November 2008

U. of South Carolina Law Review Symposium, Borrowing while Black, October, 2008

U. of Connecticut Banking Law Junior Scholars Workshop, Case for Banning Subprime Lending, May 2008

Seton Hall School of Law Predatory Lending Conference, Case for Banning Subprime Lending, May 2008

U. of Houston Teaching Consumer Law Conference, Behavior and Contract, May 2008

Indiana Judicial College, Foreclosures and the Courts (Indianapolis April 2008)

International Poverty Law Conference, Microcredit and Poverty (Valparaiso IN March 2008)

Foreclosure Defense Conference, Convener and Presenter (Valparaiso IN March 2008) (video of presentation available at: http://www.youtube.com/watch?v=WODZMxbfefE)

National Training and Information Center, Banking and Housing Summit, Mortgage-Backed Securities (Chicago December 2007)

Law and Society, New Issues in the Law of Consumer Credit (Berlin July 2007)

Federal Reserve Bank of Philadelphia, Access to Credit: Payday Lending and Alternative Credit Products (Philadelphia May 2007)

Federal Reserve Board of Governors, Community Affairs Research Conference, Price Discrimination and Foreclosures (Washington DC March 2007)

American Bar Association Business Law Section, Consumer Financial Services Committee, Class Action Settlements and Abuses (Park City UT 2006); HOEPA litigation (Breckenridge CO 1999)

Practicing Law Institute, Consumer Financial Services, Fair Lending Developments (New York March 2006)

National Consumer Law Center Consumer Rights Litigation Conferences:

    Foreclosure Crisis and Modification Programs, Boston 2010, Philadelphia 2009
    Assignee Liability and Holder in Due Course, Minneapolis 2005
    Class Action Notices for Low Literacy Readers, Boston 2004
    Predatory Lending Myths and Data to Refute Them, Oakland 2003
    Ethical Challenges in Case Investigation & Class Action Releases, Atlanta 2002
    Consumers as Creditors in Lender Bankruptcies, Baltimore 2001
    Student Loan Discharges, Denver 2000
    HOEPA and Predatory Mortgage Lending, San Diego 1998

Federal Reserve Bank of New York, Community Development Finance Research Conference, Subprime Markets and Predatory Lending (discussant) 2004

International Association of Consumer Law, Consumer Bankruptcy in the U.S. and Surendettement Proceedings in France, Athens, Greece 2003

Center for Consumer Law, University of Houston School of Law, Teaching Consumer Law, Houston 2002

Pennsylvania Bar Institute
    Abusive Financial Practices and the Elderly, Philadelphia 2004
    Fundamentals of Mortgage Foreclosures, Philadelphia 2003, Philadelphia and Harrisburg 2000
    Litigation Update, Philadelphia 2003
    Advocating for Older Adults, Philadelphia 1998
    Consumer Law for the Nonspecialist, Philadelphia, Harrisburg, Pittsburgh 1997
    Family Law and Bankruptcy, Harrisburg 1997
    Consumer Law, Philadelphia, Harrisburg, Pittsburgh 1988

**Exhibit 2**

**EXHIBIT 2**

1. **Adjustable Rate Note and Federal Truth-In-Lending Disclosure Statement for Jay J. Ralston**
2. **Sapphire Data Excel Sheets** (CHL114741, CHL114742, CHL114743)
3. **PayOption Adjustable Rate Notes**
    a. CHL041573-CHL041576; CHL041429-CHL041432
    b. CHL043534-CHL043573; CHL041670-CHL041673
    c. CHL058203-CHL058206; CHL045209
    d. CHL037562-CHL037565; CHL037566-CHL037569
    e. CHL037570-CHL037573
4. **Sample Loan Files**
    a. MIG20013-MIG20105
    b. MIG19919-MIG20012
    c. MIG21877-MIG21981
    d. MIG20105-MIG20228
    e. MIG20406-MIG20492
5. **Countrywide Home Loans, Inc., Sellers Guide - Chapter 14.0 (Version 1)** (CHL000385-CHL000392)
6. **Countrywide Home Loans, Inc., Sellers Guide – Chapter 14.0 (Version 2)** (CHL037627-CHL037643)
7. **Countrywide Home Loans, Inc., Sellers Guide Bulletin, December 20, 2004** (CHL012593-CHL012616)
8. **Sample Letter from Countrywide Home Loans, Inc. to Aegis Mortgage Corporation, dated August 17, 2004** (CHL046227)
9. **Third Amended Complaint**