# EXHIBIT 3

CONFIDENTIAL

CONFIDENTIAL                          Page 1

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                 SAN JOSE DIVISION

4    ------------------------------------

5    JAY J. RALSTON, On Behalf Of        )

6    Himself And All Others Similarly    )

7    Situated,                           ) No. 5:08-CV

8              Plaintiff,                ) 00536-JF (PSG)

9         vs.                            ) VOLUME I

10   MORTGAGE INVESTORS GROUP, INC.;     )

11   MORTGAGE INVESTORS GROUP, a         )

12   general partnership; COUNTRYWIDE    )

13   HOME LOANS, INC.; and DOES 3-10,    )

14             Defendants.               )

15   ------------------------------------

16

17         THIS TRANSCRIPT IS CONFIDENTIAL

18         PURSUANT TO PROTECTIVE ORDER

19

20       Deposition of LEONARD H. LYONS, taken

21       at 601 South Figueroa Street, Los Angeles,

22       California, commencing at 10:04 A.M.,

23       Wednesday, June 1, 2011, before

24       Judith A. Mango, CSR No. 5584.

25   PAGES 1 - 171

CONFIDENTIAL

1   APPEARANCES OF COUNSEL:

2

3       FOR THE PLAINTIFF:

4

5          BROWNE WOODS GEORGE LLP

6          BY:  LEE A. WEISS, ESQ.

7          626 RXR Plaza

8          Uniondale, New York  11556

9          (516) 522-2613

10         lweiss@bwgfirm.com

11

12       FOR THE DEFENDANT COUNTRYWIDE HOME

13      LOANS, INC.:

14

15         GOODWIN PROCTER LLP

16         BY:  STEVEN A. ELLIS, ESQ.

17         601 South Figueroa Street

18         41st Floor

19         Los Angeles, California  90017

20         (213) 426-2500

21         sellis@goodwinprocter.com

22

23

24

25

CONFIDENTIAL

Page 3

1   APPEARANCES OF COUNSEL (CONTINUED):

2

3           FOR THE DEFENDANTS MORTGAGE INVESTORS GROUP,

4           INC. AND MORTGAGE INVESTORS GROUP:

5

6                PALMER, LOMBARDI & DONOHUE LLP

7                BY:  ROLAND P. REYNOLDS, ESQ.

8                888 West 6th Street

9                12th Floor

10               Los Angeles, California  90017

11               (213) 688-0430

12               rreynolds@pldlawyers.com

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 4

1           LEONARD H. LYONS,

2     the witness, having been administered an oath in

3     accordance with CCP Section 2094, testified as follows:

4

5                EXAMINATION

6     BY MR. ELLIS:

7           Q.   Good morning.   Would you please state your full

8     name for the record.

9           A.   Leonard H. Lyons, H for Henry.   L E O N A R D,

10    H E N R Y,  L Y O N S.

11          Q.   And what is your date of birth?

12          A.   October 29, 1958.

13          Q.   And your current business address?

14          A.   5 Park Plaza, Suite 700, Irvine, California

15    92614.  I've got two, actually.

16          Q.   What's the other one?

17          A.   2049 Century Park East, Suite 400, Los Angeles,

18    California.  And I forgot the ZIP code for that one.

19          Q.   I'm guessing it's 90067, but I'm not sure.

20          A.   I think so.

21          Q.   Mr. Lyons, you have had your deposition taken

22    many times before; is that correct?

23          A.   A number of times, yes.

24          Q.   Let me just go over some of the real basic

25    information.  You understand that your testimony today

CONFIDENTIAL

Page 24

1    provide additional support for cross-examination of the

2    opposing expert or an expert that's been put forward.  I

3    shouldn't say opposing expert.

4        Q.    Do you have any plans as you sit here right now

5    to prepare any further supplement or addendum to the

6    expert report that you have submitted in this case?

7        A.    Not personally, but if asked by counsel or

8    something comes to light and I'm asked to produce it, I

9    will produce it.  But at this present time I have not

10   been asked to.

11       Q.    All right.  You currently work for a company

12   called Marcum Stonefield, correct?

13       A.    Right.  It's actually Marcum LLP.

14       Q.    Okay.  And your current title is partner; is

15   that correct?

16       A.    Yes.

17       Q.    And just in general terms what services does

18   Marcum LLP provide to its clients?

19       A.    Marcum LLP is an international public

20   accounting firm and business advisory firm.  So it has

21   everything from audit and tax consulting services to

22   investment banking and wealth management services to

23   some other different areas that I do not know of --

24       Q.    Okay.

25       A.    -- at the present time.

CONFIDENTIAL

Page 41

1    then, asked to assume that -- well, let me withdraw

2    that.

3            For the work that you were going to do in this

4    matter you were asked to create a mortgage payment

5    stream for a loan that would be at a fixed interest rate

6    of one percent for the first five years?

7    A.    That's correct.

8    Q.    Were you given any assumption for what would

9    happen after five years?

10   A.    No.

11   Q.    Other than what we have already talked about,

12   were you given any other assumptions?

13   A.    Not that I can recall at the present time.

14   Q.    Okay.  We have already marked Exhibit 2, and I

15   want to ask you some questions about Exhibit 2, but let

16   me just start by asking you:  Do you recall what

17   documents you were given to review in connection with

18   the formation of your expert opinion in this matter?

19           MR. WEISS:  Are you asking him to do that

20   without looking at the report?

21           MR. ELLIS:  He is free to look at the report,

22   or if he remembers offhand, that's fine.  Either way is

23   fine with me.

24           THE WITNESS:  I believe I looked at them all.

25   ////

CONFIDENTIAL

Page 49

1  your actual numbers versus what was supposedly -- they

2  were supposed to obtain, the difference between those

3  two would be the final calculation.

4          So there is a relationship between this model

5  and the actual numbers.

6  BY MR. ELLIS:

7      Q.   So are you offering an opinion that -- about

8  the correct measure of damages in this case?

9      A.   I was asked to assume the correct measure of

10  damages, the benefit of the bargain.

11      Q.   Okay.  And what was the -- specifically what

12  was the assumption that you were given regarding how

13  damages would be calculated in this case?

14      A.   I was just asked to determine these two models,

15  not go to the extent of completing those damage

16  calculations.

17      Q.   Okay.  So as of today have you formed any

18  opinion regarding the appropriate measure of damages for

19  the class in this case, assuming the class is certified

20  and they are able to establish liability?

21      A.   I was asked to assume the benefit of the

22  bargain at this point in time.  I have not made any

23  other determinations or opinions or was not asked to

24  provide those under the scope I'm working under.

25      Q.   Okay.  Getting back to Paragraph 17, which is

CONFIDENTIAL

Page 59

1   supplement the information that is included in Exhibits

2   2 and 4?

3       A.   Not that I have been asked to do as of this

4   point in time.

5       Q.   And as of now do you have any plans to make any

6   further corrections or addendums or supplements to what

7   is in Exhibits 2 and 4?

8       A.   Just one clarification on Table 1 for the

9   addendum.

10      Q.   Okay.   Tell me what that further clarification

11  is.

12      A.   The further clarification is the raising of the

13  extra payment of $72 that's contained in there.

14      Q.   I'm sorry.   Let me just make sure I understand

15  we are looking at the same thing.   This is the addendum.

16      A.   Right.

17      Q.   So it's Exhibit 4, correct?

18      A.   Right.

19      Q.   And we are on Table 1, correct?

20      A.   That's correct.

21      Q.   Okay.   Go ahead.

22      A.   I had been testing the model if we put an

23  additional payment in that was either a late payment fee

24  or an interest payment, so there is an extra $72 that's

25  carried through the table that has no effect because it

CONFIDENTIAL

Page 60

1    is all going to what was supposedly interest or a

2    payment that was taken outside of the mortgage.  It has

3    no effect on the principal reductions that are done.

4            So it just washes through anyhow --

5    Q.   Okay.

6    A.   -- as if the $72 wasn't even in there.

7    Q.   So are you planning to do a revised version of

8    Table 1?

9    A.   Not at the present time, no.  It's a very

10   simple explanation.

11           It has no effect on what both models were

12   trying to represent.  It was just another bell and

13   whistle that we were looking at adding on if we need to

14   add on at some point in time.  We could test and create

15   things in the model that can handle many different

16   things.

17           MR. ELLIS:  All right.  I would like to take a

18   break.

19           MR. WEISS:  Sure.

20           (Recess taken.)

21   BY MR. ELLIS:

22   Q.   All right.  Turning back to Exhibit 2, your

23   report, I did have one more question about Paragraph 17.

24           And you said in Paragraph 17 that you analyzed,

25   among other things, plaintiff's third amended class

CONFIDENTIAL

1  purpose of financial models.  Depending on what

2  parameters you get, you can adjust the model to

3  incorporate those.

4          And, ideally, you're using something that is

5  potentially publicly available to work from to save the

6  money instead of recreating the wheel.

7      Q.   So have you created a model that would

8  calculate damages on any -- using any measure other than

9  benefit of the bargain?

10          MR. WEISS:  Objection.  That's an incomplete

11  hypothetical.

12          But you can answer.

13          THE WITNESS:  That has been outside of the

14  scope.  I just have been asked to create a Hypothetical

15  1 and a Hypothetical 2, and, you know, look at what the

16  loan terms were and could we calculate what the original

17  loan terms were.

18  BY MR. ELLIS:

19      Q.   All right.  I understand that.  I'm trying to

20  understand what your -- what you say your model can and

21  can't accommodate.

22          MR. WEISS:  Objection.  He never said it can't

23  accommodate anything.  He might, but he hasn't yet.

24  BY MR. ELLIS:

25      Q.   Well, I'm going to come back to that.  I want

CONFIDENTIAL

Page 75

1    understand that part.  That's why I'm confused by what

2    you said here.

3        A.    What we're trying to say is that the teaser

4    rates themselves would not be able to repay the loan no

5    matter what the loan rate was, because the minimum loan

6    rate was above the three percent.

7              So even if you included that three percent as a

8    fully amortizing payment you would not be able to pay

9    off those mortgages.

10       Q.    And so were you assuming that the interest

11   rate, the initial interest rate, what you refer to as

12   the teaser interest rate here in Paragraph 19, would

13   apply for the full term of the loan?

14       A.    Right.  If you applied it out to the full term

15   of the loan, okay, there is no way that those payments

16   could have been made up because the margin I looked at

17   is always above -- the margin is three percent.

18             So unless we had a position where we had a zero

19   or negative index, you would never be able to pay off

20   the loan.  You would always have accrued negative

21   amortization.

22       Q.    And is that true even with 7.5 percent yearly

23   increases in the payment amount over the course of a

24   30-year loan?

25       A.    At the indexes we were seeing, I believe it was

CONFIDENTIAL

Page 86

1      A.    That's correct.

2      Q.    The minimum payment would be in Year -- I'm

3  sorry.  Let me withdraw that question.

4         In your "but for" world in Year 2 the minimum

5  payment on Mr. Ralston's loan would be no more than 7.5

6  percent more than the minimum payment in Year 1,

7  correct?

8      A.    That's correct.

9            MR. WEISS:  Objection.

10           You can answer.

11           He answered.

12           THE WITNESS:  That's correct.

13 BY MR. ELLIS:

14     Q.    And then the same thing in Year 3, the minimum

15 payment would be no more than 7.5 percent higher than

16 the payment in Year 2, correct?

17     A.    That is correct.

18     Q.    Okay.  And this would continue in Year 5.  For

19 example, the minimum payment would be no more than 7.5

20 percent more than the payment in Year 4, correct?

21     A.    That's correct.

22     Q.    Under your benefit of the bargain calculation

23 what happens in Year 6?

24     A.    I was not asked to take it out that far.

25     Q.    Okay.  So is it correct to say that your damage

CONFIDENTIAL

Page 88

1  measures of damages other than benefit of the bargain,

2  correct?

3      A.   I believe I have, yes.

4      Q.   You have heard of out-of-pocket loss?  That's a

5  term you have heard, correct?

6      A.   That's correct.

7      Q.   And restitution is a term that you have also

8  heard?

9      A.   That's correct.

10     Q.   Okay.  And do you agree that out-of-pocket loss

11  can be different than benefit of the bargain damages?

12     A.   It is possible.  It depends on the facts and

13  circumstances for each case specifically.

14     Q.   Okay.  Well, I mean, they are different

15  conceptually, right?

16     A.   They are different measures, that's correct.

17     Q.   I mean, out-of-pocket loss is a measure of

18  damage that's designed to restore an injured plaintiff

19  to where he or she was before the allegedly wrongful

20  conduct, correct?

21     A.   Well, that is your -- I would have to -- I

22  would look at Black's Law Dictionary and take an

23  exact -- or treatise for an exact determination, but it

24  pretty much states it.

25     Q.   Okay.  And benefit of the bargain is -- well,

CONFIDENTIAL

Page 89

1    how would you define benefit of the bargain?

2        A.    You got what you were intended to get.    In

3    other words, in your agreement, what you were supposed

4    to get, you got what you were supposed to have obtained.

5    If you didn't, the difference between what you got and

6    you were supposed to get is the damage.

7        Q.    Okay.  And as of today have you formed any

8    opinion regarding how the out-of-pocket loss measure of

9    damages could be calculated in this case?

10       A.    I was not asked to do that.

11       Q.    So, then, is it correct to say that as of today

12   you have not formed any opinion regarding how the

13   out-of-pocket loss measure of damages could be

14   calculated in this case?

15       A.    Not that I believe so.  Not that I can recall.

16       Q.    I want to make sure we don't have a double

17   negative in the record.  Are you --

18             I'm sorry, if you would just be kind enough to

19   read back the last question and answer.

20             (The record was read.)

21             MR. ELLIS:  Okay.  I got the answer I deserved

22   with a negative question.

23       Q.    Let me rephrase it with a question that is

24   clear.

25             As of today have you formed any opinion

CONFIDENTIAL

Page 90

1    regarding how the out-of-pocket loss measure of damages

2    can be calculated in this case?

3        A.    No, I have not.

4        Q.    Let me ask you a couple of the same questions

5    with regard to restitution.

6            I think you have already said that you have

7    heard of the term "restitution," correct?

8        A.    That's correct.

9        Q.    All right.  And benefit of the bargain damages

10   can be different than restitution, correct?

11       A.    Potentially, yes.

12       Q.    And have you formed any opinion regarding how

13   restitution could be calculated in this case?

14       A.    I have not been asked currently to do that.

15       Q.    And as a result of that you haven't been asked,

16   is it correct to say that you have not formed any

17   opinion regarding how restitution would be calculated in

18   this case?

19       A.    Not at the present time.

20       Q.    All right.  I want you to turn to Paragraph 22

21   of your report, please.  And just so the record is

22   clear, we're still on Exhibit 2.

23            Just in general terms, Paragraph 22 appears to

24   relate to yearly payment increases.  I just want to ask

25   you about the last sentence in which you state, and I'm

CONFIDENTIAL

Page 99

1   as I recall, I don't believe I have gotten the actual

2   payments.

3        Q.    Okay.   In Paragraph 25 you set forth your

4   description of the two tables.   And, as you say here in

5   Paragraph 25, as you have also testified earlier, the

6   difference between Table 1 and Table 2, and correct me

7   if I have this wrong, but I believe it's the case that

8   Table 1 assumes that the additional payment of seven --

9   I'm sorry.

10        I sort of tripped over my own words there, so

11   let me withdraw that question and just ask it

12   differently.

13        Is it correct, Mr. Lyons, that with the tables

14   that are attached to Exhibit 2, your original report,

15   Table 1 assumes that the additional payment made in

16   Years 2 through 5, because of the 7.5 percent annual

17   payment increase, is treated as an additional payment of

18   interest only?

19        A.    That's what it's intended to represent.

20        Q.    Okay.   And Table 2 was intended to take that

21   same additional payment of 7.5 percent annual payment

22   increases and apply it to principal only, correct?

23        A.    That's correct.

24        Q.    If your assumption that you were given is that

25   the loan -- let's take Mr. Ralston as an example.

CONFIDENTIAL

Page 105

1    the payment was made after the due date, what --
2    according to that front-end loan note information what
3    is their late payment percentage that they are charging,
4    is it a fixed fee or a percentage, whichever is higher
5    or lower.

6             That's probably already written into these type
7    of loan notes and in the front end of the program.  I
8    believe we already have some of that information.

9             That would then be compared, and if the payment
10   is late, you would then look at the interest, whatever
11   payment is made, did it incorporate that into account or
12   what are the provisions of the note if that payment
13   isn't made, is it added on to principal or is it
14   considered a charge that's separately billed that has no
15   effect on the principal and interest.

16            So you would look at the note parameters or
17   whatever was agreed to in terms of damages that was
18   either to be determined or what was settled upon.

19        Q.   So you would simply follow the provisions of
20   the note to determine how to treat the late payment
21   penalty; is that correct?

22        A.   Potentially.

23        Q.   How else would you do it?

24        A.   Well, if there is an agreement in terms of how
25   that is to be handled either between the parties or if

CONFIDENTIAL

1   it was a judicial determination that all late penalties

2   would be treated a certain way to make a standard

3   determination or that no late penalties are to be

4   considered at all, that is a different treatment.

5        Q.   Okay.  And, again, this is something that you

6   haven't done yet in connection with your model, correct?

7        A.   That is correct.  It's outside of the original

8   scope.

9        Q.   Okay.  How would your model take into account a

10  situation in which a borrower refinances?

11       A.   It all depends on what is written in.  You

12  know, what will be the final determination of how those

13  type of borrowers should be handled.

14            You know, what is the determination on those

15  class of borrowers that have refinanced, meaning what is

16  the -- is it at the point at which they refinance, is

17  there -- what should be included in as a measure of what

18  expenses or costs are associated or whether it was at

19  the negative amortization at that time and what the

20  parameters are.

21            So at that point in time that we know, then it

22  will be built to go over those functionalities.

23       Q.   That's something, again, you do at some point

24  in the future, correct?

25       A.   You do it at the point in which those issues

CONFIDENTIAL

Page 107

1    are determined.

2        Q.    Right.    And so as of now it has not been done,

3    correct?

4        A.    That is correct.

5        Q.    Okay.    Let me just ask.    I have a feeling I'm

6    going to get a similar answer, but let me just make sure

7    my record is clear.

8            What about if -- how would your model take into

9    account loan modifications?

10       A.    It would be exactly the same thing.    Whatever

11   determination is made, that variable will then be

12   modeled out accordingly for the class of borrowers.

13       Q.    And so once you figured out what the

14   determination is and how it would be treated, you would

15   write the code or do something to make sure that the

16   model takes it into account correctly; is that correct?

17       A.    Correct.    It's just another variable.

18       Q.    Right.    And that is a variable that you would

19   do the work to create the model -- I'm sorry.    That's

20   not right.    Let me withdraw the question.

21           That's work that you would do in the future,

22   correct?

23       A.    When you know how you need to handle those type

24   of potential class members.

25       Q.    And then the same for loans that go into

CONFIDENTIAL

Page 108

1   foreclosure.  Is that pretty much the same process, same

2   answers?

3       A.    It's another variable.

4       Q.    Right.  So you would have to first figure out

5   how -- well, I'm sorry.  I don't want to put words in

6   your mouth.  But that's something that your model would

7   eventually take into account but it doesn't currently

8   take into -- it hasn't been yet developed to take into

9   account?

10      A.    Well, I have not been provided the information

11  with which to be able to model those issues.  I could

12  make educated assumptions and create models to handle it

13  in multiple different ways but at the present time it

14  doesn't seem to make sense to create multiple variables

15  when you don't know what the primary variable will be.

16      Q.    And so as of today you haven't -- because of

17  what you just said, as of today you have not done that

18  work?

19      A.    I have not been asked to do that work, that's

20  correct.

21      Q.    And you haven't done it?

22      A.    That's correct.

23      Q.    Okay.  Staying with Paragraph 27 for a second,

24  on lines 6 and 7 there is a phrase that begins in the

25  middle of line 6, "The amount specified in the payment

CONFIDENTIAL

Page 110

1          But you can answer.

2          THE WITNESS:  Can you repeat that question,

3      please.  Sorry.

4          (The last question was read.)

5          THE WITNESS:  That is outside of what I have

6      been asked to do, but I would have to go back through

7      the loan note to see if that was an opportunity in the

8      note.

9      BY MR. ELLIS:

10         Q.   Well, let me just represent to you, okay, and

11     ask you to assume that it is true that each month

12     Mr. Ralston received a coupon which gave him four

13     options, that he could make the minimum payment, an

14     interest only payment, a fully amortizing payment for

15     his 30-year loan or a payment that was greater than the

16     fully amortizing payment for the 30-year loan.  Okay?

17         A.   Okay.

18         Q.   And I would like to also represent to you that

19     the interest only payment was more than the minimum

20     payment.  Okay?  Do you understand me so far?

21         A.   Yes.

22         Q.   Okay.  In your model, if Mr. Ralston each month

23     made an interest only payment, would your model indicate

24     that he has suffered damage in this case?

25         A.   If he made an interest only payment, I believe

CONFIDENTIAL

Page 111

1    it would.
2         Q.    And would your model -- let me just give you
3    some hypothetical numbers just to --
4         A.    That's assuming -- sorry.
5         Q.    Go ahead.
6         A.    -- that the loan was fixed and that a
7    determination was made that the benefit of the bargain
8    was that he should have gotten the loan at one percent.
9    There would be a damage number.
10        Q.    Those are the assumptions that you were asked
11   to make when you prepared your report, correct?
12        A.    That's correct.
13        Q.    Okay.  So based on those assumptions, if
14   Mr. Ralston made interest only payments, he would have
15   suffered damage, correct?
16        A.    I believe that is correct.
17        Q.    Okay.  And just to use numbers -- I'm not
18   saying these are the actual numbers, but if he had -- if
19   his minimum payment was $1,200 in a particular month and
20   the interest only payment was $1,700 in that same month
21   and Mr. Ralston paid $1,700, your model would treat $500
22   of that payment as a payment of principal, correct?
23        A.    One of them would, that's correct.
24        Q.    And that would be Table --
25             MR. WEISS:  You can ask him which table, if you

CONFIDENTIAL

Page 113

1   you take a teaser rate of between one and three percent

2   and you add on even the seven and a half percent that

3   would be added on, that because of the nature of the

4   index and the margin, that it was an impossibility for

5   the loans to be paid off, okay, assuming it was fully

6   amortized.  There would be some interest going to

7   negative amortization.

8           In the last couple -- in the last year there

9   has been a potential where I would just have to go back

10  and double-check, but because the index was down to a

11  quarter of a percent there might have been a couple of

12  months where you might have had some -- you might have

13  had potentially some of the negative amortization turned

14  around.

15          But if you look at the life cycles of loans and

16  that these rates are a mere blip and that we went from,

17  roughly, I think, three or four percent or five percent

18  down to .25 percent at a very quick pace, which was the

19  stimulus package that was put into the economy, that

20  that's not going to stay and that's not going to be the

21  long range.

22          So it is pretty much a likelihood, even if you

23  looked over a long period of time, they would not have

24  been able to be amortizing and fully amortizing at a one

25  to three percent rate.

CONFIDENTIAL

Page 114

1      Q.    Well, the calculations you refer to here,

2   though, are they reflected in Tables 1 and 2 of your

3   report or are they separate and apart from that?

4      A.    The calculation -- it was a very simple

5   calculation just to look at, which is looking at what

6   the index margin rate was and looking at that that rate

7   would be more than the interest rate, so that even an

8   amortizing payment would not capture the full amount of

9   interest.

10      Q.    So were you comparing on the one hand the

11   initial interest rate plus 7.5 percent yearly

12   increases --

13      A.    Right.

14      Q.    -- to, on the other hand, the rate set forth in

15   the note which included both the index and the margin?

16      A.    That's correct.  If you take the index and the

17   margin, okay, that rate was always higher than -- if it

18   was always higher than the one to three percent so that

19   the teaser rate could never, even with the added seven

20   and a half percent increase in what the payment was --

21   assuming that went all towards principal, you would

22   never -- in all likelihood you would never over the life

23   of the loan be able to pay off the loan under the stated

24   term dates.  Okay?

25           And if all the additional seven and a half

CONFIDENTIAL

Page 117

1    the additional negative amortization.

2        Q.   Let me just follow up for a second.  If you

3    look at Exhibit 3, Exhibit 1 to Exhibit 3.  We looked at

4    that before.  That's his note.

5            If you look at the page -- it's the first page

6    of Exhibit 1 which is entitled "Adjustable Rate Note,"

7    Paragraph 3-D looks like, if I'm reading that correctly,

8    the margin is 3.075 percent; is that correct?

9        A.   The margin is 3.075 and then I think it goes up

10   to the nearest 1/8 of a percentage higher.

11       Q.   Uh-hmm.  So you would take that number, add it

12   to --

13       A.   The index.

14       Q.   -- the index today, which is very low --

15       A.   A quarter point.

16       Q.   -- and you would --

17       A.   So you would -- to make it simple for us, if

18   you would take 3.075 and add it to .25.  So that would

19   be 3.325, if I'm adding correctly.

20       Q.   You are.

21       A.   And then rounding that up, and I think it is

22   3.375.

23       Q.   I believe that's right.  And so you're

24   comparing that number, 3.375, to what exactly?

25       A.   Either one percent or three percent plus the --

CONFIDENTIAL

Page 118

1    Q.   Escalated by 7.5 percent annual payment
2  increases?
3    A.   Right.  Not the interest rate but the payment
4  itself, that's correct.
5    Q.   All right.  Let's look at Table 1 in your
6  initial report, which we have marked as Exhibit 2.  And
7  I realize you have made some changes to this, and so let
8  me just -- let's start with this.  We will get to the
9  addendum.  I just want to walk through Table 1 on your
10  initial report.
11        Let me just -- I'm just going to pick as a
12  reference point Payment No. 13, because it sort of gets
13  us into Year 2 and it's convenient for me to do so.
14        So if you look at the row for Payment 13, which
15  in this table is listed as February of '05 -- and I
16  realize there may be some rounding issues, but the first
17  column, $291,382 under the heading "Beginning Balance,"
18  does that come from, in Row 12, the ending balance
19  number?
20    A.   That's what it's supposed to represent.
21    Q.   Okay.  And the same would be true if I looked
22  at the beginning balance in Row 21 for -- Payment 21
23  should be the same as the ending balance in Payment 20,
24  correct?
25    A.   It should be.

CONFIDENTIAL

Page 124

1   No. 13.

2           Now, this table -- and I realize this may or

3   may not have errors in it but I want to ask about this

4   first.

5           This was intended to show the additional

6   payment attributable to the 7.5 percent annual increase

7   in payment as a payment on principal, correct?

8       A.   That's correct.

9       Q.   Okay.  So in the column that reads "Extra

10  Payments" in Payment No. 13 the number 72 appears.

11          Do you see that?

12      A.   Yes, I do.

13      Q.   And what does that represent?

14      A.   That was supposed to represent the difference

15  between the original payment of $965 and the seven and a

16  half percent that was added on on top of it.  So that

17  was the $72.

18          So in this case the scheduled payment of

19  $103.07, in total payments it was showing as $1,110, all

20  right, so it included an extra $72 in there.  That was

21  an error in the table.

22      Q.   That's an error?  You're double counting the

23  $72, correct?

24      A.   We were plugging in numbers to test.  So the

25  wrong copy of the model was actually picked up for the

CONFIDENTIAL

Page 127

1     A.    That's correct.

2     Q.    Okay.  And so the total payment in Row 13 says

3     it is $1,110, correct?

4     A.    That's correct.

5     Q.    Is that an error that still exists in this

6     table?

7     A.    Well, it can be considered an error.  It also

8     can be considered that it functions correctly depending

9     on -- if that extra payment was considered additional

10    interest, then they might have to pay any additional

11    interest.  Or if it was a late payment charge, that

12    wouldn't reduce the principal amount.

13          So anything that's in that row at that point in

14    time is not affecting the principal reduction, which is

15    the proper way that Table 1 should be working.

16    Q.    If you were -- I'm sorry.  The proper way that

17    Table 1 should be working.

18          Tell me what you mean by that.

19    A.    What I mean by that is, for example, if we

20    start out saying that $965 was the proper payment month

21    by month.

22    Q.    For 1 through 12?

23    A.    For 1 through 12.  The assumption is any

24    payment above that amount, the seven and a half percent

25    per year, was being accrued toward interest.  Or any

CONFIDENTIAL

Page 128

1   payment above that that was potentially for a late

2   payment or late payment charge that was asserted would

3   go towards interest and would not affect the principal

4   balance.

5          So that's all I was really saying.  And that's

6   what this chart shows.  The only thing is the actual

7   principal balance based off of the one percent 30-year

8   amortization schedule is being reduced from principal.

9      Q.   Okay.  So shouldn't the total payment column in

10  Row 13 be $1,037?

11     A.   If it's just based off of the seven and a half

12  percent, yes.

13     Q.   Okay.  All right.  So this extra $72, which

14  then turns the total amount into $1,110 is --

15     A.   It doesn't affect the model.

16     Q.   It doesn't affect the model because you're

17  taking this money and just putting it as an interest

18  payment?

19     A.   That's correct.

20     Q.   So it doesn't affect the declining balance

21  number in the ending balance column, correct?

22     A.   That's correct.

23     Q.   All right.  I mean, so for your -- for the

24  purposes of your model it could say -- again, Payment

25  No. -- the row for Payment No. 13, this extra payment

CONFIDENTIAL

Page 132

1        And what is the -- going back to the ending

2   balance, in Row 12 the ending balance was $291,382.  I'm

3   just going to do this on a calculator because -- bear

4   with me one second, please.

5        So if you take the ending balance in Row 12

6   it's $291,382.  And if you subtract the ending balance

7   in Row 13, that's $290,587.

8        The subtraction is $795.  Is that what it's

9   supposed to be or is it supposed to be something else?

10  Is it supposed to be $722?

11      A.   You're on --

12      Q.   So if you look at -- I'm trying to figure out

13  what -- I'm looking at Row 13, Payment 13.

14       Let me ask the question differently.  Let me

15  ask the question this way.

16       The ending balance for Payment 12 is $291,382,

17  correct?

18      A.   Uh-hmm.

19      Q.   And the ending balance for Payment 13 should be

20  $291,382 minus $722, correct?

21      A.   That's correct.  I might have an error in here.

22      Q.   Yeah.  That number would be $290,660.  And, in

23  fact, it's $290,587, on the chart, which is $73 less,

24  subject to rounding.  It looks an awful lot like $72.

25      A.   Yeah.

CONFIDENTIAL

Page 133

1    Q.   So, then -- and I realize you're going to want

2    to confirm this and do your own math, but you do agree

3    that the ending balance for Payment 13 should be the

4    ending balance for Payment 12 minus the entry for the

5    principal on Payment 13, correct?

6    A.   That's correct.

7    Q.   Okay.

8    A.   And if there are any errors in here, those

9    errors will be immediately corrected and resubmitted.

10   Q.   Okay.  All right.  You were going down to Row

11   25.  I just wanted to ask you what the -- what you were

12   about to say about Row 25.  I sort of cut you off

13   because I wanted to finish on Row 13.

14   A.   Row 25, instead of the additional payment, it's

15   only an additional $72.

16   Q.   And why is that?  Why was it done that way?

17   A.   Because 72 bucks was continued through the

18   whole stream, just for testing monthly payments.

19   Q.   Okay.  So let me make sure I understand what

20   you're saying.

21         So you're saying the $1,265 number should be

22   the sum of what exactly?  $730, the principal entry,

23   plus $235, which is the interest entry, plus the $150

24   extra payment, correct?

25   A.   Hold on one second.  Okay.  That should be --

CONFIDENTIAL

1        It looks like the difference -- the number I
2    get when I subtract $291,382 -- if I start with $291,382
3    and subtract $794 it's $290,588.  Which it looks like
4    the error is $73, which, if it's subject to rounding,
5    may be the same as the $72.
6        A.   I just have to double-check the schedules.
7        Q.   Okay.  So it looks -- based on what we have
8    just been through, it looks like this ending balance
9    column may be incorrect in that it includes some double
10   counting of principal payments?
11       A.   We might have had an additional principal
12   payment, which means that if it was an additional
13   principal payment in the "Extra" column, it is handling
14   it correctly because it would reduce the principal in
15   the last column by that additional amount.
16       Q.   But in that case the total payment wouldn't be
17   the $1,037; it would be a higher payment?
18       A.   It would be the $1,110.
19       Q.   Right.  So it's not that it's inconceivable
20   that there could be an extra payment of $72 of
21   principal.  It's just not internally consistent on the
22   table as it's presented here, correct?
23       A.   Right.
24       Q.   Okay.
25       A.   Counsel was trying to make sure that those that

CONFIDENTIAL

Page 144

1  assumption being that a model could be created to handle
2  all members of the class.
3      Q.   And have you given any thought to how you would
4  create that model?
5      A.   I'm not sure I understand.
6      Q.   Well, you just made a reference to a model that
7  you could create, so I guess my question is:  Have you
8  thought about how to create a model to determine whether
9  all members of the putative class in this case have been
10  injured?
11      A.   Well, you would first look at who are the
12  members of the class, determine the members of the class
13  and then determine the parameters of what the potential
14  damages are.  For example, from what we were showing in
15  Table 1 or Table 2, potential ways of handling those
16  damages.
17          And then as you go through each individual
18  person's scenario and put it into the model you would
19  note whether they have been damaged and to what level
20  they have been damaged based on the final determinations
21  of what would constitute the provisions for the damages.
22      Q.   And that's all work that you could do in the
23  future but haven't done yet, correct?
24      A.   That's work that's been outside the scope at
25  the present time.

CONFIDENTIAL

Page 146

1    they should have gotten a one percent amortizing

2    mortgage and that's the standard that is being held as

3    the comparison, then if they paid larger amounts and

4    those amounts that they paid larger than that one

5    percent would be deemed as principal reductions, then

6    they would have damages.

7        Q.   So is it fair to say, though, that at this

8    point you haven't formed an opinion one way or another

9    on the question I asked about the putative class member

10   who made a fully amortizing payment as represented by

11   the loan servicing?

12       A.   There are not enough facts to make the

13   determination at this point in time one way or the

14   other.

15       Q.   Okay.  And so as a responsible expert, you have

16   not formed an opinion yet, correct?

17       A.   I can't give you an opinion one way or another

18   until I have the basic facts to dictate how that is to

19   be handled.

20       Q.   Okay.

21       A.   You can put forward a couple of different

22   scenarios potentially that could handle it, that you

23   could show that it could be handled.

24       Q.   Okay.  Let me ask you another question.  Let's

25   take a member of the putative class who in Year 1 makes

CONFIDENTIAL

Page 147

1    what is represented by the loan servicer to be an

2    interest only payment each month.  Okay?  Do you have

3    that in mind?

4        A.    Yes.

5        Q.    You just agreed as a preliminary matter that

6    that putative class member has not sustained any

7    negative amortization, correct?

8        A.    I can't give that answer.

9        Q.    Isn't the concept of making an interest only

10   payment -- doesn't that mean that the principal balance

11   on the loan does not go up or down in that particular

12   month?

13       A.    That would be true.

14       Q.    Okay.  So if you have a member of the putative

15   class who makes what is represented by the loan servicer

16   to be an interest only payment each month in the first

17   year of his loan and so at the end of the loan -- I'm

18   sorry, the end of that one year, the end of the one year

19   he has the same principal balance that he started with,

20   okay, you agree that that member of the putative class

21   has not sustained any negative amortization, correct?

22       A.    No.

23       Q.    Okay.  Why do you disagree with that?

24       A.    Because if a determination is made that the

25   loan should have been a one percent self-amortizing loan

CONFIDENTIAL

Page 148

1    on a 30-year basis, if his minimum interest payment that

2    the loan servicer is saying that the issuer should be

3    paid is above that one percent, then he has actually

4    paid additional interest or would have negative interest

5    apply.   He would have had excess interest paid.

6        Q.   And you're equating that with negative

7    amortization?

8        A.   Well, his principal should have been lower.   So

9    whether you want to consider it that he wasn't given the

10   proper principal reduction or whether that was

11   additional interest that he did pay or negative -- it

12   was additional interest payments.

13           So, yes, I guess you are correct.   It wouldn't

14   be negative amortization.   It would have been additional

15   interest that should not have been paid that would have

16   been assigned to a reduction in principal.

17       Q.   You are anticipating the next question I was

18   going to go to.   I appreciate that, but let me go ahead

19   and get it in the record and you can answer.

20           So if you take a member of the putative class

21   who makes what is represented to be an interest only

22   payment -- I'm sorry.   Let me start again.

23           You have a member of the putative class in Year

24   1 each month makes what's represented to you an interest

25   only payment and as a result the balance on the loan at

CONFIDENTIAL

Page 149

1    the end of the first year is the same as it was at the

2    start.  Do you have an opinion on whether that class

3    member has been injured?

4        A.    Potentially that class member has been injured.

5        Q.    Okay.  Depending on how certain things are

6    treated and how certain parameters are determined,

7    correct?

8        A.    You've got that language pretty well

9    documented.

10       Q.    Okay.  So at this point you don't have enough

11   information to say whether that class member was or

12   wasn't injured, correct?

13       A.    And to the level that they were injured.

14       Q.    If they were injured?

15       A.    That's correct.

16       Q.    Okay.  Does your model take into account other

17   loan products that are available in the market that the

18   borrower would have qualified for?

19       A.    I'm not sure I understand your question.

20       Q.    Okay.  What I'm trying to get at is, you know,

21   one way to look at sort of a "but for" world is to say

22   that if Mr. Ralston had not taken the loan that he took

23   from Mortgage Investors and maybe would have taken a

24   loan from some other vendor, and so I'm asking you does

25   your --

CONFIDENTIAL

Page 150

1          (Telephonic interruption.)

2     BY MR. ELLIS:

3          Q.    So my question is:  Does your model take into

4     account in Mr. Ralston's case other loan products that

5     were available in the market in 2005 that he might have

6     qualified for or is that something that's just not part

7     of your model at all?

8          A.    Well, that was outside of the scope of what I

9     was asked to do but that is something that can clearly

10    easily be incorporated into the model.  It's just

11    another variable, another exercise to go through.

12         Q.    So it's something that you could create a model

13    to take into account, correct?

14         A.    Yeah.  You know, it's just another subroutine

15    for part of -- in developing the damage calculation.

16         Q.    Just so the record is clear, you haven't done

17    that yet, correct?

18         A.    That's correct.

19         Q.    All right.  Now, in the case of a refinance,

20    one way to look at the "but for" world is to compare the

21    loan that the borrower had before to the loan he got --

22    you know, to the refinancing loan.

23              And my question with that background is:  Does

24    your model take into account, in the case of a

25    refinance, the comparison between the terms of the

CONFIDENTIAL

1    borrower's earlier loan and the refinance?

2              MR. WEISS:   Objection.

3              You can answer.

4              THE WITNESS:   It's the same answer as I gave to

5    the other one.   It's outside the scope of what I have

6    been asked to do currently but it's just another

7    variable that can be modeled out as another potential

8    scenario relating to the calculation "but for's."

9    BY MR. ELLIS:

10        Q.   So it's something that you haven't done up to

11   the present, correct?

12        A.   I have not been asked to do it.

13        Q.   And you haven't done it?

14        A.   And I haven't done it.

15        Q.   I only say that because sometimes people do

16   things they are not asked to do.

17              Does your -- let me ask it this way.

18              I think we're all aware of what has happened to

19   home prices generally across the country over the last

20   couple of years, but in the early part of the class

21   period, 2004, 2005, 2006, it predates some of the

22   decline in real estate prices.

23              And so my question is:   Does your model, the

24   work you have done to date, take into account any gain

25   that a putative class member might have experienced if

CONFIDENTIAL

Page 152

1   they bought the property that was incurred by the loan

2   early in the class period and then sold it a couple of

3   years later and made money on the deal?

4       A.   That's outside of the scope of what I have been

5   asked to do.   Not to say that it can't be done.   Just

6   adding the data entries points you can easily model it

7   out.

8       Q.   It's the same essentially as the last couple of

9   questions.   It's something you could do but haven't done

10  yet?

11      A.   I haven't been asked to do it.   And as long as

12  the data points are available and you can make a

13  determination in an "if then" statement or some other

14  sort of subroutine, you can take care of those.

15      Q.   Okay.   But up until now you haven't done any

16  work to have the model reflect any gain that the

17  borrower may have had from selling the property?

18      A.   That's outside of the scope of the work that I

19  was asked to do.

20      Q.   And outside of the scope of the work that you

21  have done, correct?

22      A.   That's correct.

23      Q.   Okay.   Does your model take into account any of

24  the information that the borrower received prior to

25  closing other than what's in the note and the truth in

CONFIDENTIAL

Page 156

1    into part of your model; is that right?

2        A.    Potentially, yes.

3        Q.    And I don't mean to be facetious about it, but

4    if it turned out it mattered whether, you know, the

5    borrower had blue eyes or brown eyes, if the data were

6    available you could write up if blue eyes, then this; if

7    brown eyes, then that, correct?

8        A.    That's the nature of computer programming, the

9    ability it gives you, yes.

10       Q.    So you sort of envision your models including

11   anything you can do with computer programming; is that

12   correct?

13       A.    Well, you can have certain variables that

14   either designate what the class members are and who is

15   included or excluded from the class.  And when you know

16   what those parameters are you generally can model those

17   parameters unless it is something that cannot be modeled

18   by computer or you would have to go through the class on

19   an individual basis.

20            But if you go through the class on an

21   individual basis and put that into a checked box, then

22   you could really run the remaining part of that

23   electronically.

24       Q.    So is it correct to say that anything that can

25   be -- anything that can be reduced to computer

CONFIDENTIAL

Page 157

1   programming could be part of your model?

2       A.   Pretty much, yes.

3       Q.   All right.  Let me just ask you just -- I think

4   these are going to be pretty easy questions but I just

5   want to make sure I'm not missing anything here.

6           Are you as of today providing any expert

7   opinion testimony on consumer behavior issues, either

8   generally or specifically with lending and borrowing?

9           MR. WEISS:  Objection.

10          You can answer.

11          THE WITNESS:  Not that I have been asked to do

12  today.

13  BY MR. ELLIS:

14      Q.   And as of today are you providing any expert

15  opinion testimony on issues of causation?

16      A.   Not that I have been asked to do today.

17      Q.   What about -- and I may have asked this

18  earlier.  And if I did, I apologize.

19          Are you providing any -- actually, let me back

20  up and just ask:  Have you formed an opinion on the

21  actual amount of damages, if any, suffered by

22  Mr. Ralston?

23      A.   I haven't as of today, but depending on what

24  the parameters are, what I will be asked to do, I will

25  come up with it, if asked to.

1

2

3

4

5

6           I declare under penalty of perjury

7    under the laws of the State of California

8    that the foregoing is true and correct.

9          Executed on __July 14__, 2011,

10   at __Houston, Tx__.

11

12

13

14         SIGNATURE OF THE WITNESS

15

16

17

18

19

20

21

22

23

24

25