1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

JAY RALSTON, individually and on behalf of all others similarly situated,

      Plaintiff,

      v.

MORTGAGE INVESTORS GROUP, INC., MORTGAGE INVESTORS GROUP, a general partnership, COUNTRYWIDE HOME LOANS, INC., AND DOES 3-10,

      Defendants.

Case No.: 08-536-JF (PSG)

**ORDER GRANTING-IN-PART PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY OF MICHAEL D'ALONZO; ORDER GRANTING-IN-PART DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF LEONARD H. LYONS.**

**(Re: Docket Nos. 275, 313)**

      In this putative class action, Plaintiff Jay Ralston ("Ralston") alleges that Defendants Countrywide Home Loans, Inc. ("Countrywide"), and Mortgage Investors Group, Inc. and Mortgage Investors Group ("MIG") (collectively "Defendants"), omitted material information in their residential loan documents and disclosure statements. In the operative third amended complaint ("TAC"), Ralston asserts state law claims for fraudulent omissions and violations of California's Unfair Competition Law ("UCL").

1

**United States District Court**
For the Northern District of California

Before the court are Ralston and Countrywide's independent motions to exclude expert testimony and reports submitted in relation to Ralston's motion for class certification, scheduled for hearing before Judge Fogel on December 9, 2011. Judge Fogel has referred the predicate motions to exclude expert testimony to the undersigned for disposition.[1] On November 15, 2011, the parties appeared for hearing on the instant motions. Having considered the briefs and arguments presented by each side, the court hereby GRANTS-IN-PART and DENIES-IN-PART Ralston's motion to exclude the expert testimony and rebuttal report of Michael D'Alonzo and GRANTS-IN-PART and DENIES-IN-PART Countrywide's motion to exclude the testimony of Ralston's damages expert, Leonard H. Lyons.[2]

## I. BACKGROUND

Ralston bases his motion for class certification on the "uniform set of loan documents" that Countrywide created for its approved lenders "to enable [the lenders] to generate and transfer to Countrywide as many Pay Option Adjustable Rate Mortgages ('Pay Option ARM Loans') as possible."[3] According to Ralston, a common feature of the Pay Option ARM Loans is that they "concealed and failed to disclose that, by making payments as instructed in the Truth In Lending Disclosure Statements – the only payment schedule provided at closing – negative amortization was certain to occur due to the significant difference between the interest rate upon which the payment amounts were based … and the substantially higher actual interest rate charged."[4]

---

[1] *See* Docket No. 305 (Order Referring Motions to Exclude Expert Testimony to Magistrate Paul Grewal).

[2] MIG has joined in both Countrywide's motion to exclude and Countrywide's opposition to Ralston's motion to exclude. The court's ruling thus takes effect as to MIG as well.

[3] *See* Docket No. 268 at 2 (Corrected Pl.'s Mot. For Class Certification).

[4] *See id.* at 4.

Case No.: 08-536-JF (PSG)
ORDER

**United States District Court**
For the Northern District of California

In support of his motion for class certification, Ralston served two expert reports that are directly or indirectly at issue. These are: (1) the expert report of Professor Alan M. White, who opines on the economic incentives affecting mortgage brokers' disclosure of information regarding the features of Pay Option ARM Loans, and in particular the negative amortization feature (the "White report"); and (2) the expert report of Leonard H. Lyons, who provides a framework for the assessment of damages suffered by the putative class (the "Lyons report"). Although Defendants have not sought to exclude the testimony of Professor White, they have submitted in response the expert rebuttal report of Michael D'Alonzo (the "D'Alonzo report"). Countrywide seeks to exclude the Lyons report, while Ralston seeks to exclude D'Alonzo's rebuttal.

## A.  THE D'ALONZO REPORT

D'Alonzo is a professional, licensed residential mortgage broker with over 25 years of industry experience. This includes owning his own mortgage brokerage, teaching best practices to other brokers through his role as a nationally-certified mortgage consultant ("CMC") and certified instructor for continuing education in Pennsylvania, and participating in workshops, conferences, and discussions with other mortgage brokers. D'Alonzo has been active for over 20 years in the National Association of Mortgage Brokers ("NAMB") and currently serves as NAMB President.[5] D'Alonzo has not given expert testimony or been deposed as an expert witness in the previous four years.[6]

D'Alonzo offers his opinions in rebuttal to the White report in two areas: the general practices of mortgage brokers, and the practices of mortgage brokers with respect to Option ARM loans. On the general practices of mortgage brokers, D'Alonzo explains the role of the mortgage broker in loan transactions and the relationship between the broker and the borrower-client.  He

---

[5] *See* Docket No. 314 (Decl. of Jennie Lee Anderson in Support of Plaintiff's Motion to Exclude), Ex. B ¶¶ 1-2 (Expert Rebuttal Report of Michael D'Alonzo).

[6] *Id.* ¶ 6.

Case No.: 08-536-JF (PSG)
ORDER

opines on the personal and economic incentive for brokers "to provide adequate and accurate information to their borrower-clients about loan products, features, terms and costs."[7] He also opines on the types of communications generally provided by mortgage brokers to borrowers regarding loan products and disclosures about those products. D'Alonzo specifically responds to Professor White's comments regarding the apparent lack of financial incentive for a mortgage broker to provide disclosures beyond the minimum legally mandated. D'Alonzo relies on his "knowledge and professional experience," based on his years of work as a mortgage broker, as well as the experience gained by his interactions "with thousands of mortgage brokers across the country" through his participation and leadership roles in NAMB.[8]

On the subject of Pay Option ARM Loans, D'Alonzo refers to his experience during the relevant 2004-2008 period advising "numerous borrower-clients with respect to the terms, features and costs of payment option loans" and assisting others "in securing such loans."[9] Based on his knowledge and professional experience during those years, D'Alonzo opines that mortgage brokers typically provided information to their borrower-clients about option ARM loans, costs and features, including the negative amortization features of the products.[10]

**B. THE LYONS REPORT**

Lyons has over 15 years of experience as an expert witness on damages, lost profit projections, diminished goodwill, business interruption and forensic accounting for a variety of litigation subjects. He currently is a partner at an accounting and advisory firm. In the banking and mortgage industry, his experience includes past service with the Federal Deposit Insurance

---

[7] *See id.* ¶ 11.

[8] *See id.* ¶¶ 10, 11-13.

[9] *See id.* ¶ 15.

[10] *See id.* ¶ 16.

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Corporation ("FDIC") as the Director of Investigations for the Western United States, as well as with private firms engaged in investigation and development of damages claims in numerous, high-profile cases.[11]

The Lyons report primarily addresses "whether a commonly applicable model can be created to calculate the proposed Class Members' alleged damages in this action."[12] Lyons allegedly has created such a model. The Lyons model assumes that the putative class member damages will be based on a "benefit of the bargain" measure of recovery, whereby damages consist of "the difference between the current asserted principal balance on each borrower's loan … and the principal balance that would exist, based on the payments actually made by those borrowers, if the initial 'teaser rate' were treated as the actual interest rate of the loan during the period from the loan's start date until the date on which the Note provides that borrowers would begin paying the 'Full Payment' as their 'Minimum Payment.'"[13] In other words, the model calculates the difference between borrower's current principal balance based on how the loan actually played out, and the principal balance that would exist had the loan behaved as Defendants' represented it would.

In Lyons' "benefit of the bargain" recovery analysis, borrowers "are not subject to negative amortization, since payments made according to the payment schedule provided by the Defendants when the loan was consummated are applied to principal and interest each month, with interest paid before principal."[14] Lyons asserts that his model is equipped to calculate these damages, as well as to account for differences "in origination dates, initial interest rates, index, margin, original principal balances, monthly payment amounts and other variables" by making simple changes in

---

[11] *See* Docket No. 236 (Decl. of Jessica Moy in Support of Pl.'s Mot. To Certify Class), Ex. CC ¶¶ 1-7 (Expert Report of Leonard H. Lyons Regarding Pl.'s Mot. For Class Certification).

[12] *See id.* ¶ 18.

[13] *See id.* ¶¶ 18, 21.

[14] *See id.* ¶ 21.

Case No.: 08-536-JF (PSG)
ORDER

data points.[15] To demonstrate application of the model, Lyons provides two tables showing hypothetical loan amortization schedules based on whether the additional payment amounts during years 2 through 5 of the loans (due to the annual payment increase included in the loan terms) are applied either to interest only or to principal only.[16]

## II.   LEGAL STANDARD

### A.   FEDERAL RULE OF EVIDENCE 702 – TESTIMONY BY EXPERTS

Pursuant to Fed. R. Evid. 702, an expert must be qualified by "knowledge, skill, experience, training, or education." The expert may testify if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[17]

Once the proposed witness qualifies as an expert, it is thus the responsibility of the trial court to ensure that the expert testimony admitted is both relevant and reliable.[18] The court "must determine whether the testimony has a reliable basis in the knowledge and experience of the [relevant] discipline."[19] This obligation extends not only to scientific testimony, but to all expert testimony requiring "technical" or "other specialized" knowledge.[20] The court has "broad latitude"

---

[15] *See id.* ¶¶ 20, 22.

[16] *See id.* ¶ 25.

[17] Fed. R. Evid. 702. A proposed amendment to Rule 702 will become effective as of December 1, 2011, absent contrary Congressional action. The rule as amended will include as a fourth requirement that the "expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."

[18] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

[19] *See In re Aftermarket Auto. Lighting Prods. Antitrust Litig.*, -- F.R.D. --, 2011 WL 3204588, at *6 (C.D. Cal. July 25, 2011) (quoting *Kumho Tire*, 526 U.S. at 149)).

[20] *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

Case No.: 08-536-JF (PSG)
ORDER

in deciding how to measure reliability, as well as in making the ultimate reliability determination.[21]

Where the admissibility of testimony is based on specialized as distinguished from scientific

knowledge, "Rule 702 generally is construed liberally."[22]

The Supreme Court recently indicated that so-called *Daubert* review of the reliability and

relevance of expert testimony under Fed. R. Evid. 702 is appropriate at the class certification

stage.[23] Courts in this district have embraced this understanding to apply the Rule 702 standards in

reviewing the admissibility of expert testimony on class certification issues.[24]

### III. DISCUSSION

**A. RALSTON'S MOTION TO EXCLUDE D'ALONZO'S EXPERT TESTIMONY AND REPORT**

D'Alonzo's twenty-five years of industry experience as a practicing mortgage broker,

including fifteen years running his own brokerage, and substantial experience training, consulting,

and communicating with others in the field, qualifies him as an expert in his field from the

perspective of a mortgage broker and brokerage manager.[25] Nor does Ralston directly challenge

D'Alonzo's qualifications per se. Instead, Ralston argues that this experience is insufficient for

---

[21] *See id.* at 142.

[22] *See U.S. v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). *See also Jinro Am., Inc. v. Secure Invest., Inc.*, 266 F.3d 993, 1004 ("Rule 702 is applied consistent with 'the liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers of opinion testimony.'") (quoting *Daubert*, 509 U.S. at 588)).

[23] *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ---, 131 S. Ct. 2541, 2553-54 (2011) (disagreeing with the district court's determination that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings).

[24] *See Heisler v. Maxtor Corp.*, No., 06-cv-06634 JF (PSG), 2011 WL 1496114, at *6 (N.D. Cal. Apr. 20, 2011). *See also In re Aftermarket Auto. Lighting Prods.*, 2011 WL 3204588, at *6 ("[I]n order to grant class certification, this Court must first determine whether it may rely on the methodology used by Plaintiffs' expert to decide whether the claims in this case are amenable to common proof.").

[25] *See Pecover v. Elec. Arts. Inc.*, C 08-2820 VRW, 2010 U.S. Dist. LEXIS 140632, at *10 (N.D. Cal. Dec. 21, 2010) (finding proposed expert's years of experience at one video game retailer, which "does not encompass the entire video game industry," qualified her to testify only on video game retail from a retailer's perspective).

Case No.: 08-536-JF (PSG)
ORDER

D'Alonzo to testify on the general practices of mortgage brokers and their practices with respect to Option ARM loans because he fails to establish any reliable foundation for his testimony on those subjects. Because D'Alonzo has not witnessed other brokers conducting their business, reviewed other brokers' procedures or practices, or provided empirical evidence of the basis for his opinions, Ralston contends that D'Alonzo's opinions amount to nothing more than "rank speculation."[26] Countrywide responds that D'Alonzo has satisfied the criteria for non-scientific, experience-based expert opinion testimony, especially for the purpose of rebutting the testimony of Professor White.

In evaluating D'Alonzo's testimony, the court's attention must not focus on *what* D'Alonzo says in his report, but rather, *on what basis* he has to say it.[27] There is no indication in Fed. R. Evid. 702 or the *Daubert* and *Kumho* opinions to suggest that experience alone is an insufficient foundation for expert testimony. In fact, the opposite appears to be true.[28] By relying solely or primarily on experience, however, D'Alonzo must establish how his experience provides a basis for and leads to the conclusions that he reaches.[29] D'Alonzo's proffered expert testimony may be excluded where "foundational facts demonstrating relevancy are not sufficiently established."[30]

---

[26] *See* Docket No. 313 at 3-4 (Pl.'s Mot. To Exclude Expert Testimony and Rebuttal Report of Michael D'Alonzo).

[27] *See Pecover*, 2010 U.S. Dist. LEXIS 140632, at *11 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) (on remand) ("*Daubert II*")). *See also In re Aftermarket Auto. Lighting Prods.*, 2011 WL 3204588, at *6.

[28] *See* Fed. R. Evid. 702, Advisory Committee Notes (2000 Amends.) ("[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if the sole, basis for a great deal of reliable expert testimony.").

[29] *See id.* (citing *Daubert II*, 43 F.3d at 1319) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.")).

[30] *See Trevino v. Gates*, 99 F.3d 911, 922 (9th Cir. 1996) (citations omitted).

Case No.: 08-536-JF (PSG)
ORDER

### 1. D'ALONZO ON THE GENERAL PRACTICES OF MORTGAGE BROKERS

D'Alonzo has established his extensive personal experience in the mortgage broker industry, not only as an individual in practice but as an involved participant at the state and national level in mortgage broker education, training and consulting, and agenda setting.[31] This work experience, combined with D'Alonzo's many years of interacting with mortgage brokers nationwide through a variety of forums, serves as a sufficient foundation for D'Alonzo to opine on the general practices of mortgage brokers. D'Alonzo's opinions relate to the role "typically" fulfilled by mortgage brokers and are based on his own knowledge and professional experience.[32] D'Alonzo's opinion that "the typical mortgage broker also does the same things and provides the same services" as he has in his work does not purport to be based upon facts or data beyond his personal knowledge.[33] While this experience is sufficient for D'Alonzo to testify as to his opinion of industry practices and the general practices of and incentives affecting mortgage brokers, it ultimately will fall to the presiding judge to decide whether D'Alonzo's testimony is credible and to assess the strength of his conclusions.[34] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[35]

---

[31] *See* Docket No. 330-2 (Decl. of Robert Bader in Support of Countrywide's Opposition to Pl.'s Mot. To Exclude), Ex. 2 at 24:11-22 (D'Alonzo Depo.) (D'Alonzo explaining his role as President of NAMB, setting the direction of the Association and "protecting the industry" through legislative lobbying).

[32] *See* Docket No. 314, Ex. B ¶ 9.

[33] *See id.* ¶ 10.

[34] *See Hankey*, 203 F.3d at 1168 (distinguishing determination of an expert's credibility from the preliminary question of law relating to whether the expert's methodology "fits" the conclusion) (citations omitted).

[35] *Daubert*, 509 U.S. at 596.

Case No.: 08-536-JF (PSG)
ORDER

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

Courts frequently accept experience-based, expert opinion testimony on relevant aspects of industry practice that do not offer themselves readily to scientific or statistical analysis. For example, in *Pecover v. Elec. Arts Inc.*, the court allowed proposed expert testimony on the video game industry regarding various aspects of retail handling and strategy in pricing and selling video games, based on the expert's many years as a senior executive at a large electronics retailer, as well as a private consultant.[36] The court rejected, however, those aspects of the testimony that would have required expertise beyond the proposed expert's knowledge and experience in the industry.[37] Similarly in *Fortune Dynamic v. Victoria's Secret Stores Brand Mgmt.*, the court upheld the trial court's decision to exclude testimony by a forty-year advertising and marketing professional opining that Victoria's Secret used a certain phrase as a "trademark," because "the basis of his knowledge regarding trademark use is not clear."[38] But the court found error in the exclusion of the expert's testimony that it was a standard practice in the advertising and marketing industry for companies to perform a trademark search prior to engaging in a marketing campaign, because the expert's "forty years of experience" in the industry "suggest[ed] strongly that he is familiar with what companies within the industry do when placing words on a product."[39]

The cases that Ralston relies on are not inconsistent with this conclusion. Ralston cites *Trevino v. Gates* for the proposition that testimony lacking foundational facts should be excluded.

---

[36] *See* 2010 U.S. Dist. LEXIS 140632, at *9, 14-15 (finding expert's testimony that game publishers at some point discount the wholesale price to stimulate retail sales to have "a reliable basis in [the expert's] knowledge and experience of the relevant field," because she "has direct knowledge of the decision-making strategies of retailers by virtue of having served in that capacity for many years").

[37] *See id.*, at *17 (rejecting expert's testimony regarding game publisher's promotional pricing strategy for a particular game, in part because the opinion required a comparison of the publisher's revenue and costs, which fell outside of the expert's retail sales expertise).

[38] *See* 618 F.3d 1025, 1040 (9th Cir. 2010).

[39] *See id.* at 1043.

10

Case No.: 08-536-JF (PSG)
ORDER

**United States District Court**
For the Northern District of California

But in *Trevino*, the court merely found that in the district court's broad discretion, the conclusion that proffered expert testimony lacked foundation was not manifestly erroneous.[40] The court had reached this conclusion because the testimony regarding a deceased's future income stream was based on an unsubstantiated assumption that the deceased was employed when he was killed.[41] Ralston also cites *Ollie v. Sweetwater Union High Sch. Dist.*[42] and *Jinro Am., Inc. v. Secure Invest., Inc.*[43] to support his argument that D'Alonzo's opinions are speculative and unreliable. In *Ollie*, a gender discrimination case involving sport programs and facilities in a high school district, the court excluded two experts who each had experience teaching or administering high school sports, but neither of whom had undertaken more than superficial efforts to visit the site in question or view the facilities.[44] *Ollie* does not address, however, the relevance and reliability of the proposed experts' opinions with respect to general practices in their fields. In *Jinro*, the court found that the district court had improperly allowed testimony by a purported expert on Korean business culture, because amongst other infirmities, the expert had no background or training in business or as a cultural expert, but rather had familiarized himself with business practices as part of his job duties investigating Korean companies for commercial security, and his testimony was "extremely unreliable" because it did not rely on his own personal experience or experience with the companies at issue in the lawsuit, let alone on any empirical evidence.[45] Ralston's efforts to

---

[40] *Trevino*, 99 F.3d at 922.

[41] *See id.*

[42] 267 F.R.D. 339 (S.D. Cal. 2010).

[43] 266 F.3d 993 (9th Cir. 2001).

[44] *See Ollie*, 267 F.R.D. at 341-42.

[45] *See Jinro*, 266 F.3d at 1001, 1004-06. The court in *Jinro* acknowledged that "persons experienced in a particular field may have a 'practical' expertise or specialized knowledge that might qualify them to provide relevant and reliable information to a lay jury." *See id.* at 1006.

11

Case No.: 08-536-JF (PSG)
ORDER

distinguish D'Alonzo as a mere "industry participant" and not a qualified expert in the field[46] places undue emphasis on the preference for empirical evidence or formal research – factors that might strengthen the credibility of D'Alonzo's conclusions, but are not required under Rule 702 as a basis for the admissibility of opinion testimony based on his relevant industry experience.

### 2.  D'ALONZO ON BROKER PRACTICES OFFERING PAY OPTION ARM LOANS

The link between D'Alonzo's professional knowledge and experience and his proffered opinion regarding Pay Option ARM loans is more tenuous. D'Alonzo states that he "advised numerous borrower-clients with respect to the terms, features and costs of payment option loans" during the 2004-2008 time period and "typically explained interest rate and negative amortization features of the products, as well as the costs of the product as compared to other adjustable and fixed-rate products."[47] In his deposition, D'Alonzo acknowledged that his firm's provision of Option ARM loans during the relevant period "represented a very small portion" of the loans brokered, totaling approximately 50 to 75 over a seven-year period.[48]

There is a marked distinction between years of professional practice resulting in knowledge and experience pertaining to the practiced industry, and experience that is sufficiently specific to a sub-practice *within* the industry.[49] Unlike his opinions about the general practices of mortgage brokers, the court here cannot ascertain the reliability of D'Alonzo's extrapolations to the "typical"

---

[46] *See* Docket No. 313 at 4-5 (Pl.'s Reply in Support of Mot. To Exclude).

[47] *See* Docket No. 314, Ex. B ¶ 16.

[48] *See* Docket No. 330-2, Ex. 2 at 108:1 – 108:17 (D'Alonzo Depo.).

[49] *See Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc.*, 389 F. Supp. 2d 1145, 1154 (D. Alaska 2005), *aff'd*, 518 F.3d 645 (9th Cir. 2008) (excluding expert testimony on a specialized category of insurance policies where, "[d]espite many years of experience in the insurance business" that would allow him to testify as an expert on some aspects of industry standards, the expert lacked the "particularized experience" necessary for qualification to testify as an expert on the topic of the more specialized insurance policy).

12

practices of other brokers in offering and explaining Pay Option ARMs.[50] Given the small

percentage of his work dedicated to the provision of Option ARM loans and the absence of any

testimony on the extent to which D'Alonzo's national work with NAMB may have focused on

Option ARM loans, D'Alonzo's opinion that "mortgage brokers typically provided [the same types

of] information to their borrower-clients" lacks foundation even based on his own work.[51] Nor does

D'Alonzo's general testimony that he talked "a lot" with brokers about Option ARM loans

"because it was important to make sure that consumers understood their options," without more,

form the basis for expert testimony on the topic.[52]

In sum, the court finds that D'Alonzo's "decades of experience discussing brokering with

other brokers and interacting with brokers in educational settings" is sufficient to establish the

relevance and reliability of his opinion testimony regarding the role of the broker, factors

influencing the broker-borrower relationship, and the general practices of mortgage brokers. His

experience and industry knowledge does not support reliable opinion testimony on the specific

types of documents, examples, or verbal disclosures other brokers provide their clients when

discussing a Pay Option ARM loan package.

---

[50] In contrast, D'Alonzo explained in deposition the basis for his opinions on the general practices of other brokers, including that through years of "attending conferences and seminars that talk about practices and how we do things to make the customer experience the best possible, it becomes very apparent how other mortgage brokers act and handle their customers." D'Alonzo also relied on the knowledge gleaned from "continuing education that I have taught over the years" and discussions with various brokers, numbering in the "hundreds" or "maybe thousands," and finally through "calls from other mortgage brokers, people … asking me what I do, what is my process?" *See* Docket No. 330-2, Ex. 2 at 69:11 – 70:3, 72:6 – 72:20, 89:3 – 89:13.

[51] *See* Docket No. 314, Ex. B ¶ 16.

[52] *See* Docket No. 330-2, Ex. 2 at 115:20-21.

Case No.: 08-536-JF (PSG)
ORDER

**B. COUNTRYWIDE'S MOTION TO EXCLUDE LYONS'S EXPERT TESTIMONY AND REPORT**

Countrywide challenges the Lyons report and model for calculating damages on two independent grounds: 1) the report impermissibly relies on a "benefit-of-the-bargain" theory of recovery that is foreclosed under California law; and 2) the report is riddled with mistakes and assumptions that undermine its reliability as a tool for calculating class-wide damages. Ralston responds that the measure of recovery is proper and that the Lyons report meets Rule 702 and *Daubert* standards for relevance and reliability, sufficient to pass muster for class certification.

**1. ANALYSIS OF DAMAGES MODEL FOR PURPOSES OF CLASS CERTIFICATION**

To defeat Countrywide's motion to exclude, Ralston must show that the theory and model of damages is relevant and sufficiently reliable in order to satisfy common elements of class-wide proof, as required by Fed. R. Civ. P. 23. The touchstone of this analysis is reliability of the methodology, and not a "rigorous" assessment of the theory or calculation of damages on the merits.[53] Only to the extent that the merits of the class members' substantive claims overlap with class certification issues must the court consider the merits concurrent with its evaluation under Rule 23.[54] Such an overlap is implicated here, where Countrywide's motion is based largely on attacking Ralston's theory of recovery.  However, because the present analysis is limited only to consideration of the admissibility of Lyons' testimony, the court will attempt to assess the reliability of the Lyons report methodology as a preliminary and predicate step to the trial court's rigorous analysis of the evidence supporting class certification.

---

[53] *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (distinguishing the *Daubert* standard as "correctly applied" to a party's motion to strike expert testimony at class certification from "the 'rigorous analysis' standard to be applied when analyzing" the merits of the class certification claim, e.g., for commonality or typicality).

[54] *See id.* (citing *Wal-Mart*, 131 S. Ct. at 2551-52).

14

United States District Court
For the Northern District of California

## 2.   "BENEFIT-OF-THE-BARGAIN" MEASURE OF RECOVERY

Countrywide argues that Cal. Civ. Code § 3343(b)(1) expressly prohibits the recovery of "benefit-of-the-bargain" damages in fraud actions. Countrywide cites *Alliance Mortgage Co. v. Rothwell*,[55] *Small v. Fritz*[56] and *In re First Alliance*[57] in support of its argument that benefit-of-the-bargain recovery is not available in the fraud context. Ralston responds that Section 3343 is inapplicable to the claims in this case because they are not brought based on the fraudulent sale of property, but on the "fraudulent inducement of *financing* or some other contract that is not for the purchase, sale or exchange of real property."[58] Ralston urges that Cal. Civ. Code § 3333, relating to general tort damages, provides the governing standard for Ralston's claims. Ralston further responds that the cases referenced by Countrywide do not address why the limitation on benefit-of-the-bargain recovery under Section 3343 would apply to a case involving loan fraud.

Section 3343 sets forth the damages available to one "defrauded in the purchase, sale or exchange of property."[59] The code section does not permit "the defrauded person to recover any amount measured by the difference between the value of property as represented and the actual value thereof."[60] In contrast, Section 3333, governing "torts in general" provides broadly for damages in the "amount which will compensate for all the detriment proximately caused" by the breach of obligation not arising from contract, "*except where otherwise expressly provided by this*

---

[55] 10 Cal. 4th 1226 (1995).

[56] 30 Cal. 4th 167 (2003).

[57] 471 F.3d 977 (9th Cir. 2006).

[58] *See* Docket No. 288 at 3 (Pl.'s Mem. In Opp'n to CHL's Mot. To Exclude) (emphasis in original).

[59] *See* Cal. Civ. Code § 3343(a) (providing for recovery of "the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received" as well as certain additional damages arising from the particular transaction).

[60] *See id.* § 3343(b)(1).

15

United States District Court
For the Northern District of California

*code*."[61] Thus, damages for fraud may be measured either based on the out-of-pocket restitution measure or the benefit-of-the-bargain measure, unless the fraud concerns the "purchase, sale or exchange of property."[62]

The proper measure of damages for the putative class turns on whether the Pay Option ARM loans that are the subject of Ralston's claims involve "property" under Section 3343. The pertinent case law teaches that the mortgage instruments at issue fall under "fraud cases involving the 'purchase, sale, or exchange of property,'" whereby Section 3343 "provides the exclusive measure of damages."[63] For example, in *First Alliance*, a class action involving fraudulently-induced, sub-prime residential loans, the Ninth Circuit reversed-in-relevant-part the judgment of the district court, which had awarded damages based on the jury's reliance on erroneous, later-withdrawn jury instructions providing for benefit-of-the-bargain damages.[64] Although late in the trial, the court had "recognized, and both parties [had] agreed, that … only out-of-pocket damages [were] recoverable in this type of fraud action," the trial had already been conducted "with an eye toward proving damages on a benefit-of-the-bargain basis."[65] In reviewing the claims, the Ninth

---

[61] *See* Cal. Civ. Code § 3333 (emphasis added).

[62] *See Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995) ("There are two measures of damages for fraud: out-of-pocket and benefit-of-the-bargain. The 'out-of-pocket' measure of damages is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received. The 'benefit-of-the-bargain' measure, on the other hand, is concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon had been true; it awards the difference in value between what the plaintiff actually received and what he was fraudulently led to believe he would receive. In California, a defrauded party is ordinarily limited to recovering his 'out-of-pocket' loss. In fraud cases involving the 'purchase, sale or exchange of property,' the Legislature has expressly provided that the 'out-of-pocket' rather than the 'benefit-of-the-bargain' measure of damages should apply.") (citations omitted).

[63] *See Fragale v. Faulkner*, 110 Cal. App. 4th 229, 235-36 (Cal. Ct. App. 2003).

[64] *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 1001-03 (9th Cir. 2006).

[65] *See id.*

1   Circuit explained that the proper measure of damages was out-of-pocket, calculated as the

2   difference between "the fees and interest rates that [the defendant lender] charged and those

3   another lender would have charged," as opposed to "the difference between what they paid and

4   what they thought they were paying."[66] California state court cases similarly have limited damages

5   in non-real property cases to out-of-pocket.[67]

6       Ralston seeks to distinguish the measure of damages here in two ways. First, he argues that

7   "[a] Pay Option ARM mortgage loan is not a security (or other type of property) that can be readily

8   valued like a share of stock or a parcel of real property. Thus, the legal principle [codified in Civil

9   Code § 3343] has no application here."[68] Second, Ralston argues that the Ninth Circuit's decision

10  in *In re First Alliance* relies solely upon cases involving the purchase of property, not a financing

11  instrument like the Option ARMs at issue here, and that the court did not explain why Section 3343

12  "has any relevance to fraud involving mortgage loans."[69]

13      The court is not persuaded that the subject Pay Option ARM loans can escape designation

14  as "property" under Section 3343. In light of the decision in *First Alliance*, which unambiguously

15  affirmed the district court's belated determination that its initial jury instruction based on benefit-

---

16  [66] *See id.* at 1002.

17  [67] In *Alliance Mortgage*, the California Supreme Court reviewed the claims of a lender who acquired security property by full credit bid at a non-judicial foreclosure sale. On the plaintiff's fraud claims, the court held that it had alleged at least out-of-pocket damages based on what it paid for the properties and what they actually were worth. The court addressed benefit-of-the-bargain damages only in discussing the appropriate measure of damages "for fraud by a fiduciary under section 3333." *See Alliance Mortg.*, 10 Cal. 4th at 1249-50. In a later state supreme court opinion, Justice Baxter expressed in concurrence that the measure of damages in a case involving a loss in plaintiffs' stock share value allegedly caused by certain fraudulent omissions (because had plaintiffs been apprised of the truth, they would have sold the shares prior to the plummet in value) would be limited by California's "out-of-pocket loss rule." *See Small v. Fritz,* 30 Cal. 4th 167, 195 (2003) (Baxter, J., concurring).

18  [68] *See* Docket No. 288 at 3.

19  [69] *See id.*

Case No.: 08-536-JF (PSG)
ORDER

United States District Court
For the Northern District of California

of-the-bargain recovery was improper, and only out-of-pocket damages should have been considered, the court finds that benefit-of-the-bargain will not constitute a reliable principle on which to base the damages calculation.[70] Lyons' testimony cannot be "the product of reliable principles and methods" where he relies on a theory that is precluded by law. As a result, Lyons may not testify based upon a benefit-of-the-bargain theory or calculation of damages.

### 3. THE REMAINING LYONS' TESTIMONY PRESENTS A RELIABLE FRAMEWORK FOR CALCULATING DAMAGES

Ralston has asserted that the Lyons damages model is flexible enough to accommodate additional theories of recovery, should the court reject the benefit-of-the-bargain model.[71] Thus, the fact that the model is largely built on a benefit-of-the-bargain premise may not at this stage condemn the entire Lyons report. Regardless of what the district court ultimately determines to be the appropriate theory of recovery for calculation of damages at trial, for the purposes of this motion, the court accepts Lyons' testimony that the model can account for out-of-pocket or restitution damages as well or instead of benefit-of-the-bargain damages.[72] The court therefore turns to Countrywide's challenge of Lyons' application of the methodology to the facts of the case.

---

[70] The court notes that the Ninth Circuit in *First Alliance* not only affirmed that out-of-pocket damages was the proper measure, but effectively remanded for a new trial to that effect. The fact that the circuit court found the district court's corrective instruction to the jury at the end of trial *not* to consider benefit-of-the-bargain damages to be insufficient suggests that the proper measure of damages must established early on at trial, or in this case, in developing the damages model.

[71] *See* Docket No. 288 at 1 ("This model can be used to calculate any restitution that [Countrywide] is ordered to make to Class members.") *See also id.* at 4, n.1 ("Since benefit-of-the-bargain damages are available here, there is no need for Plaintiff to provide a methodology for calculating out-of-pocket damages. Additionally, as explained below, Lyon's methodology can be adjusted to accommodate a restitution model and a variety of other factors if need be.").

[72] *See Ellis*, 657 F.3d at 982 (finding that in the context of the class certification motion, the court erroneously "seemed to end its analysis of the plaintiffs' evidence after determining such evidence was merely admissible"). In contrast, here the motion for class certification is bifurcated from the motion to exclude, and the court presently need only determine admissibility.

18

Countrywide argues that Lyons' model is incomplete and cannot reliably calculate damages for the members of the putative class, principally because it fails to account for "the numerous complex financial events that commonly arise in the context of residential mortgages, such as loan payoffs, modifications, foreclosures, and default related fees."[73] Countrywide also contends that various assumptions employed by Lyons in the model are unfounded and undermine the reliability of the model. For example, Countrywide states that Lyons' methodology assumes all class members experienced negative amortization, "even though Lyons himself admits (and the certification record confirms) that some borrowers made payments that would not result in negative amortization."[74] Countrywide contends that if not all class members experienced negative amortization, then Lyons' statement that "his model ascribes damages even to a borrower who pays the full amount of interest due" demonstrates the model's failure to provide reliable results. Countrywide further challenges the failure to account for the purported positive value or mitigating benefit provided by the Option ARM loans in the form of minimum payments that allowed borrowers to keep additional cash on hand for other purposes.[75]

Ralston argues that at this stage of the litigation, the model is necessarily flexible so that it can incorporate the data pertaining to the many variables likely to arise, depending on "the final determinants of damages" that turn on the class as ultimately defined.[76] Ralston emphasizes that the test under *Daubert* and Rule 702 is not whether the Lyons report presents a "complete model for damages," but rather if the methodologies relied upon by the expert meet the requirements for

---

[73] *See* Docket No. 275-1 at 7.

[74] *See id.* at 9 (citing Lyons Depo. 147:5 – 148:16).

[75] *See id.*

[76] *See* Docket No. 288 at 5.

Case No.: 08-536-JF (PSG)
ORDER

relevance and reliability.[77] In response to Countrywide's individual criticisms, Ralston disputes Countrywide's characterization of negative amortization as a prerequisite of any claim for damages. According to Ralston, those class members who may have been fortunate enough to avoid negative amortization "were still damaged by not receiving the loans that they were promised," such as by paying a higher interest rates.[78] Ralston also points to the testimony of Countrywide's own damages expert as evidence that negative amortization was inevitable for any borrower who made the minimum payments available through the terms of the loan.[79]

Having reviewed the assumptions and alleged inaccuracies present in Lyons' model, the court concludes that they do not foreclose its admissibility at this stage, but rather go to the weight of the evidence. The crux of Countrywide's argument is that the Lyons report offers nothing more than a simplistic spreadsheet amortization table that lacks justification for its assumptions, and furthermore offers only conclusory assurances that missing functionality can be added with ease. Yet the court finds no basis for dismissing Lyons' testimony that the methodology can calculate damages accurately on a class-wide basis by adjusting the database inputs to integrate individual loan terms and payment variables as they arise in the lender data. Those factors or variables that remain unaccounted for – such as a positive value resulting from the minimum payment option, or the possibility that some borrowers avoided negative amortization – do not dictate whether the spreadsheet developed by Lyons constitutes a "reasonable method for calculating damages on a class-wide basis."[80] To fault the Lyons report for its representation of negative amortization or the

---

[77] *See id.* at 4-5.

[78] *See id.* at 7-8.

[79] *See id.* at 8 (citing Weiss Decl., Ex. C at 100:9, 106:21-108-14)).

[80] *See Ewert v. EBay, Inc.*, C 07-4487 RMW, 2010 WL 4269259, at *9-10 (N.D. Cal. Oct. 25, 2010) (finding it "plausible" that plaintiff's damages theory could approximate injury to class members and thus constituted a "reasonable method for calculating damages on a class-wide basis").

Case No.: 08-536-JF (PSG)
ORDER

United States District Court
For the Northern District of California

absence of any positive value for the minimum payment option would be essentially to adopt Countrywide's factual position on those issues before evaluating their relevance to the definition of or certification of the class. Countrywide's argument that the report should be excluded where relevant factors are unaddressed is unpersuasive where the court has yet to determine which factors are relevant to the class claims. Unlike several cases cited by Countrywide in which the expert report used hypothetical or unfounded assumptions as a basis for determining a final calculation,[81] the Lyons report does not pretend to rely upon hypothetical data, but rather presents a structure or framework to analyze the actual loan data eventually provided to plaintiffs.

The court therefore finds that Lyons' testimony is admissible, excluding those aspects predicated on a benefit-of-the-bargain theory, for the purpose of demonstrating a method for assessing class-wide damages. The accuracy of the conclusions yet to be drawn and the persuasiveness of Lyons' methodology may be the subject of subsequent challenges by Countrywide through the submission of its own competing calculations or methodology.[82]

## IV. CONCLUSION

As set forth above, Ralston's motion to exclude D'Alonzo's expert report and testimony is therefore GRANTED-IN-PART and DENIED-IN-PART. D'Alonzo may not testify regarding the

---

[81] *See, e.g., McPhail v. First Command Financial Planning, Inc.*, 247 F.R.D. 598, 605 (S.D. Cal. 2007) (striking those portions of expert report using "purely hypothetical assumptions" in the calculations); *Housing Works, Inc. v. Turner*, 362 F. Supp. 2d 434, 448 (S.D. N.Y. 2005) (excluding  at summary judgment damages report where the calculation failed to address key factors and imposed a value on abstract concepts such as first amendment rights); *Hilderman v. Enea Teksci, Inc.*, 05-cv-1049 BTM(AJB), 2010 WL 546140, at *2 (S.D. Cal. Feb. 10, 2010) (excluding at trial expert opinion regarding damages where expert based the goodwill value of allegedly misappropriated trade secrets on assumptions regarding intangible assets, but did not know enough about the business to explain the basis for his assumptions); *Oracle v. Santa Cruz County Planning Dep't*, C 09-0373 JF, 2010 WL 4704465, at *5 (N.D. Cal. Nov. 12, 2010) (excluding at trial expert opinion based on speculation unsupported by expert's experience or by any explanation of the data and methods relied upon).

[82] *See In re Aftermarket Auto. Lighting Prods.*, 2011 WL 3204588, at *10 (admitting expert report at class certification stage notwithstanding the arguably flawed regression analysis, because the type of analysis being used was not in question, and "the Court is not supposed to decide at the certification stage which expert analysis or model is better").

21

specific practices of mortgage brokers with regard to Pay Option ARM Loans. Countrywide's motion to exclude Lyons' expert report and testimony is GRANTED-IN-PART and DENIED-IN-PART. Lyons may not testify regarding the assessment of class-wide damages based upon a benefit-of-the-bargain theory of recovery.

**IT IS SO ORDERED.**

Dated: November 30, 2011

PAUL S. GREWAL
United States Magistrate Judge

22